WILLIAM L. BURRELL JR., JOSHUA HUZZARD, and DAMPSEY STUCKEY, individually and as representatives of the classes,

Plaintiffs,

-against-

LACKAWANNA RECYCLING CENTER, INC., LACKAWANNA COUNTY SOLID WASTE MANAGEMENT AUTHORITY, LACKAWANNA COUNTY, LOUIS DENAPLES, DOMINICK DENAPLES, and THOMAS STAFF,

Defendants.

Case No.: 3:14-cv-1891

**<u>SECOND AMENDED COMPLAINT</u>**

**CLASS and COLLECTIVE ACTION**

**JURY TRIAL DEMANDED**

William L. Burrell Jr., Joshua Huzzard, and Dampsey Stuckey ("Plaintiffs"), on behalf of themselves and the Class and Collective described below, bring this Second Amended Class Action Complaint against Lackawanna Recycling Center, Inc. ("LRCI"), Lackawanna County Solid Waste Management Authority (the "Authority"), Lackawanna County (the "County"), Louis DeNaples, Dominick DeNaples, and Thomas Staff ("Defendants").

## <u>PRELIMINARY STATEMENT</u>

1.      Plaintiffs seek to hold Defendants accountable for forcing people convicted of civil contempt ("Debtors") to work in abominable and hazardous conditions at a county-owned recycling center (the "Center") and for profiting from that forced labor.

2.      For at least the last 14 years, pursuant to an agreement between LRCI and the Authority, Defendants have operated a scheme to compel the work of civilly detained child support debtors for the benefit of the County, the Authority, and LRCI and its owners, Louis and Dominick DeNaples.

1

3. Although Debtors are civil detainees who would otherwise be eligible for work release, Defendants force Debtors to work at the Center before they can "qualify" for work release. This means that for potentially hundreds of Debtors, forced labor has been the price of freedom from incarceration.

4. By coercing Debtors to work at the recycling center owned by the County and operated by LRCI for just $5 per day, Defendants prevent Debtors from earning wages through work release that would benefit Debtors and their children, who would receive those wages through child support payments.

5. Instead, LRCI operates largely through the almost-free labor of Debtors, to the benefit of all Defendants and to the detriment of Debtors and their families.

6. Working conditions at the Center are abysmal. Debtors work on conveyor belts, separating recyclable materials and garbage. The moving garbage contains dirty diapers, dead animals, medications, and chemicals. Unsorted garbage falls onto the conveyer belt, shattering glass and plastic onto Debtors and other prisoners working on the line. Liquids from the garbage splatter onto their arms and faces. When they try to wipe their faces, pieces of glass lodge in their skin. The stench from the garbage is so strong that it often causes Debtors and other prisoners to vomit. Debtors frequently develop skin problems, including itchiness and redness that they named "trash rash."

## PARTIES

7. Plaintiff William L. Burrell Jr. ("Burrell") is a resident of Scranton, PA.

8. Plaintiff Joshua Huzzard ("Huzzard") is a resident of Ocala, FL.

9. Plaintiff Dampsey Stuckey ("Stuckey") is a resident of Scranton, PA.

10. Defendant Lackawanna Recycling Center, Inc. ("LRCI") is a corporation with its principal place of business in Olyphant, Pennsylvania.

11. Upon information and belief, Defendant Louis DeNaples is a resident of Moscow, Pennsylvania. He is the president of LRCI.

12. Upon information and belief, Defendant Dominick DeNaples is a resident of Moscow, Pennsylvania. He is the vice president of LRCI.

13. Upon information and belief, Defendant Lackawanna County Solid Waste Management Authority (the "Authority") is a political body organized under the Municipal Authorities Act of 1945 of the Commonwealth of Pennsylvania.

14. Defendant Lackawanna County is a political subdivision of the Commonwealth of Pennsylvania that manages, directs, and controls the Lackawanna County Prison and its customs, policies, and practices, and employs or employed Defendant Thomas Staff.

15. Defendant Thomas Staff is and/or was an administrator employed by Defendant Lackawanna County who regulated the Work Release Program and the Community Service Program at the Lackawanna County Prison. Defendant Staff is sued in his official capacity as an administrator of the Lackawanna County Prison and its work release program.

## JURISDICTION

16. The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' related claims under state law.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants reside in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

*William L. Burrell Jr.*

18.     Plaintiff William Burrell has lived in the Scranton area since late 2010.

19.     Mr. Burrell is the father of three children, currently ages 30, 23, and 13.

20.     In 2014, Mr. Burrell was paying approximately $55.00 per week in child support for his two younger children.

21.     In early 2014, Mr. Burrell sustained an injury at work.

22.     As a result of this injury, Mr. Burrell was bedridden and unable to work for approximately three weeks.

23.     During the weeks following his injury, Mr. Burrell fell behind on his child support payments.

24.     On or around May 14, 2014, Mr. Burrell was arrested for failure to pay child support.

25.     On or around May 16, 2014, the Court of Common Pleas for the County of Lackawanna, Family Court Domestic Relations Section sentenced Mr. Burrell to two consecutive six-month terms in the Lackawanna County Prison (the "Prison").

