## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM L. BURRELL, JR., et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 3:14-cv-1891-RDM |
| | : | |
| LACKAWANNA RECYCLING | : | Honorable Robert D. Mariani |
| CENTER, INC., et al., | : | |
| | : | |
| Defendants, | : | (Electronically Filed) |

## REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS
## BY LOUIS DENAPLES AND DOMINICK DENAPLES

Defendants, Louis DeNaples and Dominick DeNaples (collectively, "DeNaples"), submit this reply brief in further support of their motion to dismiss (Doc. 102).

### I.  Improper "Group Pleading" Allegations Must Be Disregarded.

As DeNaples explained in their opening brief, before evaluating the legal merit of Plaintiffs' claims, the Court must parse the operative complaint to identify properly pleaded facts.  This must be done for each Defendant separately rather than for all Defendants lumped together as an amorphous whole.[1]  Appreciating that it is

---

[1]     "Group pleading" *i.e.*, allegations lumping unspecified defendants together without setting forth what the moving defendant is alleged to have done, are insufficient under Rule 8(a) and should be disregarded.  *See Dolan v. PHL Variable Ins. Co.*, 2016 U.S. Dist. LEXIS 161414, at *21-*22 (M.D. Pa. Nov. 22, 2016); *see also Mills v. Ethicon, Inc.*, 406 F.Supp.3d 363, 386-87 (D.N.J. 2019).

the parties' obligation to assist with this process, DeNaples identified the allegations with respect to them that were pled in conformance with Rule 8. *See* Doc. 104 at 2.

Instead of addressing the inherent deficiency in their pleading by, for example, disputing DeNaples identification of properly pleaded facts, in their response, the Plaintiffs double-down. They frame the vast majority of legal arguments with reference to "Defendants" as a undivided whole. By using this approach, Plaintiffs attempt to attribute the alleged conduct, status or knowledge of one Defendant to all Defendants.

The Court should reject Plaintiffs' attempt to paint with a single, broad brush. The claims against each Defendant, and the associated legal theories, must be evaluated separately in light of only those facts that are properly alleged against each Defendant. With respect to DeNaples, once this is done, the claims against them should be dismissed. *See* Doc. 104.

## II.   Plaintiffs Were Not "Coerced" In Violation Of The TVPA.

Plaintiffs' response reveals their house of cards. It is clear now that Plaintiffs' theory is that they had a right to participate in work release in order to earn money to pay their support obligations and, that by conditioning the exercise of that alleged right on laboring at the Center, "Defendants" (as an undivided whole) violated the TVPA. Thus revealed, the linchpin of Plaintiffs' TVPA claim is that work release is the key to their jail cells that would be handed to them only after they labored at

2

the Center. Their theory is that, by withholding the key until after they labored at the Center, the "Defendants" coerced Plaintiffs' labor in violation of the TVPA.

The linchpin of Plaintiffs' TVPA claim builds on a completely false premise. Work-release was not the key to their jail cells. Plaintiffs were not sent to prison in order to participate in work release so that they could earn money to pay their overdue support obligations. They were sent to prison because, at the time of their respective contempt hearings, the court found that they could, but were refusing to, make support payments. Plaintiffs had the keys to their cells in hand at the time they went to prison. They simply chose not to use them.

Under Pennsylvania law, participation in work release cannot be a key to a civil contemnor's prison cell. It cannot be the key, as a matter of Pennsylvania law, because, inherent in the fact that a contemnor is imprisoned is a finding by the court that the contemnor had the ability to make support payments at the time of the contempt hearing. "The law in this Commonwealth is ... that the trial court must set the conditions for a purge in such a way as the contemnor has the **present** ability to comply with the order." *Hyle v. Hyle*, 868 A.2d 601, 605 (Pa. Super. 2005) (emphasis added). The contemnor had the present ability to comply with the underlying support order, but simply chose to ignore his support obligations. *See Hyle*, 868 A.2d at 605. *See also* Doc. 107-1 (indicating the court's express finding

the Plaintiff Burrell had the "ability to pay" before incarcerating him for contempt).[2]

Civil contemnors do not get incarcerated in order to earn money through work release.  *See Hyle*, 868 A.2d at 605 (holding the trial court erred in setting the purge amount at $2,500.00 and ordering Hyle eligible for work release to earn the purge money, as the evidence did not show that he had the present ability to pay $2,500.00).  *See also Godfrey v. Godfrey*, 894 A.2d 776, 783 (Pa. Super. 2006) (trial court erred in imposing as a condition for a purge the requirement that father secure employment as such a condition will only be met sometime in the future).  To the contrary, they are incarcerated with an opportunity to "purge" their contempt by turning over money they already had.  *See*, *e.g.*, *Barrett v. Barrett*, 368 A.2d 616, 622 (Pa. 1977) (reversing a contempt order where the alleged contemnor had no present ability to pay the purge amount set by the court); *Muraco v. Pitulski*, 368 A.2d 624, 626 (Pa. 1977) (reversing a contempt order where there was no evidence that the alleged contemnor had the present ability to pay the purge amount on the day of the contempt hearing).[3]

---

[2]     In this regard, the Court must reject Plaintiffs allegations that they lacked the funds necessary to pay the purge.  *See* Doc. 115 at 13.  Those allegations are contrary to the record, *see*, *e.g.*, Doc. 107-1, and contrary to the necessary finding, as a matter of law, that Plaintiffs had the "present ability" to comply with the respective contempt orders issued by the state court.  Plaintiffs cannot be permitted to collaterally attack the underlying state court contempt orders in this proceeding.

[3]     It is otherwise well-established that Plaintiffs' had no right to participate in the prison work release program.  *See Maldonado v. Karnes*, 2014 U.S. Dist. LEXIS

In sum, Plaintiffs' participation in the prison work-release program was not, and indeed could not be, the "purge," or key to their jail cells, as such a condition could only be met sometime in the future.  *See Hyle*, *Godfrey*, *supra*.  The "purge," instead, was Plaintiffs' payment of the amount set forth in their respective contempt orders.  *See*, *e.g.*, Doc. 107-1.  It follows, therefore, that Plaintiffs had no right to right to participate in the prison work-release program and, consequently, they cannot claim that they were unlawfully coerced to provide labor or services at the Center.

The Court should, moreover, reject Plaintiffs contention that the Third Circuit "recognized" in the prior appeal of this case, that forcing a civil detainee to chose between work and continued imprisonment "is" coercion in violation of the TVPA. Doc. 115 at 13.  Plaintiffs overstate the Third Circuit's prior decision.  The Third Circuit concluded only that it was improper for this Court to *sua sponte* dismiss Plaintiff's TVPA claim at the *screening* stage, prior to service, noting that it may be that Burrell had a sufficient "choice" so that any alleged coercion to work in the Center did not convert that work into involuntary servitude.  *See Burrell v. Loungo*, 750 F. App'x 149, 160 (3d Cir. 2018).  The Third Circuit noted, moreover, that some would find that as a "civil contemnor who would be released once he paid his child

---

143560, at *12 (M.D. Pa. Oct. 8, 2014).  Work release is a privilege, not a right, and entry into a work release program is discretionary.  *Id*.

support obligations, Burrell "carr[ied] the keys of [his] prison in [his] own pockets," expressly leaving it to *this Court* "to consider such an argument." 750 F. App'x at 160, n.7 (citing *Turner v. Rogers*, 564 U.S. 431, 441-42 (2011)).

As this Court previously concluded, and because participation in the work-release program was not the purge, Plaintiffs had a sufficient "choice," however "painful" or "unpleasant" they claim, such that any alleged coercion to work in the Center did not convert that work into involuntary servitude.  Doc. 34 at 33-36 (discussing cases).  The facts have not changed with the filing of Plaintiffs' second amended complaint.

Finally, whether Plaintiffs had a "choice" is not a "factual" dispute that requires discovery, Doc. 115 at 21, but a legal determination to be made by this Court based upon the facts as alleged.  All of the facts the Court needs to make that determination are pleaded by Plaintiffs' second amended complaint.

## III.   Plaintiffs' Response Confirms DeNaples' Contention That Plaintiffs Have Not Properly Alleged A Civil Action Under Section 1595(a) Of The TVPA.

Section 1595(a) of the TVPA, 18 U.S.C. § 1595(a), as explained in DeNaples' opening brief, provides that civil actions may be brought against "perpetrators" and against those who "benefit[]" from a "venture" that the defendant "knew or should have know has engaged in violation of this chapter."  Doc. 104 at 8.

Plaintiffs response, Doc. 115, fails to address, at all, the causal defect identified by DeNaples with respect to their TVPA claims against them as a "perpetrator." Doc. 104 at 8-10. Each of those "perpetrator" claims requires a causal connection; that is, Plaintiffs must plead that DeNaples knowingly obtained the labor of Plaintiffs by one of Section 1589's prohibited means. *Id.* But Plaintiffs' response does not address where, in their complaint, they have alleged facts that, taken as true, would tend establish, or allow an inference, that DeNaples obtained Plaintiffs' labor through any of those prohibited means. Plaintiffs do not point the Court to those facts because they cannot. That is because, as demonstrated by DeNaples' opening brief, in each case there is break in the causal chain. *Id.* For example, Plaintiffs complaint fails to plead, and cannot be amended to plead, facts establishing that any "physical restraint" suffered by Plaintiffs was caused by DeNaples. *Id.* That is because, as Plaintiffs' complaint admits, the alleged forced labor was an opportunity presented to Plaintiffs by prison officials, *not* by DeNaples, and only *after* Plaintiffs had already been lawfully imprisoned to such "physical restraint." *Id.* This same causal defect, which Plaintiffs' response does not address, is present with respect to each of Plaintiffs' "perpetrator" claims against DeNaples. *Id.*

With respect to claimed beneficiary liability, Plaintiffs misconstrue Section 1595(a) in order to assert they were not obligated to plead the existence of a "venture." Doc. 115 at 16. But the plain language of Section 1595(a), as interpreted

by the courts, requires pleading the existence of a "venture" under a beneficiary theory of liability.  Doc. 104 at 11.  *See also A.B. v. Marriott Int'l, Inc.*, 2020 U.S. Dist. LEXIS 70644, at *16 (E.D. Pa. April 22, 2020).  Plaintiffs tacitly admit that they have failed to plead the required "venture" element of their claim, Doc. 115 at 17 n.8, but suggest they have nonetheless pleaded facts establishing a venture, Doc. 115 at 17.  DeNaples contends otherwise.  Doc. 104 at 11.  But even if Plaintiffs' allegations, taken together, establish a "venture," which DeNaples disputes, there are no well-pleaded facts would support an allegation or inference by Plaintiffs that DeNaples participated in the alleged venture, knowingly benefited, financially or by receiving anything of value, from participating in the alleged venture, or knew or should have known that the alleged venture has engaged in an act in violation of the TVPA.  Doc. 104 at 2, 11.

## IV.     Even If Plaintiffs Lacked A Choice, There Is No TVPA Violation.

The Court, in this case and for the reasons above, need not reach the issue of whether being forced into a prison work assignment violates the TVPA.  *See* Doc. 104 at 6, citing *Martinez v. Fed. Corr. Inst.*, 2019 U.S. Dist. LEXIS 193325, at *13-*14 (C.D. Cal. Sept. 25, 2019), *adopted by*, *Martinez v. Fed. Corr. Inst.*, 2019 U.S. Dist. LEXIS 193345 (C.D. Cal. Nov. 4, 2019) (rejecting prisoner's claim that being forced into prison work assignment violates federal criminal laws prohibiting peonage, slavery, and trafficking in persons, particularly 18 U.S.C. § 1589).

In *Martinez*, the district court concluded that the TVPA cannot be read to proscribe requiring prisoners to work in accordance with prison rules, conduct which does not offend the Thirteenth Amendment. *Id.* at *14. But Plaintiffs claim that DeNaples are improperly relying upon *Martinez* and other cases involving convicted prisoners, because Plaintiffs are civil detainees and not criminal convicts. *See* Doc. 115 at 10-12. Plaintiffs contend that because they are civil detainees, and, therefore, "not outside the ambit of the Thirteenth Amendment's involuntary servitude provision," the cases cited by DeNaples do not apply. *See* Doc. 115 at 11, quoting *McGarry v. Pallito*, 687 F.3d 505, 511 (2d. Cir. 2012).

But Plaintiffs are not "pretrial detainees" who remain "clothed in the presumption of innocence," as were the plaintiffs in *McGarry*. Plaintiffs, rather, have been adjudicated in civil contempt, with all due process rights afforded to them by law, and imprisoned lawfully for that contempt, even if such punishment is remedial or coercive. Thus, quite unlike "pretrial detainees," Plaintiffs are subject to the post-adjudicative conditions of imprisonment just like any other post-conviction prisoner. Such enforcement of child support obligations, as this Court previously concluded, does not violate the Thirteenth Amendment. *See* Doc. 34 at 32-34; *United States v. Ballek*, 170 F.3d 871, 874 (9th Cir. 1999), *cert. denied*, 528 U.S. 853 (1999) (holding that child support "fall[s] within that narrow class of obligations that may be enforced by means of imprisonment without violating the

9

constitutional prohibition against slavery"); *Claypool v. Boyd*, 1990 U.S. App. LEXIS 16873, at *4 (4th Cir. Sept. 24, 1990) (rejecting argument that a civil detainee's Thirteenth Amendment rights are violated by being required to work while imprisoned for civil contempt for failure to pay child support); *Williams v. Coleman*, 2012 U.S. Dist. LEXIS 181874, at *7 (E.D. Cal. Dec. 26, 2012), *aff'd*, 2013 U.S. App. LEXIS 16019 (9th Cir. Cal., Aug. 2, 2013) (prisoners may be required to work and "there is no authority to justify a digression from this well-established law when the case involves a civil detainee rather than a prisoner."). Further, contempt proceedings for voluntary failure to comply with court orders constitute a proper exercise of state power. *See Hicks v. Feiock*, 485 U.S. 624, 638 (1987). And the Thirteenth Amendment does not prohibit involuntary servitude as part of proper imprisonment. *See* Doc. 34 at 32-34; *Martinez*, 2019 U.S. Dist. LEXIS 193325, at *13-*14; *Claypool*, 1990 U.S. App. LEXIS 16873, at *4. *See also United States v. Kozminski*, 487 U.S. 931, 943 (1988).

It follows, therefore, that requiring a civil contemnor to serve out his full, lawfully-imposed imprisonment if he chooses not to meet the work requirements upon which access to a prison work-release program is conditioned does amount to creating slave labor (for which prison officials themselves can be sent to prison for up to 20 years). *See* Doc. 34 at 32-34; *Martinez*, *supra*.

**V.     Plaintiffs Fail To Plead The Requisite "Conduct" For Their RICO
Claim.**

Because Plaintiffs' TVPA claims fails as a matter of law, its RICO claim,
which is predicated on that claim, likewise fails.  While the Court, then, need not
reach the issue, Plaintiffs assert that because they have pleaded that DeNaples
violated the TVPA, they have pleaded enough to satisfy the "conduct" element of
their RICO claim.  Doc. 115 at 42.  Plaintiffs are wrong.  Third Circuit precedent,
which Plaintiffs ignore, requires that, in order to properly allege that a particular
defendant "conducted" the affairs of an enterprise in violation or RICO, the plaintiff
must allege that the particular defendant engaged in the predicate acts of racketeering
activity.  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 372 & n.69 (3d Cir.
2010).  It is not enough, therefore, that Plaintiffs have pleaded: "[DeNaples] …
participate in the conduct of the Enterprise's affairs by operating the Center through
the use of labor performed by prisoners, including Debtors."  Doc. 77 at ¶ 191.
Absent an allegation that DeNaples engaged in the alleged predicate acts of
racketeering activity (here, the alleged conditioning of access to work-release on
first laboring at the center), the claim fails.  At no point have Plaintiffs properly
alleged (inadequate group-pleadings set aside), that DeNaples played any role in
creating, or implementing, the hurdle to work release upon which their RICO claim
is based.

11

## VI.    DeNaples Was Not Unjustly Enriched.

Plaintiffs' response does not at all address DeNaples' argument that "[w]hen benefits are improperly conferred upon a corporate entity, its officers are typically liable only if it can be shown that the officer in question actually participated in the misconduct."  Doc. 104 at 14, quoting *USTAAD Systems, Inc. v. iCAP International Corp.*, 2010 U.S. Dist. LEXIS 71607, at *15 (M.D. Pa. July 6, 2010).  There are no facts alleged that would support an allegation or inference that DeNaples participated in the alleged misconduct that resulted in the purported "unjust" enrichment.  *Id*.  The facts supporting the other essential elements of this claim are, likewise, not pleaded as to DeNaples.  *Id*. at 14-15.

Moreover, as a matter of law, DeNaples cannot be unjustly enriched because, as explained in Plaintiffs' response, they allegedly worked at the Center pursuant to an implied-in-fact contract with Defendants.  Doc. 115 at 36.[4]  "A contract implied

---

[4]    Count V of Plaintiffs' complaint, which asserts a claim under the Pennsylvania Wage Payment and Collection Claw ("WPCL"), is not brought against DeNaples, yet Plaintiffs assert, in connection with that claim, that they had an implied contract with Defendants.  Doc. 115 at 36-37.  There are no allegations from which it can be inferred that DeNaples set the wage, paid the wage, had any ability to control how the wage was paid to Plaintiffs, or had access to, or ability to make deposits into, Plaintiffs' prison commissary accounts.  Absent such allegations, it cannot be inferred that that there was an implied contract between Plaintiffs and DeNaples.  *See Grabowski v. Dietz & Watson, Inc.*, 2017 U.S. Dist. LEXIS 159517, at *5, *8 (E.D. Pa. Sept. 27, 2017).  This does not mean, however, that Plaintiffs have not pled facts sufficient to support a finding of a contract governing their labor entered into between Plaintiffs and others.

in fact is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from acts in the light of the surrounding circumstances." *Elias v. Elias*, 237 A.2d 215, 217 (Pa. 1968). Plaintiffs' assertion, therefore, of an implied contract in connection with their WPCL claim (Count V) precludes their claim for unjust enrichment (Count VII). *See Sköld v. Galderma Labs.*, L.P., 99 F. Supp. 3d 585, 599 (E.D. Pa. 2015) (unjust enrichment is a quasi-contractual doctrine; if a valid contract exists, then there is no claim for unjust enrichment).

Even if Count V and Count VII were pleaded in the alternative, Count VII still fails as to DeNaples for still another reason. Under Pennsylvania law, a third party, like DeNaples, that benefits from a contract between two other parties, Plaintiffs and the Authority/County who set Plaintiffs pay at $5/day for work at the Center, is not unjustly enriched unless the third party requested the benefit or misled the plaintiff into performing the contract. *See Irecyclenow.com v. Starr Indem. & Liab. Co.*, 674 Fed. Appx. 161, 163 (3d Cir. 2017) (applying Pennsylvania law). Plaintiffs complaint contains not a word alleging that DeNaples requested a benefit from Plaintiffs or misled them in any way. Plaintiffs' claim for unjust enrichment should, therefore, be dismissed.

Respectfully submitted,

May 14, 2020                    s/Christopher R. Nestor
                               David R. Overstreet
                               PA 68950
                               OVERSTREET & NESTOR, LLC
                               461 Cochran Road, Box 237
                               Pittsburgh, PA 15228
                               (717) 645-1861
                               david.overstreet@palawgroup.com

Jeffrey Belardi                Christopher R. Nestor
PA 71826                       PA 82400
BELARDI LAW OFFICES            OVERSTREET & NESTOR, LLC
The TekRidge Center            1425 Crooked Hill Road #62066
50 Alberigi Drive, Suite 114   Harrisburg, PA 17106-2066
Jessup, PA 18434               (717) 350-5939
(570) 342-4555                 christopher.nestor@palawgroup.com
jeff@belardilaw.com

*Attorneys for Defendants Lackawanna Recycling Center, Inc., Louis DeNaples and Dominick DeNaples*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on May 14, 2020, I filed the foregoing REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS with the Court's ECF system such that counsel of record for all parties should receive service automatically.

s/Christopher R. Nestor
Christopher R. Nestor

No *Shepard's* Signal™
As of: May 8, 2020 7:38 PM Z

# *A.B. v. Marriott Int'l, Inc.*

United States District Court for the Eastern District of Pennsylvania

April 22, 2020, Decided; April 22, 2020, Filed

CIVIL ACTION NO. 19-5770

**Reporter**
2020 U.S. Dist. LEXIS 70644 *

A.B. v. MARRIOTT INTERNATIONAL, INC.

## Core Terms

trafficking, hotels, sex, venture, alleges, knowingly, argues, district court, benefits, Airport, rooms, motion to dismiss, cases, civil remedy, staff, facilitating, fails, amended complaint, alleged facts, franchisee, pleads, apparent agency, civil liability, participated, servitude, advertises, sexual, discovery, marketed, harbor

**Counsel:** **[*1]** For A.B., AN INDIVIDUAL, Plaintiff: JERRY KRISTAL, LEAD ATTORNEY, WEITZ & LUXENBERG, CHERRY HILL, NJ.

For MARRIOTT INTERNATIONAL, INC., Defendant: MICHAEL P. O'DAY, LEAD ATTORNEY, DLA PIPER LLP, BALTIMORE, MD; COURTNEY G. SALESKI, DLA PIPER LLP, PHILADELPHIA, PA; ELLEN E. DEW, MICHAEL BAKHAMA, DLA PIPER LLP US, BALTIMORE, MD.

**Judges:** KEARNEY, J.

**Opinion by:** KEARNEY

## Opinion

**MEMORANDUM**

**KEARNEY, J.**

**April 22, 2020**

Approximately twelve years ago, Congress added language to its prohibition on sex trafficking law allowing victims to seek a monetary remedy from a person or legitimate business which knowingly benefitted, financially or by receiving anything of value, from participating in a venture which it knew or should have known engaged in sex trafficking. In the last several months, sex trafficking victims have filed over twenty cases around the country against hotels. We today address A.B.'s claims against Marriott International arising from trafficking of her at three Philadelphia airport hotels from 2009 to 2011. She sues under both the federal law and Pennsylvania's human trafficking statute which requires knowledge. Marriott is the franchisor; it does not own these three hotels. It now moves to dismiss arguing the sex **[*2]** trafficking laws cannot, as a matter of law, apply to it. We agree A.B. does not plead facts after two attempts allowing us to reasonably infer Marriott knew of sex trafficking victimizing her. But A.B. sufficiently pleads specific facts from which we can reasonably infer Marriott, under an actual agency theory subject to discovery, knowingly benefitted from participating in a venture which it should have known engaged in her trafficking. This is all Congress requires a victim to plead. But she does not timely plead her Pennsylvania claim, nor does she plead facts allowing us to infer Marriott's knowledge under Pennsylvania's human trafficking statute. We proceed to discovery on Marriott's potential liability if a jury finds it should have known of the sex trafficking in the three airport hotels.

**I. Alleged Facts**

In 2009, eighteen year old A.B. met a sex trafficker online who convinced her to travel from her home in Florida to New York under the guise of a romantic relationship.[1] After arriving in New York, A.B. alleges her trafficker beat and raped her, and forced her into commercial sex trafficking in New York for approximately three to four weeks when another trafficker "bought" her. **[*3]** [2] From 2009 to 2011, the second trafficker forced A.B. into commercial sex acts for days at a time at Marriott International owned hotels at the Philadelphia Airport: the Fairfield Inn by Marriott — Philadelphia Airport; Renaissance Philadelphia Airport Hotel; and Four Points by Sheraton Philadelphia Airport.[3] A.B.'s trafficker forced her to sexually service paying strangers in the form of "in call[s]" and "out call[s]" at Marriott's Philadelphia Airport hotels.[4]

Between 2009 and 2011, her traffickers forced her into "in calls" at the three Marriott owned Philadelphia Airport hotels by as many as six men an evening.[5] Each man entered and exited rooms at the three Philadelphia Airport hotels, and a "constant stream of male visitors" went to her room "straight from the main lobby and front doors so that the foot traffic was both voluminous and obvious."[6] Her traffickers frequently paid for rooms at all three hotels for at least a week at a time with a prepaid credit card and hotel staff were aware of A.B.'s presence there.[7] A.B.'s traffickers brought her to each

hotel with little, if any, luggage and she did not have a phone, wallet, or any form of identification.[8] The hotel **[*4]** rooms where she performed commercial sex acts "were littered with multiple broken objects, used condoms, and other sex paraphernalia left behind in the rooms."[9] The staff at each of the three hotels saw signs of her visible injury and were aware of frequent "loud altercations" as well as "constant" attacks on her by her trafficker loud enough for staff and hotel patrons to hear.[10]

Her trafficker continued to force her into commercial sex for five years.[11] A.B. avers Marriott through hotel video surveillance and complaints regarding "suspicious activity" had actual or constructive notice of drug dealing, prostitution, "and/or general safety concerns at its hotels."[12] If Marriott paid attention to these activities at its hotels, including the "red flags" surrounding A.B.'s trafficking, she believes "it would have been impossible for them not to notice [her] victimization."[13]

### The hospitality industry's participation in sex trafficking.

The hospitality industry generally knows of its role in securing the private rooms for the sex trafficking industry in exchange for room rentals.[14] The Polaris Project, a national organization combating sex trafficking, issued reports beginning **[*5]** in 2015 regarding the role of hotels and motels in sex trafficking.[15] Marriott executives, directors, and

---

[1] ECF Doc. No. 21 at ¶¶ 5-6, 81. We granted in part A.B.'s Motion for a protective order to proceed anonymously conditioned upon filing the Complaint under seal identifying her full correct name as well as the identity of a witness whose true name is altered in the original Complaint; service of our Order and sealed Complaint upon Marriott International; and the parties' discussion of possible multi-district litigation. *See* ECF Doc. No. 3. We ordered Marriott International shall not disclose or publish information identified solely in the sealed Complaint absent further order. *Id.*

[2] *Id.* at ¶¶ 81-83.

[3] *Id.* at ¶¶ 86-87, 93, 99.

[4] *Id.* at ¶¶ 34-36. A.B. alleges traffickers use hotels as the hub of operations where victims are harbored and forced into service for buyers who come to the hotel to purchase sex, referred to as an "in call." *Id.* Traffickers also deliver victims to hotel rooms rented by buyers for sexual services, referred to as an "out call." *Id.*

[5] *Id.* at ¶¶ 87, 93, 99.

[6] *Id.*

---

[7] *Id.* at ¶¶ 88, 94, 99.

[8] *Id.* at ¶¶ 89, 95, 101.

[9] *Id.* at ¶¶ 90, 96, 102.

[10] *Id.* at ¶¶ 91-92, 97-98, 103-104.

[11] *Id.* at ¶ 105.

[12] *Id.* at ¶ 106.

[13] *Id.* at ¶¶ 106-107.

[14] *Id.* at ¶¶ 24-61.

[15] *Id.* at ¶ 24 n.4. The Polaris Project is a non-profit organization committed to confronting and ending sex and labor trafficking in North American and operates the United States National Human Trafficking Hotline. *See* Polaris Project: About Us, polarisproject.org/about-us (last visited Apr. 13, 2020).

2020 U.S. Dist. LEXIS 70644, *5

managers received and reviewed Polaris Project reports.[16] From 2009 to 2014, Marriott executives, directors, and managers also reviewed other information from publicly available sources regarding sex trafficking in hotels and met to discuss sex trafficking in their hotels.[17]

Marriott "permitted anonymity to the buyers and non-traceability, making them ideal venues for sex traffickers to sell [A.B.] for sex."[18] A.B. asserts Marriott knew or should have known such anonymity "made their hotels ideal venues" for sex trafficking and knew or should have known hotels are "the top-reported venue where sex trafficking acts occur."[19]

A.B. specifically pleads Marriott knew or should have known sex trafficking in their Philadelphia Airport hotels between 2009 and 2014, including the practices of "in calls" and "out calls" and failed to adopt and enforce anti-trafficking policies from the corporate level to the "property level," failed to train staff on how to detect and respond to sex trafficking, failed to establish safe and secure reporting mechanisms at local hotels, and failed to [*6] take measures to prevent sex trafficking at its hotels to conceal sex trafficking occurring at its hotels.[20] Despite its knowledge of sex trafficking in its hotels, Marriott did nothing to stop it, and, when Marriott eventually began to adopt policies to combat sex trafficking, "it did so in appearance only."[21]

### Marriott's control over the three Airport hotels.

Marriott sells its brand name and marketing power to third-party owners for use for building and operations run by a franchisee or third-party management company under Marriott's control.[22] The three Philadelphia Airport

---

[16] ECF Doc. No. 21 at ¶ 25.

[17] Id. at ¶¶ 26-28.

[18] Id. at ¶ 30.

[19] Id. at ¶¶ 29-32.

[20] Id. at ¶¶ 39-42.

[21] Id. at ¶¶ 59-60.

[22] Id. at ¶ 62. In response to Marriott's motion to dismiss, A.B. argues Marriott exercises day-today today control over its franchisees through franchise agreements. A.B. cites a link to a Securities and Exchange Commission filing which, if followed, links to a 2006 Courtyard by Marriott Relicensing

---

hotels where traffickers housed A.B. pay approximately ten percent of their total revenue to Marriott.[23] Each franchisee owner is contractually required to develop and maintain the property in accordance with Marriott's brand standards required by the franchise agreement.[24] Marriott may enforce its standards through periodic inspection, and even termination of the agreement if its hotels are found to be inadequate.[25]

### Marriott's actual and/or apparent agency relationship with its Philadelphia Airport hotels and willful blindness of sex trafficking at their hotels.

A.B. alleges Marriott has or had an agency relationship [*7] with each of the three Philadelphia Airport hotels created by Marriott's "exercise of an ongoing and systematic right of control" over the three hotels including: hosting online bookings on Marriott's domain; requiring the three hotels to use Marriott's customer rewards program; setting employee wages; making employment decisions and advertising for employment; sharing profits; standardizing employee training; building and maintaining the facility as specified by Marriott; standardized rules of operation; regulation site inspections; fixing pricings, and other actions depriving the three hotels from any independence in their business operations.[26] A.B. alleges an actual and/or apparent agency exists between Marriott and the three hotels because Marriott holds out the three hotels as possessing authority to act on its behalf.[27]

A.B. alleges Marriott knew or should have known its three Philadelphia Airport hotels were in areas known for high incidences of crime and prone to sex trafficking during the time of A.B.'s victimization.[28] Despite having actual or constructive knowledge of sex trafficking at their hotels, A.B. alleges Marriott repeatedly failed to

---

Franchise Agreement between Marriott International, Inc. and Apple Seven Services, L.P. in Brownsville, Texas. A.B. does not explain how this franchise agreement has anything to do with her alleged trafficking.

[23] Id. at ¶ 65.

[24] Id.

[25] Id. at ¶¶ 66-68.

[26] Id. at ¶¶ 70, 76.

[27] Id. at ¶ 77.

