THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM L. BURRELL, JR., JOSHUA      :
HUZZARD, and DAMPSEY STUCKEY,        : CIVIL ACTION NO. 3:14-CV-1891
individually and as representatives of : (JUDGE MARIANI)
the classes,                         : (Magistrate Judge Saporito)
                                     :
         Plaintiffs,                 :
                                     :
    v.                               :
                                     :
LACKAWANNA RECYCLING               :
CENTER, INC., LACKAWANNA           :
COUNTY SOLID WASTE                 :
MANAGEMENT AUTHORITY,              :
LACKAWANNA COUNTY, LOUIS           :
DENAPLES, DOMINICK DENAPLES,       :
and THOMAS STAFF,                  :
                                     :
         Defendants.                 :

MEMORANDUM OPINION
I. INTRODUCTION

Here the Court considers the Report and Recommendation ("R&R") issued by

Magistrate Judge Joseph F. Saporito addressing the four pending motions to dismiss (Docs.

99, 101, 102, 103) with which all Defendants seek dismissal of Plaintiffs' Second Amended

Complaint (Doc. 77). This case arises in relation to Plaintiffs' incarceration pursuant to

Lackawanna Court of Common Pleas civil contempt orders.  Magistrate Judge Saporito

recommends granting the motions in part and denying them in part.  (Doc. 120 at 27-28.)

For the reasons discussed below, the Court will adopt the R&R in part and will grant

Defendants' motions to dismiss.

## II. BACKGROUND

Plaintiffs were child support debtors who were sentenced to serve a period of incarceration after they failed to pay overdue child support. (Doc. 77 ¶¶ 18-96.)  While Plaintiff Stuckey may have had overlapping criminal sentences (*see* Doc. 120 at 10 n.6), Plaintiffs Burrell and Huzzard could be released before the expiration of the imposed sentence upon payment of a monetary sum established by the Lackawanna County Court of Common Pleas Order, a sum known as the "purge" amount.  (Doc. 77 ¶¶ 26, 61.)  As per Lackawanna County Prison staff directives, Plaintiffs could not participate in the work release program until they successfully completed a period of participation in the Lackawanna County Community Services Program, which in each case here resulted in working at the Lackawanna Recycling Center, Inc. for approximately eight hours a day at a pay rate of $5.00 per day paid into the inmate's prison commissary account. (Doc. 77 ¶¶ 32, 36, 42, 43, 66, 67, 70, 71, 87, 88, 91, 92.)  Court orders for Plaintiffs Burrell and Huzzard accommodated and confirmed this arrangement.  (Doc. 77 ¶¶ 33-35, 66.)

As set out in the R&R,

Since at least March 31, 2005, the [Lackawanna County Solid Waste Authority ("Authority")] and [Lackawanna Recycling Center, Inc. ("LRCI")] have been parties to a contract (the "Operating Agreement") regarding the operations of the Lackawanna County Recycling Center (the "Center"), a recycling center owned by the Authority.  Under the terms of the Operating Agreement, LRCI assumed responsibility for operation and management of the Center, including the hiring, supervision, training, and payment of personnel to staff the Center. Besides these employees of LRCI, however, the Operating Agreement also provided that the Authority would continue to "provide the same number of Prisoners from the Lackawanna County Prison that have historically worked at

the Center as part of their work release program as security requirements dictate."

In accordance with this last provision, county personnel—specifically prison guards—transport prisoners to the Center to work there.  Prison guards remain on site at the Center to supervise prisoners, maintain security, and discipline prisoners.  Some number of the prisoners supplied by the Authority to work at the Center are child support debtors sentenced to terms of incarceration following civil contempt proceedings for failure to pay child support.

(Doc. 120 at 3-4.)

Defendant Louis DeNaples is the president of LRCI.  (Doc. 77 ¶ 11.)  Defendant Dominick DeNaples is the vice president of LRCI.  (*Id*. ¶ 12.)  At the relevant time, Defendant Thomas Staff was an administrator employed by Defendant County who regulated the Work Release Program and the Community Service Program at the Lackawanna County Prison.  (*Id*. ¶ 15.)  Defendant Staff is sued only in his official capacity.  (*Id*.)

Plaintiffs' Second Amended Complaint contains seven counts.  In Count I, Plaintiffs seek to hold all Defendants liable for unlawfully obtaining their labor in violation of the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589.  (Doc. 77 ¶¶ 202-207.)  In Count II, Plaintiffs seek to hold Lackawanna County ("County"), the Lackawanna County Solid Waste Management Authority ("Authority"), and Thomas Staff liable for subjecting them to involuntary servitude in violation of the Thirteenth Amendment, made actionable by 42 U.S.C. § 1983, by requiring them to work at the Lackawanna County Recycling Center, Inc. ("LRCI") or remain incarcerated and ineligible for work release.  (*Id*. ¶¶ 208-212.)  In

Count III, Plaintiffs assert that the Center, the County, and the Authority violated the Fair Labor Standards Act ("FLSA") by failing to pay them the federal minimum wage.  (*Id*. ¶¶ 213-227.)  In Count IV, Plaintiffs assert that the Center, the County, and the Authority violated the Pennsylvania Minimum Wage Act ("PMWA") by failing to pay them the state minimum wage.  (*Id*. ¶¶ 228-232.)  In Count V, Plaintiffs assert that the Center, the County, and the Authority violated the Pennsylvania Wage Payment and Collection Law ("PWPCL") by failing to pay them their wages "in lawful money of the United States or check."  (*Id*. ¶¶ 233-237.)  In Count VI, Plaintiffs seek to hold all Defendants liable for violation of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) made actionable by 18 U.S.C. § 1964(c).  (*Id*. ¶¶ 228-243.)  In Count VII, Plaintiffs assert a state law claim for unjust enrichment.  (*Id*. ¶¶ 244-246.)

The Second Amended Complaint (Doc. 77) was filed after a panel of the Court of Appeals for the Third Circuit considered an appeal of this Court's December 8, 2016, dismissal of Plaintiff Burrell's First Amended Complaint (Docs. 11, 44) and remanded the matter for further proceedings, *Burrell v. Luongo*, 750 F. App'x 149 (3d Cir. 2018) (not precedential).  The Circuit panel concluded that this Court had properly dismissed numerous claims contained in the First Amended Complaint, *id.* at 154-57, and identified several claims that could be pursued after remand including Thirteenth Amendment and 18 U.S.C. § 1589, Trafficking Victims Protection Act ("TVPA"), claims, civil RICO claims, and state law claims, *id* at 157-60.

4

The four pending motions are Rule 12(b)(6) Motion to Dismiss Second Amended Complaint by Defendants Lackawanna County and Thomas Staff (Doc. 99); Motion to Dismiss by Lackawanna County Recycling Center, Inc. (Doc. 101); Motion to Dismiss by Louis DeNaples and Dominic DeNaples (Doc. 102); and Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to F.R.C.P. 12(b)(6) by Defendant, Lackawanna County Solid Waste Management Authority (Doc. 103).  The R&R recommends granting the motions in part and denying them in part: claims against Defendant Staff should be dismissed as redundant of the claims against his employer, Lackawanna County; FLSA, PMWA, and PWPCL claims (Counts III, IV, and V) should be dismissed for failure to state a claim; and RICO claims (Count VI) should be dismissed as to all Defendants except LRCI. (Doc. 120 at 27-28.)  Based on the foregoing, the R&R recommends that the TVPA claims in Count I go forward as to all Defendants except Defendant Staff; Thirteenth Amendment claims in Count II go forward as to Defendant County and Defendant Authority; the RICO claim in Count VI go forward as to LCRI, and the unjust enrichment claims in Count VII go forward as to all Defendants except Defendant Staff.  (*Id.* at 28.)

All parties except Defendant Staff have filed objections to the R&R.  (Docs. 121-129.)  In sum, the parties raise objections to the R&R's recommendations as to each count contained in the Second Amended Complaint with Plaintiffs objecting to the recommendations that Counts III, IV, and V be dismissed and Defendants objecting to the recommendations that Counts I, II, VI, and VII go forward.

## II. LEGAL STANDARDS

### A. <u>Report and Recommendation</u>

A District Court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition" of certain matters pending before the Court.  28 U.S.C. § 636(b)(1)(B).  If a party timely and properly files a written objection to a Magistrate Judge's Report and Recommendation, the District Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  *Id*. at § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3); M.D. Pa. Local Rule 72.3; *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011). "If a party does not object timely to a magistrate judge's report and recommendation, the party may lose its right to *de novo* review by the district court."  *EEOC v. City of Long Branch*, 866 F.3d 93, 99-100 (3d Cir. 2017).  The *de novo* standard applies only to objections which are specific.  *Goney v. Clark*, 749 F.2d 5, 6-7 (3d Cir. 1984).  However, "because a district court must take some action for a report and recommendation to become a final order and because the authority and the responsibility to make an informed, final determination remains with the judge, even absent objections to the report and recommendation, a district court should afford some level of review to dispositive legal issues raised by the report." *City of Long Branch*, 866 F.3d at 100 (internal citations and quotation marks omitted).

B. **Motion to Dismiss Standard**

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted).  A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted).  Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S.

at 679).  "Conclusory assertions of fact and legal conclusions are not entitled to the same

presumption."  *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it

does require a pleading to show 'more than a sheer possibility that a defendant has acted

unlawfully.'"  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal

citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal,* 556 U.S. at

678).  "The plausibility determination is 'a context-specific task that requires the reviewing

court to draw on its judicial experience and common sense.'"  *Id.* at 786-87 (quoting

*Iqbal,* 556 U.S. 679).

The Third Circuit Court of Appeals has identified the following three-step inquiry as

appropriate to determine the sufficiency of a complaint pursuant to *Twombly* and *Iqbal:*

> First, the court must take note of the elements a plaintiff must plead to state a
> claim. Second, the court should identify allegations that, because they are no
> more than conclusions, are not entitled to the assumption of truth. Finally,
> where there are well-pleaded factual allegations, a court should assume their
> veracity and then determine whether they plausibly give rise to an entitlement
> for relief.

*Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 221 (3d Cir.2011); *see also Connelly v. Steel*

*Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013); *Santiago v. Warminster Twp.,* 629 F.3d

121, 130 (3d Cir.2010).

In considering a motion to dismiss, the reviewing court examines

the "complaint, exhibits attached to the complaint, [and] matters of public

record," *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010), we can also

consider documents "that a defendant attaches as an exhibit to a motion to

dismiss," *Pension Benefits Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993), if they are "undisputedly authentic" and "the [plaintiff's] claims are based [on them]," *Mayer*, 605 F.3d at 230. That holding extends to settlement material because plaintiffs "need not provide admissible proof at th[e] [motion-to-dismiss] stage." *In re OSG Sec. Litig.*, 12 F. Supp.3 d 619, 622 (S.D.N.Y. 2014); *see also In re MyFord Touch Consumer Litig.*, 46 F. Supp.3d 936, 961 n.5 (N.D. Cal. 2014) (same). Moreover, the Supreme Court has been clear about the scope of our review, stating we "*must* consider the complaint in its entirety, as well as other sources [we] ordinarily examine when ruling on ... motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L.Ed.2d 179 (2007) (emphasis added).

