THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOSHUA HUZZARD, and
DAMPSEY STUCKEY, individually and
as representatives of the classes,

          Plaintiffs,

          v.

LACKAWANNA RECYCLING CENTER,
INC., and LACKAWANNA COUNTY,

          Defendants.

: CIVIL ACTION NO. 3:14-CV-1891
: (JUDGE MARIANI)

## MEMORANDUM OPINION

### I. INTRODUCTION

Here the Court considers Plaintiff's Motion for Class Certification (Doc. 286). With the dismissal of Plaintiff William Burrell on January 15, 2026 (Doc. 289), Joshua Huzzard and Dampsey Stuckey are the remaining Plaintiffs whose claims emanate from their incarceration at Lackawanna County Prison as a result of Lackawanna County Court of Common Pleas civil contempt orders for failure to pay child support and their subsequent work at the Lackawanna County Recycling Center at a pay rate of $5.00 per day. Plaintiffs now seek certification of the following classes:

1. "Trafficking Victims Protection Reauthorization Act (TVPRA) Class: All civil child support debtors who were detained at Lackawanna County Prison and

worked at the Lackawanna County Recycling Center after December 6, 2009."[1] (Doc. 286 at 1-2.)

2. "Racketeer Influenced and Corrupt Organizations Act (RICO) Class: All civil child support debtors who were detained at Lackawanna County Prison and worked at the Lackawanna County Recycling Center after December 6, 2015." (*Id*. at 2.)

3. "Unjust Enrichment Class: All civil child support debtors who were detained at Lackawanna County Prison and worked at the Lackawanna County Recycling Center after December 6, 2015." (*Id*.)

4. "Pennsylvania Minimum Wage Act (PMWA) Class: All civil child support debtors who were detained at Lackawanna County Prison and worked at the Lackawanna County Recycling Center after the entry of the May 3, 2006, Operating Agreement between LRCI and the Authority." (*Id*. at 1.)

Plaintiffs also ask the Court to appoint the firms currently representing Plaintiffs as "Class Counsel" and direct the parties "to meet and confer and submit a notice plan within fourteen days." (*Id*. at 2.) Defendants Lackawanna Recycling Center, Inc. ("LRCI") and

---

[1] Plaintiffs' Trafficking Victims claim has been referred to throughout this litigation as a claim brought under the TVPA, including in the Third Circuit's February 28, 2023, Opinion. *See Burrell v. Staff*, 60 F.4th 25, 31 (3d Cir. 2023). Therefore, the Court will continue with that identification rather than "TVPRA" in this Memorandum Opinion.

Lackawanna County ("County") oppose Plaintiffs' Motion on numerous grounds. (See Docs. 294. 295, 306.) For the reasons discussed below, the Court will grant Plaintiffs' Motion as modified.

## II. BACKGROUND

Plaintiff William L. Burrell, Jr., filed this action on September 29, 2014. (Doc. 1.) Plaintiffs Huzzard and Stuckey were added in the Second Amended Complaint filed on December 6, 2019. (Doc. 77.) Upon Plaintiffs' Motion (Doc. 276), Plaintiff Burrell's claims against Defendants were voluntarily dismissed with prejudice by Order of January 15, 2026. (Doc. 289.) Therefore, the operative complaint under consideration here is the Second Amended Complaint (Doc. 77) with Joshua Huzzard and Dampsey Stuckey as named plaintiffs.

With the Court's Memorandum Opinion and Order of August 6, 2021, Defendants' motions to dismiss were granted and Plaintiffs' Second Amended Complaint was dismissed. (Doc. 143, 144.) The Court dismissed the claims contained in the Second Amended Complaint as follows: Count I (Trafficking Victims Protection Act), Count II (42 U.S.C. § 1983 Thirteenth Amendment), Count III (Fair Labor Standards Act), Count IV (Pennsylvania Minimum Wage Act), Count V (Pennsylvania Wage Payment and Collection Law), and Count VII (Unjust Enrichment) were dismissed without prejudice; Count VI (Racketeer Influenced and Corrupt Organization Act) was dismissed with prejudice as to Defendants County, Authority, and Thomas Staff in his official capacity and dismissed without prejudice

3

as to Defendants Louis DeNaples, Dominick DeNaples, and LRCI. (Doc. 143 at 53-54; Doc. 144 ¶¶ 6, 7.) The Court granted Plaintiffs leave to file a third amended complaint within twenty-one days of the date of the Order. (Doc. 144 ¶ 8.) Plaintiffs did not file an amended complaint. Rather, on August 27, 2021, Plaintiffs filed the "Notice of Intention to Stand on Complaint and Unopposed Request for Issuance of Final Judgment" (Doc. 145) which the Court granted by Order of August 31, 2021 (Doc. 146). Plaintiffs filed their Notice of Appeal on September 30, 2021. (Doc. 147.)

On February 8, 2023, the Court of Appeals for the Third Circuit issued its opinion affirming this Court's opinion in part and reversing in part:

> we will affirm dismissal of plaintiffs' Thirteenth Amendment and Pennsylvania Wage Payment and Collection Law claims in full, and of their TVPA and RICO claims against the DeNaples brothers. We will reverse dismissal of their TVPA, FLSA, Pennsylvania Minimum Wage Act, and unjust enrichment claims against the County, the Authority, and the Corporation, and of their RICO claims against the Corporation and remand.

*Burrell*, 60 F.4th at 50. With this determination, the case went forward as to the FLSA, TVPA, unjust enrichment, and Pennsylvania Minimum Wage Act claims against the County, LRCI, and the Authority, and the RICO claim went forward as to LRCI.[2]

---

[2] Defendant Authority is not actively participating in the case at this time. On March 14, 2025, the Court issued a Memorandum Opinion (Doc. 249) and Order (Doc. 250) addressing Defendant Authority's counsel's Motion for Leave to Withdraw Appearance (Doc. 173). The Court granted the Motion based on the conclusion that Authority Counsel's

> communication issues with the Authority and the County, the status of the Authority, the duration of these issues with no signs of imminent resolution, Mr. Cognetti's irrelevance to

On May 6, 2024, the Court granted Plaintiffs' Motion for Conditional Certification of a Collective Action, Identification of Potential Collective Action Members, and Approval of Notice to Potential Collective Action Members. (Doc. 182.) Plaintiffs now seek class certification for their remaining claims.

As noted above, Plaintiffs' remaining claims emanate from their incarceration at Lackawanna County Prison as a result of Lackawanna County Court of Common Pleas civil contempt orders for failure to pay child support and Plaintiffs' subsequent work at the Lackawanna County Recycling Center ("Recycling Center" "Center") at a pay rate of $5.00 per day.

By way of historical background, the Lackawanna County Commissioners empaneled the Solid Waste Authority Committee on February 28, 1986. (LRCI Ex. A, "Lackawanna County Solid Waste Management Authority File Memo" (Doc. 294-1 at 3).) The February 5, 2008, Memo "Re: Authority History" was authored by Thomas P. Cummings, Esq., Authority solicitor at the time. (*Id.* at 3, 5.) The Memo indicates that the Committee was the forerunner of the Lackawanna County Solid Waste Management Authority which began construction of the Recycling Center in 1989. (*Id.*) The Authority

---

Plaintiffs' ability to access Authority documents, and the lack of prejudice associated with [Authority Counsel's] withdrawal indicate that his appearance serves no meaningful purpose.

(Doc. 249 at 10.)

secured a site for the recycling center in October 1989 via a warranty deed with reverter.[3]

(*Id.* at 3.)    Operations at the Center commenced in 1990.  (*Id..*)  Relevant to the

circumstances presented in this case, the Memo provides the following context:

> In February of 2005, the Commissioners issued notice to the Authority that the operational budget subsidy of the Authority, in the form of the Authority Payroll running through Lackawanna County, had been terminated.    To clearly understand the magnitude of the situation, it is important to know that the residents/municipalities  of  Lackawanna  County  benefited  from  over $600,000.00 per annum in avoided landfill tipping fees but the operation of the Authority facility ran at a deficit.  The deficit was marginalized by the County handling the payroll of the Center for the Authority. . . . The Authority had no identifiable avenue to secure the shortfall.
>
> In this light, the Commissioners provided to the Authority and the Authority accepted and approved, a contract for the operation of the facility by a private operator that guaranteed compliance with Act 1 via free drop of recyclables and a guaranteed monthly payment to the Authority in the amount of $5,000.00.  The Authority maintained full ownership and control of the facility. The operation contract  . . . solved the financial problem while allowing the same no cost service to be provided to the residents of Lackawanna County.
>
> The agreement, while meeting the need, gave rise to a labor issue.  The CBA allowed the utilization of prison labor as long as the same did not impact the unionized work force.  The contract with the private operator displaced 21 long term employees at the Center. . . .  The issue was resolved by reassignment of the Authority employees to other County agencies and departments . . . .
>
> On April 1, 2005, the contract operator commenced the physical operations at the Center.

---

[3] At his deposition, Cummings said that the parcel of land for the recycling center was "a deal . . . worked out with the [County] Commissioners and the DeNaples family": consideration for the land was $1.00 given to Louis DeNaples and Dominic DeNaples. (Pls. Ex. 1 30:3-31:22, Doc. 287-2 at 3.)

6

(Doc. 294-1 at 4.)

On May 3, 2006, Lackawanna Recycling Center, Inc., and Lackawanna County Solid Waste Management Authority entered the Professional Service Operating Agreement ("Agreement"). (Pls. Ex. 4, Doc. 287-5 at 2.) The Agreement is identified as "an amended agreement replacing the amended agreement of January 27th 2006 which replaced the Agreement of March 31, 2005." (*Id.*) Lackawanna Recycling Center, Inc., is identified as "Operator" in the Agreement. (*Id.*) Relevant provisions indicate that LRCI as Operator will "operate and manage the Center on behalf of Authority subject to the terms and conditions of th[e] Agreement." (*Id.* at 3.) The Agreement also includes the following provisions.

- "Authority shall retain the lesser of, all revenues or the first $60,000.00 of gross revenue. Said Revenue Retention shall be in monthly increments of $5,000." (*Id.*)

- The Authority agreed to "use its best efforts to . . . provide Operator with the same number of Prisoners from the Lackawanna County Prison that have historically worked at the Center as part of their work release program as security requirements dictate." (*Id.* at 5.)

At his deposition, Cummings agreed that "the use of prison labor was a financial benefit to the operation as a whole." (Pls. Ex. 1, Cummings Dep. 89:19-25, Doc. 287-2 at 5.) The deposition of Brian Jeffers, the Lackawanna County designee, confirmed that the pay rate remained $5.00 per day despite a concern raised by county officials in 2009 that it

could be a legal issue that inmates working at the Center did not receive minimum wage. (Def. County Ex. C, Jeffers Dep. 109:14-114:23, Doc. 295-1 at 225-30); *see also* Pls. Reply Brief Ex. 1, Doc. 301-2.)