26.     The court ordered that Mr. Burrell could be released early upon payment of $2,129.43.

27.     In the same order, the court ordered Mr. Burrell to "immediate work release if he qualifies."

28.     Mr. Burrell did not have $2,129.43—in fact, he had nothing close to that.

29.     Mr. Burrell was, therefore, interested in immediately exploring work release, both because it would allow him to spend time outside of prison and because it would provide him with the opportunity to earn money for himself and his children.

30.     Shortly after arriving at the Prison, Prison staff told Mr. Burrell in unequivocal terms that, in order to qualify for work release, he would have to work at the Lackawanna County Recycling Center (the "Center") for six months.

31.     Prison staff also told Mr. Burrell that for his work at the Center, he would be paid $5 per day.

32.     Prison staff told Mr. Burrell that it was the Prison's policy that child support prisoners worked half of their sentence in the Center and the other half in work release, unless they "purge out" (i.e., pay the amount set by the court in order to obtain their release) sooner—meaning that Mr. Burrell would have to work at the Center for six months before he would have the opportunity to apply for work release for the remaining six months of his sentence.

33.     On May 22, 2014, the court issued an order transferring Mr. Burrell to the Lackawanna County Prison Community Services Program.

34.     The May 22, 2014 order also stated that Mr. Burrell "is to be granted work release/house arrest status on 11/11/14 contingent upon positive work ethics and successful completion of the community services program."

35.     The May 22, 2014 order further stated that if Mr. Burrell "fail[ed] to abide by all conditions set by the community service/house arrest/work release program or fails to return to official detention, a bench warrant will be issued for his arrest and escape felony charges will be filed."

36.     Because he could not otherwise qualify for work release, and because he was eager to pay his child support debt and regain his freedom, and lacking any other option, Mr. Burrell was compelled to begin working at the Center on May 28, 2014.

37.     During the time Mr. Burrell worked at the Center, he resided at the Prison, where he was detained when he was not working at the Center.

38.     In the mornings, Prison staff drove Mr. Burrell to the Center in a van with other prisoners who were also working at the Center.

39.     Each day when his work ended, Prison staff drove Mr. Burrell and other prisoners working at the Center back to the Prison.

40.     Mr. Burrell typically worked at the Center five days per week, from approximately 7:00 a.m. to 3:00 p.m.

41.     Mr. Burrell typically received one 15-minute break and one 30-minute break each day that he worked at the Center.

42.     Mr. Burrell received five dollars for each day that he worked at the Center.

43.     These payments were deposited into Mr. Burrell's commissary account at the Prison.

44.     Mr. Burrell did not have a choice about how he received his payments.  Payment into his commissary account was the only option.

45.     For some of his time working in the facility, Mr. Burrell worked on the "soda line" alongside several other prisoners. In that role, he and several other prisoners stood in front of a conveyer belt of fast-moving refuse. The prisoners were responsible for removing recyclable glass from the line of garbage.

46. When he was not assigned to the soda line, Mr. Burrell worked in an "upper magnet" job.

47. This role was similar to his role on the soda line. Working in "upper magnet," Mr. Burrell was responsible for removing metal from a stream of garbage that included glass, plastic, and other refuse.

48. At no point during the time Mr. Burrell spent working at the Center did Defendants inform him that he was an employee covered by employment protections under federal and state law.

49. Defendants likewise failed to post notices required to be posted under federal and state law in a location where Mr. Burrell and other Debtors were likely to see them.

50. Defendants actively misled Mr. Burrell regarding the nature of his relationship with Defendants by suggesting to him that he was not an employee with rights but rather a prisoner whom they could force to perform work as punishment and as a condition of his liberty.

51. These actions prevented Mr. Burrell and those similarly situated from understanding that they had a right to federal and state minimum wage during the time they worked at the Center and for several years after.

52. Mr. Burrell's ignorance of his rights under federal and state law was not attributable to any lack of reasonable diligence on his part but, rather, Defendants' purposeful conduct in exploiting and misleading Mr. Burrell and those similarly situated.

53. A consent to join form signed by Mr. Burrell is attached hereto as Exhibit A.

*Joshua Huzzard*

54.    Plaintiff Joshua Huzzard is a resident of Ocala, Florida.

55.    From his birth until approximately May 2018, Mr. Huzzard lived in the Scranton area.

56.    Huzzard is the father of five children, currently ages 10, 8, 5, 4, and 2 months.

57.    Pursuant to child support orders, Mr. Huzzard was required to pay a total of approximately $500-550 per month to support his children.

58.    On several occasions, Mr. Huzzard fell behind on his child support payments.

59.    On several occasions, Mr. Huzzard received a summons for a court hearing.

60.    On several occasions, the domestic relations judge held Mr. Huzzard in contempt for failure to make child support payments and ordered that he be sent to the Prison.

61.    On each occasion, the court ordered that Mr. Huzzard could be released early upon payment of a "purge," the amount of which was set by the court.

62.    During one of his stints at the Prison, in mid-2013, Defendant Thomas Staff approached Mr. Huzzard and told him that he was "eligible" to work at the Center.

63.    Staff told Mr. Huzzard that, in order to be eligible for work release, Mr. Huzzard would need to work half of his sentence at the Center.

64.    Around this time, Mr. Huzzard petitioned the domestic relations judge to allow him out of the Prison on work release in order to be present at the birth of his son.