[28] Id. at ¶ 73.

thwart this activity and its **[\*8]** apathy to the risk of sex trafficking and willful blindness to the role its hotels play in sex trafficking facilitated A.B.'s trafficking at its three Philadelphia Airport hotels.[29]

A.B. alleges Marriott "breached its duties" by failing, altogether or adequately, to "distribute information to assist employees in identifying human trafficking;" "provide a process for escalating human trafficking concerns within the organization;" require "managers, employees, or owners attend training relating to human trafficking;" "provide new hire orientation on human rights and corporate responsibility;" "provide training and education on human trafficking through webinars, seminars, conferences, and online portals;" "develop and hold or require ongoing training sessions on human trafficking;" and/or "provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention."[30] A.B. alleges Marriott should have known about sex trafficking in its Philadelphia Airport hotels because of six incidents of trafficking in 2012 through 2018 in Marriott International owned hotels in California, Kansas, Massachusetts, **[\*9]** and Texas.[31]

### *Marriott facilitated A.B.'s trafficking.*

A.B. alleges Marriott profited from A.B.'s sex trafficking and knowingly or negligently aided and engaged her trafficker in his venture by leasing rooms to her trafficker when it knew, or should have known, the rooms were being used for sexual servitude.[32] A.B. alleges Marriott knew or should have known about A.B.'s trafficking because of the trafficker's frequent use of the hotels; constant traffic in the hotels; the trafficker's assistance in checking-in A.B. but not proceeding to the room; and A.B.'s appearance without luggage, her avoidance of eye contact, and prominent bruising and injury on her body.[33] A.B. alleges despite these signs of sex trafficking, Marriott failed to act and instead financially benefitted from the business brought by traffickers to its hotels.[34]

### *A.B. sued Marriott on December 9, 2019 while the Judicial Panel on Multidistrict Litigation considered centralizing similar litigation.*

On December 9, 2019, A.B. sued Marriott for physical and psychological injuries resulting from sex trafficking and exploitation under *section 1595 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008* providing **[\*10]** victims of sex trafficking with a civil remedy for damages against their traffickers and "whoever" knowingly benefits from participation in a venture the person knew or should have known engaged in sex trafficking.[35] She also alleged Marriott's knowing conduct violated Pennsylvania's human trafficking statute, *18 Pa. Cons. Stat. § 3051*.[36] The same day, plaintiffs in six similar actions moved before the United States Judicial Panel on Multidistrict Litigation in *In re: Hotel Industry Sex Trafficking Litigation* to centralize a proposed multidistrict litigation in the United States District Court for the Southern District of Ohio.[37] Plaintiffs sought to centralize twenty-one actions pending in twelve district courts, including A.B.'s action in this District. Of the twenty actions in addition to this case, six are in the United States District Court for the Southern District of Ohio and five in the United States District Court for the Northern District of Georgia, with the remaining cases in the United States District Courts for the District of

---

[29] *Id.* at ¶¶ 74, 78-79.

[30] *Id.* at ¶ 78.

[31] *Id.* at ¶ 79. If A.B.'s trafficking occurred at Philadelphia Airport hotels from 2009 to 2011, it is unclear how instances of trafficking in other hotels from 2012 to 2018 put Marriott on notice.

[32] *Id.* at ¶ 108.

[33] *Id.* at ¶¶ 109-112.

[34] *Id.* at ¶¶ 112-120.

[35] *William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1595* (the "Act").

[36] ECF Doc. No. 1.

[37] MDL 2928, ECF Doc. No. 1. The law firm representing A.B. filed the motion to centralize the proposed multidistrict litigation. The same firm, in addition to representing A.B., represents plaintiffs making similar claims against hotels under the Act in the Northeast and Mid-Atlantic: *Doe C.D. v. R-Roof Asset, LLC*, No. 19-11192 (D. Mass.); *V.G. v. G6 Hospitality, LLC*, No. 19-6071 (N.D.N.Y.); *H.G. v. Marriott International, Inc.*, No. 19-13622 (E.D. Mich.); *K.B. v. Inter-Continental Hotels Corp.*, No. 19-1213 (D.N.H.); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 19-1194 (S.D. Ohio); *A.D. v. Wyndham Hotels and Resorts, Inc.*, No. 19-120 (E.D. Va.).

Massachusetts, the Eastern District of Michigan, District of New Hampshire, Eastern District of New York, Northern District of New York, District of Oregon, Southern District **[*11]** of Texas, Eastern District of Virginia, and Western District of Washington.[38]

On February 5, 2020, the Panel denied centralization.[39] Marriott moved to dismiss A.B.'s complaint on February 20, 2020.[40] A.B. filed an amended complaint.[41] Marriott now moves to dismiss A.B.'s amended complaint.[42]

## II. Analysis [43]

A.B. seeks damages against Marriott under the Act's civil remedy provision. As analyzed below, Congress authorized a civil remedy for victims of sex trafficking under *section 1595* of the Act. A.B. also seeks damages under Pennsylvania's human trafficking statute. Marriott moves to dismiss both claims with prejudice.

To survive a *Rule 12(b)(6)* motion to dismiss, A.B. must plead "enough facts to state a claim to relief that is plausible on its face."[44] *Federal Rule of Civil Procedure 8(a)(2)* requires "a short and plain statement of the claim

showing that the pleader is entitled to relief" to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests."[45] A complaint making "[t]hreadbare recitals of the elements of a cause **[*12]** of action, supported by mere conclusory statements" is insufficient.[46]

Marriott moves to dismiss A.B.'s amended complaint arguing: (1) A.B. fails to state a claim under *section 1595* of the Act; (2) A.B. fails to allege facts to support Marriott's vicarious liability for the actions of the Philadelphia hotels where A.B. alleges trafficking occurred; (3) A.B.'s "shotgun" pleading fails to satisfy *Federal Rule of Civil Procedure 8(a)*; and (4) A.B.'s claim under the Pennsylvania statute fails, is untimely, and Marriott is exempt from liability as a matter of law.

A.B. argues she sufficiently and plausibly (1) states a claim under *section 1595* of the Act; (2) alleges Marriott's direct liability as a financial beneficiary of sex trafficking under the Act; (3) alleges Marriott's indirect liability for facilitating sex trafficking under an agency relationship with its franchisee hotels; and (4) states a claim under Pennsylvania's human trafficking statute.[47]

## A. Congress provides A.B. with a civil remedy against both traffickers and those facilitating trafficking.

Congress passed the Trafficking Victims Protection Act of 2000 "[t]o combat trafficking in persons, especially into the sex trade, slavery, and involuntary servitude, to reauthorize certain Federal **[*13]** programs to prevent violence against women, and for other purposes."[48] The legislation created criminal offenses for forced labor and

---

[38] MDL 2928 at ECF Doc. No. 235, Schedule A.

[39] *Id.* at ECF Doc. No. 1.

[40] ECF Doc. No. 15.

[41] ECF Doc. No. 21.

[42] ECF Doc. No. 25.

[43] When considering a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)* "[w]e accept as true all allegations in the plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and we construe them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018)* (quoting *Sheridan v. NGK Metals Corp., 609 F.3d 239, 262 n.27 (3d Cir. 2010)).* To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly, 550 U.S. at 556*). Our Court of Appeals requires us to apply a three-step analysis under a 12(b)(6) motion: (1) "it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim;'" (2) "it should identify allegations that, 'because they are no more

than conclusions, are not entitled to the assumption of truth;'" and, (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Connelly v. Lane Constr. Corp., 809 F.3d 780, 787 (3d Cir. 2016)* (quoting *Iqbal, 556 U.S. at 675, 679).*

[44] *Twombly, 550 U.S. at 570*.

[45] *Id.* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).*

[46] *Iqbal, 556 U.S. at 678*.

[47] ECF Doc. No. 26.

[48] ***Victims of Trafficking and Violence Protection Act of 2000, PL 106-386 (Division A), Oct. 28, 2000, 114 Stat 1464.***

sex trafficking.

In 2003, Congress passed the Trafficking Victims Protection Reauthorization Act of 2003.[49] Congress found since enactment of the 2000 legislation, the United States "made significant progress in investigating and prosecuting acts of trafficking and in responding to the needs of victims of trafficking in the United States and abroad [but] [o]n the other hand, victims of trafficking have faced unintended obstacles in the process of securing needed assistance ...."[50] Among other amendments, Congress created a civil right of action by victims of trafficking against their traffickers:

> (a) An individual who is a victim of a violation of *section 1589*, *1590*, or *1591* of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorney[']s fees....[51]

The 2003 version of the Act provided a civil remedy against the trafficker only. Congress expanded victims' remedies in 2008 when it passed the William Wilberforce Trafficking Victims Protection Reauthorization Act expanding **[*14]** civil liability to those who facilitate trafficking ventures. Congress amended *section 1595* by striking the words "of *section 1589*, *1590*, or *1591*"; inserting "(or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)" after "perpetrator"; and by adding a ten year statute of limitations.[52]

> (a) An individual who is a victim of a violation
>
> of *section 1589*, *1590*, or *1591* of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by

receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney[']s fees....[53]

In the 2008 legislation, Congress gave "victims a cause of action against those who have profited from their exploitation" and "creates a cause of action for victims of any violation of chapter 77[54] **against anyone who benefits from any such a violation**."[55] *Section 1595* "opened the door for liability against facilitators who did not directly traffic the victim, but **[*15]** benefitted from what the facilitator should have known was a trafficking venture."[56]

### 1. Elements of the civil remedy under *section 1595*.

A.B. alleges Marriott is liable to her under *section 1595* for knowingly benefitting from facilitating a venture it knew or should have known engaged in sex trafficking in violation of *section 1591(a)*.[57]

*Section 1591* of the Act imposes criminal liability for sex trafficking of children, or of any person by force, fraud, or coercion, to engage in a commercial sex act. *Section 1591(a)* provides: "[w]hoever knowingly - (1) in or affecting interstate or foreign commerce, ... recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of *paragraph (1)*, knowing, or, ... in reckless disregard of the fact, that means of force, threats of

---

[49] **Trafficking Victims Protection Reauthorization Act of 2003, PL 108-193, Dec. 19, 2003, 117 Stat 2875**.

[50] *Id.*

[51] *18 U.S.C. § 1595*. *Section 1589* imposes criminal liability for forced labor; *section 1590* for trafficking with respect to peonage, slavery, involuntary servitude, or forced labor; and *section 1591* for sex trafficking of children by force, fraud, or coercion. *Id.* *§§ 1589*, *1590*, *1591*.

[52] William Wilberforce **Trafficking Victims Protection Reauthorization Act of 2008, PL 110-457, Dec. 23, 2008, 122 Stat 5044**.

---

[53] *Id.* Language stricken from bill appears with strike through; language added appears in underline.

[54] Chapter 77 of Title 18 of the United States Code pertains to "Peonage, Slavery, and Trafficking in Persons."

[55] Charles Doyle, Cong. Research Serv., R40190, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (P.L.110-457): Criminal Law Provisions (2009) (emphasis added).

[56] Gallant Fish, *No Rest for the Wicked: Civil Liability Against Hotels in Cases of Sex Trafficking, 23 Buff. Hum. Rts. L. Rev. 119, 138 (2011)* (footnotes omitted).

[57] ECF Doc. No. 21 at ¶ 7.

force, fraud, coercion ..., or any combination of such means **[*16]** will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in *subsection (b)*."[58] As used in *section 1591*, the term "participation in a venture" means "knowingly assisting, supporting, or facilitating a violation of *subsection (a)(1)*."[59]

*Section 1595* provides a civil remedy to victims of sex trafficking: "An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person ***knew or should have known*** has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney[']s fees."[60] "The phrase 'knew or should have known,' echoes common language used in describing an objective standard of negligence."[61]

To state a claim under a *section 1595(a)* beneficiary theory, A.B. must allege facts beyond mere conclusions allowing us to plausibly infer Marriott (1) "knowingly benefit[ted] financially or by receiving anything of value"; (2) from participation in a venture; (3) it "knew **[*17]** or should have known has engaged in" sex trafficking under *section 1591*.[62]

Marriott argues A.B. fails to allege (1) it "knew or should have known" about A.B.'s sex trafficking; (2) "knowingly" benefitted from a sex trafficking venture; and (3) its "participation" in a sex trafficking "venture." It also argues A.B.'s lawyer relies on "cookie-cutter" allegations taken from pleadings of unrelated litigation and otherwise filed a "shotgun" pleading non-compliant with *Federal Rule of Civil Procedure 8(a)*.

Although Marriott argues A.B. failed to allege all three

elements of a *section 1595(a)* claim, the heart of its argument is it did not knowingly participate in a sex trafficking venture. Applying the criminal standard from *section 1591*, Marriott argues the dispositive question is whether it made an "overt act of participation in the sex trafficking." It argues there is no allegation Marriott committed an overt act in furtherance of a sex trafficking venture and A.B. does not, and cannot in good faith, allege Marriott shared a common purpose with her traffickers. Marriott argues A.B.'s construction of *section 1595* turns the Act on its head by "creating liability for any business which fails to affirmatively prevent sex trafficking by third party criminals, instead of applying **[*18]** the actual words of the statute, which impose liability on those who knowingly participate in a trafficking venture with such criminals."[63]

Although A.B.'s amended complaint is not a model of clarity, we do not view it as an attempt to create a new theory of liability on a business failing to affirmatively prevent sex trafficking. We disagree with A.B. to the extent she seeks us to find Congress imposed duties upon businesses to affirmatively prevent sex trafficking on their hotel properties as businesses who financially benefit from trafficking through room rentals. We do not read the Act as requiring hotels (and other businesses or professions possibly earning money from trafficking) to affirmatively stop the trafficking. We construe the Act under its terms as imposing liability should a jury find the business benefitted from participating in a venture it knew or should have known engaged in trafficking. Given their physical proximity as the venue for the trafficking, hotels uniquely may have more knowledge than car rental or airplane businesses, or even lawyers or accountants, who may be paid from the trafficking proceeds. Rather than reading her claims as seeking to impose a duty **[*19]** to prevent trafficking, we read A.B.'s amended complaint as seeking the civil remedy Congress gave victims of sex trafficking against "whoever knowingly benefits" from participation in a venture the person "knew or should have known engaged" in a violation of the Act. And although A.B. broadly alleges sex trafficking in the hotel industry in general, and instances of trafficking in other hotels having nothing to do with her, A.B.'s allegations at paragraphs 80-107 are more than sufficient to meet the requirements of *Rule 12(b)(6)* and Rule (8).

**2. Split in district courts addressing *section 1595***

---

[58] *18 U.S.C. § 1591(a)*.

[59] *18 U.S.C. § 1591(e)(4)*.

[60] *18 U.S.C. § 1595(a)* (emphasis added).

[61] *M.A. v. Wyndham Hotels & Resorts, Inc., No. 19-849, 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297 (S.D. Ohio Oct. 7, 2019)).*

[62] *2019 U.S. Dist. LEXIS 173675, [WL] at * 3.*

[63] ECF Doc. No. 27.

2020 U.S. Dist. LEXIS 70644, *19

**civil remedy**.

The parties do not provide us with, and we cannot find, a case from our Court of Appeals or a district court within this Circuit addressing the Act. Of the twenty-one cases submitted to the Judicial Panel for Multidistrict Litigation, three cases from the United States District Court for the Southern District of Ohio, and one case from the United States District Court for the Western District of Washington denied motions to dismiss by the hotel defendants[64] and four cases from the United States District Court for the Northern District of Georgia granted motions to dismiss without prejudice by the hotel defendants. **[*20]** [65] In the remaining cases, the defendant hotels either answered or motions to dismiss are pending.[66]

We see the disconnect here arising from two schools of thought thus far in _section 1595_ cases involving hotel liability; one adopted by the United States District Court

---

[64] See _Doe S.W. v. Lorain-Elyria Motel, Inc., No. 19-1194, 2020 U.S. Dist. LEXIS 44961, 2020 WL 1244192 (S.D. Ohio, Mar. 16, 2020)_; _H.H. v. G6 Hospitality, LLC, No. 19-755, 2019 U.S. Dist. LEXIS 211090, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019)_; _M.A., 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297_; see also M.L. v. Craigslist, Inc._, No. 19-6153 (W.D. Wash.) (report and recommendation from magistrate judge recommending denial of Wyndham's motion to dismiss).

[65] See _Doe 1 v. Red Roof Inns, Inc., No. 19-3840, 2020 U.S. Dist. LEXIS 67139, 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020)_; _Doe 2 v. Red Roof Inns, Inc., No. 19-3841, 2020 U.S. Dist. LEXIS 67140, 2020 WL 1872337 (N.D. Ga. Apr. 13, 2020)_; _Doe 3 v. Red Roof Inns, Inc., No. 19-3843, 2020 U.S. Dist. LEXIS 67141, 2020 WL 1872333 (N.D. Ga. Apr. 13, 2020)_; and _Doe 4 v. Red Roof Inns, Inc., No. 19-3845, 2020 U.S. Dist. LEXIS 67142, 2020 WL 1872336 (N.D. Ga. Apr. 13, 2020)_.

[66] Motions to dismiss pending: _H.M. v. Red Lion Hotels Corp._, No. 19-4859 (N.D. Ga.); _H.G. v. Marriott International, Inc._, No. 19-13622 (E.D. Mich.); _K.B. v. Inter-Continental Hotels Corp._, No. 19-1213 (D.N.H.); _S.J. Choice Hotels Corp._, No. 19-6071 (E.D.N.Y. - motion to dismiss expected May 1, 2020); _A.C. v. Red Roof Inns, Inc._, No. 19-4965 (S.D. Ohio); _C.T. v. Red Roof Inns, Inc._, No. 19-5384 (S.D. Ohio); _B. v. Hilton Worldwide Holdings, Inc._, No. 19-1992 (D. Ore.); _A.D. v. Wyndham Hotels and Resorts, Inc._, No. 19-120 (E.D. Va.). Motion to dismiss denied without opinion with plaintiff voluntarily dismissing hotel: _L.W. v. Hilton Worldwide Holdings, Inc._, No. 19-4171 (S.D. Tex.). Answer, no motion to dismiss: _Doe C.D. v. R-Roof Asset, LLC_, No. 19-11192 (D.Mass.); _V.G. v. G6 Hospitality, LLC_, No. 19-6071 (N.D.N.Y.).

for the Southern District of Ohio and the United States District Court for the Western District of Washington, and the other by the United States District Court for the Northern District of Georgia. A.B. relies on the cases from the Southern District of Ohio. Marriott relies on cases from the Northern District of Georgia. It argues, inaccurately we think, the cases from the Southern District of Ohio are "outliers" and "contrary to the weight of authority." Given the limited number of opinions to date, we cannot consider either theory to **[*21]** be an "outlier" or the majority view. After extensive analysis below, we disagree with Marriott's analysis. Like the United States District Court for the Southern District of Ohio, we interpret _section 1595_ as distinct from _section 1591_'s criminal liability.

**_Cases from the United States District Courts for the Southern District of Ohio and the Western District of Washington_**.

The Honorable Algenon L. Marbley, United States District Court for the Southern District of Ohio, addressed claims against corporate franchisor hotels under _section 1595_ with allegations like A.B.[67] In all three actions, plaintiff victims of sex trafficking sued defendant hotels under _section 1595_. Judge Marbley denied the defendant hotels' motions to dismiss.

We examine one case, _M.A. v. Wyndham Hotels & Resorts, Inc._, as an exemplar of Judge Marbley's reasoning. In _M.A._, plaintiff alleged victimization from sex trafficking at Days Inn by Wyndham, Comfort Inn, and Crowne Plaza locations in Columbus, Ohio. Like A.B., plaintiff M.A. alleged hotel defendants knew or should have known of her trafficking on their properties pointing to signs of trafficking including her trafficker asked for rooms near exits; rooms in which her trafficking occurred contained used **[*22]** condoms and other paraphernalia; rooms were paid for in cash; her physical deterioration such as bruising hotel staff observed or should have observed; no eye contact; long stays in the hotel; and cries for help ignored by hotel

---

[67] See _Doe S.W., 2020 U.S. Dist. LEXIS 44961, 2020 WL 1244192, at *6_; _H.H., 2019 U.S. Dist. LEXIS 211090, 2019 WL 6682152, at *3_; _M.A., 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297 at *6_. There are six civil sex trafficking cases brought against hotels pending before Judge Marbley, the most of any of other federal district court addressed in the Judicial Panel's consideration of a multidistrict litigation.

staff.[68]

The hotel defendants moved to dismiss the *section 1595* claim arguing M.A. failed to plead (1) a knowing benefit; (2) knew or should have known of a trafficking venture; and (3) participation in a venture. On the first element, hotel defendants argued receiving revenue from renting hotel rooms is not a benefit. Judge Marbley denied the objection, concluding M.A.'s allegation hotel defendants rented rooms to the trafficker is a financial benefit from a relationship with the trafficker sufficient to meet *section 1595(a)*.[69]

Moving to the "knew or should have known" of a sex trafficking venture element, Judge Marbley provided an instructive example of two ends of the spectrum for pleading civil liability based on a sex trafficking venture. On one end is *Riccio v. McLean* [70] where plaintiff alleged a sex trafficker worked with a hotel owner intending to profit from the venture, including allegations the hotel owner and sex trafficker "high-fived" each other in anticipation of the **[*23]** venture and the hotel owner witnessed plaintiff's abuse at the hands of her trafficker.[71] On the other end of the spectrum is *Lawson v. Rubin* [72] where plaintiff sued an owner who leased its condominium to defendant who procured women, including plaintiff, and sexually assaulted and abused them. Plaintiff alleged one visit by the police department and one visit by an ambulance to the condominium unit in over six years should have put the owner on notice of illegal activity. Judge Marbley found these two visits insufficient to plausibly infer knowledge or negligence necessary to state a claim for liability under *section 1595* of the Act.[73]

Judge Marbley found M.A.'s allegations somewhere in between these two ends.[74] He found the alleged sex

_____

[68] *M.A., 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297, at *1.* Judge Marbley's other two decisions; *H.H.* and *Doe S.W.* are substantially similar and apply the same analysis.

[69] *2019 U.S. Dist. LEXIS 173675, [WL] at *3.*

[70] *853 F.3d 553 (1st Cir. 2017).*

[71] *M.A., 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297, at *4.*

[72] *No. 17-6404, 2018 U.S. Dist. LEXIS 71582, 2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018).*

[73] *2019 U.S. Dist. LEXIS 173675, [WL] at *5.*

trafficking signs are insufficient to show actual knowledge but are sufficient to meet the "should have known" negligence standard.[75]

On the "participation in a venture" element, Judge Marbley rejected the hotel defendants' reliance, as Marriott does here, on *United States v. Afyare*, a 2016 criminal prosecution addressed by the United States Court of Appeals for the Sixth Circuit.[76] In *Afyare*, prosecutors charged defendants in an alleged sex trafficking ring including conspiracy **[*24]** to benefit financially from a venture to sex traffic minor victims under *section 1591(a)(2)*. The district court determined the word "venture" as used in *section 1591(a)(2)* means "sex trafficking venture," and the court excluded evidence of non-sex trafficking ventures and instructed the jury accordingly. The jury acquitted some defendants but convicted others on some charges. The district court then acquitted the convicted defendants because it found prosecutors charged a single conspiracy but presented evidence of multiple conspiracies causing prejudice to the defendants.[77] The United States appealed challenging, *inter alia*, the district court's holding a "venture" in *section 1591(a)(2)* means only a "sex trafficking venture" and not just any venture.

The Court of Appeals affirmed the district court. It found the term "venture" in the context of *section 1591(a)(2)* specifies "'a venture which has engaged in an act described in violation of *paragraph (1)*,' i.e., sex trafficking" and "most important[ly], ... requires the defendant's personal knowledge (or reckless disregard) that this venture (or someone within the venture) caused ... or used force, fraud, or coercion to cause an adult to engage in a commercial sex act. The defendant's mere membership in the venture is insufficient **[*25]** if he is ignorant of the venture's sex trafficking activities (and the means and methods thereof). That is, the government does not argue guilt by association, nor could it."[78] The court of appeals agreed with the district court's analysis *section 1591(a)(2)* requires "a

_____

[74] *2019 U.S. Dist. LEXIS 173675, [WL] at *5.*

[75] *2019 U.S. Dist. LEXIS 173675, [WL] at *6.*

[76] *632 F. App'x 272 (6th Cir. 2016).*

[77] *Id. at 274.*

[78] *Id. at 284-85.*

defendant actually participate and commit some 'overt act' that furthers the sex trafficking aspect of the venture" and the Act "did not criminalize a defendant's 'mere negative acquiescence,' and to do so would create 'a vehicle to ensnare conduct that the statute never contemplated.'"[79]

Judge Marbley declined to apply *Afyare* for two reasons: the language of the Act and principles of statutory construction. He first reasoned the language of *sections 1591* and *1595* differ; *section 1595* contains the "should have known" language while *section 1591* does not. *Section 1591(e)(4)* defines "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of *subsection (a)(1)*," and is limited in application only to "this section," meaning *section 1591*. *Section 1595* does not define "participation in a venture."[80] Judge Marbley concluded applying the definition of "participation in a venture" to the criminal liability in *section 1591(e)(4)* to the civil liability in *section 1595* voids the "should have known" language in the civil remedy and violates the **[*26]** "'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be construed so that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"[81]

Rejecting *Afyare*'s reasoning and concluding "participation" under *section 1595* does not require actual knowledge of participation in sex trafficking itself, Judge Marbley then considered whether M.A.'s complaint alleged "participation in a venture." He found allegations the hotel defendants "engag[ed] in acts and omissions that were intended to support, facilitate,

harbor, and otherwise further the trafficker's sale and victimization of the Plaintiff for commercial sexual exploitation" including repeated rental of rooms it knew or should have known to sex traffickers, sufficient to state a claim.[82] He found "[i]n the absence of a direct association, Plaintiff must allege at least a showing of a continuous business relationship between the trafficker and the hotels such that it would appear that the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement."[83]

Judge Marbley rejected the hotels' argument they **[*27]** cannot be held liable as a matter of law for the acts of their franchisee hotels, finding M.A. pleaded an agency relationship sufficient to hold the franchisor hotels liable under Ohio law.[84]

Magistrate Judge Theresa L. Fricke, United States District Court for the Western District of Washington, last week recommended the denial of the motion to dismiss by Wyndham Hotel & Resorts, Inc.[85] There, plaintiff M.L. brought a claim against Wyndham under *section 1595* alleging she is a victim of sex trafficking by her traffickers who harbored her at a Wyndham owned hotel in Kent, Washington. Plaintiff M.L. alleged at the age of sixteen and seventeen years old, traffickers held her at the hotel for over one year; advertised her services for commercial sex at the hotel; paid Wyndham and the limited liability corporation operating the local hotel for the rental of rooms; purchasers arrived at the hotel and waited in parking lots, common areas, and hallways of the hotel; hotel staff were aware of trafficking given the large number of men waiting to enter the room; the large number of condoms in trash cans and other paraphernalia; staff spoke to M.L. on more than one occasion and warned her to keep her activities **[*28]** more discrete; and police called the hotel to speak to staff regarding M.L. M.L. alleged Wyndham was aware of trafficking occurring at its hotels because it received complaints and concerns from the public and law enforcement.[86] Plaintiff alleged

---

[79] *Id. at 286*.

[80] *M.A., 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297, at *7*.

[81] *Id.* (quoting *TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S. Ct. 441, 151 L. Ed. 2d 339 (2001)*; *see also Gilbert v. United States Olympic Committee, 423 F. Supp. 3d 1112, 2019 U.S. Dist. LEXIS 166957 (D.Colo. 2019)* (cited by Judge Marbley). In *Gilbert*, female Olympic athletes sued the United States Olympic Committee and team coaches for forced labor and sex trafficking under, *inter alia*, *section 1589* (forced labor provision). The court found *Afyare* "unpersuasive" as applicable to *section 1591*, and *section 1589* "does not require a member of a venture to have committed overt acts in furtherance of obtaining forced labor or services in order for that member to be civilly liable to a plaintiff." *Id. at 1138, 2019 U.S. Dist. LEXIS 166957, *49*.

---

[82] *M.A., 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297, at *8-9*.

[83] *2019 U.S. Dist. LEXIS 173675, [WL] at *8*.

[84] *2019 U.S. Dist. LEXIS 173675, [WL] at *9-10*.

[85] *M.L. v. Craigslist, Inc.*, No. 19-6153 (W.D. Wash. Apr. 17, 2020), ECF Doc. No. 62, Report and Recommendation.

[86] *Id.* at 5-7.

Wyndham had an agency relationship with the local hotel.

Wyndham moved to dismiss arguing the complaint relies on "shotgun pleading" and fails to state a claim under *section 1595*. Magistrate Judge Fricke rejected both arguments. Examining the *section 1595* claim, Judge Fricke relied on Judge Marbley's opinions and, following his two ends of the spectrum example, found the plaintiff's complaint more like *Riccio v. McLean*.[87] Judge Fricke rejected Wyndham's reliance on *Afyare* and cases from the United States District Court for the Southern District of New York (described below).[88] Judge Fricke rejected those cases as relying on the criminal standard in *section 1591* which is not imposed in *section 1595*.

### Cases from the United States District Court for the Northern District of Georgia.

Decisions in the last few days from the United States District Court for the Northern District of Georgia, take a largely opposite view. In four cases brought by Jane Doe victims of sex trafficking [*29] against Red Roof Inns in the Atlanta area, the district court judge granted the hotel defendants' motions to dismiss claims under *section 1595*.[89]

The district court judge recognized the Jane Doe victims brought three claims under the Act against the franchisor/corporate affiliate hotels: a "standalone" claim under *section 1595(a)* and two claims on alleged criminal violations of *Sections 1591(a)(1)* and *1591(a)(2)*.[90] While recognizing a "standalone" claim under *section 1595*, the court identified the elements the

---

victim must allege under the Act: "Defendants participated in ventures that were engaged in sex trafficking and that they each had three separate types of knowledge with respect to that venture: (1) knowledge as to a benefit received from trafficking; (2) knowledge as to "assisting, supporting or facilitating" trafficking; and (3) knowledge that Plaintiff was either a minor or subject to force."[91] In doing so, the court imposed the definition of "participation in a venture" in *section 1591(e)(4)* and the standards of *section 1591(a)(2)* to claims brought under *section 1595*.

Finding "[a]ssociation alone cannot establish liability; instead, knowledge and 'some participation in the sex trafficking act itself must be shown," the court concluded plaintiffs failed to plead facts sufficient to [*30] plausibly allege defendant franchisor/corporate affiliate hotels knew or should have known of sex trafficking at local franchisee hotels.[92]

The district court judge in Atlanta in the Red Roof cases relied on *Nobel v. Weinstein* [93] from the United States District Court for the Southern District of New York involving claims against Harvey Weinstein and *Afyare*. In *Noble*, plaintiff sued Harvey Weinstein and his brother Robert Weinstein for sexual assault allegedly committed against her by Harvey Weinstein in 2014. Plaintiff brought a civil action under *section 1595* for violations of *section 1591*. Both Harvey and Robert Weinstein moved to dismiss the claims. The court denied Harvey Weinstein's motion, but granted Robert Weinstein's motion.