*Estate of Roman v. City of Newark,* 914 F.3d 789, 796–97 (3d Cir.), *cert. denied sub nom. Estate of Roman v. City of Newark, New Jersey*, 140 S. Ct. 82, 205 L. Ed. 2d 28 (2019), and *cert. denied*, 140 S. Ct. 97, 205 L. Ed. 2d 28 (2019).

Even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

[E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## III. DISCUSSION

With their objections, Defendants assert that the Magistrate Judge wrongly concluded that Plaintiffs' TVPA and Thirteenth Amendment claims, RICO claims, and unjust

enrichment claims (Counts I, II, VI, and VII) should go forward.  (Docs. 121-126, 129.[1])

Plaintiffs object to the Magistrate Judge's determination that their FLSA, PMWA, and

PWPCL claims should be dismissed.  (Docs. 127-128.[2])

## A. <u>Trafficking Victims Protection Act and Thirteenth Amendment and Claims</u>

The R&R recommends that Plaintiffs' Thirteenth Amendment and TVPA claims go

forward based on the Third Circuit's decision in *Burrell v. Luongo*, 750 F. App'x 149 (3d Cir.

2018), and the law of the case doctrine.  (Doc. 120 at 14-15.)  Defendants object to this

recommendation, asserting that the R&R's determination is not compelled by the Third

Circuit's decision.  (*See*, *e.g.*, Doc. 123 at 3; Doc. 124 at 3; Doc. 126 at 5, 8.)

## 1.  Relevant Legal Framework

As explained in the Third Circuit panel's decision,

[t]he Thirteenth Amendment abolishes "involuntary servitude, except as a
punishment for crime whereof the party shall have been duly convicted." And
while the Thirteenth Amendment's primary purpose "was to abolish the
institution of African slavery as it had existed in the United States at the time of
the Civil War, ... the Amendment was not limited to that purpose; the phrase
'involuntary servitude' was intended to extend 'to cover those forms of
compulsory labor akin to African slavery which in practical operation would tend
to produce like undesirable results.' " *United States v. Kozminski*, 487 U.S. 931,

---

[1] Defendants Louis DeNaples, Dominick DeNaples, Lackawanna Recycling Center, Inc., and
Lackawanna County filed objections to the R&R (Docs. 121, 122, 125) and briefs in support of the
objections (Docs. 123, 124, 126).  The Court hereinafter will cite to the briefs supporting the objections
(Doc. 123, 124, 126).  Defendant Lackawanna County Solid Waste Management Authority joined in the
objections filed by other Defendants.  (Doc. 129.)  As noted in the text, *see supra* p. 5, Defendant Staff
does not object to the R&R.  Thus, in the context of objections, the Court's reference to "Defendants" does
not include Defendant Staff.

[2] Plaintiffs filed objections to the R&R (Doc. 127) and a brief in support of the objections (Doc. 128).
Hereinafter the Court will cite to the brief in support of the objections.

942, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988) (quoting *Butler v. Perry*, 240 U.S. 328, 332, 36 S.Ct. 258, 60 L.Ed. 672 (1916) ). . . . "[I]nvoluntary servitude" could encompass peonage, where a person is forced, through a threat of legal sanctions, to work off a debt. *See, e.g., Bailey v. Alabama*, 219 U.S. 219, 243, 31 S.Ct. 145, 55 L.Ed. 191 (1911); *Clyatt v. United States*, 197 U.S. 207, 215-16, 25 S.Ct. 429, 49 L.Ed. 726 (1905).

. . . [T]he Supreme Court has remarked that "in every case in which [it] has found a condition of involuntary servitude, the victim had no available choice but to work or be subject to legal sanction." *Kozminski*, 487 U.S. at 943, 108 S.Ct. 2751. . . .

Similarly, under 18 U.S.C. § 1589(a), the Trafficking Victims Protection Act ("TVPA"), a victim may sue for damages and attorney fees (*see* 18 U.S.C. § 1595) if his labor or services have been obtained "by means of force, threats of force, physical restraint, or threats of physical restraint." Through this statute, "Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion, as well as through physical or legal coercion." *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017), *as amended* (Mar. 3, 2017), *petition for cert. filed* (U.S. July 31, 2017) (No. 17-154) (quoting *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) ) (internal quotation marks omitted).

*Burrell*, 750 F. App'x at 159-60.

Regarding civil contempt proceedings, The Supreme Court in *Turner* described civil

contempt as seeking

only to "coerc[e] the defendant to do" what a court had previously ordered him to do. *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 442, 31 S.Ct. 492, 55 L.Ed. 797 (1911). A court may not impose punishment "in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks v. Feiock,* 485 U.S. 624, 638, n. 9, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988). And once a civil contemnor complies with the underlying order, he is purged of the contempt and is free. *Id.,* at 633, 108 S.Ct. 1423 (he "carr[ies] the keys of [his] prison in [his] own pockets" (internal quotation marks omitted)).

564 U.S. at 441–42.

In *Hyle v. Hyle*, 868 A.2d 601 (Pa. Super. 2005), the Pennsylvania Superior Court explained that

> [t]he purpose of a civil contempt order is to coerce the contemnor to comply with a court order. *See Gunther v. Bolus,* 853 A.2d 1014, 1016 (Pa.Super.2004), *appeal denied* 578 Pa. 709, 853 A.2d 362 (2004). Punishment for contempt in support actions is governed by 23 Pa.C.S. § 4345. Section 4345 provides that

>> **(a) General rule.—**A person who willfully fails to comply with any order under this chapter, except an order subject to section 4344 (relating to contempt for failure of obligor to appear), may, as prescribed by general rule, be adjudged in contempt. Contempt shall be punishable by any one or more of the following:

>>> (1) Imprisonment for a period not to exceed six months.

>>> (2) A fine not to exceed $1,000.

>>> (3) Probation for a period not to exceed one year.

>> **(b) Condition for release.—**An order committing a defendant to jail under this section shall specify the condition the fulfillment of which will result in the release of the obligor.

> 23 Pa.C.S. § 4345.

> To be found in civil contempt, a party must have violated a court order. *See Garr v. Peters,* 773 A.2d 183, 189 (Pa. Super.2001). Accordingly, the complaining party must show, by a preponderance of the evidence, that a party violated a court order. *See Sinaiko v. Sinaiko,* 445 Pa.Super. 56, 664 A.2d 1005, 1009 (1995). The alleged contemnor may then present evidence that he has the present inability to comply and make up the arrears. *See Barrett v. Barrett,* 470 Pa. 253, 264, 368 A.2d 616, 621 (Pa.1977); *see also, Sinaiko,* 664 A.2d at 1009. When the alleged contemnor presents evidence that he is presently unable to comply

the court, in imposing coercive imprisonment for civil contempt, should set conditions for purging the contempt and effecting release from imprisonment with which it is convinced *beyond a reasonable doubt,* from the totality of the evidence before it, the contemnor has the present ability to comply.

*Barrett,* 470 Pa. at 264, 368 A.2d at 621 (emphasis in original); *see also, Sinaiko,* 664 A.2d at 1010.

*Hyle*, 868 A.2d at 604–05.

In *Hyle*, the Superior Court determined that the trial court correctly found that the individual who failed to pay child support was in contempt of the support order but the trial court erred in setting a figure that the contemnor "[did] not have the present ability to pay." *Id.* at 605.  Although the trial court recognized this, it stated in its opinion "that the purge 'is well within [the contemnor's] means to accomplish by working for a short period of time.'" *Id.* (quoting Trial Court Opinion).  The Superior Court noted that the trial court had ordered the contemnor eligible for work release so that he could obtain employment and pointed out that this arrangement meant that the "ability to comply with the purge set by the trial court will only occur sometime in the future; Appellant must first secure employment and then earn $2,500.00 to pay the purge amount."  *Id.*

*Hyle* then explained why this arrangement violated Pennsylvania law:

The law in this Commonwealth is, however, that the trial court must set the conditions for a purge in such a way as the contemnor has the **present ability** to comply with the order. *See, e.g., Barrett,* 470 Pa. at 265, 368 A.2d at 622 (reversing contempt order where alleged contemnor had no present ability to pay purge amount); *Muraco v. Pitulski,* 470 Pa. 269, 273, 368 A.2d 624, 626 (1977) (reversing contempt order where there was no evidence that alleged contemnor had present ability to pay purge amount on day of contempt

hearing); *Commonwealth ex rel. Heimbrook v. Heimbrook,* 295 Pa.Super. 300, 441 A.2d 1242, 1244 (1982) (vacating contempt order where record did not support finding that alleged contemnor had "a present ability to purge himself by making an immediate payment"); *Durant v. Durant,* 339 Pa. Super. 488, 489 A.2d 266, 268 (1985) (vacating order directing payment of purge amount where there was "nothing to indicate that appellant has access to [purge] sum ... or may readily obtain that amount"); *Travitzky v. Travitzky,* 369 Pa. Super. 65, 534 A.2d 1081, 1086 (1987) (vacating order directing payment of purge amount where there was insufficient evidence that alleged contemnor had present ability to pay purge amount on day of contempt hearing); *Wetzel v. Suchanek,* 373 Pa.Super. 458, 541 A.2d 761, 764 (1988) (reversing trial court's imposition of 60 day sentence for finding of civil contempt where the only way appellant could purge himself of sentence was by obtaining employment and remanding for trial court to impose a purge which was within appellant's present ability to comply with); *Calloway v. Calloway,* 406 Pa. Super. 454, 594 A.2d 708, 710 (1991) (affirming trial court's decision to not impose a contempt order where alleged contemnor's "present situation" was such that he could not pay purge amount).

In this case, the trial court has imposed a condition for a purge which Appellant does not have the present ability to meet. "[A] court may not convert a coercive sentence into a punitive one by imposing conditions that the contemnor cannot perform and thereby purge himself of the contempt." *Barrett,* 470 Pa. at 262, 368 A.2d at 621.

*Hyle*, 868 A.2d at 605–06.  Based on the trial court's error, the Superior Court vacated the contempt order directing payment of $2,500.00 and remanded for the trial court "to determine what conditions will be sufficiently coercive yet enable Appellant to comply with the order."  *Id.* at 606.  The civil contemnor's ability to pay the purge amount was again stressed by the Superior Court in *I.D. v. K.O.J.*, 237 A.3d 456 (Pa. Super. 2020) (Table Decision), where the court stated that "[t]he trial court's conclusion regarding the contemnor's present ability to pay the purge condition must be supported by the record and

cannot be based on speculative factors such as potential earning capacity or values of assets not in evidence." *Id.* at *3.