The deposition of Thomas Staff, Community Service Program director from 2006 to 2019, indicates that inmates incarcerated because of domestic relations violations, costs and fines issues, and "any number of minor offenses" participated in the CSP. (Pls. Ex. 6, Staff Dep. 34:15-19, 54:12-19, Doc. 287-7 at 3, 4.) Staff said that inmates working at the Center because of costs and fines issues did not actually get paid but were given credit for $50.00 a day toward their costs and fines; other inmates participating in the CSP were paid $5.00 per day. (*Id.* 55:1-3, Doc. 287-7 at 4.) Staff agreed that "[i]n general terms, inmates would become eligible for work release after they completed the community service program[.]" (*Id.* 69:20-70:1, Doc. 287-2 at 6-7.) Regarding the number of inmates at the Center, Staff testified that the goal was twenty-five people per day and he would get complaints if there were less than twenty-five. (*Id.* 86:9-17, Doc. 287-7 at 10.) He explained that, though the goal did not change through his tenure as CSP director, the number of inmates that could be provided to the Center changed because the new director of domestic relations "decided that domestic relations inmates would get or should get immediate work release." (*Id.* 88:1-18, Doc. 287-7 at 10.)

Staff testified that the procedure for signing up for the CSP was either the inmate have his attorney "submit a petition to the court for placement in the program" or "a

8

counselor would identify them as a potential candidate." (*Id.* 99:18-100:5, Doc. 287-7 at 11.) Eligibility was determined through a report and recommendation process: a counselor would fill out the R&R form and forward it to Staff to sign; Staff would sign the form and send it to the warden; the form would then go to the work release director; the work release director would return the form to Staff and Staff would prepare the order to send to the judge; and judges would take his recommendation 95% of the time. (*Id.* 120:1-7, 131:15-133:9, 135:5-9, Doc. 287-7 at 12,13, 14.)

Staff was unable to estimate how long inmates would be in the CSP before transitioning to work release:

Q. What would be, like, the maximum amount of time that someone would do in community service?

A. I think we had a restriction on it, but I don't recall what it was. I -- I can't even guess at that.

Q. Why was there a restriction on it?

A. Well, the longer you're in it the more likely you're not going to complete it.

Q. Because of it being unpleasant?

A. Yes.

Q . And who instituted the maximum restriction?

A. I think if there was actually a maximum it was in place when I got there.

Q. And then that would have remained in place the whole time you were at the prison?

A. Yes.

(Staff Dep. 130:21-131:14, Doc. 287-7 at 13.)  Staff also addressed inmates'

questions about the duration of participation in the CSP:

> Q. Pivoting back to when you were the director of community service and you would meet with inmates in their cell when they were signing up to join the program, did they have questions about the expectations and rules of the program?
>
> A. Yes.
>
> . . . .
>
> Q. And what kind of questions did they have?
>
> A. Pretty much, "When am I getting out?"
>
> Q. What would you say back to that question?
>
> A. I would tell them. If I had a bed date for them, I would tell them what their bed date was.
>
> Q. Bed date is the date that they would transfer to work release?
>
> A. Yes, or house arrest.
>
> Q. And did inmates ever decline to participate in the program after you met with them and went over the rules and regulations?
>
> A. Yes.
>
> Q. And why would they decline?
>
> A. Specific reasons I don't recall.

(Staff Dep. 71:13-18, 72:15 Doc. 287-7 at 7.)

10

Regarding the average sentence of domestic relations inmates, sometimes referred to as "child support debtors" (Jeffers Dep. 75:24-76:2, Doc. 295-1 at 191-92), Jeffers testified:

> I don't know. I mean, it could be anything. And honestly, it could be -- they basically -- I don't even want to say they gave them a sentence. What they would basically say sometimes was, you know, you're incarcerated for up to six months or pay $500, something like that. Could they say three months? Yes. It was up to the judge.

(*Id.* 76:3-11, Doc. 295-1 at 192.) The following dialogue is relevant to the length of time spent in the CSP:

> Q. . . . So the Community Service Program is . . . a program run by the prison to put workers at the recycling center, right?
>
> A. Yep.
>
> Q. And the workers would participate in community service in order to enter the Work Release Program, right?
>
> A. Yes.
>
> Q. Okay. And we've already discussed, but work release is where people work off site?
>
> A. Yes.
>
> Q. And then they come back and stay in a dormitory at the prison or the work release center?
>
> A. Yes.
>
> Q. Okay. And workers were required to work in community service to access work release from 2005 through the end of the program in 2020, right?

A. I think it was even before then.

Q. Even before that?

A. Yes.

Q. And we already discussed Tom Staff. He ran the program from 2006 to 2019?

A. Yes.

. . . .

Q. Okay. And the child support debtors were among those who worked in the Community Service Program?

A. Yes.

Q. And we also discussed those who were in prison for failure to pay costs and fines, right? They also participated in the program?

A. Yes.

Q. Any other inmates?

A. Many other inmates. It just depended upon, you know, what their sentences were. A lot of them -- for the most part, the domestic relations – the debtor -- what do you call them, child support –

Q. Child support debtors.

A. Child support debtors were sentenced there directly from the courts, the vast majority, I would say way over 90 percent of them, if not almost a hundred percent of them. There were others that were sentenced to that right from the courts. It could have been DUIs, like I say, and a lot of, you know, nonviolent offenders and stuff like that, costs and fines, obviously. And then there were those who were in there for various other reasons who were not sentenced who were looking to get on it and they would, you know, go to their counselor, they'd pound on the window when Tom would come walking by to volunteer to get on

it so they can get out of there and get into work release and/or house arrest or parole for a home plan.

Q. And when you said sentenced to it, you mean they were sentenced to community service?

A. Directly by the judge.

Q. And Mr. Staff testified that the minimum time that someone would need to work in community service before transfer to work release was about 30 days. Does that sound right to you?

A. That is correct.

Q. And that's been the case since 2005?

A. It's been the case since I was the work release director. It probably was there long before me also, but standard would be a month.

Q. Okay. And it was generally the case that about halfway through a sentence, that inmate would be transferred from community service to work release, right? That was the way that the -- or let me back up. Let's use a hypothetical. So an inmate sentenced to six months and at three months he's able to transfer to work release?

A. (Witness nods head.)

Q. Is it the case that about halfway through the initial sentence is when an inmate would go from community service to work release?

A. You know, the answer is twofold. So if you were ordered to go to work release without community service, you usually had to do half your minimum, okay? So if your minimum was 12 months, you'd have to do six months in the prison and then you could be directly transferred over to the work release center. It was extremely rare that a judge would allow someone to even get in to work in community service before half their minimum was up. You know, it's -- that's what I'm saying. Most of the individuals that were going into community service mainly had their time and they were looking to get out. They needed home plans, so they were looking to volunteer for community service when they

13

weren't sentenced to it and then get over to work release as quickly as they can. They were mostly the 30-day guys, okay? But the courts ordered the child support debtors directly to community service or directly to work release depending upon what took place in court that day.

Q. But it was generally the case that inmates -- that child support debtors would go to community service first and then work release?

A. In the most cases, yes. There were cases where they directly sentenced them to work release too.

Q. That was a minority of cases though?

A. I would say so, yes.

Q. A small minority, right?

A. Yes. Yeah. It could have been, yeah, ten percent.

(Jeffers Dep. 116:25-121:8, Doc. 295-1 at 232-37.)

Jeffers was asked about whether the "standard process" for child support debtors was "first incarcerating an individual with . . . standard orders which mention work release and then Review and Recommendation Form followed by [a] transfer order." (*Id.* 161:6-10, Doc. 295-1 at 277.) Jeffers responded that they sometimes get an order which sends the child support debtor directly to work release; where an order says a child support debtor should go to work release "if he qualifies for it," the County interprets that to mean "if he successfully completes community service." (*Id.* 161:13-19.) The orders also identified the "purge" amount, i.e., the amount that the court order said the child support debtor had to

14

come up with to be released before the identified term of incarceration expired.  (*See, e.g.,* *id.*, 187:5-19; 188:24-189:9, Doc. 295-1 at 303-05.)

Regarding the reason for doing community service, Jeffers agreed with Staff that "the purpose of people doing community service is to access that work release." (*Id.* 167:6-9, Doc. 295-1 at 283.)  The following exchange amplified this response:

Q. And so Staff here is saying that, you know, the purpose of people doing community service is to access that work release.

A. Correct.

Q. But there would be really no reason to work at the recycling center if it wasn't for that?

A. There's no reward.

Q. And is that why -- Tom Staff testified when we deposed him that there was a maximum amount of time that an inmate was allowed to be at the recycling center. Did you know what that was?

A. I don't. I don't think it was more than maybe three months, though. I highly doubt they would even be motivated long enough to stay out there that long.

Q. Is that because of the conditions at the center?

A. Same thing. Repetition over and over again, six o'clock in the morning, two o'clock in the afternoon. I mean, the meals were a hell of a lot better than the prison. But other than that...

Q. And did you consider the work done at the recycling center to be an easy job?

A. No.

Q. Why not?

A. Because it's a hard job. . . It's not an easy job. That's why when they prove themselves after 90 days, these guys are going to be workers when they come over to us and I'm not going to have to worry about them[.]

(*Id.* 167:10-168:21, Doc. 295-1 at 283-84.)

### III. ANALYSIS

Plaintiffs assert that the Court should grant class certification because they satisfy all class certification requirements set out in Federal Rule of Civil Procedure 23(a) and (b)(3). (Doc. 287 at 14.)  Defendant LRCI opposes the Motion based on assertion that class certification's predominance requirement cannot be met.  (Doc. 294 at 10.)  Defendant County opposes the Motion on similar grounds but also asserts that Plaintiffs have not shown that the commonality, typicality, and adequacy requirements are met.  (Doc. 295 at 8, 15.)  For the reasons that follow, the Court will grant Plaintiffs' Motion as modified by a narrowed definition of certified classes.

To certify a class, the Court must proceed in two steps under Rule 23.  First, Rule 23(a) states:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

16

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

If all of Rule 23(a) requirements are satisfied, the Court will proceed to Rule 23(b), which provides, in relevant part, that a class action may be maintained if Rule 23(a) is satisfied and if

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> >
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The burden to prove compliance with Rule 23 is upon the party seeking class certification, who "must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The burden is "not merely a threshold showing." *I n re Hydrogen Peroxide Antitrust Litig.*,

552 F.3d 305, 307 (3d Cir. 2008), *as amended* (Jan. 16, 2009); *see also Dukes*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard."). Factual determinations in this context "must be made by a preponderance of the evidence." *In re Hydrogen Peroxide*, 552 F.3d at 305.

All cases involving class certification questions necessitate a "thorough examination of the factual and legal allegations." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001), *as amended* (Oct. 16, 2001). In "decid[ing] which facts and legal arguments are most important to each Rule 23 requirement, [the trial court] possesses broad discretion to control proceedings and frame issues for consideration under Rule 23." *In re Hydrogen Peroxide*, 552 F.3d at 310 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 630 (1997)). However, this discretion "does not soften the rule [that] a class may not be certified without a finding that each Rule 23 requirement is met." *Id.* In some cases, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

## A. TVPA CLASS

Regarding their TVPA claim, Plaintiffs seek to certify the following class: "All civil child support debtors who were detained at Lackawanna County Prison and worked at the Lackawanna County Recycling Center after December 6, 2009." (Doc. 286 at 1-2.)

18

Defendant LRCI's arguments against certification of the TVPA class focus on causation related to Rule 23's commonality and predominance requirements and the preclusive effect of the conditional certification of the FLSA collective action. (Doc. 294 at 10-21.) Defendant County also focuses on the causation component of the commonality and predominance requirements and addresses typicality, adequacy, superiority, and manageability requirements. (Doc. 295 at 4-15.) For the reasons that follow, the Court concludes that certification of a modified TVPA class is appropriate.