65.    The court denied Mr. Huzzard's petition.

66.    In the response from the court, Mr. Huzzard was told that in order to qualify for work release, he had to first work at the Center.

67.     Because he could not otherwise qualify for work release, and because he was eager to pay his child support debt and regain his freedom, and lacking any other option, Mr. Huzzard was compelled to work at the Center.

68.     Mr. Huzzard worked at the Center five days per week, from approximately 7:00 a.m. to 3:30 p.m.

69.     Mr. Huzzard typically received one 10-15 minute break and one 30 minute break each day that he worked at the Center.  On occasion, he also received a 10 minute break in the afternoon.

70.     Mr. Huzzard received five dollars for each day that he worked at the Center.

71.     These payments were deposited into Mr. Huzzard's commissary account at the Prison.

72.     Mr. Huzzard did not have a choice about how he received his payments.  Payment into his commissary account was the only option.

73.     At the Center, Mr. Huzzard stood with other prisoners along a conveyor belt, separating recyclable items from garbage.  Mr. Huzzard sometimes worked on another conveyor belt, separating different types of glass.   He also worked on the "upper magnet," tearing open bags of garbage and emptying their contents onto the conveyor belt.

74.     At no point during the time Mr. Huzzard spent working at the Center did Defendants inform him that he was an employee covered by employment protections under federal and state law.

75.     Defendants likewise failed to post notices required to be posted under federal and state law in a location where Mr. Huzzard and other Debtors were likely to see them.

76.     Defendants actively misled Mr. Huzzard regarding the nature of his relationship with Defendants by suggesting to him that he was not an employee with rights but rather a prisoner whom they could force to perform work as punishment and as a condition of his liberty.

77.     These actions prevented Mr. Huzzard and those similarly situated from understanding that they had a right to federal and state minimum wage during the time they worked at the Center and for several years after.

78.     Mr. Huzzard's ignorance of his rights under federal and state law was not attributable to any lack of reasonable diligence on his part but, rather, Defendants' purposeful conduct in exploiting and misleading Mr. Huzzard and those similarly situated.

79.     A consent to join form signed by Mr. Huzzard is attached hereto as Exhibit B.

**Dempsey Stuckey**

80.     Mr. Stuckey is a resident of Scranton, Pennsylvania, where he has lived for approximately 10 years.

81.     Mr. Stuckey is the father of four children, currently ages 4 months, 3 years, 6 years, and 13 years.

82.     Pursuant to child support orders, beginning in approximately 2013, Mr. Stuckey was required to pay child support in the amount of $100-$166 per month.

83.     In approximately 2017, Mr. Stuckey fell behind on his child support payments due to health issues.

84.     In approximately March 2018, Mr. Stuckey was arrested.  During his arrest, the arresting officer issued him a warrant for failure to pay child support.

85.     At a contempt hearing shortly after his arrest, the court sentenced Mr. Stuckey to a term of six months in the Prison.

86.     Shortly after arriving at the Prison, Mr. Stuckey spoke with Defendant Staff about the work release program.

87.     Mr. Stuckey understood from his conversation with Staff that, in order to qualify for work release, he was required to work at the Center.

88.     Because he could not otherwise qualify for work release, and because he was eager to pay his child support debt and regain his freedom, and lacking any other option, Mr. Stuckey was compelled to begin working at the Center in approximately May or June 2018.

89.     Mr. Stuckey worked at the Center five days per week, from approximately 7:30 a.m. to 3:30 p.m.

90.     Mr. Stuckey typically received one 15 minute break and one 30 minute break each day that he worked at the Center.

91.     Mr. Stuckey received five dollars for each day that he worked at the Center.

92.     These payments were deposited into Mr. Stuckey's commissary account at the Prison.

93.     Mr. Stuckey did not have a choice about how he received his payments. Payment into his commissary account was the only option.

94.     At the Center, Mr. Stuckey stood with other prisoners along the conveyor belt, separating recyclable items from garbage. Mr. Stuckey also worked on the "upper magnet," tearing open bags of garbage and emptying their contents onto the conveyor belt. He also worked on the "glass shoot," separating clear, green, and brown glass.

95.     Mr. Stuckey worked at the Center until approximately August 2018.

96.     A consent to join form signed by Mr. Stuckey is attached hereto as Exhibit C.

## CLASS ALLEGATIONS

97.     Plaintiffs bring Counts I, II, IV, V, VI, and VII on behalf of themselves and the following class:

> All civil child support debtors who worked in the Lackawanna County Recycling Center (the "Center") pursuant to the contract between the Lackawanna County Solid Waste Management Authority and Lackawanna Recycling Center, Inc. between the earliest applicable statute of limitations and the date of final judgment in this action (the "Rule 23 Class").

98.     The persons in the Rule 23 Class are so numerous that joinder of all members is impracticable.

99.     Although the precise number of such persons is unknown, the facts on which the calculation of that number depends are presently within the sole control of Defendants.