Marriott, like the judge in the Northern District of Georgia, relies exclusively on *Noble* which, in turn, relied on the criminal liability analysis applied in *Afyare*. We are interested here in the analysis employed by the court in *Noble* with respect to the alleged trafficker's brother, Robert Weinstein. Plaintiff alleged Robert Weinstein violated *section 1591(a)(2)* because he benefitted from, and knowingly facilitated, Harvey Weinstein's violation of *section 1591(a)*. Focusing on the "participation in a venture" [*31] element in *section 1591(a)(2)*—the criminal section—the court found Plaintiff must plead Robert Weinstein "(i) knowingly

---

[87] *Id.* at 11.

[88] *Id.* at 12-17.

[89] *See Doe 1 v. Red Roof Inns, Inc., No. 19-3840, 2020 U.S. Dist. LEXIS 67139,2020 U.S. Dist. LEXIS 67139, 2020 WL 1872335 (N.D. Ga. Apr. 13, 2020)*; *Doe 2 v. Red Roof Inns, Inc., No. 19-3841, 2020 U.S. Dist. LEXIS 67140, 2020 WL 1872337 (N.D. Ga. Apr. 13, 2020)*; *Doe 3 v. Red Roof Inns, Inc., No. 19-3843, 2020 U.S. Dist. LEXIS 67141, 2020 WL 1872333 (N.D. Ga. Apr. 13, 2020)*; and *Doe 4 v. Red Roof Inns, Inc., No. 19-3845, 2020 U.S. Dist. LEXIS 67142, 2020 WL 1872336 (N.D. Ga. Apr. 13, 2020)*.

[90] *Doe 1, 2020 U.S. Dist. LEXIS 67139, 2020 WL 1872335, at *3.*

---

[91] *Id.* (citing *18 U.S.C. §§ 1595(a)*, *1591(a)(2)*, *1591(e)(4)*).

[92] *Id.* (citing *Noble v. Weinstein, 335 F.Supp.3d 504, 524 (S.D.N.Y. 2018)*; *Afyare, 632 F.App'x at 286*).

[93] *Noble v. Weinstein, 335 F.Supp.3d 504 (S.D.N.Y. 2018)*.

benefitted, (ii) from participation in a commercial sex trafficking venture, (iii) while knowing (or in reckless disregard of the fact) that means of force, fraud or coercion would be used to cause the trafficked person to engage in a commercial sex act."[94] Relying on *Afyare*—which, again analyzed the participation element in a criminal prosecution—the court in *Noble* found liability "cannot be established by association alone [and] Plaintiff must allege specific conduct that furthered the sex trafficking venture. Such conduct must have been undertaken with the knowledge, or in reckless disregard of the fact, that it was furthering the alleged sex trafficking venture. In other words, some participation in the sex trafficking act itself must be shown."[95] The court in *Noble* found plaintiff must allege facts implicating Robert Weinstein as a participant in Harvey Weinstein's 2014 assault and "without participation, there can be no violation of *Section 1591(a)(2)*."[96]

Neither the court in *Noble* nor the court in Atlanta applied an "overt act" requirement advocated by Marriott here. This undercuts Marriott's argument **[*32]** it must have committed an "overt act" to have participated in a venture it knew or should have known engaged in sex trafficking.

The court in *Noble* and in the Red Roof cases in Atlanta both applied the "participation in a venture" element from the criminal offense defined by Congress in *section 1591(a)(2)*. The court in *Noble* did not address the "knew or should have known" language in the civil remedies defined in *section 1595*. Both the court in the Red Roof cases and the court in *Noble* essentially required the victim of sex trafficking seeking a civil remedy to first prove a criminal violation of *section 1591(a)(2)*. And this is where we diverge from the judges in the Northern District of Georgia in the Red Roof cases and the Southern District of New York in *Noble.*

**3. Congress allows potential liability for businesses who "should have known" of trafficking under *section 1595*'s civil remedy.**

We disagree with the reasoning in *Noble*, adopted by the judge in the Red Roof cases, requiring a victim seeking a civil remedy under *section 1595* must first prove the criminal offense. We do not read the language of *section 1595* to impose such a burden nor do we interpret the Act as Congress intended such a restrictive reading of the remedial nature of *section 1595.*

*Section 1595(a)*, by its terms, provides a civil **[*33]** remedy to a victim of, *inter alia*, sex trafficking. The victim may bring a civil action to recover damages and attorney's fees from (1) her trafficker or (2) "***whoever*** knowingly benefits ... from participation in a venture what that person ***knew or should have known*** has engaged in" a sex trafficking venture. The definition of "participation in a venture" by its terms applies only to the criminal offense in *section 1591(a)*. This requires "knowing" or "reckless disregard" of a sex trafficking venture. If we imputed this standard into *section 1595*—which does ***not*** define "participation in a venture"—we would ignore its "knew or should have known" language. *Section 1591*, in contrast, defines a criminal violation requires knowing conduct consistent with the Supreme Court's continued reminders (albeit in other contexts) of knowledge necessary for a criminal act.[97]

*Section 1595* allows for civil liability against facilitators who benefit from what they knew or should have known is a sex trafficking venture. As a remedial statute, we construe the Act liberally.[98] Where, as here, a statute is

---

[94] *Id. at 523-24* (quoting *Afyare, 632 F. App'x at 283*).

[95] *Id. at 524.*

[96] *Id.*

---

[97] The Supreme Court reminds us it is a rule of construction in criminal statutes "wrongdoing must be conscious to be criminal." *Elonis v. United States, 575 U.S. 723, 135 S.Ct. 2001, 2009, 192 L. Ed. 2d 1 (2015)* (quoting *Morissette v. United States, 342 U.S. 246, 252, 72 S. Ct. 240, 96 L. Ed. 288 (1952)).* "The 'central thought' is that a defendant must be 'blameworthy in mind' before he can be found guilty, a concept courts have expressed over time through various terms such as *mens rea*, scienter, malice aforethought, guilty knowledge, and the like." *Id.* (quoting *Morissette, at 252*; 1 W. LaFave, Substantive Criminal Law § 5.1, pp. 332-333 (2d ed. 2003)). "Although there are exceptions, the 'general rule' is that a guilty mind is 'a necessary element in the indictment and proof of every crime.'" *Id.* (quoting *United States v. Balint, 258 U.S. 250, 251, 42 S. Ct. 301, 66 L. Ed. 604, T.D. 3375 (1922))*. The Supreme Court generally "interpret[s] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Id.* (quoting *United States v. X—United States, 513 U.S. 64, 70, 115 S. Ct. 464, 130 L. Ed. 2d 372 (1994))*.

[98] *M.A., 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297 at*

"remedial," it "should be liberally construed." We cannot read out the language of _section 1595_ imposing civil liability against a person **[*34]** who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or **should have known** has engaged in an act in violation of this chapter." We will not impose a "knowingly" state of mind requirement to _section 1595_ and ignore language Congress specifically included allowing a civil action against facilitators who should have known about a sex trafficking venture.

## B. A.B. pleads a claim for a civil remedy under _section 1595_.

To state a claim under a _section 1595(a)_ beneficiary theory, A.B. must allege facts from which we can reasonably infer Marriott (1) "knowingly benefit[ted] financially or by receiving anything of value"; (2) from participation in a venture; (3) it "knew or should have known has engaged in" sex trafficking under _section 1591_.[99] Marriott argues A.B. failed to allege facts to support the three elements.

As to her trafficking specifically, A.B. alleges:

• Between 2009-2011, A.B.'s traffickers used Marriott's three Philadelphia Airport hotels to sell illegal sex acts;

• As many as six men an evening entered each of the three hotels as an "unannounced guest," creating a "voluminous and obvious" constant stream of male visitors to A.B.'s rooms accessed through the front **[*35]** door and main lobby of the hotels;

• A.B.'s trafficker repeatedly paid for rooms at each of the three hotels for at least a week at a time with prepaid credit cards and hotel staff were aware of A.B.;

• When A.B.'s trafficker brought her to the hotels, she presented with little, if any, luggage, no phone, wallet, or identification, and when checking A.B. into the hotel, he would not proceed to the room;

• Rooms rented for trafficking were littered with multiple broken objects, used condoms, and other

sex paraphernalia which would have been noticed by staff;

• Staff at all three hotels observed A.B. with signs of visible injury on more than one occasion, frequent loud altercations, and attacks on A.B. by her trafficker were constant and loud enough for hotel patrons and staff to hear.[100]

A.B. sufficiently alleges the elements of a claim under _section 1595_ against Marriott's franchisee Philadelphia Airport hotels. In the next section we determine whether the franchisee hotels' constructive knowledge is plausibly imputed to Marriott based on an agency theory.

### _Knowingly benefits financially_.

To satisfy the first element, A.B. must plausibly allege the Marriott "knowingly benefit[ted] financially or by receiving **[*36]** anything of value" from the trafficking venture. Marriott concedes A.B. alleges Marriott knowingly benefitted from the trafficking venture through payments made by the trafficker for rooms in the three Philadelphia Airport hotels but argues this is a "conclusory label." Marriott argues there are no facts from which Marriott, as an admitted franchisor receiving a royalty from the overall revenues of a franchised hotel, "had any reason to suspect that the rooms were used to commit sex trafficking crimes ...."[101] Marriott contends the collection of rent "by an unrelated hotel manager from guests in the ordinary course of business cannot support a reasonable inference that a franchisor such as Marriott ... 'knowingly' benefited from crimes committed in those rooms."

Marriott cites _Canosa v. Ziff_, a case from the United States District Court for the Southern District of New York and which relies on _Noble_.[102] We disagree _Canosa_ supports Marriott's argument. In _Canosa_, the plaintiff sued Harvey Weinstein, his brother Robert Weinstein, and companies run by the Weinsteins for damages under the Act. Robert Weinstein and the Weinstein companies moved to dismiss the _section 1595_ claims arguing they did not participate **[*37]** in

---

_*7_ (quoting _Peyton v. Rowe, 391 U.S. 54, 65, 88 S. Ct. 1549, 20 L. Ed. 2d 426 (1968)_) (citing _Noble, 335 F.Supp.3d at 515_).

[99] _Doe S.W., 2020 U.S. Dist. LEXIS 44961, 2020 WL 1244192, at *5_; _H.H, 2019 U.S. Dist. LEXIS 211090, 2019 WL 6682152, at *2_; _M.A., 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297, at * 3_.

[100] ECF Doc. No. 21 at ¶¶ 80-107, 110, 112.

[101] ECF Doc. No. 25-1 at 9.

[102] _Canosa v. Ziff, No. 18-4115, 2019 U.S. Dist. LEXIS 13263, 2019 WL 498865 (S.D.N.Y. Jan. 28, 2019)_.

and knowingly benefit from a sex trafficking venture.[103]

The court rejected the Weinstein companies' argument. With respect to the knowingly benefitted element, the court found plaintiff alleged "by facilitating and covering up [Harvey] Weinstein's sexual assaults, [Weinstein companies] made Weinstein more likely to continue to work for [Weinstein companies]. While the facts developed in discovery may or may not substantiate this allegation, the [amended complaint] adequately pleads a symbiotic relationship between the [Weinstein companies] and [Harvey] Weinstein, in which the companies affirmatively enabled and concealed [Harvey] Weinstein's predations as a means of keeping him happy, productive, and employable which led the companies to achieve fame and reap financial benefits. ... The [Weinstein companies'] claim that there is no causal link between their acts and practices and [Harvey] Weinstein's sexual abuse of women, including [Plaintiff], is thus unpersuasive."[104]

A.B. alleged during the years of her trafficking at the three Marriott hotels (2009-2011), her trafficker rented rooms for weeks at a time, paid with a prepaid credit card, checked her in with little personal belongings, **[\*38]** a steady stream of male visitors entered the hotel through the front doors and main lobby, and the rooms bore signs of illicit sexual activity.[105] A.B. alleges Marriott knew or should have known of these "red flags" but nevertheless continued to rent rooms to A.B.'s traffickers and received financial benefit from sex trafficking by "develop[ing] and maintain[ing] business models that attract and foster the commercial sex market for traffickers and buyers alike"; "enjoys the steady stream of income that sex traffickers bring to their hotels"; "financially benefits from its ongoing reputation for privacy, discretion, and the facilitation of commercial sex"; and received "payment for rooms."[106] "[T]he rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the *§ 1595(a)* standard."[107]

While these allegations may ultimately be proven untrue or unsupported by evidence, the allegations at the motion to dismiss stage are sufficient to meet the "knowingly benefitted" element of a civil claim under *section 1595* of the Act.

### Participation in a venture.

Marriott argues A.B. fails to allege it participated in a sex trafficking venture. *Section 1591(a)(2)* imposing criminal liability **[\*39]** on "whoever knowingly ... benefits, financially or by receiving anything of value, from **participation in a venture** which has engaged in an act described in violation of *paragraph (1)*."[108]

Marriott relies primarily on *Afyare*, a case we already distinguished and disagree applies in the civil context where we may focus on whether the business should have known of the conduct. Marriott argues we should apply *Afyare* and dismiss A.B.'s amended complaint because there are no allegations Marriott "had any association with a 'sex trafficking venture'" or "committed any overt act in furtherance of that sex trafficking venture." Marriott argues "district courts" recently confirmed "these same principles" apply to civil liability under *section 1595* of the Act, citing *Noble* and another case from the United States District Court for the Southern District of New York, *Geiss v. Weinstein Co. Holdings, LLC.*[109]

We analyzed *Noble* and explained why we disagree with its reasoning applying the criminal standard of *section 1591* to the civil remedy of *section 1595*. *Geiss* applied *Noble* and reached a similar result. In *Geiss*, plaintiffs brought claims against Harvey Weinstein and his companies under *section 1595*. The court, citing *Afyare*, held "the participation giving rise **[\*40]** to the benefit must be participation in a sex-trafficking venture, not participation in other activities engaged in by the sex traffickers that do not further the sex-trafficking aspect of their venture."[110] Marriott cites this passage from *Geiss* to argue A.B. fails to allege Marriott participated in a sex

---

[103] *2019 U.S. Dist. LEXIS 13263, [WL] at \*24*.

[104] *Id.*

[105] ECF Doc. No. 21 at ¶¶ 80-107.

[106] *Id.* at ¶¶ 115-117, 124.

[107] *Doe S.W., 2020 U.S. Dist. LEXIS 44961, 2020 WL 1244192, at \*5* (citing *H.H., 2019 U.S. Dist. LEXIS 211090,*

[—] *2019 WL 6682152, at \*2*; *M.A., 2019 U.S. Dist. LEXIS 173675, 2019 WL 4929297, at \*3*).

[108] *18 U.S.C. § 1591(a)(2)* (emphasis added).

[109] *Noble v. Weinstein, 335 F. Supp. 3d 504 (S.D.N.Y. 2018)*; *Geiss v. Weinstein Co. Holdings LLC, 383 F. Supp.3d 156 (S.D.N.Y. 2019)*.

[110] *Geiss, 383 F. Supp.3d at 169*.

trafficking venture.

But *Geiss* is entirely distinguishable other than citing *section 1595*. The court recognized under the 2008 amendment of *section 1595* "victims may bring an action against a 'perpetrator' or against 'whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in' a qualifying offense."[111] Then, in a footnote, the court recognized "[t]he previous version of the statute, enacted in 2003, provided a civil action against only the 'perpetrator' of a qualifying offense. However, a 'perpetrator can be either a direct violator under *18 U.S.C. § 1591(a)(1)*, or a participant under *18 U.S.C. § 1591(a)(2)*, neither of which provisions have changed in any relevant way since 2003. The 2008 Amendment also introduces the 'should have known' language in the civil liability provision, thereby adding a constructive knowledge alternative to the existing actual knowledge standard. **[*41]** *Since this opinion assumes defendants' actual knowledge of a sex trafficking enterprise, whether the 2003 or 2008 version of the TVPA applies to a given claim is irrelevant*."[112]

The court in *Geiss* assumed both Harvey Weinstein's and his companies' actual knowledge and did not apply a "should have known" analysis. It assumed the plaintiffs sought to enforce, through *section 1595*, liability against the perpetrators of trafficking and did not examine liability for a person who knowingly benefits from participation in a venture it *knew or should have known* engaged in trafficking. The court in *Geiss* did not apply constructive knowledge as A.B. alleges. Thus, *Geiss* is inapposite, distinguishable, and not persuasive.

Marriott argues we must apply *Afyare*, *Noble*, and *Geiss* as applied by the Southern District of New York. A.B. argues we should follow the hotel cases from the Southern District of Ohio. As explained, we are persuaded the clear language of *section 1595* favors the approach taken by Judge Marbley focusing on a hotel's possible civil liability best conforms to Congress's intent in amending the Act to include a civil remedy provision, at least as applied to a hotel where there is a direct connection between a **[*42]** rental fee for the room where the trafficking is effected.[113]

---

[111] *Id. at 168*.

[112] *Id. at 168 n.3* (emphasis added).

## "Knew or should have known" of a sex trafficking venture.

Marriott argues A.B. pleads the "knew or should have known" element of the Act based only on the hospitality industry's complicity in sex trafficking. It cites three cases to support its argument "as a matter of law" allegations regarding the general hotel industry cannot support a plausible inference Marriott knew or should have known about A.B.'s sex trafficking.[114] We disagree with Marriott for two reasons: its cited cases are distinguishable, and A.B. sufficiently alleges facts Marriott's three Philadelphia Airport hotels knew or should have known about A.B.'s trafficking.

The district courts in both *Ratha* and *Misko* applied summary judgment standards with the benefit of discovery, not at the motion to dismiss stage. In those cases, the court entered summary judgment in favor of the defendant because the *evidence* under the *Rule 56* standard did not support plaintiffs' claims. We are not addressing a motion for summary judgment. The third case, decided on a motion to dismiss, is also distinguishable.[115] The *Florida Abolitionist* complaint failed to allege **[*43]** the defendant website advertising

---

[113] Judge Marbley relied on *Jean-Charles v. Perlitz, 937 F.Supp.2d 276 (D. Conn. 2013)* for support that participation in a venture under *section 1595* should not import *section 1591*'s definition. In *Jean-Charles*, plaintiffs brought claims alleging sexual abuse while students at a residential school for children in Haiti by the founder of the school. Plaintiffs brought claims under *section 1595* against a priest, the Chaplain and Director of Campus Ministry at a university who served as Chairman and President of Haiti Fund's Board of Directors during the time the founder of the school sexually abused children. The court rejected defendants' argument the allegations of the complaint failed to support a plausible inference they knew or should have known of the abuse. The complaint alleged the priest knew at least one student lived in the founder's home, witnessed the founder showing at least one student a pornographic video, and stopped communications with a school administrator who confronted the director about sexual abuse. *Id. at 288*. These allegations sufficiently raised a plausible inference the priest knew or should have known the residential school violated *section 1591*. *Id. at 288-89*. The court did not require the priest to have directly participated in the sex trafficking. Marriott distinguishes *Jean-Charles* arguing the alleged facts show direct, actual knowledge by the priest; allegations we do not have here. ECF Doc. No. 27, at 7 n.4. We already explained the allegations here at least plausibly infer Marriott's franchisee hotels should have known about her trafficking.

"adult services" saw an advertisement and knew it related to illegal sex trafficking.[116] As analyzed below, A.B. alleges conduct specifically relating to her.

We disagree with Marriott regarding A.B.'s specificity. Marriott argues A.B. alleges only general conduct in the hotel industry regarding sex trafficking imposes liability on Marriott. It is true A.B.'s amended complaint inartfully includes numerous allegations regarding the problem of sex trafficking generally, the use of hotel and motel rooms as a venue for trafficking, efforts by private organizations and the Department of Homeland Security to combat human trafficking, and news reports on sex trafficking incidents involving other victims and other hotels. If A.B. made only these allegations, we may agree with Marriott. But A.B. also specifically alleges A.B.'s trafficking in and through three identified Marriott branded hotels. At this preliminary stage, we read A.B.'s allegations regarding the hospitality industry generally as background and supporting A.B.'s allegation Marriott, along with other hotel brands, knew about the problem of sex trafficking. We draw all reasonable inferences from A.B.'s **[*44]** amended complaint on a motion to dismiss: between 2009-2011, A.B.'s traffickers used Marriott's three Philadelphia Airport hotels to sell illegal sex acts; as many as six men an evening entered each of the three hotels as an "unannounced guest," creating a "voluminous and obvious" constant stream of male visitors to A.B.'s rooms accessed through the front door and main lobby of the hotels; A.B.'s trafficker repeatedly paid for rooms at each of the three hotels for at least a week at a time with prepaid credit cards and hotel staff were aware of A.B.; when A.B.'s trafficker brought her to the hotels, she presented with little, if any, luggage, no phone, wallet, or identification, and when checking A.B. into the hotel, he would not proceed to the room; rooms rented for trafficking were littered with multiple broken objects, used condoms, and other sex paraphernalia which would have been noticed by staff; and staff at all three hotels observed A.B. with signs of visible injury on

more than one occasion, frequent loud altercations, and attacks on A.B. by her trafficker were constant and loud enough for hotel patrons and staff to hear.[117]

We find these allegations plausibly allege Marriott **[*45]** knew or should have known of a sex trafficking venture involving A.B. at its three Philadelphia Airport hotels. We can fairly infer hotel employees accepted the money from the trafficker who did not check into the room. Hotel staff knew of A.B. She appeared at the hotels with little, if any, luggage, no phone, wallet, or identification. Hotel employees cleaned up the rooms with multiple broken objects and paraphernalia. A.B. entered all three hotels with visible injury. A.B. alleges Marriott knew of the problem of sex trafficking in its and other hotels, Marriott failed to take steps to implement staff training and other preventative measures, and, as to A.B. herself, failed to act on signs of sex trafficking in each of its three Philadelphia Airport hotels between 2009 and 2011. At this stage, we can readily interpret A.B. as pleading Marriott should have known of a sex trafficking venture at the three airport hotels. Unlike a one-time visit, A.B.'s pleaded return visits with similar characteristics also allow us to infer Marriott knew of the sexual trafficking in A.B.'s prepaid hotel room.

As detailed above, A.B. pleads staff at Marriott's Philadelphia Airport hotels should have known **[*46]** about her sex trafficking. A.B. plausibly states a claim against Marriott under *section 1595*. For the same reasons, we deny Marriott's objection the amended complaint is a "shotgun" pleading violating *Rule 8(a)*.[118]

---

[114] *See Misko v. Speedway, LLC, No. 16-13360, 2018 U.S. Dist. LEXIS 88888, 2018 WL 2431638 (E.D. Mich. May 29, 2018)*; *Florida Abolitionist v. Backpage.com LLC, No. 17-218, 2018 U.S. Dist. LEXIS 55560, 2018 WL 1587477 (M.D. Fla. Mar. 31, 2018)*; *Ratha v. Phatthana Seafood Co., Lt., No. 16-4271, 2017 U.S. Dist. LEXIS 174373, 2017 WL 8293172 (C.D. Cal. Dec. 21, 2017)*.

[115] *Florida Abolitionist, 2018 U.S. Dist. LEXIS 55560, 2018 WL 1587477*.

[116] *2018 U.S. Dist. LEXIS 55560, [WL]at *5*.

[117] ECF Doc. No. 21 at ¶¶ 80-107, 110, 112.

[118] We do not view A.B.'s amended complaint as a "shotgun pleading." A complaint failing to comply with *Rule 8(a)* is referred to as a "shotgun pleading." *Bartol v. Barrowclough, 251 F.Supp.3d 855, 859 (E.D. Pa. 2017)* (quoting *Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir. 2015))*. In *Bartol*, our colleague the Honorable Eduardo Robreno identified four categories of shotgun pleadings: "(1) 'a complaint containing multiple counts where each count adopts the allegations of all preceding counts'; (2) a complaint that is 'replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action'; (3) a complaint that does 'not separat[e] into a different count each cause of action or claim for relief'; and (4) a complaint that 'assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.'" *Id.* (quoting *Weiland, 792 F.3d at 1321-23*). "The 'unifying characteristic' of these four types of shotgun pleadings 'is that they fail to one degree or another, and in one

While A.B. includes general allegations regarding the hospitality industry generally, we listed the allegations specific to her trafficking. These allegations specific to her stays at the three Marriott airport hotels are sufficient to put Marriott on notice of the claims against it. We deny Marriott's motion to dismiss.

Through discovery, Marriott may be able to adduce alternative plausible explanations from which a jury could find it had no actual or constructive knowledge. But A.B. sufficiently pleads repeated similar conduct in the three specific Marriott hotels. While we may consider dismissing more general shotgun allegations or theories based on an infrequent exposure to these common characteristics, A.B. sufficiently plead Marriott knew or should have known under the civil liability portion of the Act.

**C. A.B. plausibly pleads a principal-agent relationship for vicarious liability but fails to plead an apparent authority relationship to hold Marriott liable**.

Marriott next argues **[*47]** A.B. fails to allege it is vicariously liable for the acts or omissions of the staff at its franchisee hotels because, as a matter of Pennsylvania law, a franchisee relationship does not necessarily imply a principal-agent relationship. Marriott argues a principal-agent relationship is only established when the franchisor exercises day-to-day control over the franchisee and A.B. failed to allege facts allowing us to plausibly infer Marriott had a right to control day-to-day operations of its three franchisee airport hotels. Marriott also argues A.B. fails to allege facts to support an apparent agency theory of vicarious liability under Pennsylvania law.

A.B. responds it need not show a principal-agent relationship because Marriott is directly liable for facilitating sex trafficking under _section 1595_. Although asserting a direct liability theory against Marriott under _section 1595_ of the Act, A.B. argues Marriott is also liable under a principal-agent theory. And, although she pleads an apparent agency relationship between Marriott and the three Philadelphia Airport hotels,[119]

A.B. does not respond to Marriott's argument she fails to allege facts supporting an apparent agency theory of liability.

**1. A.B. plausibly [*48] pleads a principal-agent relationship**.

Under Pennsylvania law, "not every relationship of principal and agent creates vicarious responsibility in the principal for acts of the agent."[120] "A principal and agent can be in the relationship of a master and servant, or simply in the status of two independent contractors."[121] The "mere existence of a franchise relationship does not necessarily trigger a master-servant relationship, nor does it automatically insulate the parties from such a relationship."[122]

To hold Marriott International vicariously liable for the conduct of its franchisee hotels, there must be a master-servant relationship determined by the Pennsylvania Supreme Court's test: "whether such person is subject to the alleged employer's control or right to control with respect to his physical conduct in the performance of the services for which he was engaged ... The hallmark of an employee-employer relationship is that the employer not only controls the result of the work **but has the right to direct the manner in which the work shall be accomplished**; the hallmark of an independent contractee-contractor relationship is that the person engaged in the work has the exclusive control of **[*49]** the manner of performing it, being responsible only for the result."[123]

The key focus on whether there is a master-servant relationship is the right to control the way the servant's work is accomplished. Under Pennsylvania law this means the focus of the inquiry "should be whether the

___

way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.'" _Id._ (quoting _Weiland, 792 F.3d at 1323_). Here, A.B.'s claims are directed to one defendant, Marriott. Her allegations put Marriott on notice of the claims against it.

[119] ECF Doc. No. 21 at ¶¶ 76-77.

[120] _Myszkowski v. Penn Stroud Hotel, Inc., 430 Pa. Super. 315, 634 A.2d 622, 625 (Pa. Super. 1993)_ (quoting _Gajkowski v. Int'l Bhd. of Teamsters, 350 Pa. Super. 285, 504 A.2d 840, 848 (Pa. Super. 1986))_.

[121] _Id._ (quoting _Juarbe v. City of Phila., 288 Pa. Super. 330, 431 A.2d 1073, 1076 (Pa. Super. 1981))_.

[122] _Drexel v. Union Prescription Ctrs., 582 F.2d 781, 785-86 (3d Cir. 1978)_.

[123] _Myszkowski, 634 A.2d at 625-26_ (quoting _Green v. Independent Oil Co., 414 Pa. 477, 201 A.2d 207, 210 (Pa. 1964))_ (emphasis added).

2020 U.S. Dist. LEXIS 70644, *49

alleged master has day-to-day control over the manner of the alleged servant's performance."[124]

Marriott relies heavily on the Pennsylvania Superior Court's reasoning in *Myszkowksi v. Penn Stroud Hotel, Inc.* As a threshold matter, the trial court decided *Myszkowski* on a developed summary judgment record and, as such, is not the proper standard on a motion to dismiss. *Myszkowski* is distinguishable on its merits. Plaintiff sued Best Western and Penn Stroud Hotel for injuries sustained in a sexual assault in the ladies' room of the hotel. Plaintiff alleged Best Western failed to provide adequate security.[125] The trial court entered summary judgment in favor of Best Western.

On appeal, the Pennsylvania Superior Court examined whether Best Western had an actual agency relationship or an apparent agency relationship with Penn Stroud which had a marketing agreement with Best Western and a member of the Best Western organization [*50] allowing it to use the "Best Western" name and participate in its reservation network.[126] The court concluded the evidence did not show Best Western exercised day-to-day control over the Penn Stroud Hotel; the owners of Penn Stroud Hotel hired and fired employees, made all business decisions, set the prices for hotel accommodations, and the agreement between the entities showed Penn Stroud as an independent contractor.[127]

Marriott argues *Myszkowski* compels a finding there is no actual agency relationship between it and the Philadelphia Airport hotels. Marriott recognizes A.B. alleges it controls its franchisee hotels,[128] but argues she fails to allege facts showing it has control over the day-to-day operations. We disagree. A.B. alleges Marriott exercises "ongoing and systemic right of control over" its franchisee hotels including the "means and methods of how [its franchisee hotels] conduct *daily* business" including sharing profits, standardized training methods for employees, building and maintaining the facility in a manner specified by Marriott International; regular inspection of the facility and operation by

Marriott; and fixing prices.[129]

The evidence may ultimately prove Marriott does [*51] not exercise day-to-day control over its Philadelphia Airport hotels, but this is more properly raised after discovery. We deny Marriott's motion to dismiss on a principal-agent theory of liability.

**2. A.B.'s does not plead an apparent agency theory.**

Marriott argues A.B. fails to allege facts to support an apparent agency theory of vicarious liability, and the facts as alleged cut against an apparent agency theory. Marriott argues A.B. alleges her traffickers held her against her will at the three hotels which is "incompatible with the notion ... A.B. somehow 'relied' on a representation by Marriott."[130] A.B. does not address this argument in her response.

*Section 257 of the Restatement (Second) of Agency* provides: "One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill or such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such."[131] Under Pennsylvania law, a principal may be liable to another for the acts of its agent based on "apparent authority or agency by estoppel."[132] Two elements are required to establish apparent authority or agency [*52] by estoppel: "(1) there must be negligence on the part of the principal in failing to correct the belief of the third party concerning the agent; and (2) there must be justifiable reliance by the third party."[133]

We agree with Marriott. Under *Myszkowski,* an apparent agency theory is not applicable here as a matter of law. "Both apparent authority and agency by estoppel are 'customarily [only] relevant in the context of business transactions.'"[134] The Pennsylvania Superior Court

---

[124] *Id. at 626*.