## 2.  District Court Jurisdiction

Before considering Defendants' objection to the Magistrate Judge's determination regarding the law of the case, the Court will address the issue of jurisdiction raised by Defendants Louis DeNaples, Dominick DeNaples, and LCRI.  These Defendants contend that the *Rooker-Feldman* doctrine deprives the Court of jurisdiction over the Thirteenth Amendment and TVPA claims because Plaintiffs seek to collaterally attack their state court contempt orders which they cannot do in this proceeding.  (Docs. 136 and137 at 3 (citing *Gary v. Braddock Cemetery*, 517 F.3d 195, 206 (3d Cir. 2008) ("Under [the] *Rooker–Feldman* [doctrine], a federal court lacks subject matter jurisdiction when, in order to grant the relief sought, the federal court must conclude that the state court's judgment in a prior proceeding was entered in error, or must take action that would render the state judgment ineffectual.").)  They add that Plaintiffs cannot "by fanciful pleading, contend that they lacked the 'present ability' to comply with the underlying support orders." (*Id.*)  Plaintiffs disagree with this assessment.  (Doc. 142 at 3.)  For the reasons that follow, the Court concludes that *Rooker-Feldman* does not deprive the Court of jurisdiction over the Thirteenth Amendment and TVPA claims.

In their response to Defendants' argument, Plaintiffs assert that *Rooker-Feldman* does not apply here because their claims "do not seek to undo the state court judgments." (Doc. 142 at 3.)  They argue as follows:

> Plaintiffs have presented "independent claim[s]" under the TVPA and the Thirteenth Amendment. *See In re Philadelphia Ent. & Dev. Partners*, 879 F.3d at 500 (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005). In fact, Plaintiffs can recover regardless of whether the state courts set their purge amounts correctly as a matter of Pennsylvania child support law, as the injury alleged by Plaintiffs in this case was not caused by the state court judgment. In the context of child support contempt determinations, Pennsylvania courts must set purge conditions that "will be sufficiently coercive yet enable [the debtor] to comply with the order." *Hyle v. Hyle*, 868 A.2d 601, 606 (Pa. Super. 2005). In other words, the purge amounts were designed to be coercive. The question central to Plaintiffs' claims continues to be whether the purge amounts were coercive enough, as a matter of federal statutory and constitutional law, that their labor was procured in violation of the TVPA or the Thirteenth Amendment.  Rooker-Feldman "does not apply merely because the claim for relief if granted would as a practical matter undermine a valid state court order." *In re Philadelphia Ent. & Dev. Partners*, 879 F.3d at 503.
>
> At most, the underlying state court judgments provide evidence that, while Plaintiffs and putative class members had some means by which they could have paid their purge amounts, the amounts were high enough "to coerce the contemnor to comply with [the] court order[s]." *Id.* at 604. Without proceeding to discovery, this Court cannot evaluate whether the funds were accessible to Plaintiffs, other financial burdens faced by Plaintiffs, or other context regarding the coerciveness of the purge amount. Instead, the Court must rely on Plaintiffs' SAC, which unequivocally alleges that Plaintiffs had no other options but to work under abysmal conditions for just $5 per day to pay their child support and regain their freedom. *See* SAC at ¶¶ 28, 36, 67, 88. These allegations suffice to survive Defendants' motions to dismiss, and do not divorce this Court of jurisdiction as LRCI and the DeNaples now argue for the first time in their reply brief.

(Doc. 142 at 4.)

The United States Supreme Court has explained that "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction." *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.,* 549 U.S. 422, 430–31 (2007); *see Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 399 n. 3 (1981) (noting that a dismissal for failure to state a claim upon which relief can be granted is a judgment on the merits). *Rooker-Feldman* prevents federal district courts from exercising jurisdiction "[i]n certain circumstances, where a federal suit follows a state suit." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 163–64 (3d Cir. 2010); *Taliaferro v. Darby Twp. Zoning Bd.,* 458 F.3d 181, 192 (3d Cir.2006). Therefore, the Court, as a threshold matter, will turn to whether *Rooker-Feldman* presents a jurisdictional bar to consideration of Plaintiffs' Thirteenth Amendment and TVPA claims.

The *Rooker-Feldman* doctrine originated from two Supreme Court opinions issued over the course of six decades, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). Initially, the United States Supreme Court held that lower federal courts may not hear claims actually decided by a state court, as district courts have no appellate jurisdiction. *Rooker*, 263 U.S. at 416 (1923). The Supreme Court later extended this holding, explaining that a federal district court lacks jurisdiction over any claims that are "inextricably intertwined" with a state court judgment. *Feldman*, 460 U.S. at 486. Federal claims are "inextricably intertwined" with a previous state court judgment when "the federal court must determine that the state

court judgment was erroneously entered in order to grant the requested relief" or "the

federal court must take an action that would negate the state court's judgment." *In re*

*Knapper*, 407 F.3d 573, 581 (3d Cir. 2005). As summarized in *Taliaferro*, "[u]nder

the *Rooker-Feldman* doctrine, a district court is precluded from entertaining an action, that

is, the federal court lacks subject matter jurisdiction, if the relief requested effectively would

reverse a state court decision or void its ruling." *Id.* at 192.

The Supreme Court has stated that the scope of the *Rooker-Feldman* doctrine is

"narrow," confined to "cases brought by state-court losers complaining of injuries caused by

state-court judgments rendered before the district court proceedings commenced." *Exxon*

*Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). The doctrine is not

implicated "simply because a party attempts to litigate in federal court a matter previously

litigated in state court" and therefore "[i]f a federal plaintiff 'present[s] some independent

claim, albeit one that denies a legal conclusion that a state court has reached in a case to

which he was a party ..., then there is jurisdiction and state law determines whether the

defendant prevails under principles of preclusion.' " *Id.* at 293, (quoting *GASH Assoc. v. Vill.*

*of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)). The jurisdictional bar imposed

by *Rooker–Feldman* is not so expansive as to include federal actions "that simply raise

claims previously litigated in state court." *Exxon Mobil*, 544 U.S. at 287 n.2; *see*

*also, Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 547 (3d Cir. 2006)

("Turner's action in the district court did not complain of injuries caused by the state court

judgment.  Rather, Turner's complaint raised federal claims, grounded on the FHA [Fair Housing Act], *not* caused by the state-court judgment but instead attributable to defendants' alleged FHA violations that preceded the state-court judgment.)

In the Third Circuit, four requirements must be met for the *Rooker-Feldman* doctrine to apply: (1) the federal plaintiff lost in state court; (2) the plaintiff "complain[s] of injuries caused by [the] state-court judgments"; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments.  *Great Western*, 615 F.3d at 166 (alteration in original) (quoting *Exxon Mobil*, 544 U.S. at 284). The Circuit Court also stated that "[t]he second and fourth requirements are the key to determining whether a federal suit presents an independent-non-barred claim."  *Id.*  "A useful guidepost is the timing of the injury, that is, whether the injury complained of in federal court existed prior to the state-court proceedings and thus could not have been 'caused by' those proceedings." *Id.* at 167 (citation omitted).

As the party asserting jurisdiction, a plaintiff has an affirmative burden to show that his claims are not precluded by the *Rooker-Feldman* doctrine.  *See Khalil v. NJ Div. of Child Prot. & Permanency*, 594 F. App'x 88, 90 (3d Cir. 2015).

Applying the *Rooker-Feldman* doctrine to the facts of this case, the first requirement is met because Plaintiffs lost in state court when the Court of Common Pleas Family Court division entered enforcement orders against them and ordered their imprisonment following civil contempt proceedings.  *See Lyman v. Philadelphia Ct. of Common Pleas Domestic*

*Rels. Div.*, 751 F. App'x 174, 177 (3d Cir. 2018) (in suit for claims arising from state court

domestic relations proceedings, first *Rooker-Feldman* requirement met: "Lyman lost in state

court when [the Domestic Relations Division ("DRD")] entered enforcement orders against

him and ordered his imprisonment following civil contempt proceedings.)[3]   The third

requirement is also met because the state court judgments were rendered before the

federal suit was filed.  *Great Western*, 615 F.3d at 166.

Whether the second and fourth requirements are met are more difficult questions.

The second requirement—that a plaintiff must be complaining of injuries caused by a state-

court judgment—may also be thought of as an inquiry into the source of the plaintiff's

injury.  *Great Western*, 615 F.3d at  166 (citing *Turner v. Crawford Square Apartments III,*

*L.P.,* 449 F.3d 542, 547 (3d Cir.2006) ("Here, the district court erred by applying

the *Rooker–Feldman* doctrine 'beyond the contours of the *Rooker* and *Feldman* cases,'

because Turner's action in the district court did not complain of injuries 'caused by the state

---

[3]  *Lyman* also found the remaining three *Rooker-Feldman* requirements met:

Second, Lyman complains of injuries caused by the state court judgments, namely, that the October 29, 2014, enforcement order "made no finding regarding [his] present ability to comply with the support order or the purge amount," and that the civil contempt proceedings took place without provision of counsel for him. . . . Third, the state court judgments were finalized before Lyman filed his federal action. And fourth, we undoubtedly would have to review the state court's judgments to determine whether DRD improperly entered the enforcement orders without considering certain factors.

It thus follows that the District Court lacked subject matter jurisdiction to entertain Lyman's claims.

*Lyman*, 751 F. App'x at 178.

court judgment.'" (quoting *Exxon Mobil,* 544 U.S. at 283–84)).  "The critical task is . . . to

identify those federal suits that profess to complain of injury by a third party, but actually

complain of injury 'produced by a state-court judgment and not simply ratified, acquiesced

in, or left unpunished by it.'" *Id.* at 167 (quoting *Hoblock v. Albany County Board of*

*Elections*, 422 F.3d 77, 88 (2d Cir. 2005)).  *Great Western* also explained that

> [w]hat this requirement targets is whether the plaintiff's claims will require
> appellate review of state-court decisions by the district court. Prohibited
> appellate review "consists of a review of the proceedings already conducted by
> the 'lower' tribunal to determine whether it reached its result in accordance with
> law." *Bolden v. City of Topeka, Ks.,* 441 F.3d 1129, 1143 (10th Cir.2006). It is
> important to distinguish such appellate review from those cases in which "a
> party attempts to litigate in federal court a matter previously litigated in state
> court," *Exxon Mobil,* 544 U.S. at 293, 125 S.Ct. 1517, or in which "the federal
> plaintiff and the adverse party are simultaneously litigating the same or a similar
> dispute in state court," *Noel v. Hall,* 341 F.3d 1148, 1163 (9th Cir.2003) (cited
> with approval in *Exxon Mobil).* If the matter was previously litigated, there is
> jurisdiction as long as the "federal plaintiff present[s] some independent claim,"
> even if that claim denies a legal conclusion reached by the state court. *Exxon
> Mobil,* 544 U.S. at 293, 125 S.Ct. 1517 (internal quotation marks & citation
> omitted; alteration in original). When "the second court tries a matter anew and
> reaches a conclusion contrary to a judgment by the first court, without
> concerning itself with the bona fides of the prior judgment," the second, or
> federal, court "is not conducting appellate review, regardless of whether
> compliance with the second judgment would make it impossible to comply with
> the first judgment." *Bolden,* 441 F.3d at 1143.