The Court of Appeals for the Third Circuit has directed that where Rule 23(b)(3)'s predominance requirement is at issue, as it is here, Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement should be analyzed together. *See, e.g., Sullivan v. DB Investments, Inc.*, 67 F.3d 273, 297 (3d Cir. 2011) (internal quotation and citations omitted). Because the parties focus on commonality and predominance requirements, the Court will begin with an analysis of these requirements.

## 1. <u>Commonality and Predominance</u>

To satisfy Rule 23(a)(2)'s requirement that there must be "questions of law or fact common to the class," known as the "commonality" requirement, the putative class must raise common contentions capable of class-wide resolution. *Dukes*, 564 U.S. at 350. The focus is not on the "raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the

19

litigation." *Id.* If the issue is common to the class, the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Commonality is satisfied if "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013); *see also Dukes*, 564 U.S. at 359 ("[E]ven a single common question will do."). In evaluating commonality, "the bar is not a high one." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 486 (3d Cir. 2015). The focus for the Court is "not on the strength of each class member's claims but instead on whether the defendant's conduct was common as to all of the class members." *In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d 380, 397 (3d Cir. 2015) (internal quotations omitted). As long as the class was subjected to the "same harmful conduct by the defendant, Rule 23(a) will endure many legal and factual differences among the putative class members." *Id.; see also Rodriguez*, 726 F.3d at 382-83 (collecting Third Circuit cases focusing on the commonality inquiry on the defendant's conduct).

Rule 23(b)(3)'s requirement that "the court finds that the questions of law or fact common to the class predominate over any questions affecting only individual members," known as the "predominance" requirement, is intended to assess whether a class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." Fed. R. Civ. P. 23(b)(3) advisory committee's note to 1966 amendment. Compared with the commonality inquiry under Rule 23(a)(2), the

"predominance requirement imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members." *Sullivan.*, 667 F.3d at 297. Because of the overlap of the commonality and predominance requirements, the Third Circuit considers "the Rule 23(a) commonality requirement to be incorporated into the more stringent Rule 23(b)(3) predominance requirement and . . . . deem[s] it appropriate to 'analyze the two factors together, with particular focus on the predominance requirement.'" *In re Ins. Brokerage Antitrust Litigation,* 579 F.3d 241, 266 (3d Cir. 2009) (quoting *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 528 (3d Cir.2004)); *see also Danvers Motor Co., Inc. v. Ford Motor Co.,* 543 F.3d 141, 148 (3d Cir.2008) ("[T]he commonality requirement is subsumed by the predominance requirement.").

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016), set out the contours of the Rule 23(b)(3) predominance inquiry, stating that the requirement

> calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012) (internal quotation marks omitted). The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.,* § 4:49, at 195–196. When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried

21

separately, such as damages or some affirmative defenses peculiar to some individual class members." 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed. 2005) (footnotes omitted).

577 U.S. at 453–54.

Third Circuit "precedent provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan*, 667 F.3d at 298. *Sullivan* added that

> *Dukes* . . . mak[es] clear that the focus is on whether the defendant's conduct was common as to all of the class members, not on whether each plaintiff has a "colorable" claim. In *Dukes,* the Court held that commonality and predominance are defeated when it cannot be said that there was a common course of conduct in which the defendant engaged with respect to each individual.

*Id.* at 299 (citing *Dukes*, 564 U.S. at 350). "'Common corporate policies . . . carry great weight for certification purposes [and] predominance is rarely defeated in cases where such uniform policies exist.'" *Hargrove v. Sleepy's LLC*, No. 22-2040, 2023 WL 3943738, at *3 (3d Cir. June 12, 2023) (quoting *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 944 (9th Cir. 2019) (cleaned up)).

Plaintiffs' TVPA class claim is analyzed pursuant to 18 U.S.C. § 1589 – Forced Labor which provides in pertinent part as follows:

> **(a)** Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—

22

**(1)** by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;

**(2)** by means of serious harm or threats of serious harm to that person or another person;

**(3)** by means of the abuse or threatened abuse of law or legal process; or

**(4)** by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d).

**(b)** Whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means, shall be punished as provided in subsection (d).

**(c)** In this section:

**(1)** The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

**(2)** The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

23

18 U.S.C. § 1589.[4]

As recognized in *Burrell*, Plaintiffs Second Amended Complaint (Doc. 77) alleges

three theories as to their TVPA claims, 60 F.4th at 36:

> 204. During all relevant times, Defendants attempted to and did obtain the labor of Plaintiffs and the Rule 23 Class through threats of continued physical restraint, specifically, by telling Debtors that if they did not work at the Center they would remain ineligible for work release, in violation of 15 U.S.C. § 1589(a)(1).
>
> 205. During all relevant times, Defendants attempted to and did obtain the labor of Plaintiffs and the Rule 23 Class through abuse of law and/or legal process, in violation of 15 U.S.C. § 1589(a)(3).
>
> 206. During all relevant times, Defendants attempted to and did obtain the labor of Plaintiffs and the Rule 23 Class by causing Debtors to believe that, if they did not provide labor at the Center, they would suffer continued physical restraint without the ability to participate in work release, in violation of 15 U.S.C. § 1589(a)(4).

(Doc. 77 ¶¶ 204-206.)

Plaintiffs contend that the commonality requirement is met because

---

[4] As explained in *Burrell*,

[18 U.S.C.] § 1595 creates a civil cause of action for victims of, *inter alia*, a TVPA violation, "against the perpetrator [ ]or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter[.]" *Id.* § 1595(a). On January 5, 2023, Congress enacted the Abolish Trafficking Reauthorization Act of 2022. This amended the language in § 1595(a) to include a TVPA violation, "against the perpetrator [ ]or whoever knowingly benefits, *or attempts or conspires to benefit*, financially ...." *See* Pub. L. No. 117-347, 136 Stat. 6199, 6200 (emphasis added).

60 F.4th at 32 n.5.  Plaintiffs in a civil TVPA action "may recover damages and reasonable attorneys fees."  18 U.S.C. § 1595(a).

the resolution of Plaintiffs' claims that Defendants violated [18 U.S.C. § 1589(a)] will turn on questions that are common to the putative class, including (1) whether Defendants obtained the labor of putative class members; (2) whether Defendants threatened putative class members with continued physical restraint or abuse of the  legal process; and (3) whether the Defendants "knowingly" obtained putative class members' labor "by . . . means of" these threats. Additional common questions include whether Defendants knowingly benefitted from participation in a venture that obtained labor through prohibited means.

(Doc. 287 at 18-19.)

Plaintiffs contend that the predominance requirement is met because

Plaintiffs' TVPRA claim is based on a uniform policy that required class members to work at the Center as a condition for earlier freedom from jail and accessing work release. Because refusal to work at the Center meant remaining in jail without the ability to leave for work for a longer period of time than debtors who did work at the Center, the labor of child support debtors who worked at the Center (the putative class) was procured by threat of physical restraint. And the putative class shares the same evidence present in *Menocal* [*v. GEO Group, Inc.*, 882 F.3d 905 (10th Cir. 2018)] and *Owino* [*v. CoreCivic, Inc.*, 60 F.4th 437 (9th Cir. 2022)]—that all class members received notice of the policy (that working at the Center was required for earlier freedom), and all class members did in fact work at the Center. Coupled with common evidence of the poor working conditions at the Center and shared characteristics making class members particularly vulnerable to coercion—such as being in the physical custody of the County— "a factfinder could reasonably draw a class-wide inference of causation from common evidence pertaining to the uniform [policy]." *Id.*; *see also Burrell*, 60 F.4th at 35 (recognizing that the "most plausible inference for why Plaintiffs. . . work[ed] at the Recycling Center was the access [to] the work release program" ). "[H]ypothetical alternative explanations for the class members' labor do not defeat [Plaintiffs'] showing that the causation element is susceptible to class-wide proof." Menocal, 882 F.3d at 921.

(Doc. 287 at 29.)

25

Defendant County maintains that "every person's circumstances were different, as exemplified by the two named Plaintiffs." (Doc. 295 at 11.) Defendant LRCI asserts that the TVPA "requires individualized proof of an unlawful act that caused the plaintiff to unwillingly provide labor." (Doc. 294 at 11.) Pointing to district court cases in Georgia, Louisiana, and Oklahoma, Defendant LRCI states that "courts have denied class certification in forced labor cases because individualized issues predominate concerning whether each class member provided labor to the defendant voluntarily or were compelled to do so as a result of some unlawful conduct." (Doc. 294 at 12 (citing *Barrientos v. CoreCivic, Inc.*, Civ. A. No. 4:18-CV-70, 2023 WL 2666852, at *3 -4 (M.D. Ga. Mar. 28, 2023); *Francis v. APEX USA, Inc.*, Civ. A. No. CIV-18-583-SLP, 2021 WL 4487985, at *8 (W.D. Okla. Sept. 30, 2021); *David v. Singal Int'l, LLC*, Civ. A. No. 08-1220, 2012 WL 10759668, at *22 (E.D. La. Jan. 4, 2012)).) Defendant LRCI acknowledges that Circuit Courts have found that a class-wide inference of causation is permissible in TVPA cases. (Doc. 294 at 17 (citing *Menocal*, 882 F.3d at 919-20 (because class members received notice of sanitation policy's terms (including possible sanctions for refusing to clean) and performed work when they were assigned to do so, clear inference was that sanitation policy caused detainees to work); *Owino*, 60 F.4th at 446 (considering sanitation policy similar to *Menocal's* and finding no abuse of discretion where district court concluded "that a factfinder could reasonably draw a class-wide causation inference" from the uniform policy)).) However, Defendant LRCI distinguishes these cases from the situation here, arguing that

26

> Plaintiffs' evidence fails to establish that the County Prison's work-release program was uniformly coercive, such that no reasonable detainee would join or remain in the program voluntarily, absent the potential for serious harm or physical restraint. Thus, this is not a case like *Menocal* or *Owino* where there was no other reasonable explanation for the labor other than coercion.

(Doc. 294 at 17.)

Plaintiffs respond that causation in this case is susceptible to class-wide proof in that the early release programs were less restrictive than being kept in prison and the only way to get to an early release program was to participate in the CSP. (Doc. 301 at 15.) Plaintiffs add that "how an individual class member perceived his imprisonment is irrelevant to Plaintiffs' TVPRA claim, which hinges on the undisputed fact that being in prison is more restrictive than being free" and this is enough at the certification stage to allow a factfinder to "reasonably draw a class-wide causation inference from the uniform policy." (Doc. 301 at 21 (citing Doc. 294 at 17 (citing *Owino*, F.4th at. 446)).)

Because the parties' commonality and preponderance arguments hinge on the causation issue, the Court will first assess whether causation in this case is susceptible to class-wide proof. As a threshold matter, the Court agrees that the circumstances of the two named plaintiffs were different. However, for purposes of the present discussion, the Court assumes *arguendo* that at least one of the named Plaintiffs satisfies the typicality requirement which, in this case, would mean that at least one named Plaintiff's circumstances were consistent with what Staff and Jeffers identified to be the typical situation for a child support debtor's participation in the CSP program.