100.    Upon information and belief, the Rule 23 Class consists of more than 100 members.

101.    Plaintiffs will fairly and adequately protect the interests of the Rule 23 Class.

102.    Defendants have acted or refused to act on grounds generally applicable to the Rule 23 Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

103.    Common questions of law and fact exist as to the Rule 23 Class and predominate over any questions affecting only individual members, and include, but are not limited to, the following:

a.      Whether Defendants obtained the labor of Plaintiffs and the Rule 23 Class by causing them to believe that failure to work in the Center would result in continued physical restraint;

b.      Whether Defendants' policy and practice of requiring Plaintiffs and the

Rule 23 Class to work at the Center prior to qualifying for work release violates 18 U.S.C. § 1589;

        c.        Whether Defendants have associated with an enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity, namely repeated violations of federal prohibitions against forced labor, 18 U.S.C. § 1962(c).

        d.        Whether Defendants failed to pay Plaintiffs and the Rule 23 Class the minimum wage for all hours they worked for Defendants' benefit;

        e.        Whether Defendants failed to keep true and accurate time records for all hours worked by Plaintiff and the Rule 23 Class;

        f.        Whether Defendants failed to pay Plaintiffs and the Rule 23 Class their wages in lawful money of the United States or check; and

        g.        The nature and extent of class-wide injury and the measure of damages for those injuries.

104.     Plaintiffs' claims are typical of the claims of the Rule 23 Class they seek to represent.  Plaintiffs and the Rule 23 Class were all Debtors who were detained at the Prison and who worked at the Center.  Plaintiffs and the Rule 23 Class all sustained similar types of damages as a result of Defendants' violations of law.

105.     Plaintiffs will fairly and adequately represent and protect the interests of the Rule 23 Class.  Plaintiffs have retained counsel competent and experienced in complex class action litigation.

106.     A class action is superior to other available methods for the fair and efficient adjudication of this litigation because numerous identical lawsuits alleging identical causes of

action would not serve the interests of judicial economy. The members of the Rule 23 Class have been damaged and are entitled to recovery as a result of Defendants' common and uniform policies and procedures. Although the relative damages suffered by individual Rule 23 Class Members are not *de minimis*, such damages are small compared to the expense and burden of individual prosecution of this litigation. In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments against Defendants' practices.

## COLLECTIVE ACTION ALLEGATIONS

107.     Plaintiffs bring Count III, the FLSA minimum wage claim, on behalf of themselves and all similarly situated Debtors who worked in the Center between the earliest applicable statute of limitations and the date of final judgment who elect to join this action pursuant to 29 U.S.C. § 216(b) (the "FLSA Collective").

108.     All the work that Plaintiffs and the FLSA Collective have performed has been assigned by Defendants, or Defendants have been aware of and benefited from the work that Plaintiffs and the FLSA Collective have performed.

109.     As part of their regular business practice, Defendants have intentionally, willfully, and repeatedly engaged in a pattern, practice, or policy of violating the FLSA with respect to Plaintiffs and the FLSA Collective. This policy and pattern or practice includes, but is not limited to:

    a.  Willfully failing to pay Plaintiffs and the FLSA Collective the minimum wage for all hours worked;

    b.  Willfully failing to record all the time that Plaintiffs and the FLSA Collective have worked for the benefit of Defendants.

110. Defendants are aware, or should have been aware, that federal and state law required them to pay Plaintiffs and the FLSA Collective the minimum wage for all hours worked.

111. Defendants' conduct has been widespread, repeated, and consistent.

112. Defendants' deceptive conduct prevented Plaintiffs and the FLSA Collective from discovering or asserting their claims earlier than they did. Defendants did so by, *inter alia*, leading Plaintiffs and the FLSA Collective to believe that they were not employees entitled to receive the minimum wage for all hours worked.

113. Defendants are liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs and the members of the FLSA Collective.

114. Upon information and belief, the FLSA Collective consists of many similarly situated individuals who have been underpaid by Defendants in violation of the FLSA and who would benefit from the issuance of a court-supervised notice of the lawsuit and the opportunity to join the lawsuit.

115. Those similarly situated collective members are known to Defendants, are readily identifiable, and can be located through Defendants' records. Notice should be sent to the members of the FLSA Collective pursuant to 29 U.S.C. § 216(b).

116. At no point during the time Plaintiffs and other Debtors spent working at the Center did Defendants inform them that they were employees covered by employment protections under federal law.

117. Defendants likewise failed to post notices required to be posted under federal law in a location where Plaintiffs and other Debtors were likely to see them.

118. Defendants actively misled Plaintiffs and members of the FLSA Collective regarding the nature of their relationship with Defendants by suggesting to them that they were not employees with rights but rather prisoners whom Defendants could force to perform work as punishment and as a condition of their liberty.

119. These actions prevented Plaintiffs and those similarly situated from understanding that they had a right to federal minimum wage during the time they worked at the Center.

120. Plaintiffs' ignorance of their rights under federal law was not attributable to any lack of reasonable diligence on their part but, rather, Defendants' purposeful conduct in exploiting and misleading Plaintiffs and those similarly situated.

## COMMON FACTUAL ALLEGATIONS

### *The Agreement Between the Authority and LRCI*

121. Since at least 2005, and continuing through the present, Defendants Lackawanna County Solid Waste Management Authority and Lackawanna Recycling Center, Inc. ("LRCI") have been parties to a contract (the "Operating Agreement") regarding the operations of the Center.

122. The Operating Agreement is dated May 3, 2006 and had an initial duration of five years.

123. Under the terms of the Operating Agreement, provided that neither party was in default, the Operating Agreement would renew for four additional five-year terms under the same terms and conditions, unless LRCI advised the Authority, in writing, at least six months prior to the expiration of the existing term that LRCI did not intend to renew the Agreement.