[125] *Id. at 624*.

[126] *Id.*

[127] *Id. at 626-27*.

[128] ECF Doc. No. 21 at ¶¶ 62-68.

[129] *Id.* at ¶¶ 62-68, 75-76 (emphasis supplied).

[130] ECF Doc. No. 25-1 at 16.

[131] *Restatement (Second) of Agency, § 267* (1958).

[132] *Myszkowski, 634 A.2d at 629* (citing *Juarbe, 431 A.2d at 1079*).

[133] *Id.*

[134] *Id.* (citation and footnote omitted).

2020 U.S. Dist. LEXIS 70644, *52

affirmed the trial court's entry of summary judgment on an apparent agency theory because the plaintiff's claim "is one in tort for the alleged negligence which resulted in the sexual assault of appellant. Under the facts of this case, we fail to see how appellant can be said to have relied upon the apparent authority of Penn Stroud to avoid being the victim of this random act of violence. Our review of the record indicates that appellant has presented no evidence which even remotely supports her allegation that she *relied* upon the fact that Penn Stroud represented Best Western, as its agent, on the night she was sexually assaulted."[135]

A.B. fails to allege the elements of an apparent authority and, given the facts **[*53]** as alleged, we do not see how she relied on any representation (which is not alleged) by Marriott regarding its franchisee hotels somehow caused her injury. To the extent she can adduce facts in discovery, she may move to timely amend if necessary.

**D. A.B.'s claim under Pennsylvania law is time-barred and fails to state a claim**.

Marriott moves to dismiss A.B.'s claim under Pennsylvania's human trafficking statute, *18 Pa. Cons. Stat. § 3051*, for three reasons: (1) the statute's safe harbor provision expressly exempts Marriott International from civil liability; (2) even without the safe harbor provision, A.B. fails to state a claim; and (3) the claim is time-barred by the applicable five-year statute of limitations. We agree with Marriott and dismiss the Pennsylvania trafficking claim without prejudice for A.B. to move to amend with the benefit of more facts to possibly state a claim under Pennsylvania's statute and if possible under *Federal Rule of Civil Procedure 11*.

Under Pennsylvania's trafficking statute, it is a felony for a person who (1) "recruits, entices, solicits, advertises, harbors, transports, provides, obtains or maintains an individual if the person knows or recklessly disregards that the individual will be subject to sexual servitude;" **[*54]** or (2) "knowingly benefits financially or receives anything of value from any act that facilitates any activity described in *paragraph (1)*; ..."[136]

Pennsylvania's human trafficking statute provides a civil

remedy to victims of "human trafficking" and "the sex trade": "(1) An individual who is a victim of human trafficking may bring a civil action against any person that participated in the human trafficking of the individual in the court of common pleas of the county where the individual resides or where any of the alleged violations of this chapter occurred. (2) An individual who is a victim of the sex trade may bring a civil action in the court of common pleas of the county where the individual resides against a person that: (i) recruits, profits from or maintains the victim in any sex trade act; (ii) abuses or causes bodily harm to the victim in any sex trade act; and (iii) knowingly advertises or publishes advertisements for purposes of recruitment into sex trade activity."[137]

The parties do not cite, and we did not find, a case from the Pennsylvania courts or federal courts in Pennsylvania construing *section 3051* of the human trafficking statute, including the definition of "participation" in human trafficking. **[*55]** "Human trafficking" is defined by the statute as "[a]ny activity in violation of *section 3011* (relating to trafficking in individuals) either alone or in conjunction with an activity in violation of *section 3012* (relating to involuntary servitude)."[138] *Section 3011*, as noted above, imposes criminal liability on a person who, *inter alia*, (1) "recruits, entices, solicits, advertises, harbors, transports, provides, obtains or maintains an individual if the person knows or recklessly disregards that the individual will be subject to sexual servitude;" or (2) "knowingly benefits financially or receives anything of value from any act that facilitates any activity described in *paragraph (1)*."[139] *Section 3012* imposes criminal liability upon a person who "knowingly ... subjects an individual to labor servitude or sexual servitude, except where the conduct is permissible under Federal or State law other than this chapter."[140] The Pennsylvania General Assembly did not define the term "sex trade."

Pennsylvania's statute creates an exception, or safe harbor, to civil liability to "any person who provides goods or services to the general public and to a person who would be liable under *subsection (a)(2)*, absent a

---

[135] *Id. at 629-30* (emphasis in original).

[136] *18 Pa. Cons. Stat. Ann. § 3011*.

[137] *Id. § 3051(a)*.

[138] *Id. § 3001*.

[139] *Id. § 3011*.

[140] *Id. § 3012*.

showing that the person: (1) knowingly markets or provides its [*56] goods or services to a person liable under *subsection (a)(2)*; (2) knowingly receives a higher level of compensation from a person liable under *subsection (a)(2)*; or (3) supervises or exercises control over a person liable under *subsection (a)(2)*."[141]

### 1. A.B.'s Pennsylvania trafficking claim is time-barred on its face.

Marriott argues A.B.'s Pennsylvania human trafficking claim is time-barred on its face. Under *section 3051(h)(1)*, "[a]n action may be brought under this section by an individual who was the victim of human trafficking while an adult within five years of the last act against that individual that constitutes an offense under this chapter."[142]

A.B. alleges her trafficking began in 2009 at the age of eighteen. She alleges her trafficking lasted until 2011. Assuming the trafficking ended in 2011, A.B. had until 2016 to file a complaint. She did not file a complaint until December 9, 2019, three years after the statute expired.

A.B. concedes the trafficking at Marriott brand hotels ended in 2011 but then argues in her response brief her trafficker moved her into other venues: "through approximately May 2015 out of private residences and other hotels [and] [t]herefore, [she] could not bring a claim until at least May 2015." There are no such allegations [*57] in the amended complaint. Even if we considered claims of trafficking through May 2015, none of it occurred in Marriott owned hotels.

A.B. argues *section 3051(h)(1)* "embraces the theory of equitable tolling" by starting the statutory period "the last act against that individual that constitutes an offense under this chapter." She argues equitable tolling applies where a plaintiff "in some extraordinary way has been prevented from asserting her rights." There are no allegations regarding Marriott after 2011. There are no allegations in the amended complaint to support an equitable tolling theory.

We grant Marriott's motion to dismiss the Pennsylvania statutory claim as barred by the statute of limitations. With the benefit of more facts or discovery, A.B. may

move to amend to allege the fact basis for an equitable tolling theory, if possible under *Federal Rule of Civil Procedure 11*.

### 2. As currently pleaded, A.B. does not show Marriott being outside the safe harbor exception.

Even if timely, A.B. does not plead facts bringing Marriott outside the safe harbor of the Pennsylvania statute. Marriott argues *section 3051(b)* creates a "safe harbor" explicitly exempting it from civil liability because it is a provider of goods or services to the general public. [*58] A.B. does not contest Marriott provides "goods or services to the general public" in her response. She instead responds *section 3051(b)*'s safe harbor provision does not apply because she alleges Marriott "***knowingly*** markets or provides its goods or services to" her sex trafficker who is liable under the statute. A.B. cites paragraphs 54 and 127 of her amended complaint to support her argument Marriott falls within the "knowingly markets or provides its goods or services" exception.

In paragraph 54, A.B. alleges: "Defendant Marriott knew, as of at least early 2006, that human trafficking was occurring in its hotels and across its brand. Because of this, Defendant Marriott amended its Human Rights Policy as early as 2006 to require annual review of its policy. To date the policy merely states 'Marriott supports the elimination of all forms of forced, bonded or compulsory labor and provides associate training on human trafficking awareness and prevention.'"[143]

In paragraph 127, A.B. alleges: "Marriott's acts, omissions, and commissions, outlined above, constitute a violation of *[section 3051]*. Specifically, Marriott had a statutory obligation not to benefit financially from a venture it knew was engaged in the sex trade. [*59] At all relevant times, Marriott breached this duty by knowingly participating in, and facilitating, the harboring and provision of A.B. for purposes of commercial sex induced by force, fraud, or coercion, by its acts, omissions, and commissions."[144]

Neither of these paragraphs contain sufficient facts to allow us to draw a reasonable inference Marriott "knowingly market[ed] or provide[d] its goods or services" to A.B.'s trafficker. There is nothing in

---

[141] *Id. § 3051(b)*.

[142] *Id. § 3051(h)(1)*.

[143] ECF Doc. No. 21 at ¶ 54.

[144] *Id.* at ¶ 127.

paragraph 54 to reasonably infer Marriott "knowingly marketed or provided" its services to A.B.'s trafficker. Paragraph 127 incorporates allegations of the amended complaint, but those allegations support constructive knowledge not actual knowledge by Marriott.

We agree with Marriott as to A.B. failing to plead it "marketed" its services to the trafficker. It certainly advertised its branded hotels. But there is no basis it "knowingly" marketed its hotel rooms to foster human trafficking. We agree there are no allegations Marriott "knowingly provided" rooms to A.B.'s trafficker. Absent allegations of conduct Marriott "knowingly" provided its rooms to A.B.'s trafficker, we also dismiss on this basis.

Should discovery allow, A.B. may move **[*60]** to amend her complaint to allege facts Marriott "knowingly market[ed] or provide[d] its goods or services" to A.B.'s trafficker, if it is possible under *Rule 11*, to bring it outside the safe harbor of the Pennsylvania statute.

**3. Even without the safe harbor exception, A.B. does not allege Marriott participated in human trafficking.**

Marriott next argues even without the statutory safe harbor, A.B.'s claim under Pennsylvania statute fails because there are no facts plausibly showing it "participated in the human trafficking on the individual" or comes within the conduct imposing liability under *Section 3051(a)(2)*. Marriott argues, for the same reasons it did not "participate" in a sex trafficking venture under the federal Act, it did not "participate" in human trafficking under Pennsylvania's statute. A.B. does not address this argument, focusing instead on the safe harbor argument.

We agree with Marriott. As analyzed above, the federal Act's civil liability provision uses "knew or **should have known**" language imposing a tort-based concepts of negligence. We have no such language in the Pennsylvania statute.

*Section 3051(a)(1)* provides a civil remedy to "a victim of human trafficking ... against any person that **participated in the human [*61] trafficking** of the individual in the court of common pleas of the county where the individual resides or where any of the alleged violations of this chapter occurred."[145] The statute defines "human trafficking" as "[a]ny activity in violation

of *section 3011* (relating to trafficking in individuals) either alone or in conjunction with an activity in violation of *section 3012* (relating to involuntary servitude)."[146] Again, *section 3011* imposes criminal liability on a person who, *inter alia*, (1) "recruits, entices, solicits, advertises, harbors, transports, provides, obtains or maintains an individual **if the person knows or recklessly disregards** that the individual will be subject to sexual servitude;" or (2) "**knowingly** benefits financially or receives anything of value from any act that facilitates any activity described in *paragraph (1)*."[147] *Section 3012* imposes criminal liability upon a person who "**knowingly** ... subjects an individual to labor servitude or sexual servitude, except where the conduct is permissible under Federal or State law other than this chapter."[148]

Pennsylvania's criminal code defines levels of culpability. "A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of **[*62]** his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result." "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation."[149]

The legislative history of the Pennsylvania statute shows the civil remedy of *section 3051* "authorizes victims to bring a private cause of action **against the person who subjected them to trafficking and involuntary servitude**. ... Multiple victims may join suit against a single trafficker, and a single victim may join multiple persons who had a role in their victimization in the same suit. Generally, there is a five-year statute of

---

[145] *18 Pa. Cons. Stat. Ann. § 3051(a)(1)* (emphasis added).

---

[146] *Id.* **§ 3001**.

[147] *Id.* *§ 3011* (emphasis added).

[148] *Id.* *§ 3012* (emphasis added).

[149] *Id.* *§ 302*.

limitations. ... **[*63]** Specific definitions relating to the sex trade are also included in this section."[150]

The Pennsylvania statute does not include "should have known" language. The history of the statute contemplates an action against traffickers. Unlike the federal Act, Pennsylvania's statute's civil remedy specifically does *not* create liability for "any person who provides goods or services to the general public" and cannot be civilly liable absent a showing of "knowingly markets or provides its goods or services" to a trafficker. A.B. does not allege Marriott "knowingly provided" its services to her traffickers.

Under Pennsylvania law, "[w]hen engaging in statutory construction, a court's duty is to give effect to the legislature's intent and to give effect to all of a statute's provisions."[151] We are directed "[t]he best indication of legislative intent is the plain language of the statute."[152] We may not add words to a statute "which the legislature has omitted unless the phrase is necessary to the construction of the statute."[153] We will not do **[*64]** so here, particularly where reading "should have known" language into the statute would alter the culpability standard.

A.B. fails to allege facts Marriott participated in human trafficking — which is defined by Pennsylvania statute as requiring knowing or reckless disregard. She fails to allege facts Marriott's conduct falls within *section 3051(a)(2)* of Pennsylvania's human trafficking statute.

### III. Conclusion

We grant in part and deny in part Marriott's motion to

dismiss. We deny its objection to A.B.'s claim under *section 1595* based on constructive knowledge and to A.B.'s allegations of an actual agency relationship. We grant Marriott's motion to dismiss based on its objection it did not have actual knowledge of A.B.'s trafficking under *section 1595* of the Act (as contrasted with sufficient allegations of constructive knowledge); an apparent agency relationship fails as a matter of law; and A.B.'s claim under Pennsylvania statute is time-barred and does not sufficiently plead Marriott "knowingly" marketed or provided its hotel rooms to A.B.'s trafficker. A.B. may later move to amend with the benefit of more specificity adduced in discovery to cure these deficiencies in her **[*65]** amended complaint if she can do so consistent with this opinion and *Rule 11*.

### ORDER

**AND NOW**, this 22nd day of April 2020, upon considering Defendant's Motion to dismiss (ECF Doc. No. 25), Plaintiff's Response (ECF Doc. No. 26), Defendant's Reply (ECF Doc. No. 27), and for reasons in the accompanying Memorandum, it is **ORDERED** Defendant's Motion to dismiss (ECF Doc. No. 25) is **GRANTED in part** and **DENIED in part**:

1. Plaintiff may proceed under *18 U.S.C. § 1595* based on allegations allowing us to reasonably infer constructive knowledge and the three hotels' actual agency relationship with the Defendant;

2. Plaintiff may not presently proceed on claims of the Defendant's actual knowledge under *section 1595* or under an apparent agency relationship of the three hotels with the Defendant;

3. Plaintiff may not proceed on claims under the Pennsylvania human trafficking statute, *18 Pa. Cons. Stat. § 3051*, as time barred on the face of the amended Complaint and, even if timely, Plaintiff does not sufficiently plead Defendant knowingly marketed or provided its hotel rooms to the trafficker; and,

4. Defendant shall answer the remaining allegations on or before **May 6, 2020**.

/s/ Kearney

**KEARNEY, J.**

---

[150] JOINT STATE GOVERNMENT COMMISSION, GENERAL ASSEMBLY OF THE COMMONWEALTH OF PENNSYLVANIA, LEGISLATIVE UPDATE, HUMAN TRAFFICKING IN PENNSYLVANIA: A REVIEW OF THE ACT OF July 2, 2014, P.L. 945, No.105, at 9.(Oct. 2014) (emphasis added).

[151] *Roverano v. John Crane, Inc., No. 26 EAP 2018, No. 27 EAP 2018, 2020 Pa. LEXIS 1035, 2020 WL 808186, at *7 (Pa. Feb. 19, 2020)* (citing *1 Pa. Cons. Stat. § 1921(a)*).

[152] *Id.* (citing *Matter of Private Sale of Prop. by Millcreek Twp. Sch. Dist., 646 Pa. 339, 185 A.3d 282, 290-91 (Pa. 2018)*).

[153] *Commonwealth v. Davis, 2002 PA Super 167, 799 A.2d 860, 869 (Pa. Super. 2002)* (citing *Commonwealth v. Berryman, 437 Pa. Super. 258, 649 A.2d 961, 965 (1994)* (*en banc*), *appeal denied, 541 Pa. 632, 663 A.2d 685 (Pa. 1995)*).

**A** Neutral
As of: May 8, 2020 7:40 PM Z

## *Claypool v. Boyd*

United States Court of Appeals for the Fourth Circuit

May 18, 1990, Submitted ; September 24, 1990, Decided

No. 90-1437

**Reporter**
1990 U.S. App. LEXIS 16873 *; 914 F.2d 1490

OLIVER H. CLAYPOOL, JR., as next friend for Oliver J. Claypool, Christine O. Claypool, and Robert L. Claypool, Plaintiff - Appellee, v. FLORA B. BOYD, Individually and as Warden, Stevenson Correctional Institution; WILLIAM D. LEEKE, Individually and as Commissioner, South Carolina Department of Corrections, Defendants - Appellants, and PATRICIA M. FERGUSON; DAVID H. MARING, SR., Individually and as Chief Judge of the Family Court, 15th Judicial Circuit of South Carolina; DAVID N. WILBURN, Individually and as Presiding Judge of the Family Court, 15th Judicial Circuit of South Carolina; RICHARD W. RILEY, Individually and as Governor of the State of South Carolina; ELIZABETH J. CLAYPOOL, Defendants

**Notice: [*1]** RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Prior History:** Appeal from the United States District Court for the District of South Carolina, at Columbia. Matthew J. Perry, Jr., District Judge. C/A No. 86-1317-3-OA.

**Disposition:** *VACATED AND REMANDED*

## Core Terms

qualified immunity, imprisoned, thirteenth amendment, contempt, civil contempt, custody, injunctive, prison, declaratory relief, official capacity, summary judgment, district court, child support, court order, hard labor, contravene, sentenced, VACATED, ex-wife, paying, suits

## Case Summary

### Procedural Posture

Defendant prison officials challenged an order from the United States District Court for the District of South Carolina, at Columbia, which denied their claim of qualified immunity in plaintiff prisoner's *42 U.S.C.S. § 1983* action alleging that his *Thirteenth Amendment* rights were violated when he was required to work while in prison for civil contempt.

### Overview

The prisoner was imprisoned for civil contempt after he failed to pay child support. While in prison, the prisoner alleged that he was required to work in the kitchen, the laundry, and the book depository in violation of his *Thirteenth Amendment* rights. The prisoner filed a *§ 1983* action against the officials, alleging that persons imprisoned for civil contempt could not constitutionally be forced to work in prison. The district court denied the officials' claims of qualified immunity, but on appeal, the court ruled that the officials were entitled to qualified

1990 U.S. App. LEXIS 16873, *1

immunity. The court found that the antiquated case from another jurisdiction that the prisoner cited in support of his argument did not clearly establish that persons imprisoned for civil contempt could not be forced to work. Therefore, the court ruled that the officials were entitled to qualified immunity because they showed that their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. The court also found that because the prisoner was no longer in custody, injunctive or declaratory relief was not appropriate.

**Outcome**

The court vacated the order of the district court and remanded the case for further action.

# LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > Appealability

Civil Procedure > Judgments > Summary Judgment > General Overview

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

Civil Procedure > Appeals > Appellate Jurisdiction > General Overview

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

*HN1*[⬇]  **Summary Judgment Review, Appealability**

Because of policies underlying qualified immunity, a district court's denial of summary judgment on that basis is an immediately appealable order.

Civil Procedure > Sanctions > Contempt > Civil Contempt

Governments > State & Territorial Governments > Claims By & Against

Civil Procedure > Sanctions > Contempt > General Overview

Civil Rights Law > ... > Immunity From Liability > Local Officials > Customs & Policies

Governments > State & Territorial Governments > Employees & Officials

*HN2*[⬇]  **Contempt, Civil Contempt**

Government officials are entitled to qualified immunity to damage suits if they can show that their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Civil Procedure > ... > Declaratory Judgments > Federal Declaratory Judgments > General Overview

Governments > State & Territorial Governments > Claims By & Against

Civil Procedure > ... > Federal & State Interrelationships > State Sovereign Immunity > General Overview

Civil Procedure > ... > Federal & State Interrelationships > State Sovereign Immunity > State Immunity

Constitutional Law > State Sovereign Immunity > General Overview

*HN3*[⬇]  **Declaratory Judgments, Federal Declaratory Judgments**

The *Eleventh Amendment* bars suits seeking damages against government officials sued in their official capacities absent waiver by the state.

1990 U.S. App. LEXIS 16873, *1

**Counsel:** William Henry Davidson, II, David Leon Morrison, NAUFUL & ELLIS, P.A., Columbia, South Carolina, for Appellants.

Oliver H. Claypool, Jr., Appellee Pro Se.

**Judges:** Hall, Phillips, and Wilkinson, Circuit Judges.

**Opinion by:** PER CURIAM

# Opinion

Oliver Claypool filed a *42 U.S.C. § 1983* complaint naming, among others, Flora B. Boyd, Warden of the Stevenson Correctional Institution, and William D. Leeke, former Commissioner of the South Carolina Department of Corrections, as defendants. Boyd and Leeke appeal the district court's order denying their claim of qualified immunity. They are being sued in their individual and official capacities.

This dispute began as a child custody battle in Michigan between Oliver Claypool and his ex-wife. The Claypools were awarded joint custody of their three **[*2]** children. Mr. Claypool, who has stated that he believed that his ex-wife was neglecting and abusing the children, took them to South Carolina without court consent. The mother then obtained a court order in Michigan granting her sole custody. When Claypool and the children were finally discovered in South Carolina, the court ordered that custody was with the mother and ordered Claypool to resume paying child support. When he did not pay, Claypool was arrested. After a hearing, Claypool was found to be in contempt and he was sentenced to 150 days imprisonment. He could purge himself of contempt, however, by paying the child support he owed, a $ 1,500 fine to the county clerk, and posting a $ 2,500 cash bond with the county to assure that future payments would be made on time. The contempt finding was later reversed by the South Carolina Supreme Court.

Claypool claims that while in prison he was forced to work in violation of the *thirteenth amendment*. He was required to work, at various times, in the kitchen, the laundry, and the book depository. Claypool claims that he was imprisoned for civil contempt and therefore could not be forced to work at prison jobs.

The district court concluded **[*3]** that genuine issues of material fact were still in dispute between Claypool and Boyd and Leeke so that summary judgment was not appropriate. The defendants claim qualified immunity to suit, which is an entitlement not to stand trial under certain circumstances. *HN1*[⬆] Because of policies underlying qualified immunity, the district court's denial of summary judgment is an immediately appealable order. *See Mitchell v. Forsyth, 472 U.S. 511 (1985)* (district court's denial of qualified immunity claim is appealable order notwithstanding the absence of a final judgment).

*HN2*[⬆] Leeke and Boyd are entitled to qualified immunity to damage suits if they can show that their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Anderson v. Creighton, 483 U.S. 635 (1987)*; *see also Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982)*. Assuming that Claypool is correct in stating that he was imprisoned for civil contempt, [*] Boyd and Leeke can be held liable only if the law was clearly established that persons imprisoned for civil contempt cannot be forced to work.

 **[*4]** Claypool alleges that the *thirteenth amendment* clearly establishes that he should not be forced to work while imprisoned for civil contempt. However, Claypool is able to cite only one case which supports this interpretation. In *Flananagan v. Jepson, 177 Iowa 393, 158 N.W. 641 (1916)*, the court held that a prisoner can be forced to perform hard labor only if he has been convicted of a crime. Therefore, the plaintiff, who was held in contempt of court for violating an injunction, was unconstitutionally sentenced to hard labor.

This lone, antiquated opinion from another jurisdiction does not clearly establish the law in this area. Moreover,

---

[*] It is unclear whether Claypool was imprisoned for civil or criminal contempt. If Claypool was imprisoned for a crime then he is not entitled to the protections of the *thirteenth amendment*. *See Ray v. Mabry, 556 F.2d 881, 882 (8th Cir. 1977)* (compelling prisoners to work does not contravene *thirteenth amendment*).

1990 U.S. App. LEXIS 16873, *4

*Flanagan* is further attenuated by the admonition of the Eighth Circuit that "compelling prison inmates to work does not contravene the *Thirteenth Amendment.*" *Ray, 556 F.2d at 882*. Therefore, under *Harlow,* the defendants are entitled to qualified immunity. Additionally, *HN3*[↑] the *eleventh amendment* bars suits seeking damages against these defendants sued in their official capacities absent waiver by the state. *See Edelman v. Jordan, 415 U.S. 651 (1974)*. Because Claypool is no longer in prison, **[*5]** injunctive and declaratory relief is not appropriate. *See Papasan v. Allain, 478 U.S. 265 (1986)* (injunctive or declaratory relief available against official only where ongoing violation of federal law exists).

Accordingly, we vacate the order of the district court denying Leeke and Boyd's qualified immunity defense and remand for action consistent with this opinion. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.

*VACATED AND REMANDED*

**End of Document**

 Positive
As of: May 8, 2020 7:36 PM Z

## *Dolan v. PHL Variable Ins. Co.*

United States District Court for the Middle District of Pennsylvania

November 22, 2016, Decided; November 22, 2016, Filed

CIVIL ACTION NO. 3:15-cv-01987

**Reporter**
2016 U.S. Dist. LEXIS 161414 *; 2016 WL 6879622

TIMOTHY DOLAN, et al., Plaintiffs, v. PHL VARIABLE INSURANCE CO., et al., Defendants.

**Subsequent History:** Related proceeding at *Hyduk v. United States, 2017 U.S. Dist. LEXIS 38326 (M.D. Pa., Mar. 17, 2017)*

Motion granted by, Dismissed by *Dolan v. PHL Variable Ins. Co., 2017 U.S. Dist. LEXIS 176565 (M.D. Pa., Oct. 25, 2017)*

Dismissed by, in part, Motion denied by, in part *Dolan v. PHL Variable Ins. Co., 2018 U.S. Dist. LEXIS 58852 (M.D. Pa., Apr. 6, 2018)*

## Core Terms

allegations, annuities, funds, misrepresentations, lumped, motion to dismiss, withdrawals, products, Defendants', insurance company, fraudulent, deceptive, notice, particularity requirement, allege fraud, unfair trade practice, consumer protection, fiduciary, rollover, checks, factual allegations, circumstances, particularity, grounds

**Counsel:  [*1]** For Timothy Dolan, Ann Dolan, Estate of Jean Dolan, c/o Marybeth Dolan, Executrix, Raymond Flannery, Elizabeth Flannery, Robert Gruner, Linda Gruner, Virginia Hetherington, Carmen Fierro, Plaintiffs: John G. Dean, LEAD ATTORNEY, Elliott Greenleaf & Dean, Scranton, PA; Thomas L. Kennedy, LEAD ATTORNEY, Kennedy and Lucadamo, Hazleton, PA.

For PHL Variable Insurance Company, Defendant: John B. Dempsey, MYERS, BRIER & KELLY, LLP, Scranton, PA; Andrew R Kasner, Edison, McDowell & Hetheringto, Houston, TX.

For Forethought Life Insurance Company, Defendant: David M Skeens, J. Michael Vaughan, Paula L Brown, LEAD ATTORNEYS, Walters Bender Strohbehn & Vaughan PC, Kansas City, MO; James J. Kutz, Jason G. Benion, Post & Schell, P.C., Harrisburg, PA.

For North American Company For Life and Health Insurance, Defendant: Anthony S. Baish, Daniel CW Narvey, Paul F Heaton, Godfrey & Kahn, S.C., Milwaukee, WI; Christopher F. Petillo, Drinker Biddle & Reath LLP, Philadelphia, PA.

For Allianz Life Insurance Company of North America, Defendant: Ben V Seessel, Stephen J Jorden, Carlton Fields Jorden Burt, P.A., Hartford, CT; Emily H. Edmunds, Saul Ewing LLP, Harrisburg, PA.

**Judges:** A. Richard Caputo, United States District **[*2]** Judge.

**Opinion by:** A. Richard Caputo

## Opinion

### MEMORANDUM

Presently before me are three motions to dismiss Plaintiffs' Complaint (Doc. 1) filed by Defendants Forethought Life Insurance Company ("Forethought") (Doc. 15), PHL Variable Insurance Company ("PHL") (Doc. 33), and Allianz Life Insurance Company of North America ("Allianz") (Doc. 45) (collectively "Defendants").

This case arises out of a fraudulent scheme conducted by an independent insurance broker named Joseph S. Hyduk ("Hyduk") through his company, BNA Financial Services ("BNA"). Plaintiffs Timothy and Ann Dolan, the Estate of Jean Dolan, Raymond and Elizabeth Flannery, Robert and Linda Gruner, Virginia Hetherington, and Carmen Fierro (collectively "Plaintiffs") are now seeking monetary relief from Defendants, four insurance companies, based on Hyduk's conduct.[1]

For the reasons that follow, Defendants' motions to dismiss the Complaint will be granted in part, and denied in part.

## I. Factual Background

The facts, as set forth in Plaintiffs' [*3] Complaint (Doc. 1), are as follows. Plaintiffs are alleged to be victims of a scheme perpetrated by Hyduk and his company, BNA, while Hyduk was purportedly acting as a registered and authorized agent of Defendants, marketing, selling and exchanging their products.

Specifically, in June 2009, Hyduk allegedly became an authorized representative of Defendant Forethought pursuant to the terms of an Annuity Selling Agreement. Under his contractual arrangement with Forethought, Hyduk agreed to procure applications for individual and group annuity products issued by Forethought. Similarly, Hyduk and BNA became authorized agents for Defendant PHL in November 2010 pursuant to the terms of separate Third Party Marketing Agreements. Hyduk and BNA agreed, among other things, to actively promote the sale of PHL Products, include PHL Products on their product lists, and feature PHL Products in marketing campaigns. Based on information and belief, Plaintiffs allege that Hyduk had similar contractual arrangements with Defendants North American and Allianz.

Plaintiffs aver that Hyduk separately targeted each Plaintiff, held himself out as an agent of Defendants, and specifically presented each Plaintiff [*4] with investment opportunities with Defendants. Hyduk explained to Plaintiffs that their purchase of annuities with Defendants would be a safe investment option without risk to principal. Hyduk further explained to Plaintiffs that the minimum guaranteed return on these annuities would be one percent. Plaintiffs allege that to convince them to purchase annuities issued by Defendants, Hyduk would often present Plaintiffs with *pro forma* statements prepared by Defendants, indicating the projected returns Plaintiffs would receive on their investment. Those statements allegedly helped in convincing Plaintiffs to rollover their existing investments to products issued by Defendants.

To make purchases of annuities issued by Defendants, Plaintiffs were required to complete applications in order to obtain authorization to purchase these products. After having their applications approved, Plaintiffs, through Hyduk, would purchase annuities issued by Defendants. These purchases would be accompanied by rollover forms identifying the current plan information and the account being transferred.

Soon after Plaintiffs purchased their annuities, Hyduk manipulated Plaintiffs into selling their investments [*5] for his own gain under suspicious and alarming circumstances. Hyduk had his clients take withdrawals subject to substantial fees and penalties from their annuities issued by Defendants and Defendants would then issue checks to the annuity holders, retaining the fees applicable to the early withdrawals. After receiving the refund checks, instead of purchasing alternative investment products, Hyduk would keep those funds for his own benefit.