*Great Western*, 615 F.3d at 169.

As set out above, the parties disagree on whether Plaintiffs complain of injuries

caused by the state court judgments.  Plaintiffs assert that the Thirteenth Amendment and

TVPA were violated because, to qualify for work release and potentially earlier release from

prison, they lacked any option other than working at the Center.  (Doc. 77 ¶¶ 36, 67, 88.)

Plaintiffs say they do not complain of injuries caused by the state court judgments (Doc. 142 at 3) but their argument on the issue is vague and conclusory (*see id.* at 2-4).  In a sense it may be true that Plaintiffs' injuries were caused by what happened *after* the state court judgments, i.e., *post incarceration* allegedly coerced participation in the Community Service Program where they worked for $5.00 a day at the Center.  However, for reasons discussed in greater detail in the "Merits Analysis" section below, the civil contempt legal framework indicates that what came after Plaintiffs' incarceration is linked to the state court orders because Plaintiffs were incarcerated for failing to pay a purge amount which the state court had determined beyond a reasonable doubt they had the ability to pay.  *See supra* pp. 11-15; *see infra* p. 30.

Despite this inescapable link between the state court orders at issue and the claimed injury allegedly resulting from the lack of option in Community Service participation, the Court would not necessarily need to "determine that the state court judgment was erroneously entered in order to grant the requested relief," *In re Knapper*, 407 F.3d at 581, if the circumstances in existence at the time the state court entered the contempt orders changed thereafter such that Plaintiffs could have availed themselves of the provisions of 23 Pa. C.S. § 4352 which will be further discussed in the Merits Analysis section of this Memorandum Opinion.  Given this potential scenario, the unusual facts and claims in this case, and *Great Western's* caution against an expansive application of the *Rooker-Feldman*

doctrine, the Court concludes that the second *Rooker-Feldman* requirement is not satisfied here.

Regarding the fourth requirement, it follows from the conclusion on the second requirement that a scenario may exist where Plaintiffs would not necessarily be "inviting the district court to review and reject the state judgments." *Great Western*, 615 F.3d at 166 (citing *Exxon Mobil*, 544 U.S. at 284). Therefore, like the second requirement, the fourth requirement does not weigh in favor of finding a lack of jurisdiction.

Having determined that two of the four *Rooker-Feldman* requirements are not necessarily satisfied here, the Court has jurisdiction to consider Plaintiffs' Thirteenth Amendment and TVPA claims. Our analysis goes forward based on the presumption that Plaintiffs do not attack the state court judgment itself. To the extent Plaintiffs position is otherwise, i.e., they allege an inability on the part of Plaintiffs to purge at the time the state court order of contempt was imposed, they thereby attack the state court judgment and such a claim is barred by *Rooker-Feldman*.

### 3. Law of the Case Doctrine

As set out above, Defendants object to the Magistrate Judge's recommendation that the Thirteenth Amendment and TVPA claims go forward based on the law of the case doctrine. (*See*, *e.g.*, Doc. 123 at 3; Doc. 124 at 3; Doc. 126 at 5, 8.) For the reasons discussed below, the Court concludes that the Third Circuit panel's decision does not preclude consideration of these claims under the motion to dismiss standard.

The doctrine of the law of the case

> limits relitigation of an issue once it has been decided.... [T]his doctrine is concerned with the extent to which the law applied in decisions at various stages of the same litigation becomes the governing legal precept in later stages. 18 James Wm. Moore Et Al., Moore's Federal Practice ¶ 134.20 (3d ed.1999). The Court has defined the law of the case as a precept that " 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.' " *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (citing *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983), and citing 1B James Wm. Moore Et Al., Moore's Federal Practice ¶ 0.404[1], p. 118 (1984)).

*In re Cont'l Airlines, Inc.*, 279 F.3d 226, 232-33 (3d Cir. 2002).

It is well-established that the law of the case doctrine "does not restrict a court's power but rather governs its exercise of discretion." *In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998) (citing *Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997)).  Accordingly, the doctrine does not preclude reconsideration of previously decided issues in extraordinary circumstances such as where: "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *Id.* at 718 (citation omitted).

In this legal framework, the Court must first determine if the Thirteenth Amendment and TVPA claims now before the Court were decided by the Third Circuit panel in *Burrell v. Luongo* and became the law of the case in this litigation.

The Second Amended Complaint (Doc. 77) at issue here was filed after a panel of

the Court of Appeals for the Third Circuit considered an appeal of this Court's December 8,

2016, dismissal of Plaintiff Burrell's First Amended Complaint (Docs. 11, 44) and remanded

the matter for further proceedings, *Burrell v. Luongo*, 750 F. App'x 149 (3d Cir. 2018) (not

precedential).  As explained in the R&R,

> [i]n screening Burrell's *pro se* first amended complaint, this court found that he
> had failed to state a claim upon which relief could be granted with respect to
> both his Thirteenth Amendment indentured servitude and TVPA forced labor
> claims because Burrell had a choice between a full twelve months of
> imprisonment or work at the Center in unpleasant conditions for meager pay.
> *Burrell* [*v. Luongo*, Civ. A. No. 3:14-CV-1891], 2016 WL 7177549, at *11-14
> [(July 18, 2016)], *adopted by* 2016 WL 7175615.  (Docs. 34; Doc. 44.)  On
> appeal, the Third Circuit noted that, "given the dearth of case law in this area,
> . . . it is not clear, especially at the screening stage, whether this "choice" was
> sufficient to bring the alleged practice of coercing civil contemnors to work in
> the [Center] out of the range of involuntary servitude" or forced labor.  *Burrell*,
> 750 Fed. Appx. At 159-60.

(Doc. 120 at 14-15.)   In this context, the R&R concluded that

> [o]n remand, faced with substantively the same factual allegations concerning
> Burrell, we are, of course, compelled to agree. *Paul v. Hearst Corp*., 261 F.
> Supp. 2d 303, 305, n.4 (M.D. Pa. 2002) ("The law of the case requires that, on
> remand, 'the trial court must proceed in accordance with the mandate and the
> law as established on appeal.'  'A trial court must implement both the letter and
> spirt of the mandate, taking into account the appellate court's opinion and
> circumstances it embraces." (quoting *Bankers Tr. Co. v. Bethlehem Steel
> Corp*., 761 F.2d 943, 949 (3d Cir. 1985) (citations and alterations omitted))).

(Doc. 120 at 15.)

Defendants disagree with the assessment that the Magistrate Judge was

constrained by the law of the case doctrine to allow the Thirteenth Amendment and TVPA

claims to go forward in that the Third Circuit panel decided only that it was improper to dismiss these claims at the screening stage.  (*See*, *e.g.*, Doc. 123 at 3 (citing Doc. 120 at 16, n.9;[4] *Burrell*, 750 F. App'x at 160).)

On the Thirteenth Amendment issue, after setting out the relevant legal standard, *see supra* pp. 10-11, the Circuit panel stated that

> according to Burrell's complaint, he had a "choice"—either work in the LRC or spend an extra six months in prison. But given the dearth of case law in this area, we conclude that it is not clear, especially at the screening stage, whether this "choice" was sufficient to bring the alleged practice of coercing civil contemnors to work in the LRC out of the range of involuntary servitude. *See Steirer by Steirer v. Bethlehem Area Sch. Dist.*, 987 F.2d 989, 999 (3d Cir. 1993) *abrogation on other grounds recognized by Troster v. Pa. State Dep't of Corr.*, 65 F.3d 1086, 1087 (3d Cir. 1995) (describing cases where involuntary servitude had been recognized, such as in "labor camps, isolated religious sects, or forced confinement"); *cf. Tourscher v. McCullough*, 184 F.3d 236, 242 (3d Cir. 1999) (dismissal of complaint before service was premature where inmate held for a time as a pretrial detainee alleged that he was required to work in violation of Thirteenth Amendment).

*Burrell*, 750 F. App'x at 159.

---

[4] The R&R noted as follows:

> If we were presented with a blank slate, evaluating the facts alleged in the second amended complaint for the first time, we would find that the plaintiffs have failed to allege sufficient facts to plausibly state claims under the Thirteenth Amendment, the TVPA, or RICO (the latter claims being predicated on a pattern of TVPA offenses).  *See Burrell*, 2016 WL 7177549, at *11-*14, *16, *adopted by* 2016 WL 7175615.  But, as we have noted above, in light of the history of this litigation, our recommended disposition is constrained by the law of the case doctrine.

(Doc. 120 at 16 n.9.)

After setting out the requirements of a TVPA claim, *see supra* p. 11, the panel explained that "[a]gain, it may be that Burrell had a sufficient 'choice' so that any coercion to work at the [Center] did not convert that work into involuntary servitude, but we conclude that the claim deserves more consideration and should not have been dismissed before service of process." *Id.* at 160.  In conjunction with this conclusion, the panel noted that "[o]ne might argue . . . that as a civil contemnor who would be released once he paid his child support obligations, Burrell 'carr[ied] the keys of [his] prison in [his] own pockets.' *Turner v. Rogers*, 564 U.S. 431, 441-42, 131 S.Ct. 2507, 180 L.Ed.2d 452 (2011). We leave it to the District Court to consider such an argument." *Burrell*, 750 F. App'x at 160 n.7 (alterations in *Burrell*).

The Court concludes that the basis for remand was satisfied in part with service of Plaintiffs' Second Amended Complaint.  Further, the Court is now in a position to follow the Circuit panel's directive to give "more consideration" to the Thirteenth Amendment and TVPA claims, including the specific argument regarding whether Plaintiffs had the keys to the prison.  *See* 750 F. App'x at 160 & n.7.  While many factual allegations are similar to those contained in the Amended Complaint before the Circuit Court, notable distinctions exist between that document and the Second Amended Complaint.  For example, *Burrell* set out the following summary:

> [Burrell] claims that the state court and its domestic relations office routinely manipulate child support enforcement proceedings to obtain civil contempt findings against men who are financially unable to meet their child support obligations[,] ... [and] then [ ] sentence them to be incarcerated as civil

contemnors at [LCP], where they are assigned to work at the recycling center in substandard conditions and for meager pay.