Staff and Jeffers agreed that the reason for doing community service was to access work release. (Jeffers Dep. 167:6-9, Doc. 295-1 at 283.) When asked at his deposition what questions potential CSP participants had when Staff talked to an inmate about participating in the CSP, he responded, "Pretty much, 'When am I getting out?'" (Staff Dep. 72:2-3, Doc. 287-7 at 7.) Further, in considering the alleged conditions and policy of CSP before work release for child support debtors at the Lackawanna County Prison, *Burrell* reviewed assertions regarding conditions at the Center and plausible conclusions to be drawn:

> Plaintiffs allege that they worked at the Center because it was the only way they could qualify for work release, without which they could not pay their child support debt and regain their freedom. For just five dollars per day— approximately sixty-two-and-a-half cents per hour—they separated trash and recyclables on conveyor belts, frequently breaking out in skin rashes, suffering wounds from sharp pieces of glass, and vomiting from the stench of their abhorrent working conditions, which includes working in 100 degrees Fahrenheit. . . . The Center provides them with unsanitary toilets that have been out of order and uncleaned for months to relieve themselves and takes away their food as punishment for working too slowly. *Id.* "[E]vidence of ... extremely poor working conditions is relevant to corroborate disputed evidence regarding the use ... of physical or legal coercion ... or the causal effect of such conduct." *United States v. Kozminski*, 487 U.S. 931, 952, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). ***"[N]o individual who could pay his way to freedom would choose to work in the dangerous conditions of the Recycling Center for just five dollars per day."*** CAC & ACLU Amicus Br. at 6. Rather, ***the most plausible inference for why plaintiffs chose to work at the Recycling Center was to access the work release program that would pay them enough to enable them to pay their purge and secure their freedom.*** Plaintiffs have thus stated plausible facts from which it can be reasonably inferred that they were, at the time of their injuries, unable to pay their purge.

60 F.4th at 34-35 (emphasis added). *Burrell* also noted that "no defendant contends that conditioning access to work release on a period of dangerous, nearly unpaid labor serves any of [the] purposes of [the work release statute]. Rather, the nearly free labor for most of the grunt work at a joint public/private profit-seeking operation seems to be the point." *Id.* at 38.

Because Staff and Jeffers, former County employee deposition witnesses knowledgeable about the CSP and Recycling Center, agreed on the reason child support debtors participated in the CSP and *Burrell* spoke in broad rather than individual terms in discussing child support debtors' reasons for working at the Recycling Center, the Court concludes that a factfinder in this case could reasonably draw a class-wide causation inference based on the CSP/work-release policy to which most child support debtors were uniformly subject.

The "most" qualifier is added because evidence of record shows that the general child support debtor policy did not apply in two child support debtor situations. First, child support debtors directly assigned to work release, not more than 10% of child support debtors (Jeffers Dep. 118:18-20, Doc. 295-1 at 234), would not have been subject to the CSP policy. This group has no impact on the causation issue because they are not part of the proposed TVPA class in that they did not work at the Recycling Center.

Second, evidence of record indicates that the CSP/work-release policy at issue would not necessarily apply to child support debtors who were also incarcerated on criminal

29

matters because CSP participation for those incarcerated on criminal matters was handled differently and their motivation for participation differed from that of child support debtors. The testimony of Staff and Jeffers indicates that the general policy as to child support debtors was that participation in the CSP was the gateway to eligibility for work release and the potential to serve less than the contempt sentence imposed but those incarcerated for criminal matters were a separate category with different considerations on the part of the staff and different concerns on the part of the inmates. (*See, e.g.*, Jeffers Dep. 118:21-119:6, 120:5-23, Doc. 295-1 at 234-35, 236.)

Because prison policies and motivation for participation in the CSP differ for child support debtors and criminal detainees, the class-wide causation inference appropriate for those incarcerated *only* because they are child support debtors would likely not apply to hybrid detainees. This determination suggests that the TVPA class should be limited to individuals incarcerated only because they are child support debtors. Evidence related to Plaintiff Stuckey's incarceration illustrates why inclusion in the class of those incarcerated for both child support and criminal matters would be an impediment to class certification.

Exhibits submitted regarding Plaintiff Stuckey demonstrate the difficulty in assessing causation related to child support debtors whose incarceration also related to criminal charges or sentences. Plaintiff Stuckey was detained at the Lackawanna County Prison beginning on November 22, 2017, based on controlled substance criminal charges. (*See, e.g.*, LRCI Ex. N, Doc. 294-1 at 205-06; Pls. Ex. 15, Doc. 301-16 at 2.) On February 27,

2018, while detained on criminal charges, the Domestic Relations Section of the Court of Common Pleas of Lackawanna County found Stuckey in contempt of support orders in two Domestic Relations cases. (LRCI Ex. E, Doc. 294-1 at 23-26.) In each case, Defendant was sentenced to six months in the Lackawanna County Prison with a Special Provision that he "be placed in Immediate Work Release." (*Id.* at 24, 26.) The sentences in the two cases were to run concurrently, and Stuckey could purge the contempt in each case by paying a lump sum of $1,200.00. (*Id.*) An undated inmate record identifies an "Earliest Sentence Date" of February 27, 2018, an "Earliest Effective Date" of February 22, 2018, a "Minimum" release date of August 22, 2018, a "Maximum" release date of August 22, 2018, a "Projected Release Date" of August 22, 2018, a "Projected Parole Date" of August 22, 2018, and a note "starts day bailed on criminal charge" (Pls. Ex. 14, Doc. 301-15 at 2) which suggests that the record relates to Stuckey's Domestic Relations sentence. A "Lackawanna CO. House Arrest/Work Release *Notice to Detain*" dated April 5, 2018, requests "Please detain . . . Dampsey Stuckey as a violator of Work Release" (County Ex. S, Doc. 295-2 at 150) which suggests that Stuckey was in work release before April 5, 2018. A "Lackawanna County Prison Inmate Worker Orientation Form" for "Job Title . . . Comm. Serv." was signed by Stuckey on May 2, 2018 (County Ex. T, Doc. 295-2 at 152), which suggests that Stuckey signed up for the CSP *after* he participated in and violated the work release program.

In correspondence dated May 14, 2018, Stuckey states that he had been court-ordered to "Tom Staff program," i.e., CSP, and expressed his interest in getting out of the

31

CSP program so he could go to "laundry," asserting "I still have 4 months and I would like to make some money so when I get out I can get a room for myself and not be on the streets." (LRCI Ex. P, Doc. 29401 at 163.) The response stated, "There is a 30 day rule. If you quit community service, you will need to wait 30 days before being considered for laundry." (*Id.*)

On June 6, 2018, Stuckey was sentenced on the pending criminal charges under Court Number and Term 0000383-2018. (LRCI Ex. N, Doc. 294-1 at 158.) He was sentenced to

> Confinement for a term of a minimum period of 93 Day(s) and maximum period of 12 Month(s), or Other for the offense of Int Poss Contr Subst By Per Not Reg. It is further ordered that said Defendant be delivered by the proper authority to and treated as the law directs at the Lackawanna County Prison facility located at 137 NORTH WASHINGTON AVENUE SCRANTON, PA 18509.

(LRCI Ex. N, Doc. 294-1 at 158.) Stuckey was given 93 days credit for time served, specifically for the time he was detained at the Lackawanna County Prison from November 22, 2017, to February 22, 2018. (*Id.* at 158-59.) Identified "Confinement Conditions" include "Community Service Program: COMM SER HRS 100." (*Id.* at 159.) A June 27, 2018, Order of the Lackawanna County Court of Common Pleas on 18 Cr 383 states:

> the Parole Officer reports to the Court that [Dampsey Shaliek Stuckey] has served the minimum sentence as originally ordered by the Court, and is parole eligible.
>
> IT IS HEREBY ORDERED that the defendant be released from the Lackawanna County Prison to serve the unexpired portion of sentence with Lackawanna County Probation/Parole the Department. It is instructed the defendant report to Adult Probation within 48 hours upon release.

(LRCI Ex. O, Doc. 294-1 at 161.)

The foregoing evidence of record does not support Plaintiffs' position that the criminal component of Plaintiff Stuckey's incarceration is distinct from the child support debtor component of his sentence and, therefore, presents no obstacle to relief in the TVPA context. Plaintiffs specifically assert that

> Plaintiff Stuckey was sentenced to six months for his failure to pay child support, which was to "start [the] day bailed on criminal charges[.] Reply Br. Ex. 13, Plaintiff Stuckey Contempt Orders; Reply Br. Ex. 14, Stuckey OMSe File. Plaintiff Stuckey's criminal sentence was 93 days, and he was thus 'bailed' on February 22, 2018, well before he began working in the CSP in May 2018. Reply Br. Ex. 16, Plaintiff Stuckey Criminal Sentencing Order at LC-000858; Reply Br. Ex. 15, Plaintiff Stuckey Booking File. This is why by the time Plaintiff Stuckey started working at the Recycling Center, he would have been free to leave the jail if he paid the purge amount, as he testified to during his deposition. Reply Br. Ex. 17, Stuckey Dep. Tr. 85:1-7.

(Doc. 301 at 22-23.)

As a threshold matter, the Court notes that an evident problem with documents of record related to Stuckey's incarceration is the difficulty to ascertain a straight-line divide between Stuckey's criminal detention and his child support debtor detention. There is no reason to believe this would not be the case with other hybrid detainees.

More specifically, the documents indicate that Stuckey had not been sentenced on pending criminal charges before he began participating in the CSP in May of 2018. Further, while he was given credit for 93 days, his minimum sentence was not established to be 93 days until the June 6, 2018, sentencing date when his sentence was identified as a

33

minimum of 93 days and a maximum of twelve months.  *See supra.*  Therefore, contrary to Plaintiffs' assertion, Defendant Stuckey could not have been determined to have completed his criminal sentence on February 22, 2018, i.e., over three months *before* he was sentenced to a minimum of 93 days and a maximum of 12 months on June 6, 2018.

No document of record supports Plaintiffs' contention that Stuckey "was . . . 'bailed' on February 22, 2018," (Doc. 301 at 22).  No evidence indicates that Stuckey was *ever* "'bailed on criminal charges.'" (*See id.* (quoting Pls. Reply Br. Ex. 13).)  Stuckey himself testified that he was unable to post bail on the criminal charges.  (LRCI Ex. M, Stuckey Dep. 41:3, Doc. 294-1 at 110.)

Stuckey's deposition testimony reveals that there was considerable uncertainty as to his status at relevant times during his incarceration. (*See, e.g., id.* 82:5-84:25, Doc. 294-1 at 121.)  Notably, the fact that Stuckey began participation in the CSP program *before* he was paroled on his criminal sentence on June 27, 2018, indicates that Stuckey was not free to leave the jail if he paid the purge amount before that date.  Therefore, Stuckey's motivation for participating in the CSP would likely differ from the motivation of child support debtors not detained on criminal charges who could gain the possibility of an early release only through CSP participation.  This distinction is supported by Stuckey's request in his May 14, 2018, correspondence where there was no mention of a desire to attain an early release and he based his request to get a paying job on the assertion that he had four

months to go on his sentence and wanted to make money to get himself a room when he got out. (LRCl Ex. P, Doc. 294-1 at 163.)