124. Upon information and belief, the Operating Agreement between the Authority and LRCI remains in effect.

125.     Under the terms of the Operating Agreement, LRCI has the "overall responsibility for the management and operation services related to vehicles, equipment, and plant improvements and sole responsibility for all personnel related thereto."

126.     Under the terms of the Operating Agreement, LRCI agrees to "supervise, direct, and control the management and operation of the Center upon the terms and conditions set forth in [the] Agreement."

127.     Under the terms of the Operating Agreement, LRCI is "responsible for the selection, employment, termination of employment, supervision, direction, training and assigning of the duties of all employees at the Center.  The selection, terms of employment and termination thereof, including rates of compensation and benefits, if any, and the supervision, direction, training and assignment of duties of all such employees shall be the duty and responsibility of [LRCI].  All salaries, wages and benefits, if any of such employees shall be paid by [LRCI] and such employees shall be the employees and agent of [LRCI] and not the Authority."

128.     Under the terms of the Operating Agreement, the Authority "shall remain in existence, shall remain sole owner of the facility, and shall retain administrative, financial and operational control of the Center and the Center Assets, subject to the terms and conditions of this agreement[.]"

129.     Under the terms of the Operating Agreement, the Authority agrees to provide LRCI with "the same number of Prisoners from the Lackawanna County Prison that have historically worked at the Center as part of their work release program as security requirements dictate."

*Defendants Jointly Operate the Center*

130.     At all relevant times, Defendants the County, LRCI, and the Authority jointly operated the Center and jointly employed Debtors.

131.     At all relevant times, Defendants the County, LRCI, and the Authority suffered or permitted Debtors' work.

132.     At all relevant times, Defendants the County, LRCI, and the Authority jointly controlled employment and operations decisions at the Center.

133.     Pursuant to the Operating Agreement, County personnel select Debtors to work at the Center.

134.     Upon information and belief, County personnel and LRCI personnel have authority to terminate Debtors from their assignments at the Center.

135.     Defendants LRCI and the Authority jointly determine work rules and assignments.

136.     Defendants LRCI, the County, and the Authority jointly determine the days and hours during which Debtors will work at the Center.

137.     County personnel – specifically, prison guards – transport Debtors to the Center consistent with agreed-upon work schedules.

138.     The prison guards remain on site at the Center to supervise Debtors and ensure security.

139.     The prison guards and Center employees jointly supervise Debtors' work at the Center, including but not limited to ensuring that prisoners working on the line worked quickly.

140.     If prisoners on the line did not move quickly enough or failed to remove all the glass from the conveyor belt, the prison guards or Center staff punished them by, for example, omitting portions of their prison-provided lunch.

141.     Staff at the Center direct Debtors' work, including but not limited to assigning them to workstations, instructing them how to perform their tasks, and authorizing them to take breaks.

142.     The Authority and the County set Debtors' pay at $5 per day.

143.     Under the terms of the Operating Agreement, LRCI has the authority to set the rates of compensation of any employees of the Center.

144.     Defendants LRCI, the County, and the Authority together exercise significant control over the day-to-day conditions of Debtors' work.

***Use of Child Support Debtors for Center Labor***

145.     Since at least 2006, a significant number of the prisoners supplied by the Authority to LRCI for work at the Center have been placed in the Prison following civil contempt proceedings for failure to pay child support.

146.     Individuals in Lackawanna County who have defaulted on their child support obligations are subject to civil contempt proceedings.

147.     Upon information and belief, during civil contempt proceedings, a judge determines whether or not an individual has the ability to pay child support.

148.     Upon information and belief, individuals deemed able to pay their support obligations are routinely held in civil contempt.

149.    Upon information and belief, pursuant to Defendants' policy and practice, individuals found in contempt arising from failure to pay child support are ordered to serve time in the Lackawanna County Prison.

150.    Pursuant to Defendants' policy and practice, Debtors are typically deemed eligible for work release, if they qualify.

151.    When a prisoner qualifies for work release, they are permitted to leave the Prison for work each day, returning to the Prison at night.

152.    Prisoners on work release earn wages from their employers.

153.    Prisoners on work release must pay a fee to the County.

154.    However, in order to qualify for work release, Debtors must work in the Center for a period of time.

155.    Pursuant to Defendants' policy and practice, Debtors are ineligible for work release until they have completed their assignment at the Center.

156.    Pursuant to Defendants' policy and practice, Prison staff tell Debtors that they must work at the Center if they wish to qualify for work release.

157.    Debtors receive just $5 per day worked in the Center.

158.    Debtors' pay for their work at the Center is deposited into their commissary accounts.

159.    Debtors do not have the option of receiving their pay for their work at the Center in lawful money of the United States (i.e., cash) or check form.

160.    Payment into the commissary accounts is not equivalent to payment by lawful money of the United States or check.  Commissary accounts, among other things, earn no

interest, are tightly controlled by the Prison, and are subject to various mandatory deductions by the Prison.

161. Other than $5 per day worked, Debtors receive no payment for work performed in the Center.

162. Debtors typically spend five days per week working at the Center.

163. Debtors typically work at the Center from approximately 7:30 a.m. to 3:30 p.m.

***Working Conditions at the Center***

164. While at the Center, Debtors' primary duties include tearing open trash bags, picking recyclable material from among trash and other debris on a conveyor belt, and separating different types of glass.