Plaintiffs claim that Hyduk's rate of early withdrawals was unusually high and should have put Defendants on notice that Hyduk was not operating according to industry standards or in the best interest of their customers. The withdrawals generally occurred within the first few years following the purchase of Defendants' annuities, thus causing Plaintiffs to incur substantial surrender fees in connection with these transactions.

According to Plaintiffs, Hyduk had apparent authority to act and speak for Defendants and relied on marketing materials prepared by Defendants to entice clients to purchase Defendants' products. Defendants purportedly profited and otherwise benefited from Hyduk's fraud, as he sold many of Defendants' financial products to

---

[1] Although Plaintiffs sued four Defendants, only the above-mentioned three filed their respective motions to dismiss. The fourth Defendant, North American Company for Life and Health Insurance, answered the Complaint (Doc. 20).

his **[*6]** victims and allowed them to realize fees and profits that they would not otherwise have obtained.

Plaintiffs further allege that Defendants ignored countless "red flags" that served as warning signals that a fraud was afoot. Specifically, Plaintiffs aver that Defendants ignored numerous transactions where the sale of annuities by Hyduk's clients resulted in substantial surrender charges. Defendants also purportedly disregarded that Hyduk's clients' repeated withdrawal requests were often unaccompanied by rollover forms authorizing the transfer of funds to purchase different investments offered by other financial service providers. Hyduk's clients' repeated requests for the cash surrender value of their contracts should have alerted Defendants of the need to explore the nature and circumstances of these suspicious transactions. According to Plaintiffs, the volume of transactions in which Hyduk's victims requested withdrawals in the absence of rollover forms was atypical and signaled a likelihood of criminal activity. Yet, despite the absence of rollover information, Defendants and their respective compliance departments failed to investigate Hyduk or otherwise question the provision **[*7]** of services by their authorized agent.

Hyduk converted the withdrawn funds for his own use by asking Plaintiffs to endorse checks for the funds directly to him. Defendants, however, allegedly ignored the fact that the withdrawal forms were not signed by the annuity holder, and failed to conduct any due diligence as to the conduct of Hyduk and the circumstances of these withdrawal requests.

In sum, Plaintiffs aver that, although numerous warning signs existed, Defendants failed to conduct even minimal due diligence as to Hyduk' s operations and assets. Defendants failed to audit or inquire about the investment advice Hyduk was offering to Plaintiffs and others. Defendants also neglected to maintain basic compliance mechanisms and procedures, such as comprehensive reviews and testing, employed throughout the investment advising industry to identify and prevent the type of fraud and self-dealing that allegedly occurred here.

On October 16, 2013, Hyduk's company was raided by the Federal Bureau of Investigation. On August 4, 2014, charges were filed against Hyduk in this Court.[2]

Subsequently, Hyduk pled guilty to tax evasion and wire fraud. On July 30, 2015, he was sentenced to more than five **[*8]** years in prison

In light of the foregoing events, on November 13, 2015, Plaintiffs filed the instant three-count Complaint (Doc. 1) against Defendants.

The Complaint contains the following claims: (1) Count I alleging violations of *Pennsylvania's Unfair Trade Practices and Consumer Protection Act*; (2) Count II alleging a breach of fiduciary duties by Defendants; and (3) Count III alleging negligence.

Defendants have moved to dismiss all claims. (Docs. 15, 33, 45). The motions have been fully briefed and are now ripe for disposition.

## II. Legal Standard

*Federal Rule of Civil Procedure 12(b)(6)* provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which **[*9]** relief can be granted. *See Fed. R. Civ. P. 12(b)(6)*. When considering a *Rule 12(b)(6)* motion, the Court's role is limited to determining if a plaintiff is entitled to offer evidence in support of their claims. *See Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000)*. The Court does not consider whether a plaintiff will ultimately prevail. *Id.* A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States, 220 F.3d 169, 178 (3d Cir. 2000)*.

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)*. The statement required by *Rule 8(a)(2)* must give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. *Erickson v. Pardus, 551 U.S. 89, 93, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007)* (per curiam) (quoting *Bell Atl. Corp. v. Twombly, 550*

---

It was part of the scheme that HYDUK would improperly divert funds from his clients to himself without his clients' knowledge or consent. The majority of the diverted funds was from clients who intended the money to be rolled-over into different investments. HYDUK instructed them to make their checks payable to BNA Financial instead of the actual new investment company and deposited the funds into his own account and used the money for his personal benefit. . . .

Doc 1, at ¶ 3.

---

[2] *See* United States v. Hyduk, No. 3:14-cr-00189 (M.D. Pa., 2014):

U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). Detailed factual allegations are not required. Twombly, 550 U.S. at 555, 127 S. Ct. 1955. However, mere conclusory statements will not do; "a complaint must do more than allege the plaintiff's entitlement to relief." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009). Instead, a complaint must "show" this entitlement by alleging sufficient facts. Id. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009). As such, "[t]he touchstone of the pleading standard is plausability." Bistrian v. Levi, 696 F.3d 352, 365 (3d Cir. 2012).

The inquiry at the motion to dismiss stage is "normally broken into three parts: (1) identifying [*10] the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," Twombly, 550 U.S. at 570, 127 S. Ct. 1955, meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element. Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556, 127 S. Ct. 1955). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S. Ct. 1937. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679, 129 S. Ct. 1937.

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are [*11] based on the documents and the defendant has attached copies of the documents to the motion to dismiss. Id. The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, see City of

Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions.'" Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997)).

## III. Discussion

Defendants advance a series of arguments seeking dismissal of the Complaint in its entirety. For the reasons that follow, their motions will be granted in part and denied in part.

## A. Count I - Pennsylvania's Unfair Trade Practices and Consumer Protection Act

Defendant Forethought first argues that "dismissal is warranted under Federal Rule of Civil Procedure 9(b)" because the allegations sound in fraud. (Doc. 16, at 9).

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). As the Third Circuit has explained, "[a] plaintiff alleging fraud must . . . support its allegations with all of the essential factual background that would accompany the first paragraph of any newspaper story - that is, the who, what, when, where and how of the events at issue." U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC, 812 F.3d 294, 307 (3d Cir. 2016) (citing In re Rockefeller Ctr. Props., Inc. Securities Litig., 311 F.3d 198, 217 (3d Cir. 2002)) (citation and quotation marks omitted). In other words, a plaintiff may satisfy [*12] this requirement by pleading "the date, time and place" of the alleged fraud or deception, or by "otherwise inject[ing] precision or some measure of substantiation" into the allegation. Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (citing Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004) abrogated in part on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007)). "In order to satisfy Rule 9(b), plaintiffs must plead with particularity 'the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Lum, 361 F.3d at 223-24 (quoting Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984)). "Plaintiffs also must allege who made a

misrepresentation to whom and the general content of the misrepresentation." *Id. at 224*.

The heightened specificity required by *Rule 9(b)* extends to the pleading of all claims that "sound in fraud." *See Giercyk v. Nat'l Union Fire Ins. Co. of Pittsburgh, 2015 U.S. Dist. LEXIS 162628, 2015 WL 7871165, at *2 (D.N.J. Dec. 4, 2015); Mladenov v. Wegmans Food Markets, Inc., 124 F. Supp. 3d 360, 372 (D.N.J. 2015)*. As the Third Circuit has explained, *Rule 9(b)* applies "not only to fraud actions under federal statutes, but to fraud claims based on state law." *Christidis v. First Pennsylvania Mortg. Trust, 717 F.2d 96, 99 (3d Cir.1983)*. Here, this includes Plaintiffs' claims alleging violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), *73 P.S. § 201*.

Pennsylvania's UTPCPL makes it unlawful for individuals or businesses to engage in unfair or deceptive acts or practices. *Id.* at. *§ 201-3*. Although there is no clear guidance **[*13]** on how to treat claims under the UTPCPL for the purposes of a 12(b)(6) motion in light of *rule 9(b)*, I am guided here by courts which have required plaintiffs to satisfy the particularity requirement of *Rule 9(b)* in cases involving similar state unfair trade practices and consumer protection statutes. *See, e.g., United States ex rel. Wlochowski v. Merck & Co., 44 F. Supp. 3d 581 (E.D. Pa. 2014)* (*New Jersey Consumer Fraud Act*); *E. Point Sys., Inc. v. Steven Maxim, S2k, Inc., 133 F. Supp. 3d 430 (D. Conn. 2015)* (*Connecticut Unfair Trade Practices Act*); *In re Barclays Liquidity Cross & High Frequency Trading Litig., 126 F. Supp. 3d 342 (S.D.N.Y. 2015)* (California Unfair Competition Law or False Advertising Law); *Osness v. Lasko Prods., 868 F. Supp. 2d 402 (E.D. Pa. 2012)* (*Illinois Consumer Fraud Act*); *Dwoskin v. Bank of Am., N.A., 850 F. Supp. 2d 557 (D. Md. 2012)* (*Maryland Consumer Protection Act*); *Sadler v. Pella Corp., 146 F. Supp. 3d 734 (D.S.C. 2015)* (Illinois Consumer Fraud and Deceptive Business Practices Act).[3]

---

[3] I am, of course, mindful of cases from our Circuit which hold that if a plaintiff alleges only *deceptive* conduct under the UTPCPL, he need not meet the heightened pleading standard. *Christopher v. First Mut. Corp., 2006 U.S. Dist. LEXIS 2255, 2006 WL 166566, at *3 (E.D.Pa. Jan. 20, 2006); see also Seldon v. Home Loan Servs., Inc., 647 F. Supp. 2d 451, 469 (E.D. Pa. 2009)* (concluding that a plaintiff alleging fraudulent conduct under the UTPCPL must meet *Rule 9(b)*'s particularity requirement, whereas a plaintiff alleging deceptive conduct under the statute's "catchall provision" need not). Here, Plaintiffs' allegations go beyond mere claims of deceptive

Applying these standards to the case before me, I find that plaintiffs have failed to comply with the pleading requirements of *Rule 9(b)*.

Without a doubt, Hyduk and his company engaged in criminal conduct. However, a mere discussion of his conduct and blanket allegations alleging liability by Defendants does not plead with particularity why each and every Defendant is responsible for every action taken by Hyduk regarding every Plaintiff, or exactly what acts or omissions each Defendant allegedly committed in ignoring or failing to discover Hyduk's fraud. The Complaint does not identify **[*15]** what proceeds were taken from which Defendant or which Defendant's annuity, nor does the Complaint identify which Defendant provided a *pro forma* statement that convinced which Plaintiff to rollover which existing investment into which Defendant, nor which funds were withdrawn with substantial penalties from which Defendants, and which of Defendants' funds Hyduk kept for his own benefit. There is no attempt to set forth facts that would put each Defendant on fair notice of the individual conduct that purportedly gives rise to a claim against it.

Such sweeping, undifferentiated allegations do not satisfy *Rule 9(b)*. As numerous courts have held, "*Rule 9(b)* does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant ... and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.'" *Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir.2007)* (quoting *Haskin v. R.J. Reynolds Tobacco Co., 995 F.Supp. 1437, 1439 (M.D. Fla.1998)). Vicom, Inc. v. Harbridge Merchant Services, Inc., 20 F.3d 771, 778 (7th Cir.1994); see also Brooks v. Blue Cross and Blue Shield of Florida, Inc., 116 F.3d 1364, 1381 (11th Cir.1997)* ("Plaintiffs have simply 'lumped

conduct and plainly touch upon allegations of fraud. The Complaint alleges that "Defendants profited and otherwise benefitted **[*14]** from Hyduk's fraud," (Doc. 1, at ¶ 51), ignored "warning signals that a fraud was afoot," (¶ 5), and willfully ignored and failed "to disrupt Hyduk's fraud." (¶ 78) Plaintiffs allege that Hyduk "plundered" money from the plaintiffs, (¶ 53), "targeted" them, (¶ 30), "duped" them, (¶ 80), and "manipulated" them (¶ 39), while forging signatures (¶¶ 41, 63) and "keeping funds for his own benefit" rather than investing them as he said he did. (¶¶ 46-47) This "theft" (¶¶ 49, 77) and conversion (¶ 64) eventually led to a guilty plea to "tax evasion and wire fraud." (¶ 85). As such, Plaintiffs' reliance on *Vassalotti v. Wells Fargo Bank, N.A., 732 F. Supp. 2d 503 (E.D. Pa. 2010)* is inapposite.

2016 U.S. Dist. LEXIS 161414, *14

together' all of the Defendants in their allegations of fraud") (quoting *Vicom, 20 F.3d at 778*); *Mills, 12 F.3d at 1175* ("*Rule 9(b)* is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants'"); *Sears v. Likens, 912 F.2d 889, 893* ("A complaint that attributes misrepresentations **[*16]** to all defendants, lumped together for pleading purposes, generally is insufficient"); *In re Crude Oil Commodity Litigation, 2007 U.S. Dist. LEXIS 47902, 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007)* ("In situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and 'lumping' all defendants together fails to satisfy the particularity requirement"); *Sedona Corp. v. Ladenburg Thalmann & Co., Inc., 2005 U.S. Dist. LEXIS 16382, 2005 WL 1902780, at *12 (S.D.N.Y. Aug. 9, 2005)* ("Neither allegations of ability to control or lumped-together accusations of wrongdoing by undifferentiated groups of defendants, is sufficient to satisfy *Rule 9(b)*"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young, 1994 U.S. Dist. LEXIS 2929, 1994 WL 88129, at *7 (S.D.N.Y. Mar. 15, 1994)* ("Sweeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of *Rule 9(b)*"); *Alnwick v. European Micro Holdings, Inc., 281 F.Supp.2d 629, 640 (S.D.N.Y. Sept. 15, 2003)* (*Rule 9(b)* standards were not satisfied were complaint lumped several defendants together and "fail[ed] to specify what each defendant said").

Here, Plaintiffs do precisely what the above authority prohibits. In the Complaint, one Defendant insurance company's alleged actions are indistinguishable from those of the other Defendant insurance companies. All Defendants are alleged to have committed all alleged acts against all Plaintiffs with regard to all annuities and *pro forma* marketing materials. In particular, throughout the Complaint, all six Plaintiffs and all four Defendants **[*17]** are referred to in the collective, and all "Defendants" are alleged to have taken the same actions against all "Plaintiffs." Although it is alleged that Hyduk "separately targeted each Plaintiff" and made pitches to each (Doc 1, at ¶ 30), there is no indication what misrepresentations were allegedly made to any particular Plaintiff on behalf of which Defendant, or when, where and how the misrepresentations occurred.

This is the very definition of improper "lumping together" of multiple Defendants, and, as a number of Circuit's have long held, lumping together defendants in a fraud claim is insufficient. *See Puterman v. Lehman Bros., 332 Fed.Appx. 549 (11th Cir.2009); Swartz v. KPMG*

*LLP, 476 F.3d 756, 764 (9th Cir. 2007); Sears v. Likens, 912 F.2d 889, 893 (7th Cir.1990); Vicom, Inc. v. Harbridge Merch. Servs., Inc., 20 F.3d 771 (7th Cir. 1994); Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1317 (11th Cir.2007); Burgess v. Religious Tech. Ctr., Inc., 600 F. App'x 657, 663 (11th Cir. 2015).*

Plaintiffs also do not state with particularity the circumstances of the alleged fraud or otherwise inject the requisite precision into the allegations. *Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007)*. As such, Plaintiffs do not meet their obligation to put Defendants "on notice of the precise misconduct with which [it is] charged." *Lum, 361 F.3d at 223-224*. In fact, Plaintiffs fail to identify any specific fraudulent statements, omissions, or misrepresentations that were made to them, and fail to allege the contents of these statements and materials, and do not specify when, where, or to whom any of them occurred.[4] Those statements, if they **[*18]** were in fact made, would presumably be at least as well known to Plaintiffs as to Defendants. There is no basis then to excuse Plaintiffs from pleading such statements with particularity. *See Arnold Chevrolet LLC v. Tribune Co., 2007 U.S. Dist. LEXIS 68671, 2007 WL 2743490, at *3 (E.D.N.Y. Sept. 17, 2007)* ("Plaintiffs' claims stem from misrepresentations made to Plaintiffs themselves. Thus, the date, place, and content of the statements are not facts peculiarly within the knowledge of Defendants, but are facts shared by both parties"); *Concorde Funds, Inc. v. Value Line, Inc., 2006 U.S. Dist. LEXIS 18759, 2006 WL 522466, at *5 n. 8 (S.D.N.Y. Mar. 2, 2006)* ("Plaintiff is in as good a position as the defendants are to recall the speakers, dates, and content of the alleged misrepresentations").

Moreover, in their Complaint, Plaintiffs never invoke any specific provisions of the UTPCPL; they instead assert generally that Defendants' actions "constitute unfair and deceptive acts and practices" in violation of the UTPCPL. (Doc. 1, at ¶¶ 80, 90-92). I am left guessing

---

[4] Although Plaintiffs' briefs in opposition shed more light on the allegations, I will not consider after-the-fact allegations in determining the sufficiency of the complaint under *Rules 9(b)* and *12(b)(6)*. *See Commw. of Pa. ex. rel Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir.1988)* ("'It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'") (quoting *Car Carriers, Inc. v. Ford Motor Corp., 745 F.2d 1101, 1107 (7th Cir.1984)*); *Unger v. National Residents Matching Program, 928 F.2d 1392, 1400 (3d Cir.1991)*.

which provision or unfair practice Defendants [*19] allegedly violated, and consequently, Defendants are left guessing as well. Each Defendant is entitled to know what false representations or deceptions it (rather than the other Defendants) made to which Plaintiffs and when.

The Complaint omits the who, what, when, where, and how of the alleged fraud. There are no facts setting forth what misrepresentation was made by or on behalf of which Defendant; to which Plaintiff it was made, when and by whom; that it was made with knowledge of its falsity; that it was made with the intent to mislead Plaintiffs into relying on it; that Plaintiffs justifiably relied on the misrepresentations; and that the misrepresentation proximately caused Plaintiffs' injury. See *Gibbs v. Ernst, 538 Pa. 193, 207, 647 A.2d 882, 889 (1994).* As such, I find that Count I fails to meet the particularity requirement of *Fed. R. Civ. P. 9(b)* and will be dismissed.

## B. Count II - Breach of Fiduciary Duty

The preliminary question before me is whether the heightened specificity requirements of *Rule 9(b)* extend to Count II. I find that they do. "*Rule 9(b)*'s heightened pleading standards apply to breach of fiduciary duty claims where the breach is premised on the defendant's fraudulent conduct, ... such as an attempt 'to induce action or inaction on the part of the investors [*20] by means of falsehoods or material omissions.'" *Henneberry v. Sumitomo Corp. of America, 532 F. Supp. 2d 523, 2007 WL 2068346, at *30 (S.D.N.Y. 2007)* (quoting *In re Luxottica Group S.p.A. Sec. Litigation, 293 F.Supp.2d 224, 238 (E.D.N.Y.2003)).* Therefore, Count II, as premised on Defendant's alleged fraud, must also be dismissed for failure to meet the pleading requirements of *Rule 9(b)*, as discussed above.

## C. Count III - Negligence

Plaintiffs' negligence allegations against Defendants are not grounded in fraud. Plaintiffs neither mention the word "fraud" nor allege facts that would necessarily constitute fraud in Count III of their Complaint. For example, Plaintiffs allege that (1) Defendants failed to act reasonably and responsibly in entering into a contractual arrangement whereby they permitted Hyduk to operate in a position of trust with respect to the funds and investment decisions of Plaintiffs; (2) Defendants

failed to properly engage and supervise Hyduk; (3) Defendants failed to implement a system of checks and approvals with respect to the manner in which Hyduk dealt with their insureds. (4) Defendants failed in inquire into or investigate the frequency with which Hyduk customers made early withdrawals or changed their investment directives. (Doc. 1, at 18). Because those allegations do not rely on a fraudulent course of conduct, they cannot be evaluated pursuant [*21] to *Rule 9(b)*. *In re Suprema Specialties, Inc. Sec. Litig.,438 F.3d 256, 272-73 (3d Cir. 2006)* ("[W]here the claims are expressly premised on negligence rather than fraud, *Rule 9(b)* has been held inapplicable"). Rather, I must evaluate whether they satisfy *Rule 8. See Rawson Food Servs., Inc. v. TD Bank, N.A., 2014 U.S. Dist. LEXIS 25906, at *12 (D.N.J. Feb. 28, 2014).* I find that they do not. Similarly to discussion in the two preceding sections, lumping together all Defendants proves fatal to the allegations in Count III.

As numerous courts have held in the context of *Rule 8*, concluding mass and mutual liability without pleading the supporting facts does not show "that the pleader is entitled to relief" and does not give any of the Defendants "a fair notice of what the ... claim is and the grounds upon which it rests." *Rule 8(a)(2). See, e.g., In re Auto Body Shop Antitrust Litig., 2015 U.S. Dist. LEXIS 114292, 2015 WL 4887882, at *6 (M.D. Fla. June 3, 2015)* (finding that complaints did not meet *Rule 8* where no allegations against the defendant insurance companies "support attributing the wrongful conduct of one Defendant to unrelated and independent wrongful conduct of another Defendant. Lumping together separate and unrelated conduct in this manner does not put Defendants on notice of the grounds for the claims against them"); *Jacobs v. Soars, 2014 U.S. Dist. LEXIS 175776, 2014 WL 7330762, at *8 (D. Mass. Dec. 19, 2014)* (holding that under *Rule 8(a)*, "[j]oining all of the defendants en masse into the majority of the allegations without a factual basis to show how each individual was involved does not afford each defendant fair notice [*22] of the factual allegations and causes of action against him, her, or it"); *Joseph v. Bernstein, 2014 U.S. Dist. LEXIS 114997, 2014 WL 4101392, at *3 (S.D. Fla. Aug. 19, 2014)* aff'd, *612 Fed. Appx. 551 (11th Cir.2015)* ("When a complaint indiscriminately lumps all defendants together, it fails to comply with *Rule 8*"); *see also Paet v. Fernandez, 2013 U.S. Dist. LEXIS 30686, 2013 WL 840224, at *4 (D. Haw. Mar. 5, 2013); Gould v. Citi Mortg., Inc., 2011 U.S. Dist. LEXIS 154359, 2011 WL 7615124, at *18 (D. Minn. Dec. 29, 2011)* report and recommendation adopted, *2012 U.S. Dist. LEXIS 40775, 2012 WL 1005035 (D. Minn. Mar.*

*26, 2012)*; *Corazon v. Aurora Loan Services, LLC, 2011 U.S. Dist. LEXIS 52712, 2011 WL 1740099, at \*4 (N.D. Cal. May 5, 2011)*.

Each Defendant is entitled to know how it acted unreasonably and irresponsibly in entering into a contractual arrangement with Hyduk, how it (as opposed to the other Defendants) supposedly "failed to properly engage and supervise Hyduk," and how it "failed to implement a system of checks and approvals" or failed to investigate the frequency of all the Plaintiffs' withdrawals on all annuities issued by all Defendants. (Doc. 1, at ¶¶ 104-07). In light of the failure to sufficiently plead the allegations in Count III, it will be dismissed.

**D. Leave to Amend**

In their Motions to Dismiss, Defendants also argue that Plaintiffs should not be granted leave to amend the Complaint and request that I dismiss all claims with prejudice. (Doc. 16, at 13-15). I disagree. The Third Circuit has instructed that if a complaint is vulnerable to a 12(b)(6) dismissal, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Phillips v. Cnty. of Allegheny, 515 F.3d 224, 237 (3d Cir. 2008)*; *Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir.2002)* (citing **[\*23]** *Shane v. Fauver, 213 F.3d 113, 116 (3d Cir.2000))*. Here, because Plaintiffs may be able to allege facts sufficient to properly state their negligence, breach of fiduciary duty, and UTPCPL claims, I will grant leave to amend Counts I, II, and III of the Complaint.

**IV. Conclusion**

For the above-stated reasons, I will grant in part and deny in part Defendants' motions to dismiss the Complaint without prejudice to Plaintiffs' right to file an amended Complaint. Plaintiffs will be required to amend their pleading to state their fraud claims with respect to each Defendant insurance company with the requisite specificity. *See, e.g., F.D.I.C. v. Briscoe, 2012 U.S. Dist. LEXIS 153603, 2012 WL 8302215, at \*8 (N.D. Ga. Aug. 14, 2012)* (claims dismissed without prejudice and plaintiff granted leave to replead where defendants were improperly lumped together).

An appropriate order follows.

November 22, 2016

Date

/s/ A. Richard Caputo

A. Richard Caputo

United States District Judge

**ORDER**

**NOW**, this 22nd day of November, 2016, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motions to Dismiss (Docs. 15, 33, 45) Plaintiffs' Complaint (Doc. 1) are **GRANTED in part and DENIED in part** as follows:

(a) Count I alleging a violation of Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), *73 P.S. § 201* is **DISMISSED without prejudice** as failing to meet the particularity requirement **[\*24]** of *Fed. R. Civ. P. 9(b)*.

(b) Count II alleging a breach of fiduciary duty claim is **DISMISSED without prejudice** as failing to meet the particularity requirement of *Fed. R. Civ. P. 9(b)*.

(c) Count III alleging a negligence claim is **DISMISSED without prejudice** as failing to comply with *Fed. R. Civ. P. 8(a)*.

(2) Plaintiffs have **twenty-one (21) days** from the date of entry of this Order to file a an Amended Complaint to properly plead their negligence, breach of fiduciary duty, and UTPCPL claims and to state their claims with respect to each Defendant insurance company with the requisite specificity; otherwise, those claims, and the Complaint, will be **dismissed with prejudice**.

/s/ A. Richard Caputo

A. Richard Caputo

United States District Judge

**End of Document**

No *Shepard's* Signal™
As of: May 8, 2020 7:43 PM Z

## *Grabowski v. Dietz & Watson, Inc.*

United States District Court for the Eastern District of Pennsylvania

September 27, 2017, Decided; September 27, 2017, Filed

CIVIL ACTION NO. 16-5472

**Reporter**
2017 U.S. Dist. LEXIS 159517 *; 2017 WL 4284115

JOSEPH GRABOWSKI, Plaintiff, v. DIETZ & WATSON, INC., Defendant.

## Core Terms

wages, overtime wages, contractual, overtime, contractual obligation, allegations, implied contract, compensate, rate increase, trade show, amend

**Counsel: [*1]** For JOSEPH GRABOWSKI, Plaintiff: JULIA W. CLARK, LEAD ATTORNEY, KARPF, KARPF & CERUTTI P.C., BENSALEM, PA; ARI RISSON KARPF, KARPF, KARPF & CERUTTI, P.C., BENSALEM, PA.

For DIETZ & WATSON, INC., Defendant: CLAUDE I. SCHOENBERG, LEAD ATTORNEY, SCHOENBERG & ASSOCIATES, BALA CYNWYD, PA; STEPHANIE J. MENSING, MENSING LAW LLC, PHILADELPHIA, PA.

**Judges:** C. Darnell Jones, II, J.

**Opinion by:** C. Darnell Jones, II

## Opinion

**MEMORANDUM**

Jones, II J.

### I. Introduction

Plaintiff Joseph Grabowski brings the above-captioned action against his previous employer, Defendant Dietz & Watson, Inc., alleging the corporation's failure to pay Plaintiff overtime wages at an increased rate of pay, in violation of the *Fair Labor Standards Act, 29 U.S.C. § 209, et seq.* ("FLSA") (Count I), the *Pennsylvania Minimum Wage Act, 43 P.S. § 333.101, et seq.* ("PWMA") (Count III), and the Pennsylvania Wage Payment Collection Law, *43 P.S. § 260.1, et seq.* ("WPCL") (Count IV).[1] Currently before the court is Defendant's Motion to Dismiss Count IV of Plaintiff's Complaint, pursuant to *Fed. R. Civ. P. 12(b)(6)*. For the reasons set forth below, Defendant's Motion shall be granted.

### II. Background

From September 2009 through May 2016, Plaintiff was employed as a sales merchandizer by Defendant, a seller of deli meats and artisan cheeses. (Compl. ¶¶ 7, 10-11.) Plaintiff's **[*2]** primary work duties were to go to merchants of Defendant's products—grocery stores—and ensure that the stores' employees had adequate knowledge of the products and that the stores were correctly showcasing and marketing those products. (Compl. ¶ 12.) Plaintiff contends his job did not include making sales and that he had little to no discretion regarding how to perform his duties. (Compl. ¶¶ 12, 14.) Rather, decisions regarding the showcasing and marketing of Defendant's products were laid out in a policy created by Defendant's Marketing Department and upper management. (Compl. ¶ 14.)

---

[1] Plaintiff's Complaint does not contain "Count II" but instead, skips from Count I to Count III. (Compl. 6-7.)

For approximately the last five years of Plaintiff's employment with Defendant, Plaintiff's work also included setting up trade shows. (Compl. ¶ 15.) The associated duties performed by Plaintiff with respect to those trade shows were transporting and loading equipment and products onto Defendant's vehicles; setting up booths at the trade shows; and, discussing storage and electrical arrangements with "individuals" at the trade shows. (Compl. ¶¶ 16.) As with his other duties, Plaintiff contends he had little to no discretion in how to perform his trade show-related duties and that decisions about the trade **[*3]** shows were made by Defendant's Vice President, Marketing Department, and other upper management. (Compl. ¶ 17.)

During Plaintiff's employment, Plaintiff received a "salary of $52,000 per year, regardless of how many hours he worked," and alleges that he often worked more than 50 hours per week, particularly during the last five years of his employment. (Compl. ¶¶ 19-20.) Plaintiff claims he was a "non-exempt" employee and was therefore entitled to receive "time-and-a-half" payment for all overtime. (Compl. ¶¶ 21-22.)

## III. Standard of Review

In deciding a motion to dismiss pursuant to *Rule 12(b)(6)*, courts must accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)* (internal quotation and citation omitted). After the Supreme Court's decision in *Bell Atl. Corp. v. Twombly*, [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citing *Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable **[*4]** for the misconduct alleged. *Id.* (citing *Twombly, 550 U.S. at 556*). This standard asks for more than a sheer possibility that a defendant has acted unlawfully. *Id. Accord Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)* ("[A]ll civil complaints must contain more than an unadorned, the-defendant-unlawfully-harmed-me accusation.") (internal quotation marks omitted).

## IV. Discussion

### A. Contractual Obligation Requirement of WPCL Claims

Simply stated, "The Wage Payment and Collection Law provides employees a statutory remedy to recover wages and other benefits that are contractually due to them." *Oberneder v. Link Computer Corp., 548 Pa. 201, 696 A.2d 148, 150 (Pa. 1997)*.

More specifically, the WPCL states in pertinent part:

> Every employer shall pay all wages, other than fringe benefits and wage supplements, due to his employes on regular paydays designated in advance by the employer. Overtime wages may be considered as wages earned and payable in the next succeeding pay period. All wages, other than fringe benefits and wage supplements, earned in any pay period shall be due and payable within the number of days after the expiration of said pay period as provided in a written contract of employment or, if not so specified, within the standard time lapse customary in the trade or within 15 days from the end of such pay period.