750 F. App'x at 153 (citing July 18, 2016, R&R, Doc. 34 at 3-4) (alteration in original). In the Amended Complaint considered by the Circuit panel, Plaintiff Burrell named as defendants the Director of the Lackawanna County Domestic Relations office, Patrick Luongo, and Richard Saxton, Trish Corbett, and Vito Geroulo, identifying each as a "judge for Lackawanna County Pennsylvania." (Doc. 11 ¶¶ 11, 14, 15, 21.) These defendants are not named in the Second Amended Complaint nor is anyone identified as a Domestic Relations administrator or Lackawanna County judge. (*See* Doc. 77.) The Second Amended Complaint contains no allegations regarding manipulation of child support proceedings by the state court and the domestic relations office to obtain civil contempt findings against men who are financially unable to meet their child support obligations. (*See id.*) Therefore, the factual basis upon which the Circuit panel considered the Thirteenth Amendment and TVPA claims has now changed.

Given the differences between the current procedural posture of the case and distinctions between the Amended Complaint (Doc. 11) and the Second Amended Complaint (Doc. 77), the Court concludes that *de novo* review of the merits of Plaintiffs' Thirteenth Amendment and TVPA claims would not run afoul of the *Burrell* decision. Therefore, the Court will proceed with a merits analysis of these claims.

### 4.  Merits Analysis

The pertinent question identified in *Burrell* regarding a Thirteenth Amendment claim is whether "the victim had no available choice but to work or be subject to legal sanction,'" 750 F. App'x at 159 (quoting *Kozminski*, 487 U.S. at 943).  Here that question is specifically whether Plaintiffs had a choice whether to work at the Center or be subject to legal sanction. As to the TVPA, the relevant question identified in *Burrell* is similar, i.e., whether Plaintiffs "labor or services have been obtained 'by means of force, threats of force, physical restraint, or threats of physical restraint.'"  *Id.* at 160 (quoting *Muchira*, 850 F.3d at 617).  The sufficiency of the "choice" Plaintiffs had regarding their work at the Center is central to whether that work was converted to involuntary servitude.  *Id.*

Proceeding with the analysis outlined in *Burrell*, the Court focuses on the various choices Plaintiffs made and the impact of those choices.  At the outset, the Court notes that consideration of the "choice" issue in *Burrell* was undertaken in the context of allegations in the Amended Complaint (Doc. 11) that the state court and domestic relations office manipulated child support enforcement proceedings to obtain civil contempt findings against men who were financially unable to meet their child support obligations and this set the stage for incarceration and work at the Center.  750 F. App'x at 153.  With these allegations, the propriety of Domestic Relations actions and the state court contempt orders was at issue and the Circuit panel focused on the choice identified by Burrell--the "'choice' of either to work [at the Center] or spend an extra six months in prison."  *Id.* at 159.  As discussed

above, the Second Amended Complaint makes no allegations regarding manipulation of child support enforcement proceedings as the foundation for Plaintiffs' incarceration and work at the Center. *See supra* pp. 27-28. Therefore, the Court finds no allegations in the Second Amended Complaint present a barrier to considering the interplay between Plaintiffs' responses to the state court contempt orders and their subsequent choice regarding participation in the Community Service Program.

The state court's need to find "beyond a reasonable doubt, from the totality of the evidence before it, the contemnor had the ability to comply," *Barrett*, 368 A.2d at 621, indicates that the question of whether Plaintiffs "'had no available choice but to work [at the Center] or be subject to legal sanction,'" *Burrell*, 750 F. App'x at 159 (quoting *Kozminski*, 487 U.S. at 943), encompasses consideration of the choice initially faced by each Plaintiff, i.e., to either pay the amount the Court of Common Pleas had determined he had the ability to pay beyond a reasonable doubt or be incarcerated. Because a court may not impose punishment "in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks,* 485 U.S. at 638 n. 9, and a court "may not convert a coercive sentence into a punitive one by imposing conditions that the contemnor cannot perform and thereby purge himself of the contempt,'" *Hyle*, 868 A.2d at 606 (quoting *Barrett*, 368 A.2d at 621), it must follow unavoidably that each Plaintiff necessarily had the ability to pay the purge amount at the time the order of incarceration was imposed.

The counseled Second Amended Complaint makes the following averments

concerning Plaintiff Burrell:

>       24. On or around May 14, 2014, Mr. Burrell was arrested for failure to
> pay child support.
>
>       25. On or around May 16, 2014, the Court of Common Pleas for the
> County of Lackawanna, Family Court Domestic Relations Section sentenced
> Mr. Burrell to two consecutive six-month terms in the Lackawanna County
> Prison (the "Prison").
>
>       26. The court ordered that Mr. Burrell could be released early upon
> payment of $2,129.43.
>
>       27. In the same order, the court ordered Mr. Burrell to "immediate work
> release if he qualifies."
>
>       28. Mr. Burrell did not have $2,129.43—in fact, he had nothing close to
> that.
>       . . .
>
>       36. Because he could not otherwise qualify for work release, and
> because he was eager to pay his child support debt and regain his freedom,
> and lacking any other option, Mr. Burrell was compelled to begin working at the
> Center on May 28, 2014.

(Doc. 77 at 4, 6.)  The actual purge amount established for Plaintiff Burrell was $7,033.00.

(Doc. 107-1 at 1.)

Although the specific averments as to Plaintiffs Huzzard and Stuckey do not identify

a purge amount and do not include a categorical statement that they did not have the

amount identified, it was averred as to each that "[b]ecause he could not otherwise qualify

for work release, and because he was eager to pay his child support debt and regain his

freedom, and lacking any other option, [he] was compelled to begin working at the Center."
(Doc. 77 ¶¶ 67, 88.)

Given the relevant legal framework, the Court must consider whether Plaintiffs'
assertions that they had no option but to work at the Center and Burrell's assertion that he
did not have the ability to pay $2,129.43 are entitled to the presumption of truth which
attaches to well-pleaded facts.  As set out above, the presumption of truth is subject to an
important caveat: it attaches "only to those allegations for which there is sufficient 'factual
matter' to render them 'plausible on [their] face.'"  *Schuchardt*, 839 F.3d at 347 (quoting
*Iqbal*, 556 U.S. at 679).  Here state law establishes that Plaintiffs had the ability to pay the
purge at the time they were incarcerated.  *See supra* pp. 12-15.  Taken from the starting
point that the undisturbed Court of Common Pleas orders conclusively established that
Plaintiffs were able to pay the purge at the time of their incarceration, Plaintiffs' conclusory
assertions regarding "lacking any option" but to work at the Center and Plaintiff Burrell's
statement that he "did not have $2,129.43" (Doc. 77 ¶¶ 28, 36, 67, 88) are not entitled to a
presumption of truth and, if accepted, would present an attack on the state court contempt
judgments which is precluded by *Rooker-Feldman*, *see supra* pp. 21-23.

To plausibly state a claim for relief, Plaintiffs would, at a minimum, have to plead
facts which show that financial situations changed after the state court made its findings
such that they were no longer able to pay the purge amount and they were prevented from
availing themselves of the provisions of 23 Pa. C.S. § 4352 which generally allow for

requests for modification of previous support orders and retroactive modification of arrears in certain circumstances or, alternatively, how availing themselves of modification pursuant to state domestic relations law would not have provided them with the choice they said they were deprived of regarding working at the Center.[5]

In the Second Amended Complaint, the Court finds no averments stating or implying changed financial circumstances following the issuance of the state court orders.  (*See* Doc. 77.)  Without such a showing, the Court has no basis to conclude that Plaintiffs did not have their own keys to the prison—the finding by the Court of Common Pleas that they had the

---

[5] 23 Pa. C.S. § 4352 addressed "Continuing jurisdiction over support orders" and provides the following in pertinent part:

**(a) General rule.--**The court making an order of support shall at all times maintain jurisdiction of the matter for the purpose of enforcement of the order and for the purpose of increasing, decreasing, modifying or rescinding the order[.] . . . A petition for modification of a support order may be filed at any time and shall be granted if the requesting party demonstrates a substantial change in circumstances.

. . . .

**(e) Retroactive modification of arrears.--**No court shall modify or remit any support obligation, on or after the date it is due, except with respect to any period during which there is pending a petition for modification. If a petition for modification was filed, modification may be applied to the period beginning on the date that notice of such petition was given, either directly or through the appropriate agent, to the obligee or, where the obligee was the petitioner, to the obligor. However, modification may be applied to an earlier period if the petitioner was precluded from filing a petition for modification by reason of a significant physical or mental disability, misrepresentation of another party or other compelling reason and if the petitioner, when no longer precluded, promptly filed a petition. . . .

23 Pa. C.S. § 4352; *M.A. v. F.W.A.*, 241 A.3d 470 (Pa. Super. 2020) (considering retroactive application pursuant to 23 Pa. C.S. § 4352); *Albert v. Albert*, 707 A.2d 234 (Pa. Super. 1998) (same).

ability to pay would be undisturbed and this Court would be legally obligated to respect the determination of the state court that Plaintiffs had the ability to pay the purge amount.

In their filings related to Defendants' pending motions (Docs. 134, 142), Plaintiffs point to no facts supporting an inference of changed circumstances nor do they seek an opportunity to make the requisite showing. However, they assert in their sur-reply brief that discovery is needed to evaluate "whether the funds were accessible to Plaintiffs, other financial burdens faced by Plaintiffs, or other context regarding the coerciveness of the purge amount." (Doc. 142 at 4.) The asserted need for discovery on these issues is without merit. First, the answer to the questions of what funds were accessible to Plaintiffs and what other financial burdens they had are fully within Plaintiffs' control. Therefore, no discovery need be engaged in to provide a factual basis for a claim that Plaintiffs' experienced changed financial circumstances. Second, discovery regarding "the coerciveness of the purge amount" (*id*.) is not necessary because that amount was set by the Court of Common Pleas to coerce the contemnor to comply with the *previously court-ordered child support* and, as a matter of state law, had to be, at the time set, an amount determined to "beyond a reasonable doubt [to be] an amount the contemnor has the present ability to pay." *Barrett*, 368 A.2d at 621.