The foregoing analysis of Stuckey's situation and motivation shows that an individual detained for hybrid criminal/child support debtor matters presents a need for specific individual determinations regarding details of the detention and raises questions for each person so detained for which answers are not readily found. Because the class-wide inference of causation cannot presumptively apply in hybrid detention circumstances, those incarcerated with interwoven criminal and child support violations are an impediment to certification of the proposed TVPA class.

The Court concludes that the most efficient way to address this difficulty is to limit the TVPA class to those individuals who are incarcerated only on the basis of being a child support debtor. Therefore, pursuant to the Court's power to *sua sponte* redefine a proposed class, *see Geraghty v. U.S. Parole Commission*, 579 F.2d 238, 253 (3d Cir. 1978),[5] *vacated*

---

[5] A recent decision in the Third Circuit noted that

the Court "is not bound by Plaintiffs' proposed class definition and has broad discretion to redefine the class, whether upon motion or *sua sponte*." *In re Pressure Sensitive Labelstock Antitrust Litig.*, Civ. No. 3:03-MDL-1556, 2007 WL 4150666, at *1 (M.D. Pa. Nov. 19, 2007). The Third Circuit has "held that a court should alter the class definition in lieu of rejecting class certification" but only "*if possible*." *See* 3 Newberg and Rubenstein on Class Actions § 7:27 (6th ed. Supp. June 2024) (emphasis added) (citing *Finberg v. Sullivan*, 634 F.2d 50, 64 n.9 (3d Cir. 1980) ("The problem identified by the district court might well be remedied by requiring a more specific or a narrower definition of classes. The district court should not deny certification on account of such problems without considering the possibility of redefining the classes.")).

*on other grounds, U.S. Parole Commission v. Geraghty*, 445 U.S. 388 (1980), the Court finds it appropriate to proceed with analysis of the propriety of a TVPA class redefined to include individuals detained **only** on the basis of their status as child support debtors, i.e., their detention as a child support debtor is not interwoven with any criminal matter.  As such, for the purpose of consideration of Rule 23 requirements, the TVPA is redefined as follows: **All civil child support debtors whose period of incarceration at Lackawanna County Prison was based** *only* **on the inmate's status as a child support debtor and who worked at the Lackawanna County Recycling Center after December 6, 2009, pursuant to the Community Service Program.**

Considering this redefined TVPA class, the Court finds that commonality and predominance requirements are satisfied.  The commonality and preponderance issues regarding child support debtors include questions related to their "statutory right to be free from having their labor knowingly coerced" by means proscribed in 18 U.S.C. § 1589(a), including

> physical restraint, like plaintiffs allege they faced (albeit pursuant to a legal order) if they were unable to access the work release program to pay their purge; and . . . abuse of law or legal process, like conditioning access to a work release program on the furnishing of a period of nearly free labor.

---

*Vaccarro v. Amazon.com.dede, LLC*, No. CV 18-11852 (GC) (TJB), 2025 WL 974660, at *3 n.4 (D.N.J. Apr. 1, 2025); *see generally* 2 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 6:17 at 633 (4th ed. 2002) ("The fact that the class is defined inadequately or too broadly is not a fatal defect. Courts may redefine the classes themselves, if they possess adequate information."); Wolff, *Discretion in Class Certification*, 162 U. Pa. L. Rev. at 1924–25 (describing some examples of courts exercising authority *sua sponte* to certify classes other than ones proposed by plaintiffs).

*Burrell*, 60 F.4th at 38.[6]

As discussed regarding causation, evidence shows that Defendants' "conduct was common as to all of the class members," *In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d at 397, as the Court has redefined the TVPA class. Therefore, the commonality requirement is satisfied.

---

[6] *Burrell* specifically assessed the application of § 1589(a)(3) to the alleged facts in this case:

> The Professional Service Operating Agreement between the Corporation and the Municipal Authority states that the "Authority shall use its best efforts to ... provide [the Corporation] with the same number of Prisoners from the Lackawanna County Prison that have historically worked at the Center as part of their work release program as security requirements dictate." App. 150. Plaintiffs allege that "the only individuals typically performing this work are those from the Prison. The Center does not employ hourly-paid workers to regularly perform this work." App. 133 ¶ 176. And under the Operating Agreement, "the Authority shall retain the lesser of[ ] all revenues or the first $60,000.00 of gross revenue." App. 148. So long as the Center brings in more than $60,000, the Corporation and the Authority share the profits earned by exploiting plaintiffs' and their purported class members' nearly free labor—labor which plaintiffs purport to have provided so as to be eligible to later access the work release program, earn real wages, pay their purges, and free themselves from civil incarceration.

> That is a clear example of "the use ... of a law or legal process ... in a[ ] manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action," which the TVPA defines as an abuse of law or legal process. 18 U.S.C. § 1589(c)(1); *see id.* § 1589(a)(3) (proscribing the obtaining or providing of labor or services by means of the abuse of law or legal process)

60 F.4th at 38.

The Court also finds that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Evidence shows not only that Defendants' "conduct was common as to all of the class members, [evidence also shows that] all of the class members were harmed by [Defendants'] conduct." *Sullivan*, 667 F.3d at 298. This is so because all class members were harmed when their participation in work release which would provide an earlier release based on the ability to pay the purge was delayed by a period of $5.00 a day labor at the Recycling Center pursuant to the policy of mandatory participation in the CSP as a gateway to work release. While questions regarding damages and dates of participation in the CSP relate to individual class members, these questions do not defeat predominance--as long as the class was subjected to the "same harmful conduct by the defendant, Rule 23(a) will endure many legal and factual differences among the putative class members." *In re Cmty. Bank of N. Virginia Mortg. Lending Practices Litig.*, 795 F.3d at 397. Here, the central TVPA issues are common to the redefined class.

Because the commonality and predominance requirements are satisfied as to child support debtors who participated in the CSP and were incarcerated only because of contempt of Domestic Relations court orders, the Court will assess whether the redefined TVPA class satisfies the remaining Rule 23 requirements.

## 2. <u>Numerosity</u>

The numerosity requirement for a proposed class is satisfied if "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  Judicial economy is a core purpose of the numerosity requirement. *In re Modafinil Antitrust Litig.*, 837 F.3d 328, 252-53 (3d Cir. 2016.)  Though there is no minimum number of class members required, generally joinder is presumed impracticable "when the potential number of class members exceeds 40." *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th 890, 896 (3d Cir. 2022).  Other factors relevant to Rule 23(a)(1) include "the claimants' ability and motivation to litigate as joined plaintiffs, the financial resources of class members, the geographic dispersion of class members, the ability to identify future claimants, and whether the claims are for injunctive relief or for damages." *Allen v. Ollie's Bargain Outlet, Inc.*, 37 F.4th at 900 (citing *In re Modafinil Antitrust Litig.*, 837 F.3d at 250, 253).

Plaintiffs contend that the County's production shows that there are over 590 people in the TVPA class, a number which "readily satisfy[ies] the numerosity requirement." (Doc. 287 at 14.)  Defendants do not specifically address the numerosity requirement.

Because the Court has redefined the TVPA class, the Court must determine if sufficient evidence supports numerosity for the limited class.  Given the testimony of Staff and Jeffers identifying the inmates who participated in the CSP and their separate classification of child support debtors and those serving a criminal sentence, *see supra*, the Court draws the reasonable inference that the hybrid situation presented with Stuckey's

incarceration is not common enough to be a separate classification of those participating in the CSP. Further, no evidence suggests that the elimination of individuals serving hybrid sentences from the 590 people identified by the County to be in Plaintiffs' proposed TVPA class would affect numerosity to an extent that joinder would be practicable.

Given Plaintiffs' uncontested assertion that their proposed class far exceeds the presumptive minimum of forty and the Court's finding that the redefined class would not significantly affect numerosity, the Court concludes that the numerosity requirement is satisfied. Additional factors identified in *Allen* support this determination: the claimants' ability and motivation to litigate as joined plaintiffs is questionable given the demonstrated difficulties they have experienced navigating court-related matters; and given the child support debtors alleged inability to pay the purge at the time of their child support debtor incarceration, the financial resources of class members is likely limited.

### 3. Typicality

The typicality element requires Plaintiffs to prove that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Even though commonality and typicality "tend to merge… they are distinct requirements under Rule 23." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Commonality evaluates the sufficiency of the class itself while typicality evaluates the sufficiency of the named plaintiff. *Id.* Typicality allows the Court to "screen out class actions in which the legal or factual position of the representatives is markedly different from

40

that of other members of the class even though common issues of law or fact are present."

*Marcus,* 687 F.3d at 598.  In order to satisfy typicality:

> (1) the claims of the class representative must be generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory; (2) the class representative must not be subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation; and (3) the interests and incentives of the representative must be sufficiently aligned with those of the class.

*In re Schering Plough,* 589 F.3d at 599.

Plaintiffs assert that Rule 23(a)'s typicality requirement is met because the claims of

the named Plaintiffs are typical of each other and the class in that they were both

> child support debtors required to work in the CSP to gain access to earlier freedom.  Any factual differences, such as the preceding criminal sentence that Plaintiff Stuckey served, or sentences where Plaintiff Huzzard did not work in the CSP while detained at the Prison, do not impact the common questions, the predominance of those common questions over individualized issues, and the typicality of Named Plaintiffs' claims.

(Doc. 301 at 22.)

For the reasons discussed in the Commonality and Preponderance section above,

Plaintiff Stuckey does not satisfy the typicality requirement as the Court has redefined the

class.  The Court will, therefore, dismiss Damspey Stuckey as a Named Plaintiff for

purposes of the TVPA class.

As to Plaintiff Huzzard, Defendants are correct that he was incarcerated numerous

times as a child support debtor and was terminated from work release on several occasions.

41

(*See, e.g.,* Doc. 295 at 5-8.)   However, when incarcerated as a child support debtor, Huzzard participated in the CSP with the goal of getting to work release.  (*See, e.g.,* LRCI Ex. F Huzzard Dep. 71:5-72:16, 77:1-4, Doc. 294-1 at 46, 47.)  Therefore, despite Huzzard's failures in the work release program, he satisfies *Schering Plough's* typicality factors:  (1) Huzzard's claims are "generally the same as those of the class in terms of both (a) the legal theory advanced and (b) the factual circumstances underlying that theory," 589 F. 3d at 599; (2) Huzzard's claims are not "subject to a defense that is both inapplicable to many members of the class and likely to become a major focus of the litigation," *id.*; and (3) Huzzard's "interests and incentives [are] sufficiently aligned with those of the class," *id.* Therefore, the typicality requirement is satisfied.

## 4. **Adequacy**

Rule 23(a)(4) requires plaintiffs to prove that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4). The primary purpose of this prerequisite

> is "to determine whether the named plaintiffs have the ability and the incentive to vigorously represent the claims of the class." *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 393 (3d Cir. 2015). Thus, for a class representative to be adequate, she must "have a minimal degree of knowledge about the case and have no conflict of interest with class counsel and members of the class[.]" *In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020) (cleaned up); *see also Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012) ("[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class."). "A conflict must be fundamental to violate Rule 23(a)(4)." *Dewey*, 681 F.3d at 184

42

(internal quotation marks omitted).

*Duncan v. Governor of Virgin Islands*, 48 F.4th 195, 209–10 (3d Cir. 2022).