165. Occasionally, a Debtor is assigned to perform additional duties including cleaning, mopping the bathroom, emptying out "cages" on the lower level, handing out food, and making coffee. The individual performing this work is referred to as the "mayor."

166. The work Debtors perform at the Center is dirty, dangerous, and unpleasant. Debtors are exposed to needles, feces, fine glass particulate, and other unsafe materials.

167. Although workers at the Center were issued a uniform and gloves, this gear did not protect them from what was a very hazardous job.

168. The gloves provided by the Center were not water or glass resistant, and workers, including Debtors, were cut by glass through their gloves.

169. The workers either wore the shoes they arrived with at the Prison, soft-sided shoes they purchased from commissary, or – occasionally – used boots provided by the Prison. When the Prison did provide boots, they were badly worn with holes in them. Many workers, including

Debtors, cut their feet on jagged pieces of glass on the floor, or stepped on nails that pierced the soles of their shoes.

170.    As a result of sorting garbage at the Center, fecal matter, vomit, rancid juices, and toxic materials got on workers' skin.

171.    Many workers at the Center, including Debtors, suffered from something the workers called "trash rash," which was an extremely itchy, burning rash often lasting all week and only fading during the days when Debtors were not working at the Center.

172.    Glass often flew from the conveyer belt, smashing and splintering onto the faces and arms of workers, including Debtors.

173.    Often, these tiny pieces of glass became lodged in the skin of the workers, including Debtors.  When workers, including Debtors, wiped away sweat, the glass would lodge deeper into their skin.

174.    Additionally, workers, including Debtors, were exposed to fumes with no mask, had to use filthy, unsanitary toilets that had not been working or cleaned in months, were required to work in temperatures of more than 100 degrees Fahrenheit, and had food taken away from them as punishment.

175.    Debtors often suffer injuries resulting from their work at the Center, including those caused by inadequate shoes, gloves, and other protective gear.

176.    Upon information and belief, the only individuals typically performing this work are those from the Prison.  The Center does not employ hourly-paid workers to regularly perform this work. On occasion, employees of the Center perform this work when there are not enough workers from the Prison to do it.

177. If Debtors do not agree to work at the Center, they will not qualify for work release and will remain in the Prison, unable to leave to earn wages, for the duration of their sentence.

178. By telling Debtors that they must work at the Center to qualify for work release, Defendants and their agents intentionally attempt to and do cause Debtors to believe and would cause any reasonable person to believe that, if they do not work at the Center, they will be subject to physical restraint in the form of continued incarceration without the opportunity to work outside the Prison in the work release program.

179. By telling Debtors that their right to access the work release program is contingent upon them working at the Center, Defendants and their agents knowingly attempt to and do obtain the labor of Debtors through the abuse or threatened abuse of legal process.

180. By telling Debtors that they will become eligible for work release only if they work at the Center, Defendants ensure that the Center will have access to a steady supply of low-cost labor.

181. Defendants were aware of Debtors' work at the Center.

182. Defendants benefitted from Debtors' work at the Center.

183. Upon information and belief, Debtors' work at the Center reduced the Center's operating costs, benefitting LRCI and its owners, including but not limited to Louis and Dominick DeNaples.

184. Upon information and belief, Debtors' work at the Center reduced the Center's operating costs, benefitting the County and the Authority.

**The Enterprise**

185.     Each Defendant is part of an association-in-fact constituted by the Center, LRCI, the Authority, Louis DeNaples, Dominik DeNaples, and Thomas Staff, which shall be referred to as the "Enterprise."

186.     In conducting its illegal racketeering scheme, the Enterprise acts with the common purpose of illegally obtaining low-cost manual labor from Debtors, which benefits the Center, LRCI , Louis DeNaples, and Dominik DeNaples in the form of increased savings and profit from the contract with the Authority, and benefits the Authority in the form of a reduced fee paid to LRCI under the Operating Agreement.

187.     The structure of the Enterprise is set forth in detail in the Operating Agreement, as described in paragraphs 121-144, *supra*.

188.     The Authority participates in the conduct of the Enterprise's affairs by furnishing the Center and LRCI with a reliable source of free labor in the form of prisoners, including Debtors.

189.     The County participates in the conduct of the Enterprise by requiring prisoners, including Debtors, to work at the Center as a precondition to work release; by transporting prisoners, including Debtors, to the Center; and by providing County personnel to "supervise" the prisoners' work at the Center.

190.     Thomas Staff participates in the conduct of the Enterprise by coordinating the selection and transportation of Debtors to the Center.

191.     LRCI, Louis DeNaples, and Dominik DeNaples participate in the conduct of the Enterprise's affairs by operating the Center through the use of labor performed by prisoners, including Debtors.

192.     In doing so, LRCI is able to operate the Center at a substantially reduced cost to the County.

**Unlawful Racketeering Activity**

193.     The Enterprise engages in a scheme to unlawfully extract Debtors' labor, in violation of 18 U.S.C. § 1589.

194.     Taken together, the actions of the Enterprise constitute a pattern of racketeering activity.

195.     Domestic relations judges in Lackawanna County frequently hold child support debtors in contempt of court and sentence them to prison time.