43 Pa.C.S.A. § 260.3(a).

The Third Circuit **[*5]** has long held that the "WPCL does not create a right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. The contract between the parties governs in determining whether specific wages are earned." *Weldon v. Kraft, Inc., 896 F.2d 793, 801 (3d Cir. 1990); see also De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003)* (same); *Calli v. ARC Maint., Inc., No. 5:14-cv-5292, 2016 U.S. Dist. LEXIS 6923, at *22 (E.D. Pa. Jan. 21, 2016)* (same).

When no *written* contract obligates a defendant to pay the wages sought by a plaintiff, he or she "will have to establish the formation of an implied oral contract between [the defendant] and its employees." *De Asencio, 342 F.3d at 309; see also Braun v. Wal-Mart Stores, Inc., 2011 PA Super 121, 24 A.3d 875, 954 (Pa. Super. Ct. 2010)* ("We agree with the . . . Third Circuit's observation that '[absent an express contract], an employee raising a WPCL claim would have to establish, at a minimum, an implied oral contract between the employee and employer.''. "A promise to pay for services can only be implied, however, in

circumstances under which the party rendering the services would be justified in entertaining a reasonable expectation of being compensated by the party receiving the benefit of those services." *Oxner v. Cliveden Nursing & Rehab. Ctr. PA, L.P., 132 F. Supp. 3d 645, 649 (E.D. Pa. 2015)* (citing *Martin v. Little, Brown & Co., 304 Pa. Super. 424, 450 A.2d 984, 987 (Pa. Super. Ct. 1981))* (discussing what would be required to infer an implied contract in a WPCL claim).

Thus, a claim under the WPCL "does not provide for relief due **[*6]** under state or federal law," as opposed to wages due to an employee under a contract with an employer. *Lehman v. Legg Mason, Inc., 532 F. Supp. 2d 726, 734 (M.D. Pa. 2007)* (dismissing a WPCL claim which relied on the FLSA and the PMWA as a source for the obligation of the defendant to pay wages, instead of a contract); *see also Scott v. Bimbo Bakeries, Inc., 2:10-cv-03154, 2012 U.S. Dist. LEXIS 26106, at *16-18 (E.D. Pa. Feb. 29, 2012)* (dismissing a WPCL claim for overtime wages in which the only basis for the obligation to pay those wages were FLSA and PMWA claims) (citing *Lehman, 532 F. Supp 2d at 734*).

A plaintiff's failure to plead to the existence of *any* contract, express or implied, will render a WPCL claim unsuccessful. *See, e.g., Lehman, 532 F. Supp. 2d at 733-34; Rosario v. First Student Mgmt., LLC, 5:15-cv-06478, 2016 U.S. Dist. LEXIS 108172, at *26 (E.D. Pa. Aug. 16, 2016)* ("[T]he mere existence of an employer-employee relationship is not sufficient to establish a contractual right to recovery under the WPCL. The Third Circuit has clearly required plaintiffs lacking a formal written agreement to allege at the very least an implied oral contract."); *Mackereth v. Kooma, Inc., 2:14-cv-04824, 2015 U.S. Dist. LEXIS 63143, at *30 (E.D. Pa. May 14, 2015)* (dismissing WPCL claim because "Plaintiffs do not allege the existence of a contractual right, either express or implied, to recover the wages they seek [including the overtime wages sought] pursuant to the WPCL."); *Drummond v. Herr Foods Inc., 2:13-cv-05991, 2014 U.S. Dist. LEXIS 2409, at *10-11 (E.D. Pa. Jan. 9, 2014)* **[*7]** (granting a motion to dismiss because the plaintiff did not plead "any such contractual obligation [to pay overtime pay], either express or implied.").

However, when a plaintiff does plead the existence of a contract, the defendant's obligation to pay the *specific* wages sought by the plaintiff must flow from the governing contract. *See Arrington v. Willow Terrace & RC Operator, LLC, 2:16-cv-02599, 2016 U.S. Dist. LEXIS 139669, at *8-9 (E.D. Pa. Oct. 7, 2016)* ("Plaintiff

fail[ed] to plead any facts demonstrating that Plaintiff was contractually entitled to *this* compensation. Absent a specific allegation of a[n] [express or implied] contract between Plaintiff and Defendant whereby Defendant was obligated to make *these* payments, Plaintiff's claim is insufficient.") (emphasis added).

When assessing WPCL allegations based upon an express contract, an interpretation of the terms of an express contract must reveal the contractual obligation, or the plaintiff will not be entitled to relief. *See, e.g., Calli, 2016 U.S. Dist. LEXIS 6923, at *23* (dismissing a salaried employee's WPCL claim for overtime wages because the agreements did not specify those wages be paid); *Scott, 2012 U.S. Dist. LEXIS 26106, at *15-17* (dismissing a WPCL upon determining that the contract did not obligate the defendants to make payment of the wages sought). **[*8]**

Likewise, the requirement that an implied contract carry with it a "reasonable expectation" for compensation commands that the oral agreement actually concern the wages sought in the action. *See, e.g., Weldon, 896 F.2d at 801* ("Nor do we believe that a reasonable trier of fact could infer from [the] statement[s] [offered as proof of an implied contract,] the existence of an implied contractual obligation."); *Oxner 132 F. Supp. 3d at 649-50* (finding normal payments were implied by the services performed however, overtime wages were neither promised nor implied); *Miller v. Cerebain Biotech Corp., 2:16-cv-03943, 2016 U.S. Dist. LEXIS 154597, at * 15-16* (finding an implied contractual obligation for the sought wages based on an e-mail discussing the terms of a plaintiff's future employment, its compensation, the announcement of the plaintiff having been hired for the position, and the plaintiff's performance of the requested services).

**B. Count IV of Plaintiff's Complaint Fails to Sufficiently Plead a WPCL Claim**

Count IV of Plaintiff's Complaint alleges in pertinent part that: "Plaintiff had an agreement with Defendant whereby Defendant agreed to compensate Plaintiff for all services he performed during his employment"; "Plaintiff performed the agreed-upon services for Defendant"; and, "Defendant **[*9]** failed to properly compensate Plaintiff for the services rendered as specified by the Parties' employment agreement (included [sic] but not limited to paying Plaintiff for all hours worked after hours and on weekends)." (Compl. ¶¶ 41, 43.) Construing said Complaint in a light most

favorable to Plaintiff, this Court finds his WPCL allegations to be insufficient.

### 1. Plaintiff Failed to Adequately Plead the Existence of an Express Contractual Obligation

Plaintiff's Complaint fails to indicate whether the employment "agreement" to which he refers was express or implied. "*Federal Rule of Civil Procedure 8(a)* permits a plaintiff to assert the existence of an express, written contract either by setting it forth verbatim in the complaint, or the plaintiff may attach a copy as an exhibit, or plead it according to its legal effect." *Rivera v. Dealer Funding, LLC, 178 F. Supp. 3d 272, 275-276 (E.D. Pa. 2016)* (internal quotation marks and citations omitted). Plaintiff has not satisfied any of these alternatives. Instead, he simply states that the agreement existed and that Defendant failed to "properly compensate Plaintiff for the services rendered as specified by" that agreement. (Compl. ¶¶ 40-44.) Plaintiff fails to allege any obligation created by this "agreement." Although he concedes Defendant paid **[*10]** him a salary for the entirety of his employment, Plaintiff claims Defendant should have *also* paid him additional wages for the extra hours he worked. (Compl. ¶ 19.) This—without more—is insufficient. *See Calli, 2016 U.S. Dist. LEXIS 6923, at *23* (salaried employee's WPCL claim was dismissed because the agreement "ma[de] no mention of overtime wages and therefore [did] not evidence a contractual agreement to pay overtime wages.").

### 2. Plaintiff Failed to Adequately Plead the Existence of an Implied Contractual Obligation

Assuming in the alternative that the "agreement" referred to in the Complaint was intended to be interpreted as an implied contract, Plaintiff's WPCL claim remains deficient because it is devoid of any facts from which this Court can construe the existence of any promise by Defendant to pay overtime wages at an increased rate of pay. In *Oxner*, an employee who was required to work additional hours at home, sought payment for those hours at an increased rate. *132 F. Supp. 3d at 647-48*. The court, while allowing her to be paid at her regular rate, dismissed her claim for overtime wages, holding as follows:

> Oxner alleges defendants [required her] to work this extra time, but nowhere in the amended complaint does Oxner contend that Defendants

promised **[*11]** to or implied that they would compensate her at a higher rate of pay for this extra work. Rather, Oxner merely claims that she was entitled to overtime pay for her hours worked over forty. This claim is a legal conclusion couched as a fact and the Court need not give it credence.

*Id. at 650* (internal quotations marks omitted) (citations omitted).

In the matter before this Court, nothing Defendant is alleged to have done, said, agreed to, or promised would have "justified [Plaintiff] in entertaining a reasonable expectation of being compensated" in the form of increased overtime wages. Accordingly, Plaintiff has failed to sufficiently plead a WPCL claim on the basis of an implied contractual obligation.

### C. Amendment

Amendments to a Complaint may be made as a matter of course, but only if the amendment occurs within: "21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under *Rule 12(b)*, *(e)*, or *(f)*, whichever is earlier." *Fed. R. Civ. P. 15(a)(1)*.

Inasmuch as the conditions for amendment as a matter of course are absent here, amendment is only permitted by leave of court or with the written consent of the **[*12]** opposing party. *Fed. R. Civ. P. 15(a)(2)*. Leave must be freely granted "when justice so requires." *Id.* However, leave may be denied where undue delay, bad faith, dilatory motive, prejudice, or futility are present. *Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000)*. In examining futility, the legal standards of *Rule 12(b)(6)* must be applied. *Id.*

While Plaintiff's current Complaint does not sufficiently plead the existence of a contractual obligation on the part of Defendant to pay Plaintiff overtime wages at an increased rate of pay, this Court cannot conclude that any attempt to amend said Complaint would be futile and shall therefore grant Plaintiff leave to amend.[2]

---

[2] In the event Plaintiff elects to take advantage of this Court's granting of leave to amend, said amendment must point to a contractual obligation to pay overtime wages. In his current Complaint, Plaintiff's first mention of entitlement to overtime pay at an increased rate states that the issue will be "discussed supra." (Compl. ¶ 21.) However, the only other

**V. CONCLUSION**

For the reasons set forth above, Defendant's Motion to Dismiss shall be granted and Plaintiff shall be granted leave to amend Count IV of his Complaint.[3]

An appropriate Order follows.

BY THE COURT:

/s/ C. Darnell Jones, II J.

**ORDER**

AND NOW, this 27th day of September, 2017, it is hereby ORDERED that upon consideration of Defendant's Motion to Dismiss Count IV of Plaintiff's Complaint (ECF No. 5) and Plaintiff's Opposition thereto (ECF No. 6), said Motion is GRANTED. It is further ORDERED that in the event Plaintiff intends to file an Amended Complaint, he shall do so **on or before October 18, 2017**.

BY **[*13]** THE COURT:

/s/ C. Darnell Jones, II J.

_____

End of Document

_____

reference to overtime pay is contained in his allegations of "non-exempt" employee entitlement under the FLSA and PMWA. (Compl. ¶¶ 26-27, 35-36.) As previously discussed, entitlement to wages under federal and state law is insufficient to maintain a claim under the WPCL. While this Court does not comment on the validity of Plaintiff's FLSA and PMWA claims, Plaintiff's potential future success in recovering under those laws will not entitle him to relief under the WPCL. Plaintiff must instead show either an express or implied contract which obliges Defendant to pay him the overtime wages sought.

[3] In the event Plaintiff elects to amend Count IV, he shall also correct the numbering of all Counts contained within the Amended Complaint.

No *Shepard's* Signal™
As of: May 8, 2020 7:37 PM Z

## *Maldonado v. Karnes*

United States District Court for the Middle District of Pennsylvania

October 8, 2014, Decided; October 8, 2014, Filed

CIVIL NO. 3:CV-14-1330

**Reporter**
2014 U.S. Dist. LEXIS 143560 *; 2014 WL 5035470

WILLIAM MALDONADO, Plaintiff v. WARDEN ROBERT J. KARNES, ET AL., Defendants

## Core Terms

inmate, prison, verbal, protective custody, confinement, sentence, custody, rights, constitutional right, liberty interest, accompanied, retaliation, placement, duration, in forma pauperis, work release, threats

**Counsel:** **[*1]** William Maldonado, Plaintiff, Pro se, Lebanon, PA.

**Judges:** RICHARD P. CONABOY, United States District Judge.

**Opinion by:** RICHARD P. CONABOY

## Opinion

### MEMORANDUM

### Background

William Maldonado (Plaintiff), an inmate presently confined at the Lebanon County Correctional Facility, Lebanon, Pennsylvania, initiated this pro se civil rights action pursuant to 42 U.S.C. § 1983. Accompanying the complaint is an in forma pauperis application.[1] For the reasons set forth below, Maldonado will be granted temporary in forma pauperis status for the sole purpose of the filing of this matter. However, Plaintiff's complaint will be dismissed, without prejudice.

Named as Defendants are three employees of the Lebanon County Correctional Facility: Warden Robert Karnes; Deputy Warden for Operations Timothy Clements; and Correctional Counselor Tina Verna. Plaintiff indicates that he is presently serving concurrent sentences imposed **[*2]** by the Lebanon County Court of Common Pleas and the Lehigh County Court of Common Pleas.

Maldonado's initial claim vaguely asserts that the Warden "told the honorable judges that i [sic] was considered a probalem [sic] prisoner which was totally a lye [sic]." Doc. 1, ¶ IV(1). Plaintiff contends that his statement was false he has been confined at the prison for four (4) months without any disciplinary violations. The only other allegation set forth regarding Warden Karnes is a general allegation that the Warden also stated that Maldonado had requested protective custody.[2]

With respect to Deputy Warden Clements, the Complaint contends that said Defendant incorrectly stated that the Lehigh County Prison refused to take

_____

[1] Maldonado completed this Court's form application to proceed in forma pauperis and authorization to have funds deducted from his prison account. The Court then issued an Administrative Order directing the Warden at his present place of confinement to commence deducting the full filing fee from Plaintiff's prison trust fund account.

[2] Plaintiff notes that while at the Lebanon County prison he was purportedly assaulted numerous times. There is no discernible claim stated that any of the Defendants either assaulted him or failed to protect his safety.

2014 U.S. Dist. LEXIS 143560, *2

custody of Plaintiff, which Maldonado concludes is incorrect because he was sentenced to serve concurrent sentences at the Lehigh County Prison. See id. at ¶ 2.

While Plaintiff was being held in the prison's protective custody unit, Corrections Counselor Verna [*3] purportedly made verbal threats towards the prisoner for filing grievances, refused to let him contact his attorney, or do anything for him "as she's required to as a corr counselor." Id. at ¶ 3. Maldonado seeks injunctive relief, specifically a transfer to the Lehigh County Prison; placement on work release, removal from protective custody and that the warden be directed to prepare a statement admitting that he is not a problem prisoner.

## Discussion

When considering a complaint accompanied by a motion to proceed in forma pauperis, a district court may rule that process should not issue if the complaint is malicious, presents an indisputably meritless legal theory, or is predicated on clearly baseless factual contentions. *Neitzke v. Williams, 490 U.S. 319, 327-28, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989); Douris v. Middleton Township, 293 Fed. Appx. 130, 132 (3d Cir. 2008).* Indisputably meritless legal theories are those "in which either it is readily apparent that the plaintiff's complaint lacks an arguable basis in law or that the defendants are clearly entitled to immunity from suit ... ." *Roman v. Jeffes, 904 F.2d 192, 194 (3d Cir. 1990)* (quoting *Sultenfuss v. Snow, 894 F.2d 1277, 1278 (11th Cir. 1990)).*

The United States Court of Appeals for the Third Circuit has added that "the plain meaning of 'frivolous' authorizes the dismissal of in forma pauperis claims that . . . are of little or no weight, value, or importance, not worthy of [*4] serious consideration, or trivial." *Deutsch v. United States, 67 F.3d 1080, 1083 (3d Cir. 1995).* It also has been determined that "the frivolousness determination is a discretionary one," and trial courts "are in the best position" to determine when an indigent litigant's complaint is appropriate for summary dismissal. *Denton v. Hernandez, 504 U.S. 25, 33, 112 S. Ct. 1728, 118 L. Ed. 2d 340 (1992).*

## Verbal Threats

Plaintiff alleges in part that Warden Karnes and Deputy Warden Clements made false statements and that

Correctional Counselor Verna verbal threatened him. There is no assertion that any of those purported comments were accompanied by any physical abuse.

The use of words generally cannot constitute an assault actionable under *§ 1983. Johnson v. Glick, 481 F.2d 1028, 1033 n.7 (2d Cir.); Maclean v. Secor, 876 F. Supp. 695, 698-99 (E.D. Pa. 1995); Murray v. Woodburn, 809 F. Supp. 383, 384 (E.D. Pa. 1993)* ("Mean harassment . . . is insufficient to state a constitutional deprivation."); *Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185, 189 (D.N.J. 1993)* ("[V]erbal harassment does not give rise to a constitutional violation enforceable under *§ 1983.").*

Mere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations. *Balliet v. Whitmire, 626 F. Supp. 219, 228-29 (M.D. Pa.)* ("[v]erbal abuse is not a civil rights violation . . ."), aff'd, *800 F.2d 1130 (3d Cir. 1986)* (Mem.). A constitutional claim based only on verbal threats will fail regardless of whether it is asserted under the *Eighth Amendment's cruel and unusual punishment clause,* see *Prisoners' Legal Ass'n, 822 F. Supp. at 189,* or under the *Fifth Amendment's* substantive *due process clause.*

Verbal harassment, with some reinforcing act accompanying them, however, may state a constitutional [*5] claim. For example, a viable claim has been found if some action taken by the defendant escalated the threat beyond mere words. See *Northington v. Jackson, 973 F.2d 1518 (10th Cir. 1992)* (guard put a revolver to the inmate's head and threatened to shoot); *Douglas v. Marino, 684 F. Supp. 395 (D.N.J. 1988)* (involving a prison employee who threatened an inmate with a knife). Moreover, alleged instances of verbal harassment which are not accompanied by any physical contact are constitutionally insufficient. See *Hart v. Whalen, 2008 U.S. Dist. LEXIS 71960, 2008 WL 4107651 *10 (M.D. Pa. July 29, 2008); Wright v. O'Hara, 2004 U.S. Dist. LEXIS 15984, 2004 WL 1793018 *7 (E.D. Pa. 2004)*(correctional officer's words and gestures, including lunging at prisoner with a clenched fist were constitutionally insufficient because there was no physical contact).

There is no indication that any of the verbal falsehoods and threats allegedly voiced against Maldonado were accompanied by a reinforcing act involving a deadly weapon as contemplated under *Northington* and *Douglas.* More importantly, it is not alleged that the

alleged verbal abuse was accompanied by any physically intrusive behavior. Given the circumstances described by Plaintiff, the purported verbal remarks attributed to the Defendants were not of such magnitude to shock the conscience as contemplated by this Court in *S.M. v. Lakeland School District, 148 F. Supp.2d 542, 547-48 (M.D. Pa. 2001)* and thus, did not rise to the level of a constitutional violation.

With respect to the assertion **[*6]** that Plaintiff was falsely described as being a problem prisoner, prisoner's disagreement with "evaluations and opinions regarding him" are insufficient to set forth an actionable constitutional claim. See *Paine v. Baker, 595 F.2d 197, 201 (4th Cir. 1979)*. Moreover, "defamation is actionable under *42 U.S.C. § 1983* only if it occurs in the course of or is accompanied by a change or extinguishment of a right or status guaranteed by state law or the Constitution." *Clark v. Township of Falls, 890 F. 2d 611, 619 (3d Cir. 1989)*. Accord *Siegert v. Gilley, 500 U.S. 226, 233-35, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991)*.

Maldonado has not alleged that a significant interest other than potential damage to his reputation occurred as a result of the purported defamation. It is noted that the purported defamation did not cause his arrest or incarceration. Thus, there are no facts to support his apparent claim that the alleged defamatory labeling of the Plaintiff as being a problem prisoner caused him any actual constitutionally recognized injury. Because the Plaintiff does not have a constitutionally protected interest in his reputation, his Complaint to the extent that it seeks to pursue a claim of slander/defamation may not proceed. See *Paul v. Davis, 424 U.S. 693, 701-02, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976)*(liberty interest requires more than mere injury to reputation).

**Access to the Courts**

The Complaint includes a vague claim that Correctional Counselor Verna refused **[*7]** to let Plaintiff contact his attorney while he was held in protective custody.

Inmates have a constitutional right of meaningful access to law libraries, legal materials or legal services. *Bounds v. Smith, 430 U.S. 817, 821-25, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977)*. The United States Supreme Court in *Lewis v. Casey, 518 U.S. 343, 351-54, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)*, clarified that an inmate plaintiff, in order to set forth a viable claim under Bounds, must demonstrate that a non-frivolous legal claim being pursued in the courts had been frustrated or

was being impeded. A plaintiff must also allege an actual injury to his litigation efforts.

Based upon a careful review of the Complaint, Plaintiff raises no contention that his pursuit of a non-frivolous legal claim was frustrated or impeded due to the conduct attributed to Defendant Verna. Accordingly, under the standards announced in Lewis, the Complaint to the extent that it is seeking to assert a denial of access to the courts claim is subject to dismissal.

**Protective Custody**

The United States Supreme Court has held that a federal inmate has "no legitimate statutory or constitutional entitlement" to any particular custodial classification even if a new classification would cause that inmate to suffer a "grievous loss." *Moody v. Daggett, 429 U.S. 78, 88 n.9, 97 S. Ct. 274, 50 L. Ed. 2d 236 (1976)*; *James v. Reno, 39 F. Supp. 2d 37, 40 (D.D.C. 1999)*(citation omitted) (a federal inmate "has no liberty **[*8]** interest in his security classification").

Moreover, any lack of change in custody classification and institutional placement did not result in the type of atypical or significant hardship necessary to establish a constitutional violation under *Sandin v. Conner, 515 U.S. 472, 480-84, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)*.[3] See *James v. Reno, 39 F. Supp. 2d 37, 40 (D.D.C. 1999)*.

In *Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)*, the United States Supreme Court held that while under certain circumstances, states may create liberty interests protected by the *Due Process Clause*,

these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the *Due Process Clause* of its own force . . ., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id. at 484* (citations omitted). The Court of Appeals for the Third Circuit in *Griffin v. Vaughn, 112 F.3d 703 (3d*

_____

[3] The United States Supreme Court in Sandin shifted the focus of liberty interest analysis from one "based on the language of a particular regulation" to "the nature of the deprivation" experienced by the prisoner. *Id. at 481*.

2014 U.S. Dist. LEXIS 143560, *8

*Cir. 1997)*, addressed an action initiated by a Pennsylvania state inmate who had been held in administrative custody for a prolonged period. The Court applied Sandin and concluded that placement without any type of due **[*9]** process hearing for a period of fifteen (15) months was not an atypical and significant hardship. Furthermore, the inmate's "commitment to and confinement in administrative custody did not deprive him of a liberty interest and that he was not entitled to procedural due process protection." *Id. at 708*. It added that prolonged confinement in administrative custody, including being required to eat meals in their cell, was not cruel and unusual punishment. *Id. at 709*. Finally, an inmate placed in administrative custody pursuant to a legitimate penological reason could "be required to remain there as long as that need continues." Id.

There is no assertion by Plaintiff that his placement on protective custody status was not warranted. In fact, Plaintiff indicates that he has been subjected to numerous assaults while in the prison. Second, since Plaintiff indicates that he has only been incarcerated for four (4) months, there is no allegation that the duration of Maldonado's protective custody placement was of such magnitude or duration as to constitute the atypical and significant hardship contemplated under *Griffin* and *Sandin*.

In conclusion, the placement of Plaintiff on protective custody status and any **[*10]** associated restrictions and deprivationswithout any claim that it was of a prolonged unwarranted duration does not rise to the level of a viable constitutional claim.

### Retaliation

A liberal reading of the pro se Complaint also indicates that Corrections Counselor Verna retaliated against Plaintiff for his pursuit of administrative remedies.

"Retaliation for the exercise of a constitutional right is itself a violation of rights secured by the Constitution." *White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990)*; *Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000)*(a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges that he was denied, only that the challenged actions were motivated in substantial part by a desire to punish him for the exercise of a constitutional right).

In *Rauser v. Horn, 241 F.3d 330, 333 (2001)*, the Third Circuit held that a prisoner must prove that the conduct which led to the alleged retaliation was constitutionally protected. If the prisoner satisfies that requirement he must then show he suffered some "adverse action" at the hands of prison officials. Id. Allah defined adverse action as being "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *Allah, 229 F.3d at 225*.

Next, the prisoner must prove a causal link between the **[*11]** exercise of the constitutional right and the adverse action against him. Under *Rauser*, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest. *Id. at 334*.

Based on those factors, it is clear that Plaintiff has not presented any facts which could establish that his exercise of a constitutionally protected right was a substantial or motivating factor behind the alleged acts of retaliation as required by Rauser. With respect to the factually sparse contentions that Verna made verbal threats and refused to let him contact his attorney, Plaintiff has not sufficiently alleged facts which could support a claim that those actions were retaliatory.

### Work Release

As partial relief, Plaintiff requests that he be granted work release. An inmate does not have a protected liberty or property interest in prison employment. *James v. Quinlan, 866 F.2d 627, 629-30 (3d Cir. 1989)*; *Bryan v. Werner, 516 F.2d 233, 240 (3d Cir. 1975)*. The right to earn wages while incarcerated is a privilege, not a constitutionally guaranteed right.

An inmate's expectation **[*12]** of keeping a specific prison job, or any job, does not implicate a protected property interest." *Wilkins v. Bittenbender, 2006 U.S. Dist. LEXIS 20179, 2006 WL 860140 *9 (M.D. Pa. March 31, 2006)* (Conaboy, J.) (quoting *Bulger v. United States Bureau of Prisons, 65 F.3d 48, 50 (5th Cir. 1995))*. See also *Coakley v. Murphy, 884 F.2d 1218, 1221 (9th Cir. 1989)* (holding inmates have no property interest in continuing in work-release program); *Ingram v. Papalia, 804 F.2d 595, 596 (10th Cir. 1986)* (finding Constitution does not create a property interest in prison employment).

In *Winsett v. McGinnes, 617 F.2d 996, 1005 (3d Cir. 1980)*, the Third Circuit similarly held that "there is no constitutionally mandated right to enter a discretionary parole release program." The instant plaintiff has no right to employment while he serves his sentence and the work release program is discretionary, see *Babcock v. Michelle Snare, et al., Civil No. 94-2054, 1995 U.S. Dist. LEXIS 22795, at *8 (M.D. Pa. September 29, 1995)* (Nealon, J.) (holding that decisions involving work release for county prison inmates are discretionary), Maldonado cannot claim any due process interest in work release program participation arising from the Constitution and as such his request to be placed on work release lacks merit.

**Habeas Corpus**

Maldonado alleges in part that the terms of his sentence are no being properly carried out. Inmates may not use civil rights actions to challenge the fact or duration of their confinement or to seek earlier or speedier release. *Preiser v. Rodriguez, 411 U.S. 475, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1975)*. The United States Court of Appeals for the Third Circuit **[*13]** has similarly recognized that civil rights claims seeking release from confinement sounded in habeas corpus. See *Georgevich v. Strauss, 772 F.2d 1078, 1086 (3d Cir. 1985)*.

The United States Supreme Court in *Edwards v. Balisok, 520 U.S. 641, 646, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997)*, similarly concluded that a civil rights claim for declaratory relief "based on allegations ... that necessarily imply the invalidity of the punishment imposed, is not cognizable" in a civil rights action. *Id. at 646*. Based on the reasoning announced in Georgevich and Edwards, Plaintiff's present claims that the terms of his sentence are not being properly carried out to the extent that they challenge the fact or duration of his sentence are not properly raised in a civil rights complaint. Accordingly, any such claims will be dismissed without prejudice to any right Maldonado may have to pursue those allegations via a properly filed federal habeas corpus petition.

**Conclusion**

Since Maldonado's civil rights complaint is "based on an indisputably meritless legal theory," it will be dismissed, without prejudice, as legally frivolous. *Wilson, 878 F.2d*

*at 774*. An appropriate Order will enter.[4]

/s/ Richard P. Conaboy

RICHARD P. CONABOY

United States District Judge

DATED: OCTOBER 8th, 2014

**ORDER**

AND NOW THIS 8th DAY OF OCTOBER, 2014, in accordance with the accompanying Memorandum, IT IS HEREBY ORDERED THAT:

1. Plaintiff's action is **DISMISSED WITHOUT PREJUDICE** as frivolous pursuant to *28 U.S.C. § 1915 (e) (2) (B) (i)* .

2. The Clerk of Court is directed to **CLOSE** the case.

/s/ Richard P. Conaboy

RICHARD P. CONABOY

United States District Judge

_____

End of Document

_____

[4] If Plaintiff can allege facts which could establish that the duration of his protective custody has been excessively prolonged; or that he is being subjected to unconstitutional conditions **[*14]** of his confinement; or otherwise cure the deficiencies outlined herein, he may file a motion for reconsideration within fourteen (14) days of the date of this Order.

 Positive
As of: May 8, 2020 7:39 PM Z

## *Martinez v. Fed. Corr. Inst.*

United States District Court for the Central District of California

September 25, 2019, Decided; September 25, 2019, Filed

Case No. 2:19-cv-07742-JFW-MAA

**Reporter**
2019 U.S. Dist. LEXIS 193325 *; 2019 WL 5791454

JUAN DIEGO MIRANDA MARTINEZ, Petitioner, v. FEDERAL CORRECTIONAL INSTITUTION #2, Respondent.

**Subsequent History:** Adopted by, Writ of habeas corpus denied, Dismissed by, Without prejudice, Judgment entered by *Martinez v. Fed. Corr. Inst., 2019 U.S. Dist. LEXIS 193345 (C.D. Cal., Nov. 4, 2019)*

## Core Terms

prison, sentence, work assignment, confinement, challenges, inmate, civil rights, conditions, custody, involuntary servitude, habeas relief, requests, violates, conditions of confinement, habeas petition, habeas corpus, incarcerated, convicted, asserts, slavery

**Counsel:** **[*1]** Juan Diego Miranda Martinez, Petitioner, Pro se, ADELANTO, CA.

For Federal Correctional Institution No. 2, Respondent: Assistant 2241-194 US Attorney LA-CV, LEAD ATTORNEY, Office of US Attorney, Criminal Division - US Courthouse, Los Angeles, CA.

**Judges:** MARIA A. AUDERO, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** MARIA A. AUDERO

## Opinion

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This Report and Recommendation is submitted to the Honorable John F. Walter, United States District Judge, pursuant to *28 U.S.C. § 636* and General Order 05-07 of the United States District Court for the Central District of California.