Based on this review of Plaintiffs' Second Amended Complaint, the Court finds they have pled no facts and raised no inference supporting changed circumstances. Further, Plaintiffs have pled no facts which support an inference that they were prevented from

availing themselves of the provisions of 23 Pa. C.S. § 4352 and they have provided no facts regarding the ineffectiveness of modification regarding the issue of their alleged lack of choice to work at the Center.  Because this is the minimum Plaintiffs must show to plead plausible claims for relief on their Thirteenth Amendment and TVPA claims, i.e., that they did not have the keys to the prison, *Turner*, 564 U.S. at 441-42, Defendants' motions to dismiss these claims are properly granted.  The Court further concludes that it cannot be definitely determined at this time that leave to amend would be futile, particularly given the Third Circuit panel's guidance that the context of the choice given civil contemnors is important and the fact that there is a "dearth of case law in this area."  *Burrell*, 750 F. App'x at 159.  Because the Court cannot conclude that amendment would be futile, the dismissal of the Thirteenth Amendment and TVPA claims will be without prejudice.[6]

---

[6] Although the Court concludes that dismissal without prejudice is appropriate in the circumstances presented here, the Court makes no determination on the potential merits of Thirteenth Amendment and TVPA claims based on the possibility that Plaintiffs experienced diminished financial circumstances subsequent to the entry of the state court contempt orders such that the choice they had to pay the purge amount at that time was no longer an option and they were unable to avail themselves of modification pursuant to 23 Pa. C.S. § 4352 or that mechanisms available under state domestic relations law would not provide them the choice they said they were deprived of regarding working at the Center.  At this stage, the Court concludes only that a showing of changed financial circumstances and the unavailability or inadequacy of domestic relations remedies potentially impacts these claims in a legally significant way.  This is not to say that Plaintiffs were subject to any legal sanction when they chose to participate in the Community Service Program—that is an analysis that only need be undertaken if Plaintiffs' choice changed significantly. ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them," *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988).)  Magistrate Judge Saporito's thorough analysis of the Thirteenth Amendment and TVPA claims raised in the Amended Complaint (Doc. 11) illustrates certain difficulties Plaintiffs' face in stating plausible claims for relief under the Thirteenth Amendment and TVPA.  (*See* Doc. 34 at 30-41.)

## B.  RICO Claims

In their Second Amended Complaint, Plaintiffs allege in Count VI that all Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") by violating 18 U.S.C. § 1962(c) and 1964(c) with the "patterns of racketeering" being that Defendants and the Enterprise engaged in acts and schemes violating the TVPA, 15 U.S.C. § 1589(a)(1). Because the Court has concluded that Plaintiffs' TVPA claims must be dismissed and the RICO claims are based on alleged TVPA violations, Plaintiffs' RICO claims also must be dismissed.  The question is whether dismissal of these claims should be with or without prejudice.

Magistrate Judge Saporito made several findings regarding Plaintiffs' RICO claims which the parties have not challenged.  He concluded that the RICO claims against the County and the Authority should be dismissed for failure to state a claim because a civil RICO action under 18 U.S.C. § 1964(c) cannot be maintained against a municipal corporation as a matter of law.  (Doc. 120 at 21 (citing *Gentry v. Resolution Tr. Corp.*, 937 F.2d 899, 914 (3d Cir. 1991).)  The R&R notes that this rationale also applies to an official-capacity RICO claim against Defendant Thomas Staff.  (Doc. 120 at 21 n.10.)  Therefore, RICO claims against the County, the Authority, and Thomas Staff in his official capacity will be dismissed with prejudice.

The R&R also recommends that RICO claims against Louis and Dominick DeNaples be dismissed because facts alleged in the Second Amended Complaint "are not sufficient to

establish that Louis and Dominick DeNaples personally—separate and apart from their roles as corporate officers—'conducted or participated in the conduct of the enterprise's affairs, not just their own affairs.'"  (Doc. 120 at 23 (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001)) (additional citations omitted).[7])  Unlike the claims against the County and the Authority, due to the basis upon which dismissal is recommended, the Court cannot conclude that granting leave to amend RICO claims against Louis DeNaples

---

[7] The R&R set out the following analysis of Plaintiffs' RICO claims against Louis DeNaples and Dominick DeNaples:

"To plead a RICO claim under § 1962(c), 'the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *In re Brokerage Antitrust Litig.*, 618 F.3d 300, 362, (3d Cir. 2010).  Under the statute, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. 1961(4).  In this case, the plaintiffs have pleaded an association-in-fact enterprise comprised of (1) LRCI, (2) its corporate officers and co-owners, Louis and Dominick DeNaples, (3) Lackawanna County and Thomas Staff, in his official capacity, and (4) the Authority.

The Supreme Court has recognized that a corporation's owner could be sued as a RICO 'person' acting through the corporation as the 'enterprise.'  However, the Court distinguished this scenario from the type of claim where a corporation is alleged to be a RICO person based on an alleged association with its own employees." *Friedland v. Unum Grp.*, 50 F. Supp. 3d 598, 605 (D. Del. 2014) (citations omitted) (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163-64 (2001)).  Here, the plaintiffs have asserted the latter type of claim, naming LRCI as a defendant and a RICO "person" that conducted or participated in the alleged association-in-fact enterprise.  The plaintiffs further name LRCI's officers and co-owners, Louis and Dominick DeNaples, as additional participants in the enterprise.  But the facts in the second amended complaint are not sufficient to establish that Louis and Dominick DeNaples personally—separate and apart from their roles as corporate officers—"conducted or participated in the conduct of the 'enterprise's affairs." *Cedric Kushner Promotions*, 533 U.S. at 162; *see also Friedland*, 50 F. Supp. 3d at 605; *Curtin v. Tilley Fire Equip. Co.*, No. Civ. 99-2373, 1999 WL 1211502, at *3 (E.D. Pa. Dec. 14, 1999).

(Doc. 120 at 22-23.)

and Dominick DeNaples would be futile.  Therefore, RICO claims against these Defendants will be dismissed without prejudice.

The R&R recommends that the RICO claim against LRCI go forward because the Second Amended Complaint plausibly pleaded an association-in-fact enterprise and the necessary predicate acts of racketeering by LCRI was plausibly pleaded because the R&R found that Plaintiffs' had plausibly pleaded a TVPA claim against LCRI.  (Doc. 120 at 24-25 & n.11.)  As set out above, the Court has determined that Plaintiffs' TVPA claims must be dismissed.  Therefore, the RICO claim against LCRI also must be dismissed.  The Court will dismiss the RICO claim against LCRI without prejudice for the same reasons as the TVPA claims are dismissed without prejudice.

## C.  Unjust Enrichment

The R&R concludes that Plaintiffs' unjust enrichment claim (Count VII) should go forward because it was "pleaded as a companion to the plaintiffs' forced labor and indentured servitude claims," and "'[w]here the unjust enrichment claim rests on the same improper conduct as the underlying tort claim, the unjust enrichment claim will rise or fall with the underlying claim.'"  (Doc. 120 at 25-26 (citing *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999)) (quoting *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 493 (E.D. Pa. 2016)).)  Plaintiffs agree with Magistrate Judge Saporito, stating that he "correctly understood Plaintiffs' unjust enrichment claim to be connected to their forced labor claims."  (Doc. 134 at 13.)  Because Plaintiffs'

unjust enrichment claim rises or falls on the Thirteenth Amendment and TVPA claims, the unjust enrichment claim must also be dismissed.  Because the Court has concluded that the Thirteenth Amendment and TVPA claims should be dismissed without prejudice, it follows that the Unjust Enrichment claim should be dismissed without prejudice.

## D.  **FLSA and PWMA Claims**

The R&R recommends dismissal of Plaintiffs' FLSA and PWMA minimum wage claims against LRCI, Lackawanna County, and the authority (Count III) because the relationship is not one of employment.  (Doc. 120 at 17-18 (citing *Wilkerson v. Samuels*, 524 F. App'x 776 779 (3d Cir. 2013) (per curiam) ("It is well established that a prisoner is not an employee under the Fair Labor Standards Act (FLSA), because the relationship is not one of employment,  but arises out of the prisoner's status as an inmate."); *Tourscher v. McCullough,* 184 F.3d 236, 243-44 (3d Cir. 1999) (holding that pretrial detainees were not "employees" under the FLSA); *see also Matherly v. Andrews,*  859 F.3d 264, 278 (4th Cir. 2017) (holding that civil detainee committed as sexually violent person was not an "employee" under the FLSA); *Smith v. Dart,* 803 F.3d 304, 314 (7th Cir. 2015) ("We cannot see what difference it makes if the incarcerated person is a prisoner, civil detainee, or pretrial detainee."); *Villarreal v. Woodham,* 113 F.3d 202, 206 (11th Cir. 1997) (FLSA does not apply to prisoners who have not been convicted--as with convicted prisoners, pretrial detainees are in a custodial relationship, they were under the supervision and control of a governmental

entity, and they were provided by the prison with all of their basic needs).)

Plaintiffs object to the R&R's recommendation that these claims be dismissed, maintaining that the critical distinction between this case and those relied upon by the Magistrate Judge is that Plaintiffs were working for a private entity outside the prison setting and caselaw supports the conclusion that, in these circumstances, they can pursue claims under the wage and hour laws. (*See*, *e.g.* Doc. 138 at 2-3.)   With this objection, the Court will assess whether the facts pled in the Second Amended Complaint plausibly give rise to FLSA and PMWA claims.

As stated in the R&R, claims under the FLSA and PMWA are to be analyzed under the same standards. (Doc. 120 at 18 (citing *Ford-Greene v. NHS, Inc.*, 106 F. Supp. 3d 590, 612-13 (E.D. Pa. 2015).)

The FLSA provides in relevant part: "Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages . . . not less than" minimum wage. 29 U.S.C. § 206(a)(1).  The FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The term "employer" "includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency." 29 U.S.C. § 203(d).  In *Thompson v. Real Estate Mortgage Network*, 748 F.3d 142 (3d Cir. 2014), the Third Circuit noted that

the breadth of these definitions is both intentional and obvious:

> When determining whether someone is an employee under the FLSA, "economic reality rather than technical concepts is to be the test of employment." Under this theory, the FLSA defines employer "expansively," and with "striking breadth." The Supreme Court has even gone so far as to acknowledge that the FLSA's definition of an employer is "the broadest definition that has ever been included in any one act."

*In re Enterprise Rent–A–Car Wage & Hour Emp't Prac. Litig.,* 683 F.3d 462, 467–68 (3d Cir.2012) (citations omitted).

*Thompson*, 748 F.3d at 148.

The "economic reality" concept in FLSA analysis was announced In *Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28 (1961), where the Supreme Court first stated that "'economic reality' rather than 'technical concepts' is to be the test of employment" for purposes of the FLSA.  *Id.* at 33.[8]  The Court of Appeals for the Third Circuit recognized

---

[8] As stated in *Henthorn v. Department of Navy*, 29 F.3d 682 (D.C. Cir. 1994), this directive gave rise to a

> four-factor "economic reality" test for determining whether an individual is an "employee" covered by the FLSA.   This test considers the extent to which typical employer prerogatives govern the relationship between the putative employer and employee.  The test asks: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *See Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir.1983) (internal quotations omitted).

*Henthorn*, 29 F.3d at 684.  Although the test has been applied in the prisoner/FLSA context, *see*, *e.g.*, *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984), appellate courts moved away from its usage in favor of an economic reality test at a higher level of generality after finding the *Bonette* factors unhelpful in determining the economic reality of the employment relationship in the prisoner context. *Danneskjold v. Hausrath*, 82 F.3d 37, 40-44 (2d Cir. 1996) (listing cases).