Plaintiffs assert that the adequacy requirement is satisfied because

Plaintiffs Huzzard and Stuckey were subjected to the same requirement of working at the Recycling Center to obtain work release and were paid the same wage of $5 per day as all putative class members. Plaintiffs Huzzard and Stuckey have no conflicts with the class and their ability and incentive to vigorously represent other class members is confirmed by their active participation in this litigation and understanding that they are representing the interests of the class. Ex. 11, Huzzard Dep. Tr. 99:22-100:2; Ex. 12, Stuckey Dep. Tr. 100:3-6. Plaintiffs have answered written discovery requests and testified at in-person depositions. Finally, Plaintiffs' counsel are experienced civil rights lawyers who have collectively litigated many wage/hour and trafficking lawsuits.

(Doc. 287 at 23-24.)

For reasons discussed in previous sections of this Memorandum Opinion, Plaintiff Stuckey does not satisfy the adequacy requirement. However, based on the current record, the Court has no basis to conclude that Plaintiff Huzzard will not fairly and adequately protect the interests of the class. This determination is supported by the Court's conclusions regarding the requirements discussed above and Huzzard's testimony related to the issue of adequacy:

Q. Okay. I just have a few questions for you, Mr. Huzzard. Are you seeking to be a class representative in this case?

A. Yes, ma'am.

Q. And can you tell me why you are seeking to be a class representative?

A. Because I just want to make sure that everybody that's in the class gets what they deserve and that it never happens again to anybody else.

Q. Okay. And can you tell me what you expect your goal to be as a class representative?

A. To make sure that everything is in the best interest of the class.

Q. Okay. So, as a class representative, would you be looking out for your own interests or those of the class?

A. Of the class.

Q. And have you been kept updated about developments in this case?

A. Yes, ma'am.

(Pls.' Ex. 11, Huzzard Dep. 99:10-100:5, Doc. 287-112 at 4.)  This dialogue shows that

Plaintiff Huzzard understands his role and has the ability and incentive to "fairly and

adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

## 5. Superiority

The final requirement to satisfy Rule 23(b)(3) is that the "class action is superior to

other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ.

P. 23(b)(3).

> The superiority requirement asks a district court "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 632 (3d Cir.1996), *aff'd,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Fed. R. Civ. P. 23(b)(3) instructs that the matters pertinent to this inquiry include:

44

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in [managing] a class action.

Id.

In re Cmty. Bank of Northern Virginia, 418 F.3d 277, 309 (3d Cir. 2005).

a. Class Members Interest in Controlling Separate Actions

As to the first factor, "the interest of members of the class in individually controlling the prosecution or defense of separate actions," Fed. R. Civ. P. 23(b)(3)(A), Plaintiffs maintain that class members have little interest in individual control over this litigation because their individual recovery is likely to be relatively small. (Doc. 287 at 32.) Plaintiffs assert that Amchem supports the class action mechanism in these circumstances as a means "'to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'" (Id. (quoting Amchem, 521 U.S. at 617 (internal quotation omitted)).) The Court agrees that this logic applies to Plaintiffs' claims here. Therefore, this factor weighs in favor of Plaintiffs.

b. Related Litigation

Regarding "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class," Fed. R. Civ. P. 23(b)(3)(B), consideration of pending litigation does not show any impediment to the TVPA class certification.

45

Plaintiffs state "there is no directly related litigation under Federal Rule of Civil Procedure 12(b)(3)(B)." (Doc. 287 at 33.) Plaintiffs acknowledge that two cases were filed in the Middle District by Vsevolod Garanin under a similar legal theory but "he is not a member of this class because he served a criminal sentence rather than a civil contempt sentence." (*Id.* n.33.) The Court agrees that the proposed class/collective in this case differs from that proposed by Garanin and others in a case originally filed by Garanin *pro se* on February 21, 2023, Civil Acton No. 3:23-CV-296. The plaintiffs filed the counseled Second Amended Complaint (Doc. 48) in Civil Acton No. 3:23-CV-296 on September 18, 2023. The Second Amended Complaint indicates that the plaintiffs' claims, including Garanin's claim related to $5.00 a day compensation for his participation in the CSP and work at the Recycling Center, arise from a period of incarceration which began on January 8, 2019, when he was serving the sentence imposed following his plea of guilty to attempted theft by deception. (Civ. A. No. 3:23-CV-296 Doc. 48 ¶¶ 60-64.) "Class/Collective Allegations" identify the following class/collective:

> All criminally sentenced prisoners who worked in the Lackawanna County Recycling Center pursuant to the contract between the Lackawanna County Solid Waste Management Authority and Lackawanna Recycling Center, Inc., between the earliest applicable statute of limitations and the date of final judgment in this action.

(Civ. A. No. 3:23-CV-296 Doc. 48 ¶ 83.) The Court granted all pending motions to dismiss by Order of December 11, 2024, and determined that granting leave to amend would be futile. (*Id.* Doc. 91 at 2-3.) However, claims against Lackawanna County Solid Waste

Management Authority were not dismissed. (*Id.* at 2.) The Court is now dealing with service issues as to the Authority. (*See id.* Docs. 94-106.)

Garanin's earlier action, Civil Action No. 3:21-CV-644, was filed *pro se* on April 8, 2021. (Civ. A. No. 3:21-CV-644 Doc. 1.) The Complaint states that Garanin was booked into the Lackawanna County Prison on January 8, 2019, pursuant to a three-month sentence "for failing to correct a report in the Prison," Garanin was interested in exploring work release and learned that he would first have to participate in the CSP at a rate of $5.00 a day to do so, and he began the CSP at the Recycling Center on February 5, 2019. (*Id.* ¶¶ 24, 25, 32-34, 41.) Following the Court's grant of motions to dismiss (*see id.* Docs. 76, 81) and approval of Plaintiff's notices of voluntary dismissal (*see id.* Docs. 107-110), the Court closed the case on January 13, 2025, because there were no remaining defendants. (*Id.* Doc. 110.) Garanin filed a Notice of Appeal on February 13, 2025. (*Id.* 113.)

This litigation review shows that the cases related to the Recycling Center have not been "commenced by or against members of the class," Fed. R. Civ. P. 23(b)(3)(B), in that the class as redefined excludes the "criminally sentenced prisoners" who are the subject of the *Garanin* litigation. (Civ. A. No. 3:23-CV-296 Doc. 48 ¶ 83.) Therefore, this factor weighs in favor of Plaintiffs.

*c. Forum Considerations*

Concerning "the desirability or undesirability of concentrating the litigation of the claims in the particular forum," Fed. R. Civ. P. 23(b)(3)(C), the Court agrees with Plaintiffs

47

that "concentrating the litigation in this forum makes sense under Fed. R. Civ. P. 23(b)(3)(C) because all of the claims occurred in this judicial district" (Doc. 287 at 33). Defendants do not argue otherwise. Therefore, this factor weighs in favor of Plaintiffs.

*d. Manageability*

Concerning "the difficulties likely to be encountered in managing a class action," Fed. R. Civ. P. 23(b)(3)(D), Plaintiffs assert that there are not likely to be any significant difficulties managing this case as a class. (Doc. 287 at 33.) Plaintiffs point to evidence produced by Defendants that will expedite wage claims, including "attendance sheets, pay records, and dates of confinement records sufficient for Plaintiffs to estimate the approximate number of days, and thereby hours, worked by each class member." (*Id.* at 33-34.) Plaintiffs also state that, from this information, they can "estimate the wages owed to each class member by multiplying the hours worked by the minimum wage and subtracting out the $5 per day that Defendants paid." (*Id.* at 34.)

The Court agrees that the issues identified as to damages and participation in the CSP do not render class action unmanageable. As will be discussed in greater detail below, the Court further finds that concern related to the trial management of a case which presents both FLSA and TVPA claims to a jury does not render the redefined TVPA class itself unmanageable. Rather, the Third Circuit's *Burrell* opinion supports the conclusion that issues related to the dual theories of recovery can be addressed as the case proceeds. *See* 60 F.4th at 42 n.10. Therefore, this factor weighs in favor of Plaintiffs.

48

While the foregoing analysis indicates that class certification is appropriate for the redefined TVPA class, before granting class certification, the Court will address Defendant LRCI's assertion that "[c]onditional certification of Plaintiffs' FLSA collecti[ve] action should bar certification of Plaintiffs' proposed TVPA and TVPA-dependent classes." (Doc. 287 at 19.)

## 6. Preclusive Effect of FLSA Action

Defendant LRCI's argument that conditional certification of the FLSA collective action should bar certification of the TVPA class and related classes is based on the assertion that Plaintiffs have already chosen their theory of the case and they cannot pursue an alternative theory. (Doc. 295 at 19-20.) The Court rejects this argument.

In the Memorandum Opinion in which the Court considered Plaintiffs' Motion for Conditional Certification of a Collective Action, Identification of Potential Collective Action Members, and Approval of Notice to Potential Collective Action Members (Doc. 159), this Court addressed an argument similar to that raised here. (Doc. 181 at 13-14.)

> [T]he Third Circuit's *Burrell* decision . . . supports the validity of both FLSA and TVPA claims at this stage of the proceedings. *Burrell* agreed that the parties can plead facts in the alternative and they may state separate claims and defenses regardless of consistency pursuant to Rule 8 of the Federal Rules of Civil Procedure but Plaintiffs "cannot assert contradictory factual allegations that are not legitimately in doubt." 60 F.4th at 42 n.10. Importantly, *Burrell* explained the situation at issue here as follows:
>
>> [W]hether plaintiffs' work was involuntary is not a fact; it is a mixed question of law and fact . . . .. Of course, plaintiffs cannot prevail on the merits on both their TVPA claims, which require

some degree of involuntary work, and their FLSA claims, which require that they worked voluntarily. But that does not bar plaintiffs from presenting both theories to a factfinder who can conclude whether the facts prove that plaintiffs' work was voluntary or involuntary.

*Id.*

With this explanation, the Circuit Court did not preclude Plaintiffs from going forward with both FLSA and TVPA claims at this stage of the proceedings. Rather, the Court unequivocally concluded that Plaintiffs cannot prevail on both claims and Plaintiffs can ***present both to a factfinder at a later stage in the proceedings***.

(Doc.181 at 13-14 (emphasis added).)  Given this Third Circuit guidance on the issue of the

viability of presenting both FLSA and TVPA claims to the factfinder, the Court finds

Defendant LRCI's argument unavailing.

## 7.  TVPA Class Conclusion

Because the Court has found that the redefined TVPA class satisfies all relevant

Rule 23 requirements of, the Court will certify the following TVPA class:

**All civil child support debtors whose period of incarceration at Lackawanna County Prison was based *only* on the inmate's status as a child support debtor and who worked at the Lackawanna County Recycling Center after December 6, 2009, pursuant to the Community Service Program.**

## B.  RICO CLASS

Plaintiffs seek to certify the following RICO class: "All civil child support debtors who

were detained at Lackawanna County Prison and worked at the Lackawanna County

50

Recycling Center after December 6, 2015." (Doc. 286 at 2.) For the reasons that follow, the Court concludes that certification of a modified RICO class is appropriate.

"Establishing liability under [§ 1962(c) ] of the RICO statute requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, plus an injury to business or property." *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 483 (3d Cir. 2015) (internal quotation marks and citation omitted).