196.     As part of their sentence, Debtors are frequently deemed eligible for work release, if they qualify.

197.     Upon arrival at the Prison or shortly thereafter, County personnel, including but not limited to Defendant Staff, inform Debtors that in order to qualify for work release, they must first work at the Center.

198.     County personnel make clear to Debtors that if they do not work at the Center, they will not be eligible for work release.

199.     Debtors must typically work at the Center for a portion of their sentences before becoming eligible for work release.

200.     Through this scheme, the Enterprise obtains low-cost labor from Debtors by threatening them with continued confinement if they decline to work.

201.     This racketeering activity has the natural and foreseeable consequence of depriving Debtors of money or property, including the wages that they should be paid for their work at the Center, and the wages that they would otherwise earn during work release.

## COUNT I
### Violation of the Trafficking Victims Protection Act
### (Asserted by Plaintiffs against all Defendants on behalf of the Rule 23 Class)

202.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of the Complaint.

203.   During all relevant times, Defendants knowingly obtained the labor of Plaintiffs and the Rule 23 Class.

204.   During all relevant times, Defendants attempted to and did obtain the labor of Plaintiffs and the Rule 23 Class through threats of continued physical restraint, specifically, by telling Debtors that if they did not work at the Center they would remain ineligible for work release, in violation of 15 U.S.C. § 1589(a)(1).

205.   During all relevant times, Defendants attempted to and did obtain the labor of Plaintiffs and the Rule 23 Class through abuse of law and/or legal process, in violation of 15 U.S.C. § 1589(a)(3).

206.   During all relevant times, Defendants attempted to and did obtain the labor of Plaintiffs and the Rule 23 Class by causing Debtors to believe that, if they did not provide labor at the Center, they would suffer continued physical restraint without the ability to participate in work release, in violation of 15 U.S.C. § 1589(a)(4).

207.   During all relevant times, Defendants knowingly benefitted from the labor provided by Plaintiffs and the Rule 23 Class.

## COUNT II
### Violation of the Thirteenth Amendment of the Constitution of the United States of America pursuant to 42 U.S.C. § 1983
### (Asserted by Plaintiffs against the County, the Authority, and Thomas Staff on behalf of the Rule 23 Class)

208.   Plaintiffs incorporate by reference all previous and subsequent paragraphs of the Complaint.

209.   During all relevant times, Defendants acted under color of law.

210. During all relevant times, Defendants deprived Plaintiffs and the Rule 23 Class of the rights, privileges, and immunities guaranteed by the Constitution of the United States of America.

211. Specifically, during all relevant times, Defendants subjected Plaintiffs and the Rule 23 Class to involuntary servitude by requiring them to work in the Center or remain incarcerated and ineligible for work release.

212. The County and the Authority acted pursuant to policies or customs of engaging in the alleged constitutional violations.

**COUNT III**
**Violation of the Fair Labor Standards Act**
**(Asserted by Plaintiffs against LRCI, the County, and the Authority on behalf of the FLSA Collective)**

213. Plaintiffs incorporate by reference all previous and subsequent paragraphs of the Complaint.

214. Defendants failed to pay Plaintiffs and the FLSA Collective the minimum wages to which they are entitled under the FLSA.

215. Defendants jointly "employed" Plaintiffs and the FLSA Collective members as "employees" within the meaning of the FLSA.

216. Defendants suffered or permitted Plaintiffs and the FLSA Collective to work many hours each week.

217. Plaintiffs' and the FLSA Collective members' work benefited Defendants by reducing the need for paid employees and artificially reducing their labor costs through access to a steady supply of sub-market rate labor for which Defendants did not provide unemployment and health insurance, worker's compensation, minimum wages, and/or overtime premiums.

218.     Plaintiffs and the FLSA Collective performed work that was integral and necessary to the Center's operations.

219.     Plaintiffs' and the FLSA Collective members' work financially benefited Defendants.

220.     Each Defendant exercised substantial control over the terms and conditions of Plaintiffs' and the FLSA Collective members' work.

221.     Defendants jointly exercised substantial control over the terms and conditions of Plaintiffs' and the FLSA Collective members' work.

222.     Defendants are employers engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 203(d), 203(s), 203(r), and 206(a).

223.     At all relevant times, Plaintiffs and the FLSA Collective were employees employed by Defendants within the meaning of 29 U.S.C. §§ 203(e) and 206(a).

224.     As a result of Defendants' violations of the FLSA, Plaintiffs and the FLSA Collective suffered damages by being denied minimum wages in accordance with the FLSA in amounts to be determined at trial, and are entitled to recovery of such amounts; liquidated damages; prejudgment interest; and attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

225.     Defendants' unlawful conduct, as described in this Class and Collective Action Complaint, has been intentional and willful.

226.     Defendants were aware or should have been aware that the practices described in this Class and Collective Action Complaint were unlawful.

227.     Defendants have not made a good faith effort to comply with the FLSA with respect to Plaintiffs' and Collective Members' compensation.

**COUNT IV**
**VIOLATION OF THE PENNSYLVANIA MINIMUM WAGE ACT**
**(Asserted by Plaintiffs against LRCI, the County, and the Authority**
**on behalf of the Rule 23 Class)**

228.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of the Complaint.