## I. BACKGROUND

On September 6, 2019, Petitioner Juan Diego Miranda Martinez (in some records identified as Juan Diego Martinez-Miranda) filed a petition for a writ of habeas corpus pursuant to *28 U.S.C. § 2241* ("*Section 2241*"). ("Petition," ECF No. 1.) Upon a guilty plea, Petitioner was convicted and sentenced in the United States District Court for the District of Arizona of one count of reentry of a removed alien (*8 U.S.C. § 1326(a)*). *See* Judgment in a Criminal Case, *United States v. Martinez-Miranda*, No. 4:17-cr-01117-CKJ-EJM (D. Ariz. Oct. 31, 2017), ECF No. 28.[1] Petitioner was sentenced to a term of forty-one months in the custody of the Bureau of Prisons. **[*2]** *See id.*

---

[1] The Court takes judicial notice of Petitioner's criminal proceedings. *See Fed. R. Evid. 201(b)(2)* ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Harris v. County of Orange, 682 F.3d 1126, 1131-32 (9th Cir. 2012)* (court may take judicial notice of "documents on file in federal or state courts").

Petitioner admittedly does not challenge his conviction or sentence, however. (*See* Petition at 6.) Instead, Petitioner challenges his institution's imposition of a work assignment while he is incarcerated. (*See id.* at 3 (describing the decision or action Petitioner challenges as "Forced work assignemt [sic]/Forced Labor/Prison Treatment/Domestic Servitude").) Petitioner asserts four claims for relief:

1. "Forced to Work in VIOLATION of; THE FEDERAL PRISON INDUSTRIES (FPI) INMATE WORK PROGRAMS, *28 CFR §§ 345.35(a)*, *345.42(d)*, and, The PROGRAM STATEMENTS *§§ 345.35(a)*, *345.42(d)*";

2. "Deliberate and Conscious VIOLATION of; CHAPTER 77, PEONAGE, SLAVERY, AND TRAFFICKING IN PERSONS, *18 USCS §§ 1581-1597*, by the F.C.I. II's personnel, specifically; *§ 1589 of title 18 USCS*, against Inmate Mr. Juan Diego Miranda Martinez";

3. "Deliberate and Conscious VIOLATION against the Constitution for Thee American Union, Specifically the *Thirteenth Amendment* of 1865, by the personnel of THE F.C.I. II., 28 Led 89, 114 US 417 Ex Parte Wilson, 03/30/1885 the personnel are violating the 5th. 6th. and, 8th, in addition to the 13th. Amend."; and

4. "EXHAUSTION of Administrative process in Accordance with; *28 CFR §§ 40.1-40.10*, and, *42 USCS § 1997e*, presented to THE B.O.P. WESTERN REGIONAL OFFICE, and, CENTRAL OFFICE, via PS Form 3800, 7016 3010 0001 0688 7855, and, PS Form 3800, 7017 0660 0001 0777 3413. **[*3]** Appeals Court 6th *380 F.3d 989*::Boyd Vs. Corr. Corp. Of Am, 06/15/14."

(Petition at 7-9.) Liberally construing the Petition as best as the undersigned can discern, Petitioner contends that he should not be subjected to a work assignment while he is incarcerated at the Federal Correctional Institution, and that being forced to work as part of the execution of his sentence violates federal law. (*See* Petition at 3, 7-9, 11, 14, 16.)

As discussed below, summary dismissal of the action is appropriate.

## II. DISCUSSION

*Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts* ("Habeas Rules") requires summary dismissal of federal habeas petitions "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." *See also Habeas Rule 1(b)* (applying the Habeas Rules to habeas actions brought pursuant to *Section 2241*).

### A. The Petition Exceeds the Court's Habeas Jurisdiction.

As a preliminary matter, the Petition does not clearly invoke the Court's habeas jurisdiction. Relief in the form of a writ of habeas corpus may be granted to a person in custody under the authority of the United States if the petitioner can show that he is "in custody in violation of the Constitution or laws or treaties of the United States." *28 U.S.C. § 2241(c)(1)*, *(3)*. In general, **[*4]** habeas proceedings provide a forum in which to challenge the "legality or duration" of a prisoner's confinement. *Crawford v. Bell, 599 F.2d 890, 891 (9th Cir. 1979)*; *see also Preiser v. Rodriguez, 411 U.S. 475, 484, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973)* ("[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody . . . ."); *Tucker v. Carlson, 925 F.2d 330, 331 (9th Cir. 1991)* (concluding that challenges to "the manner in which [a] sentence was executed," or to "the fact or duration of . . . confinement," are properly brought in habeas petitions pursuant to *Section 2241*). A habeas corpus petition brought pursuant to *Section 2241* is the proper vehicle for a federal inmate's challenge to the manner, location, or conditions of a sentence's execution. *Hernandez v. Campbell, 204 F.3d 861, 864 (9th Cir. 2000)*. To the extent a federal inmate challenges his conditions of confinement, or to the extent the inmate seeks damages or injunctive relief for civil rights violations, the inmate's claims are properly brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)* ("*Bivens*"). *See Badea v. Cox, 931 F.2d 573, 574 (9th Cir. 1991)*; *Tucker, 925 F.2d at 332*.

Here, Petitioner avers that his petition "is NOT a challenge of conviction or sentence, But Rather a Claim of Unlawful Treatment," and that he challenges "Prison Treatment/Forced Labor." (Petition at 3, 6.) Petitioner essentially claims that requiring him to participate in a work assignment while incarcerated is a violation of federal law. (*See id.* at 7-8.) He requests drastically **[*5]** disparate forms of relief: On the one hand, Petitioner

requests an order "to Commend [sic] the FEDERAL AGENCY and its officers to Stop inflicting Unlawful, Infamous Punishments upon [him]" (*id.* at 6) and also an order directing Respondent "to produce ALL I.R.S. Forms . . . which were Utilized to Report Petitioner's Forced Employment Taxes During the Petitioner's confinement" (*id.* at 9). On the other hand, he also seeks an order "Commanding the federal B.O.P. to forthwith Release/Discharge the Petitioner from Unlawful Imprisonment, and, to Order the EXPUNGEMENT OF PROFILES per, *34 USCS § 40743*, and the Destruction of Records per, *28 CFR § 25.9*, and, that [Petitioner] be Provided with Permanent Residence Status, and, a Protective Order." (*Id.* at 9.) In his administrative remedy appeal, which is attached as an exhibit to the Petition, Petitioner also requests from the Bureau of Prisons "Monetary Compensation of Ten Million U.S. Dollars" in addition to expungement of his criminal records and discharge from incarceration. (*Id.* at 11.)

Petitioner's allegations sound in civil rights, not in habeas. The Ninth Circuit Court of Appeals generally has entertained claims arising from prison work assignments in the context of civil rights actions for damages **[*6]** and injunctive relief, not in actions for habeas relief. *See, e.g., Serra v. Lappin, 600 F.3d 1191, 1196 (9th Cir. 2010); Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994)*. Petitioner's allegations that he is being forced to participate in a work assignment in prison relate to the conditions of his confinement, not the manner, location, or conditions of the execution of his criminal sentence. *See Luedtke v. Berkebile, 704 F.3d 465, 465-66 (6th Cir. 2013)* (affirming dismissal of claim that prison officials violated prisoner's "*Thirteenth Amendment* rights by refusing to pay him the wages he earned in his prison job" "because *§ 2241* is not the proper vehicle for a prisoner to challenge conditions of confinement"); *Franklin v. Johns, No. 5:08-HC-2140-BO, 2008 U.S. Dist. LEXIS 118648, at *2, 2008 WL 8162541, at *1 (E.D.N.C. Oct. 6, 2008)* ("When [petitioner] asserts that he is being forced to work, he is not challenging the fact or length of his confinement; rather, he is challenging the conditions of his confinement. Habeas corpus relief is not appropriate . . .."); *Rose v. Dretke, No. 2:04-CV-0131, 2004 U.S. Dist. LEXIS 12539, at *4, 2004 WL 1515510, at *1 (N.D. Tex. July 2, 2004)* ("[A]ny challenge to the requirement to work while in prison challenges the conditions of petitioner's confinement. A challenge to conditions of confinement must be presented as a civil rights complaint . . . . Petitioner's [claim] is not cognizable in a habeas corpus action."), *adopted, 2004 U.S. Dist.*

*LEXIS 13433, 2004 WL 1614920 (N.D. Tex. July 19, 2004)*. A civil rights complaint, not a petition for habeas relief, is the **[*7]** better vehicle for challenging the "Unlawful Treatment" Petitioner purportedly has suffered. (Petition at 6.)

Although Petitioner requests relief in the form of release from prison (*see* Petition at 9), which is within the ambit of a writ of habeas corpus, Petitioner's claims challenge the conditions of his confinement and are properly the subject of a civil rights complaint, "[d]espite the relief he seeks." *Shook v. Apker, 472 F. App'x 702, 702-03 (9th Cir. 2012)*; *see, e.g., Allah v. Warden, No. CV 17-05201 AG (RAO), 2017 U.S. Dist. LEXIS 145293, at *4-5 (C.D. Cal. Aug. 31, 2017)* (concluding that *Bivens* was the appropriate vehicle for a petitioner's challenges to conditions of confinement, "even if [the p]etitioner had requested release from custody or some other appropriate habeas relief"). Because Petitioner avers that he does not challenge his conviction or sentence, challenges the conditions of his confinement, and seeks forms of relief well outside the ambit of habeas relief, *Section 2241* may not be the proper vehicle for Petitioner's claims.

The Court has discretion to construe the Petition as a civil rights complaint. *See Wilwording v. Swenson, 404 U.S. 249, 251, 92 S. Ct. 407, 30 L. Ed. 2d 418 (1971)*, *superseded by statute on other grounds as stated in Woodford v. Ngo, 548 U.S. 81, 84, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)*. Exercising such discretion is inappropriate here. *First*, Petitioner expressly cast his Petition as one brought pursuant to *Section 2241* by using the form for **[*8]** *Section 2241* petitions promulgated by the Administrative Office of the United States Courts. (*See generally* Petition.) Further, at least some forms of relief Petitioner requests bear resemblance to habeas relief that likely would be unavailable in a civil rights suit. (*See* Petition at 9 (requesting an order that the Bureau of Prisons "forthwith Release/Discharge the Petitioner from Unlawful Imprisonment").) The Court is uncertain whether Petitioner would seek relief in the form of release if he were to proceed pursuant to *Bivens*, and the Court doubts that Petitioner would be entitled to such relief. *See Crawford, 599 F.2d at 892* ("The appropriate remedy for such constitutional violations [with respect to conditions of confinement], if proven, would be a judicially mandated change in conditions and/or an award of damages, but not release from confinement."). *Second*, Petitioner has not paid the $350 fee for filing a civil complaint, has not shown he is eligible to proceed without prepayment of the filing fee

pursuant to _28 U.S.C. § 1915(a)_, and has not authorized the fee to be deducted from his prison trust account pursuant to _28 U.S.C. § 1915(b)_. The Court cannot presume that Petitioner would continue to pursue this action if he knew he ultimately would be **[*9]** obliged to pay the $350 filing fee regardless of the outcome of his case. _Third_, the Court would be obligated to screen the converted Petition under _28 U.S.C. §§ 1915A_ to determine whether the action is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. If the converted Petition ultimately were to be dismissed on the basis that it is frivolous, malicious, or fails to state a claim, that dismissal would count as a "strike" against Petitioner with respect to _28 U.S.C. § 1915(g)_, which provides that a prisoner who has three "strikes" may not bring an action or appeal without prepayment of the full filing fee "unless the prisoner is under imminent danger of serious physical injury." _Fourth_, it is not in the interest of judicial economy to convert the Petition to a federal civil rights complaint because the case would require additional court resources to deal with the problems created by the different filing fees, the absence of information called for by the civil rights complaint form utilized in this district, and the potential service issues relative to individuals whose conduct may be in issue. In sum, the Court should **[*10]** decline to convert the action to a civil rights action brought pursuant to _Bivens_, and instead should treat the Petition as it purports to be: a petition for habeas relief pursuant to _Section 2241_.

## B. Petitioner's Habeas Claims Fail as a Matter of Law.

The Court liberally construes the Petition to challenge the manner, location, or conditions of the execution of Petitioner's sentence insofar as he (1) contends that he is being subjected to involuntary servitude, which is prohibited by federal law, by being required to work and being punished for refusing to work, and (2) seeks relief in the form of a writ either compelling his release or directing his institutional custodian to remove sanctions impacting the duration of his confinement placed upon him for refusing to participate in a work assignment.[2]

(_See_ Petition at 8 (indicating Petitioner was sanctioned for refusing a work assignment); _id._ at 9 (requesting release as a form of relief).) _Cf. Usselman v. Daniels, No. 07-1035-PA, 2007 U.S. Dist. LEXIS 64455, at *1, 2007 WL 2463243, at *1 (D. Or. Aug. 24, 2007)_ (considering an involuntary servitude theory in a work assignment-related claim brought in a habeas petition pursuant to _Section 2241_). So construed, summary dismissal of the Petition is appropriate because it plainly appears from the face of **[*11]** the Petition that Petitioner is not entitled to habeas relief. _See Habeas Rule 4_.

"When a person is duly tried, convicted, sentenced and imprisoned for crime in accordance with law, no issue of peonage or involuntary servitude arises." _Draper v. Rhay, 315 F.2d 193, 197 (9th Cir. 1963)_. The _Thirteenth Amendment_ provides, "Neither slavery nor involuntary servitude, _except as a punishment for crime whereof the party shall have been duly convicted_, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1 (emphasis added). "By its terms the Amendment excludes involuntary servitude imposed as legal punishment for a crime." _United States v. Kozminski, 487 U.S. 931, 943, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (1988)_. Requiring a prisoner to work in accordance with prison rules does not offend the _Thirteenth Amendment. Berry v. Bunnell, 39 F.3d 1056, 1057 (9th Cir. 1994)_; _see also Ali v. Johnson, 259 F.3d 317, 318 (5th Cir. 2001)_ (concluding that the _Thirteenth Amendment_ contemplates involuntary servitude by prisoners not specifically sentenced to perform labor). Likewise, "the _Eighth Amendment_ does not apply unless prisoners are compelled to perform physical labor which is beyond their strength, endangers their lives or health, or causes undue pain." _Berry, 39 F.3d at 1057_. Moreover, "[a] prisoner has no basis for asserting a violation of due process simply because he is made or allowed to work for low pay as punishment for a crime of which he was lawfully convicted." _Serra, 600 F.3d at 1196_ (discussing _Fifth Amendment_ due process claim based on **[*12]** denial of wages for prison work).

Petitioner asserts that that he was given a work

---

[2] The notion that Petitioner encountered sanctions impacting the duration of his confinement is solely the Court's generous and speculative extrapolation from the Petition, which shows that Petitioner was disciplined for refusing a work assignment (Code 306). (_See_ Petition at 12, 15, 17-18.) The record before the Court does not indicate that Petitioner's sentence has been affected in any way by his refusal to work. Accordingly, relaxing the assumption that he suffered sanctions affecting the fact or duration of his confinement, Petitioner has not shown that he is "in custody in violation of the Constitution or laws or treaties of the United States" for his refusal to work. _28 U.S.C. § 2241(c)(3)_.

2019 U.S. Dist. LEXIS 193325, *12

assignment against his will, violating the *Fifth*, *Eighth*, and *Thirteenth Amendments*.[3] (*See* Petition at 8.) But Petitioner's situation is expressly excepted from the federal constitutional protections he invokes. Federal habeas relief is unavailable as a matter of law. *See, e.g., Rinaldi v. Guttierez, No. CV 11-5795 GW (MRW), 2011 U.S. Dist. LEXIS 154861, at \*4 n.1, 2011 WL 7766616, at \*1 n.1 (C.D. Cal. Oct. 19, 2011)* (concluding habeas claim that petitioner had been forced to work in federal prison "is without merit as a matter of law"), *adopted, 2012 U.S. Dist. LEXIS 57383, 2012 WL 1413600 (C.D. Cal. Apr. 23, 2012); Usselman, 2007 U.S. Dist. LEXIS 64455, at \*3, 2007 WL 2463243, at \*1-2* (summarily dismissing *Section 2241* petition because federal prisoner's claim that required work assignment violated the *Thirteenth Amendment* was not a claim upon which relief may be granted).

Petitioner fails to justify how the other federal laws and regulations he invokes relate to his claim that he should not be compelled to work in prison. Petitioner contends he is being forced to work in violation of *28 C.F.R. § 345.35(a)* and *28 C.F.R. § 345.42(d)*. (*See* Petition at 3, 7.) Those regulations provide that an inmate "currently under an order of deportation, exclusion, or removal" is not eligible for a work assignment with the Federal Prison Industries ("FPI"). It may be true that Petitioner is not a citizen of the United States. (*See* Petition at 3 (indicating Petitioner **[\*13]** is a "Mexican National").) *See also* Criminal Complaint, *United States v. Martinez-*

---

[3] Petitioner also claims the work assignment violates his *Sixth Amendment* rights. (*See* Petition at 8.) But Petitioner does not explain how the *Sixth Amendment* is implicated here. The *Sixth Amendment* provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." Even liberally construing the Petition, the Court cannot discern how the *Sixth Amendment* is related to Petitioner's claim that he should not be required to work while his in custody, as Petitioner has not identified any criminal prosecution to which the *Sixth Amendment* would apply. Petitioner's conclusory invocation of the *Sixth Amendment* is insufficient to provide a basis for granting habeas relief. *See Greenway v. Schriro, 653 F.3d 790, 804 (9th Cir. 2011)* ("[Petitioner's] cursory and vague claim cannot support habeas relief."); *James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)* ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

*Miranda*, No. 4:17-cr-01117-CKJ-EJM (D. Ariz. June 22, 2017), ECF No. 1 (indicating Petitioner is a citizen of Mexico). Nevertheless, setting aside the question of whether Petitioner is being held "in custody in violation of" these regulations, *28 U.S.C. § 2241(c)(3)*, nothing in the criminal case or in this habeas action demonstrates that Petitioner is "currently under an order of deportation, exclusion, or removal." Nor has Petitioner indicated that the work assignment at issue, designated "CS LAND AM" (*see* Petition at 18), was an FPI program to which the regulations he cites would apply.

Petitioner further contends that being forced into a prison work assignment violates federal criminal laws prohibiting peonage, slavery, and trafficking in persons, particularly *18 U.S.C. § 1589*, which is a criminal statute prohibiting the procurement of forced labor. (*See* Petition at 8.) Aside from failing to explain how he is "in custody in violation of" this criminal law, *28 U.S.C. § 2241(c)(3)*, Petitioner has not shown that this statute applies to federal prison institutions requiring inmates to work, especially in light of the Ninth Circuit's express opinion that "[w]here **[\*14]** a person is duly tried, convicted, sentenced, and imprisoned for crime in accordance with law, no issue of peonage or involuntary servitude arises." *Draper, 315 F.2d at 197*. Indeed, courts have recognized that Congress passed *18 U.S.C. § 1589* "to implement the *Thirteenth Amendment* against slavery or involuntary servitude." *United States v. Toviave, 761 F.3d 623, 629 (6th Cir. 2014); see also* U.S. Const. amend. XIII, § 2 ("Congress shall have power to enforce this article by appropriate legislation."); *Trafficking Victims Protection Act of 2000 § 102(b)(22), 22 U.S.C. § 7101(b)(22)* (stating congressional finding that passage of *18 U.S.C. § 1589* would target "[c]urrent practices of sexual slavery and trafficking of women and children . . . abhorrent to the principles" of the *Thirteenth Amendment*); *Owino v. CoreCivic, Inc., No. 17-CV-1112 JLS (NLS), 2018 U.S. Dist. LEXIS 81091, at \*21, 2018 WL 2193644, at \*8 (S.D. Cal. May 14, 2018)* ("Congress enacted the [Trafficking Victims Protection Act, of which *18 U.S.C. § 1589* is a part,] pursuant to its power to enforce the *Thirteenth Amendment*."). Accordingly, the statute cannot be read to proscribe requiring prisoners to work in accordance with prison rules, conduct which does not offend the *Thirteenth Amendment*. *See, e.g., Ayala v. Livingston, No. 6:16cv612, 6:16cv1144, 2017 U.S. Dist. LEXIS 151130, at \*11, 2017 WL 9292195, at \*4 (E.D. Tex. June 26, 2017)* (rejecting forced-labor claim by inmate who alleged he worked in prison without adequate compensation on the basis that the inmate could not show a *Thirteenth Amendment* violation), *adopted, 2017 U.S. Dist. LEXIS 149875, 2017 WL*

4081466 (E.D. Tex. Sept. 14, 2017); *Bass v. County of San Diego, No. 08-cv-2135-MMA (NLS), 2009 U.S. Dist. LEXIS 136987, at *12-14, 2009 WL 10671992, at *5 (S.D. Cal. Aug. 25, 2009)* (citing *United States v. Reynolds, 235 U.S. 133, 148-50, 35 S. Ct. 86, 59 L. Ed. 162 (1914),* and *Draper, 315 F.2d at 197,* and concluding **[\*15]** that prisoner failed to state a claim pursuant to *18 U.S.C. § 1589* because allegations that the prisoner was required to work while he was serving his prison sentence were insufficient).

Finally, Petitioner asserts without explanation that the institution violated *26 U.S.C. § 6116,* which requires prisons to provide information for tax administration. (*See* Petition at 3.) He also speculates that the institution may have violated other federal tax laws. (*See id.* at 9.) Petitioner does not explain how he is being held "in custody in violation of" these tax laws, *28 U.S.C. § 2241(c)(3),* or how the institution's purported violation of the tax laws affects the execution of his sentence in any way. That is, the Court cannot discern how Petitioner being sanctioned for refusing to work is related to the institution's provision of information to the Internal Revenue Service. Petitioner's summary citation of tax law is insufficient to support a claim for habeas relief. *See Greenway v. Schriro, 653 F.3d 790, 804 (9th Cir. 2011); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).*

In sum, Petitioner's habeas claims fail as a matter of law.

**C. The Court Lacks Personal Jurisdiction**.

Finally, construing the Petition as a *Section 2241* petition, the Court lacks personal jurisdiction over the action. The proper respondent to a habeas action challenging present physical confinement **[\*16]** is "the warden of the facility where the prisoner is being held." *Rumsfeld v. Padilla, 542 U.S. 426, 435, 124 S. Ct. 2711, 159 L. Ed. 2d 513 (2004).* Where the improper respondent is named in a *Section 2241* petition, the Court lacks personal jurisdiction over the action and may dismiss the action. *See Johnson v. Reilly, 349 F.3d 1149, 1153 (9th Cir. 2003).* Here, Petitioner has named the institution in which he is incarcerated as sole Respondent. (*See* Petition at 1.) Because Respondent is not Petitioner's custodian—that is, the warden of the Federal Correctional Institution—the Court lacks personal jurisdiction.

Accordingly, the Petition should be dismissed.

**III. CONCLUSION**

IT THEREFORE IS RECOMMENDED that the District Judge issue an order: (1) approving and accepting this Report and Recommendation, and (2) directing that judgment be entered dismissing this action without prejudice to filing a civil rights complaint pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971).*

DATED: September 25, 2019

/s/ Maria A. Audero

MARIA A. AUDERO

UNITED STATES MAGISTRATE JUDGE

---

*End of Document*

 Neutral

As of: May 8, 2020 7:39 PM Z

# *Martinez v. Fed. Corr. Inst.*

United States District Court for the Central District of California

November 4, 2019, Decided; November 4, 2019, Filed

Case No. 2:19-cv-07742-JFW-MAA

**Reporter**
2019 U.S. Dist. LEXIS 193345 *; 2019 WL 5784738

JUAN DIEGO MIRANDA MARTINEZ, Petitioner, v. FEDERAL CORRECTIONAL INSTITUTION #2, Respondent.

**Prior History:** *Martinez v. Fed. Corr. Inst., 2019 U.S. Dist. LEXIS 193325 (C.D. Cal., Sept. 25, 2019)*

## Core Terms

civil rights

**Counsel:** **[*1]** Juan Diego Miranda Martinez, Petitioner, Pro se, ADELANTO, CA.

For Federal Correctional Institution No. 2, Respondent: Assistant 2241-194 US Attorney LA-CV, LEAD ATTORNEY, Office of US Attorney, Criminal Division - US Courthouse, Los Angeles, CA.

**Judges:** JOHN F. WALTER, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JOHN F. WALTER

## Opinion

ORDER ACCEPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Pursuant to *28 U.S.C. § 636*, the Court has reviewed the Petition, the other records on file herein, and the Report and Recommendation of the United States Magistrate Judge. The time for filing objections has expired and no objections have been made.

IT THEREFORE IS ORDERED that (1) the Report and Recommendation of the Magistrate Judge is accepted and adopted; and (2) Judgment shall be entered denying the Petition and dismissing this action without prejudice to filing a civil rights complaint pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)*.

DATED: November 4, 2019

/s/ John F. Walter

JOHN F. WALTER

UNITED STATES DISTRICT JUDGE

JUDGMENT

Pursuant to the Order Accepting Report and Recommendation of United States Magistrate Judge,

IT IS ORDERED AND ADJUDGED that the Petition is denied and the action is dismissed without prejudice to filing a civil rights complaint pursuant **[*2]** to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971)*.

DATED: November 4, 2019

/s/ John F. Walter

2019 U.S. Dist. LEXIS 193345, *2

JOHN F. WALTER

UNITED STATES DISTRICT JUDGE

---

**End of Document**

 Caution
As of: May 8, 2020 7:42 PM Z

# *USTAAD Sys. v. iCAP Int'l Corp.*

United States District Court for the Middle District of Pennsylvania

July 16, 2010, Decided; July 16, 2010, Filed

CIVIL ACTION NO. 1:09-CV-1149

**Reporter**
2010 U.S. Dist. LEXIS 71607 *; 2010 WL 2838593

USTAAD SYSTEMS, INC., Plaintiff v. iCAP
INTERNATIONAL CORP. t/b/d/a CAP COMPUTER
CONSULTANTS, INC. and CARLOS AGUADO,
Defendants

**Subsequent History:** Reconsideration denied by
*USTAAD Sys. v. iCAP Int'l Corp., 2010 U.S. Dist. LEXIS
108558 (M.D. Pa., Oct. 12, 2010)*

## Core Terms

unjust enrichment, civil conspiracy, allegations,
software, alter ego liability, motion to dismiss, corporate
veil, misconduct, counts, express contract, participated,
shareholders, disregarded, benefits, rights, ego

**Counsel:** **[*1]** For USTAAD Systems, Inc., Plaintiff:
Ronald L. Finck, LEAD ATTORNEY, Kathryn L.
Simpson, Mette, Evans & Woodside, Harrisburg, PA.

For iCAP International Corporation and Cap Computer
Consultants, Inc., as successor to iCAP International
Corporation, Carlos A. Aguado, Defendants: Harvey
Freedenberg, LEAD ATTORNEY, McNees, Wallace &
Nurick, Harrisburg, PA; Kimberly A. Selemba, LEAD
ATTORNEY, McNees Wallace & Nurick LLC,
Harrisburg, PA.

**Judges:** Judge CHRISTOPHER C. CONNER, United
States District Judge.

**Opinion by:** CHRISTOPHER C. CONNER

## Opinion

**MEMORANDUM**

This is a diversity action sounding in breach of contract,
unjust enrichment, intentional interference with
contractual relations, alter ego liability, and civil
conspiracy, filed by plaintiff USTAAD Systems,
Incorporated ("USTAAD"). USTAAD claims that
defendant Cap Computer Consultants, Incorporated
("CCC") and its president and sole shareholder,
defendant Carlos Aguado ("Aguado"), breached the
terms of a contract and improperly recouped monies to
which USTAAD is entitled. Presently before the court is
a motion to dismiss three of the complaint's six counts
for failure to state a claim upon which relief may be
granted. (*See* Doc. 3.) For the reasons that follow, the
motion **[*2]** will be granted in part and denied in part.

**I. Statement of Facts** [1]

USTAAD is a technology company that owns proprietary
software known as the "Rigel Software System"
("Rigel"). (Doc. 1, Ex. A P 7.) On September 28, 2004,
USTAAD entered into an exclusive agreement with

---

[1] In accordance with the standard of review for a motion to
dismiss pursuant to *Rule 12(b)(6)*, the court will present the
facts as alleged in the complaint. See *infra* Part II. However,
those portions of the complaint which consist of no more than
legal conclusions or a formulaic recitation of the elements of a
cause of action have been disregarded. *Ashcroft v. Iqbal,
U.S.    , 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).*

2010 U.S. Dist. LEXIS 71607, *2

Branch Electric ("Branch"), [2] wherein Branch obtained a license to use Rigel and USTAAD contracted to provide maintenance, customer support, and enhancement services for the software. (Id. PP 11-12, 20.) Around the same time, USTAAD entered into a contract with CCC wherein CCC agreed to assume USTAAD's obligation to provide customer support, maintenance, and software modification services to Branch under the USTAAD-Branch licensing agreement. (Id. PP 16-17, 23.) According to the complaint, customer support and maintenance [*3] fees due under the USTAAD-Branch contract remained payable to USTAAD, and the services performed by CCC were completed on USTAAD's behalf. [3] (See id. PP 22-23.)

In or about August of 2007, USTAAD allegedly discovered that CCC was collecting fees from Branch in exchange for its software support services. (Id. H 26.) USTAAD contends that such an arrangement violated its agreement with CCC. Accordingly, on May 20, 2009, USTAAD filed a complaint in the York County Court of Common Pleas, asserting, *inter alia*, that "CCC and [Aguado] . . . engaged in a course of conduct calculated to advance their own economic and business interests to the detriment of USTAAD." (Id. P 25.) CCC and Aguado removed the action to federal court on June 17, 2009. (Doc. 1.)

The complaint contains a total of six separate counts accusing CCC of breach of contract, and CCC and Aguado of unjust enrichment, intentional interference with contractual relations, and of engaging in a civil conspiracy to appropriate profits belonging to USTAAD. In addition, USTAAD characterizes CCC as [*4] an alter ego of Aguado and therefore seeks to pierce CCC's corporate veil and to hold its shareholders-namely, Aguado-personally liable for CCC's corporate conduct. On June 22, 2009, CCC and Aguado filed a motion to dismiss three of the complaint's six counts for failure to state a claim upon which relief may be granted. (See Doc. 3.) The motion has been fully briefed and is now ripe for disposition.

## II. Standard of Review

*Rule 12(b)(6) of the Federal Rules of Civil Procedure*

provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. *FED. R. CIV. P. 12(b)(6)*. When ruling on a motion to dismiss under *Rule 12(b)(6)*, the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Gelman v. State Farm Mut. Auto. Ins. Co., 583 F.3d 187, 190 (3d Cir. 2009)* (quoting *Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008))*; see also *Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007)* (quoting *Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005))*. Although the court is generally [*5] limited in its review to the facts contained in the complaint, it "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." *Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994)*; see also *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997)*.