*Goldberg's* directive that the term "employee" be interpreted "in light of the 'economic reality' of the relationship between the parties." *Tourscher v. McCullough*, 184 F.3d 236, 243 (3d Cir. 1999). In consideration of the prisoner plaintiff's argument that pretrial detainees and convicted prisoners should be paid minimum wage for their work in the prison (the plaintiff was assigned to work in the prison cafeteria while the appeal of his conviction was pending in state court, *id.* at 242), *Tourscher* reasoned as follows:

> Each circuit that has addressed the question has concluded that prisoners producing goods and services used by the prison should not be considered employees under the FLSA. *See Gambetta v. Prison Rehabilitative Industries,* 112 F.3d 1119, 1124–25 (11th Cir.1997); *Danneskjold v. Hausrath,* 82 F.3d 37, 43 (2d Cir.1996); *Reimonenq v. Foti,* 72 F.3d 472, 475 n. 3 (5th Cir.1996); *Henthorn v. Department of Navy,* 29 F.3d 682, 684–87 (D.C.Cir.1994); *McMaster v. Minnesota,* 30 F.3d 976, 980 (8th Cir.1994); *Hale v. Arizona,* 993 F.2d 1387, 1392–98 (9th Cir.1993) (en banc); *Franks v. Oklahoma State Indus.,* 7 F.3d 971, 972 (10th Cir.1993); *Harker v. State Use Indus.,* 990 F.2d 131, 133 (4th Cir.1993); *Miller v. Dukakis,* 961 F.2d 7, 8–9 (1st Cir.1992); *Vanskike v. Peters,* 974 F.2d 806, 809–10 (7th Cir.1992); *but cf. Watson v. Graves,* 909 F.2d 1549, 1554–55 (5th Cir.1990) (holding the FLSA applicable where the prisoners worked for an outside construction company in competition with other private employers and where this competition tended to undermine compliance with the FLSA).
>
> In *Danneskjold,* the Second Circuit reasoned as follows:
>
> The relationship is not one of employment; prisoners are taken out of the national economy; prison work is often designed to train and rehabilitate; prisoners' living standards are determined by what the prison provides; and most such labor does not compete with private employers....
>
> As a result, no Court of Appeals has ever questioned the power of a correctional institution to compel inmates to perform services for the institution without paying the minimum wage. Prisoners may thus be ordered to cook, staff the library, perform janitorial

42

> services, work in the laundry, or carry ou[t] numerous other tasks
> that serve various institutional missions of the prison, such as
> recreation, care and maintenance of the facility, or rehabilitation.
> Such work occupies prisoners' time that might otherwise be filled
> by mischief; it trains prisoners in the discipline and skills of work;
> and it is a method of seeing that prisoners bear a cost of their
> incarceration.

82 F.3d at 42–43.

*Tourscher*, 184 F.3d at 243.  Based on this analysis, the Third Circuit Court agreed with its sister circuits "prisoners who perform intra-prison work are not entitled to minimum wages under the FLSA."  *Id.*

*Toursher* then went on to examine how pretrial detainee status affected the FLSA calculation, noting that the only circuit which has examined the  question of whether the FLSA's minimum wage provision should apply to work performed by a pretrial detainee held that the FLSA is inapplicable to pretrial detainees working for prison authorities since, like prisoners, they are not employees under the FLSA.  *Id.* (citing *Villarreal v. Woodham,* 113 F.3d 202, 206–07 (11th Cir.1997)).  *Tourscher* set out the following reasoning contained in *Villarreal*:

> "Focusing on the economic reality of the situation in its entirety, we conclude
> that [a pretrial detainee] is not an "employee" under the FLSA. The purpose of
> the FLSA is to protect the standard of living and general well-being of the
> American worker. Because the correctional facility meets Villarreal's needs, his
> "standard of living" is protected. In sum, "the more indicia of traditional, free-
> market employment the relationship between the prisoner and his putative
> 'employer' bears, the more likely it is that the FLSA will govern the employment
> relationship." Villarreal's situation does not bear any indicia of traditional free-
> market employment contemplated under the FLSA. Accordingly, we hold that

> Villarreal and other pretrial detainees in similar circumstances are not entitled
> to the protection of the FLSA minimum wage requirement."

*Tourscher*, 184 F.3d at 243-44 (quoting Villarreal, 113 F.3d at 207).  The circumstances of

the plaintiff's prison employment in *Villarreal* were that he was a pretrial detainee in a county

correctional facility when the sheriff required him to perform translation services for other

inmates, medical personnel, and court personnel.  *Villarreal*, 113 F.3d at 202.  As an issue

of first impression, the Eleventh Circuit held that "pretrial detainees who perform services at

the direction of correction officials and for the benefit of the facility are not covered under the

FLSA."  *Id.* at 204.  *Tourshcer* agreed with *Villarreal's* "economic reality" rationale and found

that the plaintiff's employment in the prison cafeteria "bears no indicia of traditional free-

market employment."  184 F.3d at 244.

> Based on *Toursher*, this Court has observed that

> The Third Circuit Court has explicitly held that prisoners who perform
> intraprison work are not entitled to minimum wages under the FLSA. *Tourscher
> v. McCullough,* 184 F.3d 236, 243 (3d Cir.1999). In doing so, the Third Circuit
> Court found that each circuit that has addressed the question of whether an
> inmate is entitled to the federal minimum wage has concluded that prisoners
> producing goods and services used by the prison should not be considered
> employees under the FLSA. *See id.* (citing *Gambetta v. Prison Rehabilitative
> Indus.,* 112 F.3d 1119, 1124–25 (11th Cir.1997); *Danneskjold v. Hausrath,* 82
> F.3d 37, 43 (2d Cir. 1996); *Reimoneng v. Foti,* 72 F.3d 472, 475 n. 3 (5th
> Cir.1996); *Henthorn v. Dept. of Navy,* 29 F.3d 682, 684–87
> (D.C.Cir.1994); *McMaster v. Minnesota,* 30 F.3d 976, 980 (8th Cir.1994);  *Hale
> v.. Arizona,* 993 F.2d 1387, 1392–98 (9th Cir.1993) (en banc); *Franks v.
> Oklahoma State Indus.,* 7 F.3d 971, 972 (10th Cir.1993); *Harker v. State Use
> Indus.,* 990 F.2d 131, 133 (4th Cir.1993); *Miller v. Dukakis,* 961 F.2d 7, 8–9 (1st
> Cir.1992); *Vanskike v. Peters,* 974 F.2d 806, 809–10 (7th Cir.1992)).

*Banks v. Roberts*, Civ. A. No. 1:06-CV-01232, 2007 WL 1574771, at *10 (M.D. Pa. May 31, 2007), *aff'd*, 251 F. App'x 774 (3d Cir. 2007).  In *Banks,* the plaintiff, an inmate at USP-Canaan, worked as a landscaper on the USP-Canaan compound and the opinion noted that he did not assert that any of his landscaping duties took place on any property other than the USP-Canaan compound.  *Id.*  In these circumstances, the court found that the plaintiff was not entitled to be paid minimum wage for his work.  *Id.*

Cases in this Circuit and elsewhere uniformly hold that prisoner-laborers who perform work within the prison compound, whether working for prison authorities or private employers, were not "employees" under the FLSA.[9]  Importantly, courts have not held that "prisoners are *categorically* barred from ever being 'employees' within the meaning of the FLSA merely because of their prisoner status."  *Henthorn v. Department of Navy*, 29 F.3d 682, 685 (D.C. Cir. 1994) (citing *Vanskike*, 974 F.2d at 808; *Hale*, 993 F.2d at 1393).  Notably, prisoners as a class are not exempted from FLSA coverage.  *Carter*, 735 F.2d at 13.  As *Carter* explained,

> in § 13 of the FLSA, 29 U.S.C. § 213 (1982), Congress has set forth an extensive list of workers who are exempted expressly from FLSA coverage. The category of prisoners is not on that list. It would be an encroachment upon the legislative prerogative for a court to hold that a class of unlisted workers is excluded from the Act. Congress must be presumed to be aware of and to approve of the use by the courts of the economic reality test, which involves a case-by-case factual analysis.

735 F.2d at 13.

---

[9] Quotations and parenthetical case information set out in the R&R (Doc. 120 at 17-18) relate to the intra-prison work context.

*Henthorn* noted that "cases in which courts have found that the FLSA does govern inmate labor have involved prisoners working outside the prison for private employers. *Id.* (citing *Watson,* 909 F.2d at 1553–54 (prisoners working for construction company outside the prison on work release program were "employees" of company governed by the FLSA); *Carter,* 735 F.2d at 13–14 (prisoner working as a teaching assistant at community college which paid him his wages directly could be FLSA "employee")). The D.C. Circuit concluded that "[i]n cases such as *Watson* and *Carter* where the prisoner is voluntarily selling his labor in exchange for a wage paid by an employer other than the prison itself, the Fair Labor Standards Act may apply." 29 F.3d at 686. *Henthorn* distinguished such cases from others like *Hale* and *Vanskike*

> in which the prisoner is legally compelled to part with his labor as part of a penological work assignment and is paid by the prison authorities themselves, the prisoner may not state a claim under the FLSA, for he is truly an involuntary servant to whom *no* compensation is actually owed. *See Vanskike,* 974 F.2d at 809 ("Thirteenth Amendment's specific exclusion of prisoner labor supports the idea that a prisoner performing required work for the prison is actually engaged in involuntary servitude, not employment."); *see also Wilks* [*v. District of Columbia,* 721 F. Supp. 1383, 1384 (D.D.C. 1989)] (typically "inmate labor belongs to the penal institution and inmates do not lose their primary status as inmates just because they perform work").

*Henthorn*, 29 F.3d at 686.

Based on these distinctions, *Henthorn* held that

> A prerequisite to finding that an inmate has "employee" status under the FLSA is that the prisoner has freely contracted with a non-prison employer to sell his labor. Under this analysis, where an inmate participates in a non-obligatory work release program in which he is paid by an outside employer, he may be

46

able to state a claim under the FLSA for compensation at the minimum wage. However, where the inmate's labor is compelled and/or where any compensation he receives is set and paid by his custodian, the prisoner is barred from asserting a claim under the FLSA, since he is definitively not an "employee." At the pleading stage, this means that a federal prisoner seeking to state a claim under the FLSA must allege that his work was performed without legal compulsion and that his compensation was set and paid by a source other than the Bureau of Prisons itself. Absent such allegations, prison labor is presumptively not "employment" and thus does not fall within the ambit of the FLSA.

*Id.* at 686-87.

This Court finds the straight-forward, common sense approach taken by the D.C. Circuit applicable to the case at bar.  As a threshold matter, the pleading-stage inquiry set out in *Henthorn* does not undermine the Third Circuit's holding in *Tourscher* that "prisoners who perform intra-prison work are not entitled to minimum wages under the FLSA." 184 F.3d at 243.  Further, insofar as the *Henthorn* analysis is rooted in consideration of the "'indicia of the free market employment relationship,'" *Tourscher*, 184 F.3d at 243 (quoting *Villarreal*, 113 F.3d at 207), between an employer and employee as applied in the prisoner context, application of *Henthorn's* pleading stage requirements does not run afoul of principles set out in *Tourshcer* and *Villarreal.*  Thus, the Court will now turn to the question of whether Plaintiffs' Second Amended Complaint alleges "that the prisoner has freely contracted with a non-prison employer to sell his labor" and "that their work was performed without legal compulsion and that any compensation received for their work was set and paid by a non-prison source."  *Henthorn*, 29 F.3d at 686-87.