Plaintiffs maintain that "[b]ecause Plaintiffs' RICO claim is predicated on the alleged trafficking violations, Plaintiffs' RICO claim presents the same common questions as their TVPRA claim." (Doc. 287 at 20.) Defendant LRCI, the only remaining Defendant in the RICO claim, *Burrell*, 60 F.4th at 41-42, 50, argues that "Plaintiffs' RICO claim is premised on the predicate acts of forced labor in violation of 18 U.S.C. § 1589. Plaintiffs' RICO claim cannot be certified for the same reasons that their claims cannot be certified when sued upon directly under the TVPA." (Doc. 294 at 22.)

Because the parties agree that the RICO claim is premised on the same conduct as the TVPA claim and the viability of the RICO class hinges on the viability of the TVPA class, the Court concludes that the viability of the RICO class, redefined in the same manner as

51

the TVPA class, satisfies the class certification criteria of Rule 23.[7]  Therefore, the Court will

certify a RICO class defined as follows:

> **All civil child support debtors whose period of incarceration at Lackawanna County Prison was based *only* on the inmate's status as a child support debtor and who worked at the Lackawanna County Recycling Center after December 6, 2015, pursuant to the Community Service Program.**

## C. UNJUST ENRICHMENT CLASS

Plaintiffs seek to certify the following unjust enrichment class: "All civil child support

debtors who were detained at Lackawanna County Prison and worked at the Lackawanna

County Recycling Center after December 6, 2015." (Doc. 286 at 2.)  The Court concludes

that certification of a modified unjust enrichment class is appropriate.

To succeed on a claim for unjust enrichment, a party must demonstrate: (1) that it

"conferred a benefit upon Defendants; (2) Defendants appreciated the benefit; and (3)

Defendants accepted and retained the benefit under circumstances making it inequitable for

Defendants to retain the benefit without paying him." *Weir v. Progressive Advanced Ins.*

*Co.*, Civ. A. No. 3:25-CV-1504, 2025 WL 3270525, at *7 (M.D. Pa. Nov. 24, 2025) (quoting

---

[7] Although the number of people in the TVPA and RICO classes differ due to applicable work dates (TVPA class applies to child support debtors who worked at the Recycling Center after December 9, 2009; RICO class applies to child support debtors who worked at the Recycling Center after December 6, 2015), discovery shows more than 260 people in the RICO class. (Doc. 287 at 15.)  For the reasons the Court found the numerosity requirement satisfied int the TVPA context, *see supra* pp. 39-40, the numerosity requirement is also satisfied for the RICO class.

*Argue v. Triton Digital, Inc.*, Civ. A. No. 16-133, 2017 WL 1611254, at *4 (W.D. Pa. Apr. 28, 2017).

Based on the Court's TVPA analysis, the unjust enrichment class, redefined in a manner consistent with the redefined TVPA and RICO classes, satisfies the requirements of Rule 23. Common questions which will predominate the unjust enrichment analysis going forward include whether Plaintiffs' $5.00 a day labor conferred a benefit on Defendants; whether Defendants knew they were benefitting from the $5.00 a day labor; and whether Defendants "accepted and retained the benefit under circumstances making it inequitable for Defendants to retain the benefit" of the $5.00 a day labor provided by Plaintiffs. At his deposition, Mr. Cummings verified the commonality of the benefit conferred by prison labor and Defendants' appreciation of the benefit. (Pls. Ex. 1 Cummings Dep. 88:17-91:5 (County benefitted from the use of prison labor by avoiding the cost of labor and LRCI benefitted because, without prison labor, LRCI would have had the cost of the labor which would have been a cost to municipalities and the County)).) Clearly, this issue will predominate the litigation of the unjust enrichment claim.

Because the remaining Rule 13 requirements are not distinguishable from those discussed in the TVPA class analysis, the Court concludes that a redefined unjust

enrichment class is appropriately certified.[8]  Therefore, the Court will certify an unjust

enrichment class defined as follows:

> **All civil child support debtors whose period of incarceration at Lackawanna County Prison was based *only* on the inmate's status as a child support debtor and who worked at the Lackawanna County Recycling Center after December 6, 2015, pursuant to the Community Service Program.**

## D. PMWA CLASS

Plaintiffs seek to certify the following Pennsylvania Minimum Wage Act ("PMWA")

class: "All civil child support debtors who were detained at Lackawanna County Prison and

worked at the Lackawanna County Recycling Center after the entry of the May 3, 2006,

Operating Agreement between LRCI and the Authority."  (Doc. 286 at 1.)  The Court

concludes that certification of a modified PMWA class is appropriate.

Because the FLSA analysis applies to the PMWA analysis, *Burrell*, 60 F.4th at 42

n.9, the conditional certification of a collective action on Plaintiffs' FLSA claim which alleges

that Defendants violated the FLSA by willfully failing to pay Plaintiffs the minimum wage for

all hours worked (Doc. 143 at 2) establishes the viability of the PMWA claim unless

Defendants point to a material distinction between the two.  Because Defendants'

participation and payment policies related to the CSP apply to all Plaintiffs in the redefined

---

[8] Like the RICO class, discovery shows more than 260 people in the Unjust Enrichment class.  (Doc. 287 at 15.)  For reasons previously discussed, this satisfies the numerosity requirement.  *See supra* pp.39-40, 52 n.7.

class, the bases for finding class certification requirements met as to the TVPA, RICO, and unjust enrichment classes also apply to the PMWA class unless a consideration not germane to those classes exists with the PMWA class.

Defendant LRCI points to the PMWA's three-year statute of limitations as a bar to PMWA class certification in that the statute of limitations question in this case "can only be answered by analyzing the contents of the plaintiff's mind," a situation which "defeats predominance." (Doc. 294 at 25-26 (citing *Thorn v. Jefferson–Pilot Life Ins. Co.*, 445 F.3d 311, 320-21 (4th Cir. 2006); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir.1998)).) More specifically, Defendant LRCI asserts that Plaintiffs have

> alleged that the statute of limitations with respect to their FLSA claim, and by extension, their PMWA claim, was equitably tolled because they were actively misled about their rights. *See* Doc. 181 at 15. But Plaintiff Huzzard admitted at his deposition that he was not actively misled about his rights, which means that equitable tolling would not apply to Huzzard's PMWA claim (or FLSA claim). LRCI Ex. F (Huzzard Dep.) at 96:3-99:5. The alleged PMWA violations (and FLSA violations) occurred as to Plaintiff Huzzard in 2013 - six years before the second amended complaint naming Huzzard and asserting the PMWA claim was filed in 2019. Doc. 77 at ¶ 62. Without equitable tolling, Plaintiff Huzzard's PMWA claim (and FLSA claim) is clearly time barred.
>
> Here, whether a plaintiff was actively misled, such that equitable tolling should apply, can only be answered by analyzing the contents of the plaintiff's mind. Plaintiff Huzzard's deposition testimony establishes that fact-based determinations for each plaintiff's state of mind regarding whether they were actively misled are not amenable to treatment on a class-wide basis.

(Doc. 294 at 26.)

Plaintiffs respond that Defendant LRCI's argument "ignores that Plaintiffs' statute of limitations argument solely involves Defendants' uniform conduct, and, contrary to LRCI's argument, has nothing to [do] with 'analyzing the contents of the plaintiff's mind.'" (Doc. 301 at 10.)  In support of their position, Plaintiffs assert,

> [a]s explained by the Third Circuit, common issues related to equitable tolling predominate when "the inquiry necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) (quoting *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 488 (W.D. Pa. 1999)). Defendant LRCI similarly acknowledges that "when the statute of limitations question is straightforward and susceptible to class-wide determination, it does not defeat predominance." LRCI Opp. at 25.
>
> Plaintiffs' allegations of equitable tolling are unequivocally premised on Defendants' conduct: "Plaintiffs contend that the statute of limitations should be equitably tolled because defendants failed to conspicuously post required notices to alert them to their rights as employees and 'actively misled Plaintiffs and members of the FLSA Collective regarding the nature of their relationship with Defendants by suggesting to them that they were not employees with rights but rather prisoners.'" *Burrell*, 60 F.4th at 48 (citing Second Amended Complaint). So, just as in *Linerboard*, the "[k]ey questions will not revolve around whether [Plaintiffs] knew" of the unlawful nature of their treatment, but instead, "the critical inquiry will be whether defendants successfully concealed the existence of the unlawful nature of their acts, which proof will be common among the class members in each class." 305 F.3d at 162 (internal citation omitted).

(Doc. 301 at 10-11.)

Based on *Burrell's* discussion of equitable tolling, 60 F.4th at 48-49, other relevant caselaw, this Court's determination that equitable tolling applied in the FLSA context (Doc. 181 at 14-16), and consideration of relevant discovery, the Court agrees with Plaintiffs that

56

the predominance inquiry here involves Defendants' conduct rather than a plaintiff's

individual state of mind.

In *Hedges v. United States*, 404 F.3d 744 (3d Cir. 2005), cited approvingly in *Burrell*,

60 F.4th at 48, the Third Circuit explained that

> [e]quitable tolling applies when a plaintiff has "been prevented from filing in a
> timely manner due to sufficiently inequitable circumstances." *Seitzinger v.
> Reading Hosp. & Med. Ctr.,* 165 F.3d 236, 240 (3d Cir.1999). This occurs "(1)
> where the defendant has actively misled the plaintiff respecting the plaintiff's
> cause of action; (2) where the plaintiff in some extraordinary way has been
> prevented from asserting his or her rights; or (3) where the plaintiff has timely
> asserted his or her rights mistakenly in the wrong forum." *See Robinson,* 107
> F.3d at 1022 (applying this test in a Title VII action against the Government).[3]
> The plaintiff, however must "exercise due diligence in preserving his claim."
> *Irwin,* 498 U.S. at 96, 111 S.Ct. 453. Equitable tolling is an extraordinary
> remedy which should be extended only sparingly. *Id.; see also Barren by
> Barren v. United States,* 839 F.2d 987, 992 (3d Cir.1988) ("limitations periods
> must be strictly construed").

*Hedges*, 404 F.3d at 751.

> *Burrell* discussed the statute of limitations issue in detail:
>
> Plaintiffs contend that the statute of limitations should be equitably tolled
> because defendants failed to conspicuously post required notices to alert them
> to their rights as employees and "actively misled Plaintiffs and members of the
> FLSA Collective regarding the nature of their relationship with Defendants by
> suggesting to them that they were not employees with rights but rather
> prisoners whom Defendants could force to perform work as punishment and as
> a condition of their liberty," and "[t]hese actions prevented Plaintiffs and those
> similarly situated from understanding that they had a right to federal minimum
> wage during the time they worked at the Center." App. 127 ¶¶ 118–119.
>
> While we have not decided whether an employer's failure to post required FLSA
> notices, by itself, tolls the statute of limitations, at least one other Court of
> Appeals has. *See Cruz v. Maypa*, 773 F.3d 138, 146–47 (4th Cir. 2014). In

*Cruz*, the Fourth Circuit Court of Appeals extended its prior precedent—holding "that the 180–day filing requirement of the Age Discrimination in Employment Act ("ADEA") was tolled by reason of the plaintiff's employer's failure to post statutory notice of workers' rights under the Act"—to the FLSA context, because "the notice requirements in the ADEA and the FLSA," and their purposes, "are almost identical," and, unlike the ADEA, the FLSA lacks an administrative filing requirement. *Id.* (citing *Vance v. Whirlpool Corp.*, 716 F.2d 1010 (4th Cir. 1983)). We have held the same in the ADEA context, and a panel of our Court applied that holding in the Title VII context. *See Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 193 (3d Cir. 1977); *Hammer v. Cardio Med. Prods., Inc.*, 131 F. App'x 829, 831–32 (3d Cir. 2005). And we need not categorically conclude that failure to post notices is itself sufficient to equitably toll the limitations period. Plaintiffs here allege more: that defendants actively misled them by failing to post notices and telling them that they were not employees with rights but rather prisoners who could be forced to work for below the minimum wage. App. 126–27 ¶¶ 117–118. These allegations amount to "active misleading" such that equitable tolling applies. *See Hedges v. United States*, 404 F.3d 744, 751 (3d Cir. 2005).[11]

Accordingly, plaintiffs' FLSA claims against the County, the Authority, and the Corporation are not barred by the statute of limitations.