229.     During all relevant times, Plaintiffs and the Rule 23 Class were employed by Defendants as defined by 43. P.S. § 333.103(f) and were therefore "employees" as defined by the PMWA, 43 P.S. § 333.103(h).

230.     During all relevant times, Defendants "suffered or permitted" Plaintiffs and the Rule 23 Class to work and acted directly or indirectly in the interest of an employer in relation to Plaintiffs and are therefore "employers" as defined by the PMWA, 43 P.S. § 333.103(g).

231.     Defendants failed to pay Plaintiffs and the Rule 23 Class the minimum wage as required by the PMWA.

232.     As a result, Plaintiffs and the Rule 23 Class suffered monetary damages.

**COUNT V**
**VIOLATION OF THE PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW**
**(Asserted by Plaintiffs against LRCI, the County, and the Authority**
**on behalf of the Rule 23 Class)**

233.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of the Complaint.

234.     During all relevant times, Defendants employed Plaintiffs and the Rule 23 Class in this Commonwealth and are therefore "employers" are defined by the WPCL, 43 P.S. § 260.2a.

235.     During all relevant times, Defendants failed to pay Plaintiffs and the Rule 23 Class their wages in lawful money of the United States or check, in violation of the WPCL.

29

236.     Therefore, Plaintiffs and the Rule 23 Class are entitled to liquidated damages equal to 25% of the total wages due, or $500, whichever is greater.

237.     As a result, Plaintiffs and the Rule 23 Class suffered monetary damages.

## COUNT VI
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (Asserted by Plaintiffs against all Defendants on behalf of the Rule 23 Class)

238.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of the Complaint.

239.     Defendants violated RICO by violating 18 U.S.C. §§ 1962(c) and 1964(c).

240.     Defendants and the Enterprise engaged in the acts and schemes described above, which violate 15 U.S.C. § 1589(a)(1), and which constitute patterns of racketeering.

241.     By conducting the Enterprise through a pattern of racketeering, Defendants injured Plaintiffs and the Rule 23 Class.

242.     Among other things, each of these RICO violations caused Plaintiffs and the Rule 23 Class to suffer loss of past, current, and prospective wages.

243.     As a result, Plaintiffs and the Rule 23 Class suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

## COUNT VII: UNJUST ENRICHMENT
### (Asserted by Plaintiffs against all Defendants on Behalf of the Rule 23 Class)

244.     Plaintiffs incorporate by reference all previous and subsequent paragraphs of the Complaint.

245.     Plaintiffs' labor at the Center conferred a benefit on all Defendants in the form of, among other things, decreased costs and increased profits.

246. It would be unjust for Defendants to retain the value of this benefit without payment to Plaintiffs and the Rule 23 Class.

**DEMAND FOR JURY TRIAL**

247. Plaintiffs demand a trial by jury for all issues so triable.

**PRAYER FOR RELIEF**

248. Plaintiffs, individually and on behalf of all others similarly situated, seek the following relief:

    a. That, at the earliest possible time, Plaintiffs be allowed to give notice of this collective action, or that the Court issue such notice, to the members of the FLSA Collective (as defined above). Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied minimum wages for all hours worked;

    b. Unpaid minimum wages and overtime and an additional and equal amount as liquidated damages pursuant to 29 U.S.C. §§ 201, *et seq*., and the supporting United States Department of Labor regulations;

    c. Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    d. Designation of Plaintiffs as Class Representatives and counsel of record as Class Counsel;

    e. Awarding Plaintiffs and the Rule 23 Class their actual damages and any applicable statutory damages, including but not limited to unpaid minimum wages and liquidated damages under the PMWA and WPCL;

    f. Issuance of a declaratory judgment that the practices complained of in this

Complaint are unlawful under the TVPA, the FLSA, the PMWA, WPCL, and RICO;

g. An injunction requiring Defendants to pay all statutorily-required damages and prohibiting any further violations of the TVPA, the PMWA, WPCL, and RICO;

h. Appropriate statutory penalties;

i. Pre- and post-judgment interest;

j. Attorneys' fees and costs of this action;

k. A reasonable incentive award for the named Plaintiffs to compensate them for the time they spent attempting to recover wages and other damages for Class Members and for the risks they took in doing so; and

l. Such other relief as this Court shall deem just and proper.

Dated: December 6, 2019                      Respectfully submitted,

s/Juno Turner
Juno Turner (admitted *pro hac vice*)
David H. Seligman (admitted *pro hac vice*)
Brianne Power (admitted *pro hac vice*)
Towards Justice
1410 High Street, Suite 300
Denver, CO 80219
Tel: 720.239.2060
juno@towardsjustice.org
david@towardsjustice.org
brianne@towardsjustice.org

s/Matthew K. Handley
Matthew K. Handley (admitted *pro hac vice*)
Rachel E. Nadas (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
777 6th Street, NW
Eleventh Floor
Washington, DC 20001
Telephone: (202) 559-2433
mhandley@hfajustice.com

William A. Anderson (admitted *pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
Telephone: (202) 559-2433
wanderson@hfajsutice.com

Marielle Macher
Peter Zurflieh
Community Justice Project
118 Locust Street
Harrisburg, PA  17101
(717) 236-9486, ext. 214
mmacher@cjplaw.org
pzurflieh@cjplaw.org