Federal notice and pleading rules require the complaint to provide "the defendant notice of what the . . . claim is and the grounds upon which it rests." *Phillips, 515 F.3d at 232* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*. To test the sufficiency of the complaint in the face of a *Rule 12(b)(6)* motion, the court must conduct a two-step inquiry. In the first step, the factual and legal elements of a claim should be separated; well-pleaded facts must be accepted as true, while mere legal conclusions may be disregarded. *Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009)*. Once the well-pleaded factual allegations have been isolated, the court must determine whether they are sufficient to show a "plausible claim for relief." *Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009)* (citing [*6] *Twombly, 550 U.S. at 556*); *Twombly, 550 U.S. at 555* (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level"). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal, __ U.S. at __, 129 S. Ct. at 1949*. When the complaint fails to establish defendant liability, however, courts should generally grant plaintiffs leave to amend their claims before dismissing a complaint that is merely deficient. See *Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002)*; *Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000)*.

---

[2] Branch is a wholly owned division of Rexel, Incorporated. (Doc. 1, Ex. A P 11.)

[3] The agreements are attached as Exhibits A-C to the complaint.

## III. Discussion [4]

The instant motion seeks dismissal of three of the complaint's six counts. Specifically, CCC and Aguado have moved to dismiss (1) Count Three, which purports to state a claim against Aguado for unjust enrichment; (2) Count Five, which characterizes CCC as a "mere [] alter ego of Aguado" and seeks to pierce CCC's corporate veil; and (3) Count Six, which alleges that CCC and Aguado engaged in a civil conspiracy to appropriate rights and profits belonging to USTAAD. The court will first address USTAAD's allegation of alter ego liability before considering its claims for unjust enrichment and civil conspiracy.

### A. Alter Ego Liability

In Pennsylvania, "the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person." *Lumax Indus. v. Aultman, 543 Pa. 38, 669 A.2d 893, 895 (Pa. 1995)*. Courts may set aside this general rule "only in limited circumstances when the [corporate] form is used to defeat public convenience, justify wrong, protect fraud or defend crime." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc., 267 F.3d 340, 353 (3d Cir. 2001)* (quoting *Kiehl v. Action Mfg. Co., 517 Pa. 183, 535 A.2d 571, 574 (Pa. 1987)*); see also *Trs. of the Natl Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 193 n.6 (3d Cir. 2003)* (explaining that "piercing the corporate veil is not technically a mechanism for imposing 'legal' liability, but for remedying the fundamental unfairness [that] will result from a failure to disregard the corporate form" (internal quotations omitted)). In such situations, a party may be permitted to pierce the corporate veil and impose liability upon the corporation's shareholders. *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir. 2002)*. However, a litigant seeking this remedy must overcome an exacting inquiry, for there is a strong presumption

against disregarding the corporate form. *Lumax, 669 A.2d at 895*; *Wedner v. Unemployment Bd., 449 Pa. 460, 296 A.2d 792, 794 (Pa. 1972)*.

To pierce the corporate veil, one must demonstrate "that a corporation's affairs and personnel were manipulated to such an extent that it became nothing more than a sham used to disguise the alter ego's use of its assets for his own benefits in fraud of its creditors." *Kaplan v. First Options., 19 F.3d 1503, 1521 (3d Cir. 1994)*. [*9] Circumstances which typically permit veil-piercing include, *inter alia*, the following:

> The failure to observe corporate formalities; non-payment of dividends; insolvency of debtor corporation; siphoning the funds from corporation by dominant shareholders; non-functioning of other officers and directors; absence of corporate records; whether the corporation is a mere facade for the operations of a common shareholder or shareholders; and gross undercapitalization.

*E. Minerals & Chems. Co. v. Mahan, 225 F.3d 330, 333 n.7 (3d Cir. 2000)* (quoting *Wheeling-Pittsburgh Steel Corp. v. Intersteel, Inc., 758 F. Supp. 1054, 1059 (W.D. Pa. 1990)*). In sum, a plaintiff requesting alter ego liability must demonstrate "that the corporation's owners abused the legal separation of a corporation from its owners and used the corporation for illegitimate purposes." *Kaplan, 19 F.3d at 1521*. The proof necessary to impose alter ego liability must be clear and convincing. *Lutyk, 332 F.3d at 194*.

In the instant matter, USTAAD's complaint fails to meet the exacting standard required to pierce the corporate veil under Pennsylvania law. It is devoid of factual allegations which suggest that CCC failed to observe corporate [*10] formalities or pay dividends, that it is insolvent, or that Aguado inappropriately siphoned its funds. Furthermore, no facts are pled which might show that CCC was a sham, that it did not maintain corporate records, or that it is grossly undercapitalized. Instead of pleading such facts, USTAAD flatly asserts that CCC is "under the control and domination of Aguado" and that it "fails to maintain its own corporate independence" from Aguado. (See Doc. 1, Ex. A PP 54-55.) These conclusory assertions, unsupported by allegations of fact, do nothing to further USTAAD's claim and have been disregarded by the court. See *Iqbal, U.S. at , 129 S. Ct. at 1950* (explaining that a court must disregard claims which consist of no more than legal conclusions, for they are "not entitled to the assumption of truth").

---

[4] Jurisdiction over the instant action is based on diversity of citizenship, see *28 U.S.C. § 1332*, which in this case requires the court to apply Pennsylvania law to the parties' substantive claims. See *Norfolk S. Ry. Co. v. Basell USA, Inc., 512 F.3d 86, 91-92 (3d Cir. 2008)*. Neither party disputes the application of Pennsylvania state law to this matter. Accordingly, decisions of the Pennsylvania Supreme Court are binding precedent upon this court, while Pennsylvania Superior [*7] Court decisions will be treated as persuasive precedent. See *State Farm Fire & Cas. Co. v. Estate of Mehlman, 589 F.3d 105, 107 n.2 (3d Cir. 2009)*.

USTAAD attempts to salvage its claim by pointing to the software support contract it entered with CCC in 2004. According to USTAAD, it is significant that Aguado signed this agreement on behalf of CCC and in his individual capacity. USTAAD argues that "[t]his fact alone illustrates how casually Aguado distinguishes between his own acts and acts taken by the corporation[.]" (Doc. 10 at **[*11]** 11.) The court disagrees. Aguado is the sole owner of CCC and therefore it is not surprising that his signature appears on company contracts. Although his sole ownership status is certainly relevant to the veil-piercing inquiry, it is not sufficient-without some additional factual allegations-to impose alter ego liability. [5] See *Lumax, 669 A.2d at 895* (explaining that alter ego liability is typically not imposed simply because a single individual owns the entire company). Accordingly, the motion to dismiss this count will be granted. The court will, however, permit USTAAD to seek leave to amend its complaint in order to address the above-described deficiencies.

## B. Unjust Enrichment

Count Three of the complaint contends that Aguado was unjustly enriched when he appreciated benefits he received from CCC as a result of CCC's alleged breach of contract. (See Doc. 1, Ex. A. P 45.) Specifically, USTAAD avers that CCC accepted payments directly from Branch and that Aguado had knowledge of these transactions. The complaint does not specify how Aguado participated in the purported misconduct, but USTAAD argues that he is subject to personal liability because he "exclusively controls all aspects of CCC [and] it can reasonably be inferred that Aguado, himself,

participated in orchestrating the arrangements between Branch and CCC." [6] (Doc. 10 at 13.)

Under Pennsylvania law, "when there is no express contract between the parties, a plaintiff may still recover under a quasi-contract theory" such as a theory of unjust enrichment. *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc., 2003 PA Super 332, 832 A.2d 501, 507 (Pa. Super. Ct. 2003)*; see also *Ne. Fence & Iron Works, Inc. v. Murphy Quigley Co., 2007 PA Super 287, 933 A.2d 664, 667 (Pa. Super. Ct. 2007)* (stating that a quasi-contract claim may lie when one party is unjustly enriched at another party's expense). To make out a claim for unjust enrichment, a plaintiff must establish three elements: "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 180 (3d Cir. 2008)* (citing *Limbach Co. LLC v. City of Phila., 905 A.2d 567, 575 (Pa. Commw. Ct. 2006)*. **[*15]** Pennsylvania tribunals consider the third element of the doctrine-whether enrichment of the defendant is unjust-to be the inquiry's principal focus. See *AmeriPro Search, Inc. v.*

___

[5] USTAAD argues that the court should deny the motion to dismiss because "[d]iscovery of information that is currently within the sole control of the Defendants will confirm the underlying allegations of the Complaint." (Doc. 10 at 12.) To obtain such discovery, however, USTAAD's claim must possess facial plausibility. See *Iqbal, U.S. at , 129 S. Ct. at 1949* (explaining that a claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant **[*12]** is liable for the misconduct alleged"). In its current form, USTAAD's claim for alter ego liability is premised on a single, rather innocuous fact: that Aguado signed the 2004 software support agreement. Under Pennsylvania law-and federal pleading standards-this claim is simply too speculative to proceed. See *Phillips, 515 F.3d at 234* (stating that the allegations "must be enough to raise a right to relief above the speculative level" (quoting *Twombly, 550 U.S. at 555*)).

[6] The 2004 software services agreement **[*13]** at issue herein states that it is an agreement between CCC, Aguado, and USTAAD. (See Doc. 1, Ex. A.) Aguado's signature appears on this document, but all rights, duties, and obligations under the agreement exclusively flow between CCC and USTAAD. The terms of the agreement do not provide Aguado with any rights in his individual capacity, nor is he burdened with any responsibilities stemming from the contract. Absent some exchange of benefit and/or detriment between Aguado and USTAAD, the contract between these two parties is not supported by valid consideration and there simply is no express contract between them. See *Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002)* (explaining that a valid contract requires consideration and that consideration "confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise" (quoting *Channel Home Ctrs. v. Grossman, 795 F.2d 291, 299 (3d Cir. 1986))*). By pursuing a quasi-contract claim against Aguado, USTAAD implicitly concedes that no express contract exists between it and Aguado and, by extension, that Aguado did **[*14]** not breach the terms of an express contract. See *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alternatives, Inc., 2003 PA Super 332, 832 A.2d 501, 507 (Pa. Super. Ct. 2003)* (holding that a quasi-contract action is appropriate only when there is no express contract between the parties).

2010 U.S. Dist. LEXIS 71607, *14

*Fleming Steel Co., 2001 PA Super 325, 787 A.2d 988, 991 (Pa. Super. Ct. 2001)*.

When benefits are improperly conferred upon a corporate entity, its officers are typically liable only if it can be shown that the officer in question actually participated in the misconduct. See *Wicks v. Milzoco Builders, Inc., 503 Pa. 614, 470 A.2d 86, 90 (Pa. 1983)*; *Parker Oil Co. v. Mico Petro & Heating Oil, LLC, 2009 PA Super 105, 979 A.2d 854, 856 (Pa. Super. Ct. 2009)* (explaining that under the "participation theory," a corporate officer may be held liable "for a business debt where that person participates in tortious conduct that led to the liability"). In other words, a corporate officer is not subject to liability for corporate misconduct merely because he or she is an officer of the corporation. See *Loeffler v. McShane, 372 Pa. Super. 442, 539 A.2d 876, 878-79 (Pa. Super. Ct. 1988)* (distinguishing between an officer's misfeasance, which is actionable, and nonfeasance, for which no liability may lie). Rather, Pennsylvania courts require active, personal participation in the events in question. **[*16]** See *Shay v. Flight C Helicopter Servs., Inc., 2003 PA Super 86, 822 A.2d 1, 17-20 (Pa. Super. Ct. 2003)* (surveying cases in which liability is imposed and contrasting with cases in which no liability is imposed).

USTAAD alleges that Aguado controls and manages the operations of CCC and that CCC began to collect fees directly from Branch despite Aguado's knowledge of the exclusive agreement between Branch and USTAAD. (See Doc. 1, Ex. A P 26, 54.) In addition, USTAAD claims that Aguado negotiated the 2004 software services agreement. Construing these allegations in the light most favorable to USTAAD, the court can reasonably infer that Aguado actively participated in the alleged misconduct attributed to CCC. Thus, the court finds these that USTAAD has sufficiently stated a claim for unjust enrichment under Pennsylvania law. See, e.g., *Loeffler, 372 Pa. Super. 442, 539 A.2d 876* (finding active participation when officer personally authorized payment in question); *Bank of Landisburg v. Burruss, 362 Pa. Super. 317, 524 A.2d 896 (Pa. Super. Ct. 1987)* **[*17]** (finding active participation when bank president negotiated deal, arranged for delivery of goods, and neglected to arrange alternate financing). The motion to dismiss this claim will therefore be denied.

### C Civil Conspiracy

The final count before the court is Count Six, a claim for civil conspiracy. USTAAD pleads this cause of action in the alternative, asserting that if "CCC is not the alter ego

of Aguado . . . , USTAAD alleges that CCC conspired with Aguado to engage in a civil conspiracy" to "appropriate rights and profits belonging to USTAAD." (Doc. 1, Ex. A PP 59-60.) Under Pennsylvania law, a cognizable civil conspiracy claim consists of the following elements: "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003)* (quoting *Strickland v. Univ. of Scranton, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997))*. According to the "intracorporate conspiracy doctrine," however, "an entity cannot conspire with one who acts **[*18]** as its agent." Id.; see also *Rife v. Borough of Dauphin, 625 F. Supp. 2d 212, 221-22 (M.D. Pa. 2008)* (same). Thus, an agent that acts entirely within the scope of his or her employment or agency may not, as a matter of law, conspire with his or her employer or principal. See *Gen. Refractories, 337 F.3d at 313*; *Heffernan v. Hunter, 189 F.3d 405, 412-13 (3d Cir. 1999)*.

Nowhere in the complaint does USTAAD allege that Aguado acted outside the scope of his employment or corporate agency. The complaint simply avers that Aguado controls and is the sole owner of CCC, and that Aguado knew about the exclusive agreement entered between Branch and USTAAD. [7] (See Doc. 1, Ex. A PP 5, 26, 54, 60.) These contentions are insufficient to show that Aguado was acting in a personal capacity. See *Gen. Refractories, 337 F.3d at 313* (requiring pleading to allege facts showing defendant was acting in a personal, as opposed to official, capacity). The court will thus grant the motion to dismiss the civil conspiracy claim, but will permit USTAAD to seek leave to amend the complaint in order to rectify the deficiencies identified herein.

### IV. Conclusion

For the foregoing reasons, the court will dismiss Counts Three, Five, and Six of the complaint. USTAAD's pleading does not contain sufficient factual allegations

---

[7] USTAAD also alleges that "Aguado and CCC engaged in a common plan and scheme **[*19]** to appropriate rights and profits belonging to USTAAD." (Doc. 1, Ex. A P 60.) This formulaic recitation of the elements of the cause of action has been disregarded. See *Iqbal,     U.S.    , 129 S. Ct. at 1949*.

to support its contention that Aguado was unjustly enriched, that CCC is the alter ego of Aguado, or that Aguado and CCC engaged in a civil conspiracy to defraud USTAAD.

An appropriate order follows.

/s/ Christopher C. Conner

CHRISTOPHER C. CONNER

United States District Judge

Dated: July 16, 2010


## ORDER

AND NOW, this 16th day of July, 2010, upon consideration of the motion (Doc. 3) to dismiss, filed by defendants iCAP International Corporation t/b/d/a Cap Computer Consultants, Incorporated and Carlos Aguado, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. The motion (Doc. 3) to dismiss is GRANTED in part and DENIED in part as follows:

a. The motion is GRANTED with respect to Counts Five and Six.
b. The motion is DENIED in all other respects.

2. Plaintiff USTAAD Systems, Incorporated **[*20]** shall be permitted to seek leave to file an amended complaint on or before August 9, 2010. Any motion filed pursuant to this Paragraph shall comply with *Local Rule 15.1* or be stricken as improperly filed.

/s/ Christopher C. Conner

CHRISTOPHER C. CONNER

United States District Judge

**End of Document**

 Positive
As of: May 8, 2020 7:41 PM Z

# Williams v. Coleman

United States District Court for the Eastern District of California

December 26, 2012, Decided; December 26, 2012, Filed

CASE NO. 1:11-cv-01189-GBC (PC)

**Reporter**
2012 U.S. Dist. LEXIS 181874 *; 2012 WL 6719483

MICHAEL B. WILLIAMS, Plaintiff, v. BRUCE COLEMAN, et al., Defendants.

**Subsequent History:** Affirmed by, Motion denied by, As moot *Williams v. Coleman, 2013 U.S. App. LEXIS 16019 (9th Cir. Cal., Aug. 2, 2013)*

**Prior History:** *Williams v. Coleman, 2012 U.S. Dist. LEXIS 127671 (E.D. Cal., Sept. 6, 2012)*

# Core Terms

detainee, Vocational, rights, allegations, violations

**Counsel:** **[*1]** Michael B. Williams, Plaintiff, Pro se, COALINGA, CA.

**Judges:** Gerald B. Cohn, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** Gerald B. Cohn

# Opinion

ORDER DISMISSING ACTION, WITH PREJUDICE,

FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED

Doc. 11

**I. Procedural History, Screening Requirement, and Standard**

On July 8, 2011, Plaintiff Michael B. Williams ("Plaintiff"), a civil detainee proceeding pro se and in forma pauperis, filed this civil rights action filed this civil rights action pursuant to *42 U.S.C. § 1983*. Doc. 1. On September 7, 2012, the Court issued a screening order, dismissing Plaintiff's complaint, with leave to amend. Doc. 10. On September 28, 2012, Plaintiff filed an amended complaint. Doc. 11.

The proceedings in forma pauperis statute states as follows: "Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action or appeal . . . fails to state a claim upon which relief may be granted." *28 U.S.C. § 1915(e)(2)(B)(ii)*.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief. . . ." *Fed. R. Civ. P. 8(a)(2)*. Detailed factual allegations **[*2]** are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (citing *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007))*, and courts "are not required to indulge unwarranted inferences," *Doe I v. Wal-Mart Stores, Inc., 572 F.3d 677, 681 (9th Cir. 2009)*. While factual allegations are accepted as true, legal conclusions are not. *Iqbal, 556 U.S. at 678*.

Plaintiff is a civil detainee. "[T]he rights afforded prisoners set a floor for those that must be afforded . . . civil detainees." *McNeal v. Mayberg, 2008 U.S. Dist. LEXIS 101926, 2008 WL 5114650, at \*4 (E.D. Cal. Dec. 3, 2008)*, citing *Hydrick v. Hunter, 500 F.3d 978, 989 (9th Cir. 2007)* (reversed on other grounds) (quoting *Youngberg v. Romeo, 457 U.S. 307, 322, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982)*. *See also Semeneck v. Ahlin, 2010 U.S. Dist. LEXIS 125075, 2010 WL 4738065, at \*3 (E.D. Cal. Nov. 16, 2010)*; *Leonard v. Bonner, 2010 U.S. Dist. LEXIS 102199, 2010 WL 3717248, at \*2 (E.D. Cal. Sep. 15, 2010)*; *Allen v. Mayberg, 2010 U.S. Dist. LEXIS 15350, 2010 WL 500467, at \*5 (E.D. Cal. Feb. 8, 2010)*. Therefore, though Plaintiff is a detainee and not a prisoner, the Court may refer to the rights of prisoners to determine the rights afforded Plaintiff.

While prisoners **[\*3]** proceeding pro se in civil rights actions are still entitled to have their pleadings liberally construed and to have any doubt resolved in their favor, the pleading standard is now higher, *Hebbe v. Pliler, 627 F.3d 338, 342 (9th Cir. 2010)*. Under *§ 1983*, plaintiff must demonstrate that each defendant personally participated in the deprivation of his rights. *Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002)*. This requires the presentation of factual allegations sufficient to state a plausible claim for relief. *Iqbal, 556 U.S. at 678-79*; *Moss v. U.S. Secret Service, 572 F.3d 962, 969 (9th Cir. 2009)*. The mere possibility of misconduct falls short of meeting this plausibility standard. *Iqbal, 556 U.S. at 678*; *Moss, 572 F.3d at 969*.

*Section 1983* provides a cause of action for the violation of constitutional or other federal rights by those acting under color of state law. *E.g., Patel v. Kent School Dist., 648 F.3d 965, 971 (9th Cir. 2011)*; *Jones, 297 F.3d at 934*. For each defendant named, plaintiff must show a causal link between the violation of his rights and an action or omission of the defendant. *Iqbal, 556 U.S. at 678-79*; *Starr v. Baca, 652 F.3d 1202, 1205-06 (9th Cir. 2011)*; *Corales v. Bennett, 567 F.3d 554, 570 (9th Cir. 2009)*. **[\*4]** There is no respondeat superior liability under *§ 1983*, and each defendant may only be held liable for misconduct directly attributed to him or her. *Iqbal, 556 U.S. at 677-79*; *Ewing v. City of Stockton, 588 F.3d 1218, 1235 (9th Cir. 2009)*.

## II. Plaintiff's Amended Complaint

## A. Allegations

In Plaintiff's amended complaint, he names defendants Arthur D. Fortin, Vocational Laundry Facilitator; Bruce Coleman, Hospital Vocational Supervisor; and Gabriel Diaz, Hospital Vocational Supervisor, employed at Coalinga State Hospital ("Coalinga"). Am. Compl. at 1, 3-4, Doc. 11.

Plaintiff states he was "allegedly forced" to perform at the state hospital from August 2, 2010 through August 31, 2012 for $1.00 per hour, 2 hours per day, 10 hours per week, for a total of 40 hours per month, for less than federal minimum wage and overtime compensation. *Id.* at 4. Plaintiff alleges defendants are liable on theory of respondeat superior, for the torts of its employees in execution of a government policy or custom. *Id.* at 5. Plaintiff alleges violations of the *Thirteenth Amendment* for failure to pay Plaintiff overtime wages under the California Labor Code, the Fair Labor Standards Act, failure to provide Plaintiff **[\*5]** with pay reporting time premiums, or to provide accurate and itemized wage stubs. *Id.*

Plaintiff seeks injunctive relief, unpaid wages, and damages. *Id.* at 4, 6.

## B. Minimum Wage for Civil Detainee Patient Workers

Plaintiff claims that whenever he may be employed, he will not be provided appropriate wages for services as an employed patient worker at Coalinga. Plaintiff claims that the wages received violate the Fair Labor Standards Act ("FLSA") and the *Thirteenth Amendment* (forced involuntary servitude).

## 1. FLSA

The FLSA requires employers to pay employees a minimum hourly wage and overtime pay. *29 U.S.C. §§ 201-19 (1988)*. In a non-prisoner case, the Supreme Court articulated an "economic reality test" to be considered in deciding if an employee-employer relationship exists. *Goldberg v. Whitaker House Coop., 366 U.S. 28, 33, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961)*. In *Goldberg,* the Court held that a determination under the FLSA of whether an employment relationship exists should be based on the "economic reality" of the employment situation. The Court did not specify factors to be weighed in this evaluation. However, the Ninth Circuit, in deciding if an employer-employee relationship

2012 U.S. Dist. LEXIS 181874, *5

exists, has applied an "economic reality" [*6] test which identifies four factors: whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. See *Gilbreath v. Cutter Biological Inc., 931 F.2d 1320, 1324 (9th Cir. 1991)*.

The proper starting point in a case such as this is the state's control over its civil detainees. Where the state provides the detainees' food, shelter, and clothing, gives permission for a detainee to be allowed the privilege of working, the state's absolute power over the detainee is a power that is not a characteristic of, but <u>inconsistent with</u>, the bargained-for exchange of labor which occurs in a true employer-employee relationship. See *Gilbreath, 931 F.2d at 1325*; *see also Allen v. Mayberg, 2010 U.S. Dist. LEXIS 15350, 2010 WL 500467, at *11 (E.D. Cal. Feb. 8, 2010)*. Plaintiff has not stated an economic need for the FLSA. Plaintiff has not stated facts to address any of the above factors. Thus, Plaintiff fails, and appears unable, to state a cognizable wage claim under the FLSA.

## 2. *Thirteenth Amendment*

The law is clear that prisoners may be required to [*7] work and that any compensation for their labor exists by grace of the state. *Vanskike v. Peters, 974 F.2d 806, 809 (7th Cir. 1992)* (citing *Draper v. Rhay, 315 F.2d 193, 197 (9th Cir. 1963)*; *Sigler v. Lowrie, 404 F.2d 659 (8th Cir. 1968)*. There is no authority to justify a digression from this well-established law when the case involves a civil detainee rather than a prisoner. Further, Plaintiff's factual allegations fail to show that a civil detainee is forced to hold a job at Coalinga. Rather, the facts show that civil detainees are allowed vocational training when such positions become available. This implies a voluntary election to participate in vocational training/placement. Accordingly, notwithstanding Plaintiff's current non-employment status, he is unable to state a cognizable claim that he is being forced into involuntary servitude in violation of the *Thirteenth Amendment*.

## C. Supervisory Liability and Linkage

Under *§ 1983*, Plaintiff must link the named defendants to the participation in the violation at issue. *Iqbal, 556 U.S. at 678-79*; *Simmons v. Navajo County, Ariz., 609*

*F.3d 1011, 1020-21 (9th Cir. 2010)*; *Ewing, 588 F.3d at 1235*; *Jones v. Williams, 297 F.3d at 934*. Liability [*8] may not be imposed on supervisory personnel under the theory of respondeat superior, *Iqbal, 556 U.S. at 676*; *Ewing, 588 F.3d at 1235*, and administrators may only be held liable if they "participated in or directed the violations, or knew of the violations and failed to act to prevent them," *Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989)*; *accord Starr, 652 F.3d 1202, 1205-08 (9th Cir. 2011)*; *Corales, 567 F.3d at 570*; *Preschooler II v. Clark County School Board of Trustees, 479 F.3d 1175, 1182 (9th Cir. 2007)*; *Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997)*. Some culpable action or inaction must be attributable to defendants and while the creation or enforcement of, or acquiescence in, an unconstitutional policy may support a claim, the policy must have been the moving force behind the violation. *Starr, 652 F.3d at 1205*; *Jeffers v. Gomez, 267 F.3d 895, 914-15 (9th Cir. 2001)*; *Redman v. County of San Diego, 942 F.2d 1435, 1446-47 (9th Cir. 1991)*; *Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989)*.

Plaintiff names defendants Arthur D. Fortin, Vocational Laundry Facilitator; Bruce Coleman, Hospital Vocational Supervisor; and Gabriel Diaz, Hospital Vocational Supervisor. Plaintiff's [*9] allegations are insufficient to hold them liable based on their position of authority as Plaintiff has not alleged any facts linking him to acts or omissions, which suggest he participated or directed the violations, or knew of the violations and failed to prevent them. *Iqbal, 556 U.S. at 676*; *Ewing, 588 F.3d at 1235*. Accordingly, the Court finds that Plaintiff fails to state a cognizable claim for relief under *§ 1983* against names defendants Arthur D. Fortin, Vocational Laundry Facilitator; Bruce Coleman, Hospital Vocational Supervisor; and Gabriel Diaz, Hospital Vocational Supervisor, based upon supervisory liability.

## III. Conclusion and Order

Plaintiff's amended complaint fails to state any claims upon which relief may be granted. Plaintiff was previously notified of the deficiencies in his claims and granted leave to amend, but he was unable to cure the deficiencies. *Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000)*; *Noll v. Carlson, 809 F.2d 1446, 1448-49 (9th Cir. 1987)*. Based on the record in this case, the Court finds that further leave to amend is not warranted.

Accordingly, pursuant to *28 U.S.C. §§ 1915A* and *1915(e)*, the Court HEREBY ORDERS that this action be DISMISSED, with [*10] prejudice, based on

2012 U.S. Dist. LEXIS 181874, *10

Plaintiff's failure to state any claims upon which relief may be granted under *§ 1983*.

IT IS SO ORDERED.

Dated: December 26, 2012

/s/ Gerald B. Cohn

UNITED STATES MAGISTRATE JUDGE

---

**End of Document**

Positive
As of: May 8, 2020 7:41 PM Z

# *Williams v. Coleman*

United States Court of Appeals for the Ninth Circuit

July 24, 2013, Submitted[***]; August 2, 2013, Filed

No. 13-15082

---

[***] The panel unanimously concludes this case is suitable for decision without oral argument. See Fed. R. App. P. 34(a)(2).

536 Fed. Appx. 694, *694; 2013 U.S. App. LEXIS 16019, **16019

**Reporter**
536 Fed. Appx. 694 *; 2013 U.S. App. LEXIS 16019 **; 2013 WL 3963463

MICHAEL B. WILLIAMS, Plaintiff - Appellant, v. BRUCE COLEMAN, Vocational Supervisor at Coalinga State Hospital; GABRIEL DIAZ, Vocational Services Assignment Supervisor at Coalinga State Hospital, Defendants - Appellees.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Subsequent History:** US Supreme Court certiorari denied by *Williams v. Coleman, 2014 U.S. LEXIS 1396 (U.S., Feb. 24, 2014)*

**Prior History:** [**1] Appeal from the United States District Court for the Eastern District of California. D.C. No. 1:11-cv-01189-GBC. Gerald B. Cohn, Magistrate Judge, Presiding **.

*Williams v. Coleman, 2012 U.S. Dist. LEXIS 181874 (E.D. Cal., Dec. 26, 2012)*

**Disposition:** AFFIRMED.

# Core Terms

allegations

**Counsel:** MICHAEL B. WILLIAMS, Plaintiff - Appellant,

Pro se, Coalinga, CA.

**Judges:** Before: ALARCÓN, CLIFTON, and CALLAHAN, Circuit Judges.

# Opinion

[*694] MEMORANDUM *

Michael B. Williams, a civil detainee confined at Coalinga State Hospital pursuant to California's Sexually Violent Predator Act, appeals pro se from the district court's judgment dismissing his action alleging that defendants violated the *Thirteenth Amendment* and the Fair Labor Standards Act. We have jurisdiction under *28 U.S.C. § 1291*. We review de novo a dismissal for failure to state a claim under *28 U.S.C. § 1915A*, *Resnick v. Hayes, 213 F.3d 443, 447 (9th Cir. 2000)*, and *28 U.S.C. § 1915(e)(2)*, *Barren v. Harrington, 152 F.3d 1193, 1194 (9th Cir. 1998)* (order). We affirm.

The district court properly dismissed Williams's action because the allegations in his amended complaint did not "contain[ [**2] ] enough facts to state a claim to relief that is plausible on its face." *Hebbe v. Pliler, 627 F.3d 338, 341-42 (9th Cir. 2010)* (citation and internal quotation marks omitted); *see also* U.S. Const. amend. XIII, § 1 (prohibiting involuntarily servitude); *Gilbreath v. Cutter Biological, Inc., 931 F.2d 1320, 1324-25 (9th Cir. 1991)* (discussing economic reality test to consider for determining whether an employer-employee relationship exists).

We do not consider arguments and allegations raised for the first time on appeal. *See Padgett v. Wright, 587 F.3d 983, 985 n.2 (9th Cir. 2009)* (per curiam).

Williams's motion filed on March 6, 2013 is denied as moot.

**AFFIRMED.**

---

** Williams consented to proceed before a magistrate judge. See *28 U.S.C. § 636(c)*.

---

* This disposition is not appropriate for publication and is not precedent except as provided by *9th Cir. R. 36-3*.

536 Fed. Appx. 694, *694; 2013 U.S. App. LEXIS 16019, **2

**End of Document**