Regarding the question of whether the work was performed "without legal compulsion," *Henthorn* looked for allegations by the plaintiff that the work he performed was voluntary and not compelled by the Bureau of Prisons.  *Id.*  Here, Plaintiffs do not allege that they freely contracted with a non-prison employer and their work at the Center was voluntary and not compelled by the Lackawanna County Prison.  Plaintiffs specifically allege that they were actively misled into believing that they were prisoners who could be forced to work as punishment and as a condition of liberty.  (Doc. 77 ¶¶ 50, 76, 118.)  As discussed in the preceding section addressing Plaintiffs' Thirteenth Amendment and TVPA claims, Plaintiffs also allege that because they could not otherwise qualify for work release and because they wanted to pay their child support and regain their freedom, and because they lacked any other option, they were "compelled" to begin working at the Center.  (Doc. 77 ¶¶ 36, 67, 88.)   Setting aside the question of whether Plaintiffs were actually compelled to work at the Center which was addressed as to the Thirteenth Amendment and TVPA claims, with paragraphs 36, 67, and 88, Plaintiffs do not allege that their work at the Center was freely contracted and voluntary.  Therefore, Plaintiffs' Second Amended Complaint does not establish or infer that their work at the Center was voluntary.

As to the second part of the inquiry—whether their compensation was set by a non-prison source, Plaintiffs specifically allege that the Authority and the County set Debtors' pay at $5.00 per hour.  (Doc. 77 ¶ 142.)  Because the County operates the Lackawanna

County Prison, Plaintiffs do not unequivocally allege that their compensation of $5.00 a day was set by a non-prison source.

Because Plaintiffs' Second Amended Complaint does not satisfy the two-pronged test for pleading sufficiency set out above, their FLSA and PMWA claims will be dismissed. The claims will be dismissed without prejudice because the Court cannot determine on the present record that granting leave to amend would be futile.

With this determination, Defendants' statute of limitations defenses on the FLSA and PMWA claims as to Defendants Burrell and Huzzard and consideration of the parties' equitable tolling arguments as to these Defendants (Doc. 105 at 6; Doc. 115 at 128; Doc. 132 at 10; Doc. 138 at 8) will not be considered at this time.

### E. PWPCL Claims

Count V of the Second Amended Complaint asserts PWPCL claims against LRCI, Lackawanna County, and the Authority for failure to pay the plaintiffs in "lawful money of the United States or check."  (Doc. 77 ¶ 235.)  Specifically, the Second Amended Complaint alleges that, while participating in the Community Service Program and working at the Center, Plaintiffs were paid $5 for each day they worked at the Center, which was deposited into their prison commissary accounts. (*Id.* ¶¶ 157, 158.)  Plaintiffs contend that payment into their prison commissary accounts was not equivalent to payment by lawful money of the

United States (i.e., cash) or check, due to various restrictions placed on their use of funds in their prison commissary accounts.  (*Id.* ¶¶ 159, 160.)

The R&R set out the following relevant legal framework:

"The [PWPCL] statute itself does not create a right to compensation." Sendi v. NCR Comten, Inc., 619 F. Supp. 1577, 1579 (E.D. Pa. 1985). The PWPCL merely "provides employees a statutory remedy to recover wages and other benefits that are *contractually* due to them." *Lehman v. Legg Mason, Inc.* , 532 F. Supp. 2d 726, 733 (M.D. Pa. 2007) (quoting *Oberneder v. Link Computer Corp.* , 696 A.2d 148, 150 (Pa. 1997)); *see also Ford-Greene,* 106 F. Supp. 3d at 613; *Sendi,* 619 F. Supp. at 1579. "Accordingly, a prerequisite for relief under the [P]WPCL is a contract between employee and employer that sets forth their agreement on wages to be paid. Relief under the [P]WPCL is implausible without existence of a contract." *Lehman* , 532 F. Supp. 2d at 733 (citations omitted). In other words, "[for the [P]WPCL to apply, an employer-employee relationship is required." *Gladstone Tech. Partners, LLC v. DahI* , 222 F. Supp. 3d 432, 439 (E.D. Pa. 2016).

(Doc. 120 at 19-20.)

The R&R concludes that, for the reasons stated regarding Plaintiffs' FLSA and PMWA claims, Plaintiffs "failed to allege an employer-employee relationship" and their PWPCL claims against LRCI, Lackawanna County, and the Authority should be dismissed for failure to state a claim upon which relief can be granted.  (Doc. 120 at 20.)

Plaintiffs object to this conclusion because the R&R does not address whether Plaintiffs pled the existence of a contract and ignores Plaintiffs' argument that they did.  (Doc. 128 at 7.)  Plaintiffs assert that, "[t]o the extent the PWPCL contains a contractual requirement, they have satisfied it" because

employees can satisfy the requirement by alleging an "implied oral contract" arising from the employment relationship.  (*Id*.)  Plaintiffs further allege that the Second Amended Complaint sets out the allegations necessary to satisfy the elements of implied contract.  (*Id.* at 7-8 (citing *Oxner v. Clivedon Nursing & Rehabilitation Center PA, L.P.*, 132 F. Supp. 3d 645, 649 (E.D. Pa. 2015)).)

The WPCL does not create a right to compensation; it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. *De Asencio v. Tyson Foods, Inc.,* 342 F.3d 301, 309 (3d Cir.2003) (citing *Antol v. Esposto,* 100 F.3d 1111, 1117 (3d Cir.1996)). The contract between the parties governs in determining whether specific wages are earned. *Id.* Where an employee does not work under a written employment contract or collective bargaining agreement, the employee will have to establish the formation of an implied oral contract to recover under the WPCL. *Id.* at 309–10; *see also Braun v. Wal–Mart Stores, Inc.,* 24 A.3d 875, 954 (Pa.Super.Ct.2011) (citing *De Asencio,* 342 F.3d at 309), *aff'd,* 106 A.3d 656 (Pa.2014).

Under Pennsylvania law, an implied contract arises when parties agree on the obligation to be incurred, but their intention, instead of being expressed in words, is inferred from the relationship between the parties and their conduct in light of the surrounding circumstances. *See Halstead v. Motorcycle Safety Found., Inc.,* 71 F.Supp.2d 455, 459 (E.D.Pa.1999). An offer and acceptance need not be identifiable and the moment of formation need not be precisely pinpointed. *See Ingrassia Constr. Co., Inc. v. Walsh,* 337 Pa.Super. 58, 486 A.2d 478, 483 (1984). In general, there is "an implication of a promise to pay for valuable services rendered with the knowledge and approval of the recipient, in the absence of a showing to the contrary." *Martin v. Little, Brown & Co.,* 304 Pa. Super. 424, 450 A.2d 984, 987 (1981). As the Pennsylvania Superior Court explained, "a promise to pay the reasonable value of the service is implied where one performs for another, with the other's knowledge, a useful service of a character that is usually charged for, and the latter expresses no dissent or avails himself of the service." *Id.* (citing *Home Prot. Bldg. & Loan Ass'n,* 143 Pa. Super. 96, 17 A.2d 755, 756–57 (1941); 17A Am.Jur.2d Contracts § 5). A promise to pay for services can only be implied, however, in circumstances under which the party rendering the services would be justified

in entertaining a reasonable expectation of being compensated by the party receiving the benefit of those services. *Id.*

*Oxner*, 132 F. Supp. 3d at 649.

Although the Court has concluded that Plaintiffs' Second Amended Complaint does not allege an employer-employee relationship for PMWA purposes, even if the Court were to assume *arguendo* that this determination does not control the PWPCL claims, Plaintiffs' implied contract argument would fail.

The Second Amended Complaint asserts that prison staff told Plaintiff Burrell that he would receive $5.00 a day for working at the Center (Doc. 77 ¶ 31) and he received $5.00 a day for working at the Center which were deposited in his commissary account (*id.* ¶¶ 42, 43). Plaintiffs Huzzard and Stuckey do not assert that they were told they would receive $5.00 per day for working at the Center. (*See id.* ¶¶ 54-96.) As to these Plaintiffs, the Second Amended Complaint alleges only that they in fact received $5.00 a day and those payments were deposited in their commissary accounts. (*Id.* ¶¶ 70, 71, 91, 92.)

These allegations fall short of stating a plausible claim for relief based on an implied contract theory. According to *Lehman,* "a prerequisite for relief under the [P]WPCL is a contract between employee and employer that sets forth *their agreement on wages to be paid.*" 532 F. Supp. 2d at 733 (emphasis added). The PWPCL seeks to remedy the employer's breach of a contractual obligation to pay

52

earned wages.  *DeAsencio*, 342 F.3d at 309.  The Second Amended Complaint

contains no allegation that a person acting with the authority to speak for any

Defendant established that Plaintiffs would be paid $5.00 for their services.  Thus,

the Court cannot infer from the Second Amended Complaint that the parties

"agree[d] on the obligation to be incurred."  *Oxner*, 132 F. Supp. 3d at 649 (citing

*Halstead*, 71 F. Supp. 2d at 459).  Because Plaintiffs' rely on the existence of an

implied contract to support their PWPCL claims and no allegations in the Second

Amended Complaint support the existence of an implied contract regarding an

agreement on wages to be paid or breach of a contractual obligation to pay earned

wages, Plaintiffs PWPCL claims will be dismissed.  The dismissal will be without

prejudice as the Court cannot conclude that granting leave to amend would be

futile.

## IV. CONCLUSION

For the foregoing reasons, the R&R (Doc. 120) will be adopted in part and

Defendants' motions to dismiss (Docs. 99, 101, 102, 103) will be granted.  Count I

(Trafficking Victims Protection Act), Count II (42 U.S.C. § 1983 Thirteenth Amendment),

Count III (Fair Labor Standards Act), Count IV (Pennsylvania Minimum Wage Act), Count V

(Pennsylvania Wage Payment and Collection Law), and Count VII (Unjust Enrichment) of

Plaintiffs' Second Amended Complaint (Doc. 77 at 26-30) will be dismissed without

prejudice.  Count VI (Racketeer Influenced and Corrupt Organization Act) of the

Second Amended Complaint (Doc. 77 at 30) will be dismissed with prejudice as to

Defendants County, Authority, and Thomas staff in his official capacity and will be

dismissed without prejudice as to Defendants Louis DeNaples, Dominick DeNaples,

and LCRI.  A separate Order is filed simultaneously with this Memorandum

Opinion.

Robert D. Mariani
United States District Judge