60 F.4th at 48-49.

Both the FLSA and PMWA require that notices of the employee's rights under the relevant act be posted in a conspicuous place in the employer's establishment.  29 C.F.R. § 516.4; 34 Pa. Code § 231.37.  Failure to post required notices is an important part of *Burrell's* analysis regarding equitable tolling.  60 F.4th 48-49.  The importance is highlighted by the fact that the Circuit Court noted that failure to adhere to statutory notice requirements

may, on its own, support equitable tolling.[9] *Id.* at 48. Neither Defendant addresses this issue. Perhaps this is so because Huzzard's testimony establishes that the required FLSA/PMWA notices were not posted in a conspicuous place at the Recycling Center.

> Q. [The Second Amended Complaint] says, "Defendants likewise failed to post notices as required to be posted under federal and state law in a location where Mr. Huzzard and other debtors were likely to see them." Do you see that?
>
> A. Yes, sir.
>
> Q. Are you aware as to whether or not there were labor law posters at the Recycling Center during any of the stints that you were there?
>
> A. I don't recall seeing any.
>
> Q. And if I recall your testimony earlier today, when you arrived at the Center, you went from the break room directly to the line to do work; is that correct?
>
> A. Yes, sir.
>
> Q. Did you visit any other areas in the Recycling Center building at any time during your stints there other than perhaps the bathroom?
>
> A. No, sir.

---

[9] *Burrell's* treatment of the issue of whether failure to post the required notice would alone support equitable tolling suggests that it is likely that failure to post the notice in this case would be adequate. Because *Burrell* approvingly cited *Cruz* where the Fourth Circuit extended its reasoning that the ADEA statute of limitations was tolled because of the defendant's failure to post the statutorily required notice, 60 F.4th at 48 (citing *Cruz*, 773 F.3d at 146-47), and noted that the Third Circuit approved of equitable tolling in ADEA and Title VII cases where plaintiffs alleged failure to post was the sole basis for equitable tolling, *id.* (citing *Bonham*, 569 F.2d at 193; *Hammer*, 131 F. App'x at 831-32), it is likely the Circuit Court would apply the *Cruz* logic to equitable tolling of an FLSA and/or PMWA case.

Q. So, you don't know whether or not there were labor law posters anywhere in that building, correct?

A. We were brought through the main entryway, and I don't recall seeing any.

Q. Were you particularly looking for labor law posters when you went to the Recycling Center?

A. No, sir.

Q. You don't know if they were there or not?

A. Not a hundred percent, no.

Q. So, it's inaccurate for the allegations today that we failed to post them, correct?

. . . .

Q. You don't know if they were there, correct?

A. I'm not sure.

Q. You weren't looking for the labor law posters when you went to the Recycling Center, correct?

A. No.

Q. You can't say that we failed to post them, correct?

A. I don't know.

(LCRI Ex. F, Huzzard Dep. 96:3-97:23.)

This dialogue shows that evidence of record supports a conclusion that Defendants did not comply with FLSA/PMWA notice requirements.  Huzzard's testimony establishes at

the very least that FLSA/PMWA notices were not posted in a *conspicuous* place as required

by 29 C.F.R. § 516.4 and 34 Pa. Code § 231.37.

As noted above, *Burrell* considered that this alone may provide a basis for equitable

tolling. *See supra* p. 59 n.9.  Like *Burrell*, this Court "need not categorically conclude that

failure to post notices is itself sufficient to equitably toll the limitations period [because]

Plaintiffs here allege more."  60 F.4th at 48.  The "more" identified in *Burrell* remains at issue

in this case, i.e., the allegation that

> defendants actively misled [Plaintiffs] by failing to post notices *and* telling them
> that they were not employees with rights but rather prisoners who could be
> forced to work for below the minimum wage [if they wanted to access the work
> release program and gain early release.]  These allegations amount to "active
> misleading" such that equitable tolling applies. *See Hedges v. United States*,
> 404 F.3d 744, 751 (3d Cir. 2005).

*Id.* (emphasis added).

Defendant LRCI's argument to the contrary based on Huzzard's testimony is without

merit.  Huzzard did not, as alleged by Defendant LRCI, "admit[ ] at his deposition that he

was not actively misled about his rights."  (Doc. 294 at 30.)  A review of the following

dialogue shows that Defendant LCRI's characterization is inaccurate.

> Q. How is it that LRCI actively misled you in any way, Mr. Huzzard, during the course
> of your participation in the community service program?
>
> A. I'm not sure.
>
> Q. Is it your claim that someone from LRCI in some way misled you during your
> participation in the community service program?

A. I'm not sure.

Q. Well, I'm asking you if that's your claim?

A. I guess.

Q. It is? Okay. So, my question to you is, how is it that somebody from LRCI actively misled you during any of your stints in the community service program?

A. I do not know. Upper management at that place didn't discuss anything with us.

Q. "Upper management at the Recycling Center didn't discuss anything with us," being you and your fellow inmates?

A. Yes.

Q. So, it's fair to say then that nobody at LRCI would have actively misled you at any time during your stints at the Recycling Center, correct?

A. I don't know.

(LCRI Ex. F, Huzzard Dep. 98:5-99:5, Doc. 294-1 at 53.)

Huzzard's uncertainty can hardly be seen to be an admission that he was *not* actively misled about his participation in the CSP. This dialogue shows that Huzzard's expressed uncertainty about whether he had been actively misled is likely attributable to the formulation of the questions posed in that they did not address the essential issue of whether CSP participants had been misled by Staff or others about the nature of their participation in the CSP. As this is the only argument proffered in support of Defendant LRCI's position, Defendant LRCI has not undermined *Burrell's* assessment that equitable tolling of the statute of limitations is appropriate for Plaintiffs' FLSA and PMWA claims.

62

Defendant County's position that "Plaintiffs do not set out how the County uniformly 'actively misled' the detainees" (Doc. 306 at 2) fares no better.  While the Court agrees that the named Plaintiffs have told different stories and entered the CSP under different circumstances (*id.*), redefining the PMWA class as it has been redefined for TVPA, RICO, and unjust enrichment classes eliminates the conflict identified by Defendant County.

Importantly, evidence of record supports a finding that Plaintiffs in the redefined class, i.e., child support debtors incarcerated only on that basis, were uniformly "actively misled" about FLSA/PMWA rights because the testimony of Cummings, Staff, and Jeffers indicates that child support debtors were told that, as child support debtor prisoners, they had to work for $5.00 a day to gain access to the work release program and an early release. *See supra.*  Further, the email chain cited above shows an awareness on the part of County personnel that prison workers at the Recycling Center "may have to get minimum wage" (Pls.' Reply Brief Ex. 1 (Doc. 301-2)), and it is undisputed that Defendants did nothing about this recognized issue during the relevant time.  Further, as noted above, Defendants do not discount evidence supporting the alleged failure to post notices in conspicuous places at the Recycling Center.  Therefore, the Court finds that equitable tolling of the PMWA statute of limitations is appropriate in this case and that the bases for equitable tolling are common to the PMWA class in that all members of the redefined class were subject to the same notice failures and the same information about CSP participation.

Because the statute of limitations is the only basis upon which the PMWA class is challenged, and because the wage issue is common to all child support debtors incarcerated only for that reason, resolution of the PMWA claim "necessarily focuses on defendants' conduct, that is, what defendants did rather than what plaintiffs did." *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 163 (3d Cir. 2002) (quoting *In re Flat Glass Antitrust Litigation,* 191 F.R.D. 472, 488 (W.D. Pa. 1999)).

For the foregoing reasons, the Court concludes that a redefined PMWA class is appropriately certified.[10]  Therefore, the Court will certify PMWA class defined as follows:

**All civil child support debtors whose period of incarceration at Lackawanna County Prison was based *only* on the inmate's status as a child support debtor and who worked at the Lackawanna County Recycling Center the entry of the May 3, 2006, Operating Agreement between LRCI and the Authority.**

## E. Other Matters

### 1. Appointment of Class Counsel

The Court having determined that certification of the four redefined classes is appropriate, the Court must appoint class counsel pursuant to Rule 23(g)(1). Rule 23(g)(1)(A), requires the Court to consider:

(i) the work counsel has done in identifying or investigating potential claims in the action;

---

[10] Numerosity is clearly satisfied for the PMWA class because the 650 people estimated through discovery to be part of the FLSA collective action would also be part of the PMWA class. (Doc. 287 at 14.)

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).  A Court may further "consider any other matter pertinesnt to counsel's ability to fairly and adequately represent the interests of the class." *Id*. at 23(g)(1)(B).

Here, Defendants do not oppose appointment of Plaintiffs' counsel as class counsel. Counsel has demonstrated the ability to identify and investigate potential claims, their knowledge of the applicable law, their willingness to commit resources to representing the class, and their experience in handling class and collective actions related to federal and state wage and anti-trafficking laws. (*See* Pls. Ex. 17, Handley Decl., Doc. 287-18; Pls. Ex. 18, Turner Decl., Doc. 207-18; Pls. Ex. 19, Macher Decl., Doc. 207-19.)  Therefore, the Court will appoint Plaintiffs' counsel—Towards Justice, Community Justice Project, and Handley Farah & Anderson, PLLC--as class counsel.

## 2. Proposed Class Notice and Notice Plan

Pursuant to Rule 23(c)(2)(B), for any class certified under Rule 23(b)(3), "the Court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Here, Plaintiffs propose that upon entry of the Class Certification Order "the parties meet

65

and confer regarding a proposed notice plan and submit same to the Court within fourteen days." (Doc. 287 at 42.) The Court agrees that a "meet and confer" approach to resolving notice and timeline issues is appropriate.

## IV. CONCLUSION

For the reasons discussed above, Plaintiffs' Motion for Class Certification (Doc. 286) will be granted as modified, i.e., granted as to the four redefined classes and with only Plaintiff Huzzard as the Named Plaintiff for the TVPA, RICO, Unjust Enrichment, and PMWA classes. Plaintiff Dampsey Stuckey will be dismissed as a Named Plaintiff for the Rule 23 class action claims. Plaintiffs' request that Plaintiffs' counsel be appointed class counsel will be granted. Plaintiffs' request that the Court direct the parties to meet and confer regarding the submission of a notice plan will be granted. A separate Order will be entered.

Robert D. Mariani
United States District Judge

66